**Docket No. 12-17506**

*In the*

# United States Court of Appeals

*for the*

# Ninth Circuit

———————◆———————

BETSY FEIST, PETER ECKERSLEY
and ELECTRONIC FRONTIER FOUNDATION,

*Appellees,*

v.

RCN CORPORATION and PAXFIRE, INC.,

*Appellants.*

———————————————

*Appeal from a Decision of the United States District Court for the Northern District of California,
Case No. 3:12-mc-80135-SI with Related Case Nos. 3:12-mc-89119, 3:12-mc-80121
and 3:12-mc-80140 · Honorable Susan Y. Illston*

## EXCERPTS OF RECORD
## VOLUME III OF III – Pages 194 to 391

ANDREW GROSSO, ESQ.
ANDREW GROSSO & ASSOCIATES
Georgetown Place
1101 Thirtieth Street, N.W., Suite 300
Washington, D.C. 20007
(202) 298-6500 Telephone
(202) 298-5599 Facsimile

*Attorney for Appellant,
Paxfire, Inc.*

 

# TABLE OF CONTENTS

| Docket Entry | Description | Page |
|---|---|---|

**VOLUME I OF III – Pages 1 to 10**

| 50 | Order on Motion for Review,<br>Filed November 6, 2012 | 1 |

**VOLUME II OF III – Pages 11 to 193**

| 51 | Defendant Paxfire, Inc.'s Notice of Appeal,<br>Filed November 8, 2012 | 11 |
| 47 | Attachment to Declaration of Tenaya M. Rodewald in Support of<br>Motion to Quash Subpoenas Issued by Defendant Paxfire, Inc.<br>and Request for Protective Order,<br>Filed October 17, 2012 | |
| | Exhibit G:  Privilege Log | 13 |
| 39 | Order Granting Defendant's Motions for Leave to File Sur-Reply<br>and Leave to Amend Its Third Affirmative Defense; and Order Denying<br>in Part and Granting in Part Plaintiff's Motion to Dismiss Counterclaims,<br>Filed September 24, 2012 | 148 |
| 44 | Transcript of Proceedings in United States District Court,<br>Southern District of New York, Case No. 3:12-mc-80140-SI,<br>before the Honorable John G. Koeltl,<br>Date of Proceedings:  September 18, 2012 (Filed September 24, 2012) | 149 |
| 31 | Selected Attachment to the Declaration of Andrew Grosso<br>in Support of Paxfire, Inc.'s Motion for Relief from Non-Dispositive<br>Pre-Trial Order of Magistrate Judge,<br>Filed August 27, 2012 [Case No. 3:12-mc-80135-SI] | |
| | Exhibit B:  [First] Declaration of Peter Eckersley | 191 |

## VOLUME III OF III – Pages 194 to 391

| 30 | Order Granting in Part and Denying in Part Motions to Quash, Filed August 13, 2012 [Case No. 3:12-mc-80135-SI] | 194 |

| 23 | Order Relating Cases, Filed July 2, 2012 [Case No. 3:12-mc-80135-SI] | 209 |

| 21 | Selected Attachments to Declaration of Andrew Grosso in Support of Opposition of Paxfire, Inc. to Motion of Electronic Frontier Foundation and Peter Eckersley to Quash Subpoenas Issued by Paxfire, Inc. and Request for Protective Order, Filed June 22, 2012 [Case No. 3:12-mc-80135-SI] | |

Exhibit E: Class Action Complaint — 210

Exhibit I: Declaration of Eugene H. Spafford — 243

Exhibit J: First Amended Answer, Affirmative Defenses, and Counterclaims of Defendant Paxfire, Inc., to Plaintiff's Class Action Complaint — 288

15 — Notice of Related Cases, Filed June 20, 2012 [Case No. 3:12-mc-80135-SI] — 330

13 — Selected Attachments to Declaration of Andrew Grosso in Support of Opposition of Paxfire, Inc. to Motion of Betsy Feist to Quash Subpoenas to Consultants and Request for Protective Order, Filed June 11, 2012

Exhibit M: [First] Declaration of Peter Eckersley, Dated September 26, 2011 — 335

Exhibit N: [Second] Declaration of Peter Eckersley in Support of Motion to Quash Subpoenas Issued by Defendant Paxfire, Inc. and Request for Protective Order, Filed June 6, 2012 — 339

7 — Selected Attachment to Declaration of Kim E. Richman [Exhibit C] in Support of Betsy Feist's Motion to Quash Deposition Subpoenas to Consultants and Request for Protective Order, Filed June 4, 2012 [Case No. 3:12-mc-80121-JSW]

Exhibit A: Subpoena *[Duces Tecum to Eff]* to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action — 357

Exhibit C:  Subpoena *[Duces Tecum to Peter Eckersley]*     367
                   to Produce Documents, Information, or Objects or to
                   Permit Inspection of Premises in a Civil Action

U.S. District Court, California Northern District (San Francisco)     374
Civil Docket for Case No. 3:12-mc-80135-SI

U.S. District Court, California Northern District (San Francisco)     383
Civil Docket for Case No. 3:12-mc-80121-SI

1

2

3

4

5

6

7

8

9

10                      **UNITED STATES DISTRICT COURT**

11                 **NORTHERN DISTRICT OF CALIFORNIA**

12                    **SAN FRANCISCO DIVISION**

|  |  |
|---|---|
| 13   BETSY FEIST, | Case No. 12-cv-80119 SI (NC) |
| 14           Plaintiff, | Related cases:<br>        12-cv-80135 SI (NC)<br>        12-cv-80121 SI (NC) |
| 15        v. |         12-cv-80140 SI (NC) |
| 16   RCN CORPORATION and PAXFIRE,<br>     INC., | **ORDER GRANTING IN PART AND<br>DENYING IN PART MOTIONS TO<br>QUASH** |
| 17          Defendants. |  |
| 18 |  |

19

20       The motions to quash addressed in this order concern subpoenas issued by Paxfire in this

21 district to seven nonparties in connection with a class action filed by Betty Feist against RCN and

22 Paxfire in the Southern District of New York.  That case is captioned *Betsy Feist v. RCN Corp.*,

23 No. 11-cv-05436 JGK.  The subpoenaed nonparties and Feist move to quash each of the

24 subpoenas, arguing that the subpoenas call for privileged documents and information.  The

25 motions are GRANTED IN PART AND DENIED IN PART.

26   //

27

28

# I. BACKGROUND

**A.    Summary of the claims, defenses, and counterclaims in *Feist***

The following facts are taken from the complaint filed in *Feist*.[1]  Feist, a resident of New York, uses RCN's services to access the internet and to conduct searches through search engines like Yahoo! and Google.  RCN is an internet service provider (ISP).  Paxfire is a company that profits from redirecting internet users who mistype web addresses to webpages it operates.

Feist alleges that RCN and Paxfire intentionally and unlawfully intercepted, manipulated, and marketed data sent by users of various ISPs to search engines like Yahoo!, Google, or Bing.  ISPs generally provide to their users access to the internet.  When a user types a correctly-spelled domain name into her browser (such as www.google.com), that domain name is sent to the ISP's server, which translates the domain name into the IP address assigned to that domain name (like 216.239.51.99) by using a Domain Name System (DNS) resolver.  Once the DNS translates the domain name into its corresponding IP address, the ISP then takes the user to the server corresponding to that IP address.

Feist claims that RCN used Paxfire's technology to (1) have its DNS resolvers incorrectly translate the domain names entered by its users such that the users are directed to servers operated by RCN and Paxfire rather than to the servers that actually correspond to the domain names entered by the users; and (2) intercept data entered by the users to monitor user activity.  Through these actions, defendants intercepted the communications between the users and the search engines without the users' consent or knowledge.  Paxfire generates revenue by posting advertisements on the servers to which users are directed and by selling the data it gathers from users to third parties.  Paxfire then splits the revenue it generates with RCN.

Netalyzr is a publicly available tool that evaluates the functionality provided by an internet connection, including DNS behavior.  It was developed by Nicholas Weaver, Christian Kreibich, and Vern Paxson, all of whom are researchers affiliated with the International Computer Science Institute (ICSI) and the University of California at Berkeley.  These

---

[1] Compl., Req. for Judicial Notice, Ex. A, Dkt. No. 8, 12-mc-80135.  The court takes judicial notice of the complaint in *Feist* under Federal Rule of Evidence 201.

1   researchers discovered the unlawful interceptions that form the basis of Feist's complaint by

2   using the Netalyzr. Feist herself did not discover that RCN and Paxfire were intercepting and

3   redirecting her communications with search engines until she used the Netalyzr. Feist consulted

4   with the researchers who developed the Netalyzr regarding the technological aspects of the

5   allegations in her complaint.

6       Feist brings seven claims against RCN and Paxfire: (1) violations of the Wiretap Act, 18

7   U.S.C. § 2510; (2) violations of Virginia's Consumer Protection Act; (3) violations of New

8   York's General Business Law; (4) conversion; (5) unjust enrichment; (6) breach of contract; and

9   (7) breach of the implied covenant of good faith and fair dealing.

10      In its answer, Paxfire denies Feist's allegations and claims that Feist conspired with the

11  Electronic Frontier Foundation (EFF) and ICSI to damage and destroy Paxfire and its business

12  model by publishing false allegations regarding Paxfire's business practices.[2] Paxfire claims that

13  the activities of Feist, EFF and ICSI caused its customers to sever their business relationships

14  with it and led to the termination of negotiations for the sale of Paxfire to a third party. Paxfire

15  brings the following counterclaims against Feist, all of which arise under the laws of New York:

16  (1) tortious interference with contracts; (2) tortious interference with business relationships; (3)

17  slander; and (4) libel. A motion to dismiss these counterclaims is fully briefed and is under

18  submission.[3]

19  **B.      The subpoenas at issue**

20      Paxfire issued document and deposition subpoenas to the following nonparties: ICSI,

21  Kreibich, Paxson, Weaver, EFF, Eckersley, and Giles. The nonparties and Feist move to quash

22  each of the subpoenas, arguing that the subpoenas call for privileged information.[4] Paxfire

23  opposes the motions. Each of the motions was referred to this court by District Judge Illston.

24  [2] Answer ¶ 5, Req. for Judicial Notice, Ex. B, Dkt. No. 8, Case No. 12-mc-80135. The court
    takes judicial notice of this pleading filed in *Feist* under Federal Rule of Evidence 201.

25  [3] Mot. to Dismiss, Req. for Judicial Notice, Ex. C, Dkt. No. 8, Case No. 12-mc-80135. The court

26  takes judicial notice of this motion filed in *Feist* under Federal Rule of Evidence 201.
    [4] *See* Case No. 12-mc-80119, Dkt. No. 1 (motion to quash filed by Giles); 12-mc-80121, Dkt.

27  Nos. 1, 7 (motions to quash filed by Feist); Case 12-mc-80135, Dkt. No. 1 (motion to quash filed
    by Eckersley and EFF); Case No. 12-mc-80140, Dkt. No. 1 (motion to quash filed by ICSI and

28  Kreibich).

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                    3
MOTIONS TO QUASH

## II. STANDARD OF REVIEW

The scope of the discovery that can be requested through a subpoena under Rule 45 is the same as can be requested under Rule 34, which in turn is the same as can be requested under Rule 26(b). Under Federal Rule of Civil Procedure 26(b), "[p]arties may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Relevant information need not be admissible at the trial if the discovery appears reasonably calculated to lead to the discovery of admissible evidence." FED. R. CIV. P. 26(b)(1).

A court must quash or modify a subpoena that fails to allow reasonable time to comply, requires a person to travel more than 100 miles from his residence or place of employment, "requires disclosure of privileged or other protected matter, if no exception or waiver applies," or "subjects a person to undue burden." FED. R. CIV. P. 45(c)(3)(A). Additionally, a court may quash a subpoena that requires the disclosure of confidential research or the opinion of an unretained expert that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party. FED. R. CIV. P. 45(c)(3)(B).

## III. DISCUSSION

**A.      The document subpoenas issued to ICSI, Christian Kreibich, Vern Paxson, Nicholas Weaver, EFF, and Peter Eckersley are quashed in part**

ICSI is a center for research in computer science and a nonprofit institute that has been affiliated with the University of California at Berkeley since 1988.[5] ICSI collaborates with political and industry groups such as EFF, news organizations, and writers on computer science issues.[6]

Kreibich, Paxson, and Weaver are ICSI researchers.[7] They created the Netalyzr and published several peer-reviewed papers, news articles, and blog posts regarding the same.[8] While conducting the investigations and research that form the basis of these papers and articles, the ICSI researchers collaborated with EFF, Peter Eckersley, the New Scientist, Poly NYU,

---

[5] Kreibich Decl. ¶ 4, Dkt. No. 3, Case No. 12-mc-80140.
[6] *Id.*
[7] *Id.* ¶¶ 9-10.
[8] *Id.* ¶¶ 10-14.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                          4
MOTIONS TO QUASH

1   Google, Microsoft, and Yahoo![9]

2          EFF is a nonprofit civil liberties and legal aid organization that supports lawsuits and

3   engages in policy discussions with respect to user rights to privacy, free speech, and innovation as

4   applied to the internet and other technologies.[10]  EFF also researches and publishes articles on its

5   website concerning technology, civil liberties, and user rights.  In the last few years, EFF has

6   been concerned with issues of network neutrality.

7          Eckersley is EFF's Technology Projects Director.  He is a computer scientist who works

8   on internet policy issues, including privacy and network neutrality.[11]  Eckersley first became

9   aware of the issues presented in the *Feist* lawsuit when the ICSI researchers contacted him in

10  April 2011 about the Netalyzr's test results.[12]  Eckersley then published a blog post on EFF's

11  website in conjunction with the ICSI researchers concerning Paxfire's redirection of search

12  engine traffic.[13]  Eckersley and EFF provided advice and informal consulting to Feist concerning

13  the issues in the *Feist* litigation, but they were not retained as paid consultants.[14]

14         Paxfire issued subpoenas to ICSI, the ICSI researchers, EFF, and Eckersley that call for

15  the production of all documents referencing (1) Feist and her counsel, including consulting

16  agreements and expert witness agreements; (2) all payments made by Feist or her counsel to ICSI

17  or EFF; (3) any litigation in which the subpoenaed nonparties participated in any way and in

18  which Feist's lawyers were also involved; (4) communications by the subpoenaed nonparties with

19  respect to Feist or her counsel, Paxfire, RCN, the New Scientist or Jim Giles, Poly NYU, or the

20  Netalyzr; (5) articles and drafts of articles authored by the subpoenaed nonparties concerning

21  Feist or her counsel, Paxfire, or the Netalyzr; and (6) all research results concerning Paxfire or

22  RCN or any of the ISPs mentioned in the *Feist* complaint.[15]  The time period for these documents

23  [9] *Id.*
24  [10] Cohn Decl. ¶ 1, Dkt. No. 3, Case No. 12-mc-80135.
    [11] Eckersley Decl., Dkt. No. 5, Case No. 12-mc-80140.
25  [12] *Id.*¶¶ 7-8.
    [13] *Id.*¶ 16.
26  [14] *Id.*¶¶ 19-20.
    [15] Document subpoena to ICSI, Smith Decl., Ex. A, Dkt. No. 2, Case No. 12-mc-80140;
27  Document subpoena to Kreibich, Smith Decl., Ex. B, Dkt. No. 2, Case No. 12-mc-80140;
    Document subpoenas to Paxson and Weaver, Richman Decl., Ex. E, F; Dkt. No. 2, Case No. 12-
28  mc-80121; Document subpoenas, Rodewald Decl., Ex. A, B, Dkt. No. 7, Case No. 12-mc-80135.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                    5
MOTIONS TO QUASH

198

1    is January 1, 2008, to the present with respect to the documents in categories (1), (2), and (3);

2    January 1, 2011, to the present with respect to category (4); and April 1, 2011, to the present with

3    respect to category (5). Category (6) has no temporal limitation.

4    **1.    The subpoenas are quashed with respect to documents generated after July**

5    **24, 2011, that fall within categories (1), (2), (3), and (4) because they are**

6    **protected by the work-product doctrine under Rule 26(b)(3)**

7    Feist moves to quash these subpoenas, arguing that the documents requested are

8    privileged because the ICSI and each of its researchers "acts and has acted as a consultant to

9    plaintiff Betsy Feist in connection with this litigation" and the documents were created "in

10   anticipation of or in connection with the litigation."[16] Feist claims that she and her counsel began

11   informally consulting with Eckersley in May 2011. [17] Feist also claims that she began consulting

12   with Kreibich, Paxson, and Weaver in July 2011 and that she signed a consulting agreement with

13   these researchers on August 31, 2011.[18] Feist claims that these persons and entities assisted her

14   and her counsel in understanding the technical aspects of internet communications, the use of

15   proxy servers by RCN and Paxfire, and the results generated by the Netalyzr. Feist contends that

16   she and her counsel shared information and documents with the researchers based on an

17   agreement to keep such information and documents confidential.

18   Paxfire opposes the motion, arguing (1) that no documents generated before July 24,

19   2011, can be protected by the work-product doctrine because Feist did not retain her attorneys

20   until that date; that there is no written consulting agreement with ICSI, Eckersley, or EFF, and

21   that the written consulting agreement with the ICSI researchers was signed three months after

22   *Feist* was filed; (3) the information in the documents at issue was generated in the regular course

23   of business; (4) any privileges that may apply were waived; and (5) any privileges that may apply

24   are outweighed by Paxfire's need to obtain the documents to defend against Feist's claims against

25   it.[19]

26

27   [16] Mot, Dkt. No. 1, Case No. 12-mc-80121; Richman Decl. ¶ 3.
     [17] Richman Decl. ¶¶ 14-15.

28   [18] *Id.*
     [19] Opp'n, Dkt. No. 15, Case No. 12-mc-80121.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                6
MOTIONS TO QUASH

199

1    Federal Rule of Civil Procedure 45(c)(3)(A)(iii) requires a court to quash a subpoena that

2    "requires disclosure of privileged or other protected matter, if no exception or waiver applies."

3    Under the work-product doctrine, which is codified in Federal Rule of Civil Procedure 26(b)(3),

4    "a party may not discover documents and tangible things that are prepared in anticipation of

5    litigation or for trial by or for another party or its representative (including the other party's

6    attorney, consultant, surety, indemnitor, insurer, or agent). But, subject to Rule 26(b)(4), those

7    materials may be discovered if: (i) they are otherwise discoverable under Rule 26(b)(1); and (ii)

8    the party shows that it has substantial need for the materials to prepare its case and cannot,

9    without undue hardship, obtain their substantial equivalent by other means." FED. R. CIV. P.

10   26(b)(3)(A).

11   Under Rule 26(b)(3), the work-product doctrine cannot apply to a document unless the

12   document is prepared by or for a party or its representative. Here, the earliest date on which Feist

13   can be considered a party to *Feist* is July 24, 2011, which is the date on which she claims to have

14   first consulted with her attorneys regarding Paxfire.[20] Thus, any requested documents generated

15   prior to July 24, 2011 are not protected under Rule 26(b)(3).

16   Feist argues that the protections of Rule 26(b)(3) "apply during the course of Feist's

17   attorneys' investigation of the matter, even before a client was formally retained" because "it is

18   reasonable and prudent (if not explicitly required) for an attorney to investigate claims before

19   agreeing to represent a client or file an action."[21] The court is not persuaded by this argument for

20   two reasons. First, the language of Rule 26(b)(3) refers specifically to a "party or its

21   representative," which suggests that the work-product doctrine applies only after a party has

22   become involved in a matter. *See* FED. R. CIV. P. 26(b)(3)(A) ("a party may not discover

23

24   [20] *See* Feist Deposition Tr. at 9:12-16, Grosso Decl., Ex. E, Dkt. No. 12-cv-80121 (Q: "I'd like to
     ask you how you first heard about Paxfire. A: "I first heard from one of my lawyers who's not

25   here today, Kim Richman, who called me and discussed it with me"); Tr. at 196:23-25, 197:1-2
     (Q: "And do you remember when you had that initial conversation with [] Richman?" A: "Well, I

26   think it was probably on July 24th or 25th, 2011"); Tr. 198:18-25 (Q: "Do you remember whether
     he said if he was contacting you in his capacity as an attorney?" A: "I don't remember if he used

27   those words, but clearly he was contacting me about a case I might potentially be involved in so it
     was as an attorney he was doing that").

28   [21] Reply at 4, Dkt. No. 20, Case No. 12-mc-80121.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART               7
MOTIONS TO QUASH

200

1   documents and tangible things that are prepared in anticipation of litigation or for trial by or for

2   *another party or its representative . . .*") (emphasis added). Second, the authorities cited by Feist

3   in support of its argument are not controlling on this court.

4           With respect to the documents that were generated after July 24, 2011, the court finds that

5   some of them are subject to the protections of Rule 23(b)(3), namely those in categories (1), (2),

6   (3), and most of the documents in category (4).

7           To qualify for protection against discovery under Rule 26(b)(3), "documents must have

8   two characteristics: (1) they must be prepared in anticipation of litigation or for trial, and (2) they

9   must be prepared by or for another party or by or for that other party's representative." *In re*

10  *Grand Jury Subpoena*, 357 F.3d 900, 907 (9th Cir. 2004) (citation and internal quotation marks

11  omitted).

12          As to the first characteristic, the requested documents in categories (1), (2), and (3), which

13  concern the consulting agreement between the subpoenaed nonparties and Feist, "can be fairly

14  said to have been prepared or obtained because of the prospect of litigation." *Id.* The requested

15  documents in category (4), with the exception of documents referencing the New Scientist and

16  reporter Jim Giles, concern communications by the subpoenaed nonparties with respect to the

17  Netalyzr and the parties involved in *Feist*, and therefore, they can be said to have been prepared

18  because of the prospect of litigation.

19          These documents also meet the second characteristic, because they were created by or for

20  the subpoenaed nonparties, all of whom have been consultants for Feist since May and July 2011.

21  Whether or not the consulting work performed by the subpoenaed nonparties was done in

22  accordance with a formal or informal consulting agreement makes no difference under Rule

23  26(b)(3), as that rule does not make any distinctions with respect to the definition of "consultant."

24          The remaining documents in category (4), which concern communications with the New

25  Scientist, a science publication, and Jim Giles, a reporter for the New Scientist; as well as the

26  documents in category (6), which concern articles and research performed by the subpoenaed

27  nonparties, cannot be said to have been prepared because of the prospect of litigation, and

28  therefore are not entitled to protection under Rule 26(b)(3). *See In re Grand Jury Subpoena*, 357

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                    8
MOTIONS TO QUASH

201

1  F.3d at 908 (holding that a document can be fairly said to have been prepared or obtained because

2  of the prospect of litigation if it "would not have been created in substantially similar form but for

3  the prospect of that litigation").

4         Because the work-product doctrine applies to the documents in categories (1), (2), (3), and

5  (4), as described above, Paxfire may discovery these documents only if they are otherwise

6  discoverable under Rule 26(b)(1) and Paxfire shows that it has substantial need for the materials

7  to prepare its case and cannot obtain their substantial equivalent by other means.  Paxfire has not

8  met this burden.  Paxfire states conclusorily that "the information is needed by Paxfire to prepare

9  its defense as well as its counterclaims, and it is unable to get this information from any other

10  source" and that "Paxfire must obtain the documents from the researchers who provided Ms. Feist

11  the information on which she based her complaint . . . without that information, Paxfire will be

12  unable to learn what evidence it may face at trial."[22]  These statements are insufficient to establish

13  an inability to obtain the information that forms the basis of Feist's complaint from other means,

14  as that information can be obtained from Feist herself.  Accordingly, Paxfire may not discover

15  any of the documents to which the work-product doctrine applies.

16         Paxfire claims that any privilege applicable to the requested documents was waived

17  because Kreibich sent an email to reporter Jim Giles and to Feist's lawyers stating that Giles "is

18  up to date on our findings, so it seems helpful for all of you to have each other's contact

19  information."[23]  As this email does not show that any privileged communications were disclosed

20  to Giles, the court finds that the work-product protection that applies to the documents was not

21  waived.

22         **2.     The subpoenaed nonparties must produce nonprivileged responsive**

23                 **documents generated before July 24, 2011, that fall within categories (1), (2),**

24                 **(3), and (4)**

25         The subpoenaed nonparties must produce nonprivileged responsive documents generated

26  before July 24, 2011, that fall within categories (1), (2), (3), and (4).  Because some of these

27

28  [22] Opp'n at 8, Dkt. No. 15, Case No. 12-mc-80121.
   [23] *Id.* at 6.

1  documents are relevant to Paxfire's counterclaims only, the nonparties are not required to produce

2  any documents, or a privilege log for any documents they withhold as privileged, until sixty days

3  after the motion to dismiss Paxfire's counterclaims is decided.

4      **3.    The subpoenas are quashed with respect to the documents in categories (5)**

5          **and (6) because the documents contain confidential research**

6      A court may quash a subpoena that requires the disclosure of confidential research or the

7  opinion of an unretained expert that does not describe specific occurrences in dispute and results

8  from the expert's study that was not requested by a party. FED. R. CIV. P. 45(c)(3)(B).

9      Here, Feist and the subpoenaed nonparties argue that the requested documents in

10 categories (5) and (6) contain confidential and "potentially commercially sensitive information

11 related to government and nongovernment entities."[24]  Categories (5) and (6) call for articles and

12 drafts of articles authored by the subpoenaed nonparties concerning Feist or her counsel, Paxfire,

13 or the Netalyzr, as well as all research results obtained by the subpoenaed nonparties concerning

14 Paxfire or RCN.  The court is persuaded that these documents constitute confidential research

15 within the meaning of Rule 45(c)(3)(B); accordingly, the subpoenas are quashed with respect to

16 these documents.

17 **B.    The deposition subpoenas issued to ICSI, Christian Kreibich, EFF, and Peter**

18      **Eckersley are quashed**

19      Paxfire issued deposition subpoenas to ICSI, Kreibich, EFF, and Eckersley.[25]  As

20 discussed above, Feist claims that these persons and entities assisted her and her counsel in

21 understanding the technical aspects of internet communications, the use of proxy servers by RCN

22 and Paxfire, and the results generated by the Netalyzr.  None of the subpoenaed nonparties has

23 been identified by Feist as a testifying expert.

24      The subpoenaed nonparties move to quash the subpoenas, arguing that they may not be

25 deposed under Rule 26(b)(4)(D) because they are non-testifying experts who were consulted in

26 anticipation of or in preparation for this litigation.

27 [24] Kreibich Decl. ¶ 16.

28 [25] Deposition subpoenas, Smith Decl., Ex. C, D, Dkt. No. 2, Case No. 12-mc-80140; Deposition subpoenas, Rodewald Decl., Ex. C, D, Dkt. No. 7, Case No. 12-mc-80135.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                    10
MOTIONS TO QUASH

1    Federal Rule of Civil Procedure 26(b)(4)(D) provides that "a party may not, by

2  interrogatories or deposition, discover facts known or opinions held by an expert who has been

3  retained or specially employed by another party in anticipation of litigation or to prepare for trial

4  and who is not expected to be called as a witness at trial.  But a party may do so only: (i) as

5  provided in Rule 35(b); or (ii) on showing exceptional circumstances under which it is

6  impracticable for the party to obtain facts or opinions on the same subject by other means."  This

7  rule "precludes discovery against experts who were informally consulted in preparation for trial,

8  but not retained or specially employed."  FED. R. CIV. P. 26 advisory committee's note.

9    As each of the subpoenaed nonparties was consulted by Feist in preparation for the *Feist*

10  litigation, none of them may be deposed or served with interrogatories under Rule 26(b)(4)(D).

11  Here, Paxfire has not shown exceptional circumstances to circumvent this rule, as Paxfire can

12  obtain information to support its defenses and counterclaims from Feist herself, from the articles

13  that the subpoenaed nonparties have published, and from its own experts.  Accordingly, these

14  deposition subpoenas are quashed.

15  **C.    The document subpoena issued to Jim Giles is quashed**

16    Jim Giles, a California resident, is a freelance journalist who published several stories in

17  the New Scientist Magazine, which is a weekly print and online publication for a general

18  audience that focuses on science and technology.[26]  Giles wrote a handful of articles that were

19  published on the New Scientist website concerning the Netalyzr and explaining how a user could

20  use the Netalyzr to track interference by his or her ISP.[27]  One of these articles mentioned that the

21  *Feist* case had been filed.[28]

22    Paxfire served a subpoena on Giles that calls for documents generated between January 1,

23  2011, to the present that reference or contain communications pertaining to Feist, Feist's counsel,

24  Paxfire, or the Netalyzr.[29]

25    Giles moves to quash the subpoena, arguing that the documents Paxfire requests, with the

26
27  [26] Giles Decl. ¶¶ 1-4, Dkt. No. 3, Case No. 12-mc-80119.
    [27] *Id.*
28  [28] *Id.*
    [29] *Id.*, Subpoena, Ex. C.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                    11
MOTIONS TO QUASH

1    exception of his published articles, are privileged under the California Constitution and California

2    Shield Laws because they contain information concerning his newsgathering activities with

3    respect to the ISP search-redirection scandal.[30] Giles further contends that Paxfire cannot

4    demonstrate that an exception or waiver applies to this privilege. Giles seeks a protective order

5    limiting any future subpoenas that may be issued to him by any of the parties in *Feist*.

6        Paxfire argues that the documents at issue are relevant to its counterclaims against Feist,

7    because they contain defamatory statements that Feist or her attorneys allegedly made to the New

8    Scientist regarding its business practices.[31] Paxfire claims that because Feist's attorneys have

9    confirmed the existence of communications between themselves and Giles, any privilege as to the

10    documents has been waived.

11        **1.**      **New York law applies to Giles' claim of privilege**

12        The court first must determine whether federal or state law applies to Giles' claim of

13    privilege. "The common law—as interpreted by United States courts in the light of reason and

14    experience—governs a claim of privilege unless any of the following provides otherwise: the

15    United States Constitution; a federal statute; or rules prescribed by the Supreme Court. But in a

16    civil case, state law governs privilege regarding a claim or defense for which state law supplies

17    the rule of decision." FED. R. EVID. 501. When a party in a civil suit asserts a privilege, "it

18    makes no difference whether the supposedly privileged matter is direct or circumstantial evidence

19    of a state claim; if it is in a line of proof that culminates in an element of a state claim or defense,

20    then state rules of privilege apply." 23 CHARLES ALAN WRIGHT, ARTHUR R. MILLER & EDWARD

21    H. COOPER, FEDERAL PRACTICE AND PROCEDURE § 5434 (3d ed. 2012 supp.).

22        Here, state law governs Giles' claim of privilege, because Paxfire claims that the

23    documents at issue are relevant to its counterclaims against Feist, all of which arise out of the law

24    of New York. *See Shaklee Corp. v. Gunnell*, 110 F.R.D. 190, 192 (N.D. Cal. 1986) ("Where, as

25    here, state and federal claims are joined, but the evidence affects only the state claims the state

26    law of privilege applies.").

27

28

[30] Mot., Dkt. No. 1, Case No. 12-mc-80119.
[31] Opp'n, Dkt. No. 9, Case No. 12-mc-80119.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART          12
MOTIONS TO QUASH

1    The court must now determine whether California law or New York law should govern

2    Giles' claim of privilege.  Giles argues that California law should govern because he resides in

3    California, he wrote the news articles that gave rise to the privilege in California, and the

4    subpoena was issued out of California.[32]  Paxfire argues that New York law should govern

5    because the *Feist* litigation is pending in the Southern District of New York, the communications

6    at issue are relevant to Paxfire's counterclaims, which arise out of New York law, and the

7    communications were made by Feist and her counsel while they were in New York.[33]  The Ninth

8    Circuit has not determined which state law should apply when the court hearing a discovery

9    dispute is in a different state from the court hearing the underlying action, but district courts in

10   this circuit have held that "the court hearing the discovery dispute must apply the choice of law

11   rules of its forum" to determine this question.  *See, e.g.*, *Wolpin v. Philip Morris Inc.*, 189 F.R.D.

12   418, 423 (C.D. Cal. 1999) (citations omitted).

13   The choice-of-law "approach that has been adopted in California is the 'governmental

14   interest' analysis."  *Liew v. Official Receiver and Liquidator*, 685 F.2d 1192, 1195 (9th Cir. 1982)

15   (citations omitted).  This analysis requires the court to make three separate inquiries: (1) the court

16   first must determine whether the laws of each jurisdiction differ on the issue before it; (2) if the

17   laws differ, then the court must determine what interests, if any, the competing jurisdictions have

18   in the application of their respective laws; and (3) if a conflict exists between the interests of the

19   jurisdictions, then the court must determine which jurisdiction's interests would be most impaired

20   if its policies were subordinated to those of the other jurisdiction.  *Id.*

21   As to the first inquiry, the laws of California and New York differ with respect to Giles'

22   claim of privilege.  California's Shield Law provides journalists with an absolute privilege with

23   regard to "any unpublished information obtained or prepared in gathering, receiving or processing

24   of information for communication to the public."  CAL. CONST. art. I. § 2(b).  On the other hand,

25   New York's Shield Law "provides journalists . . . only a qualified privilege with regard to news

26   that is both unpublished and not obtained under a promise of confidentiality."  *Baker v. Goldman*

27

28   [32] Mot. at 4.
     [33] Opp'n at 7.

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                              13
MOTIONS TO QUASH

206

1   *Sachs & Co.*, 669 F.3d 105, 107 (2d Cir. 2012) (citation omitted).  Here, the communications at

2   issue, which are unpublished, cannot be said to have been obtained under a promise of

3   confidentiality because Feist's lawyers have disclosed to Paxfire the existence of such

4   communications.  As such, these communications would be protected by an absolute privilege

5   under the laws of California, but they would be protected by a qualified privilege under the laws

6   of New York.

7          As to the second inquiry, it appears that a conflict exists between the interests of

8   California and New York in the application of their laws to Giles' claim of privilege.  On the one

9   hand, California has an interest in protecting its journalists from having to produce unpublished

10  information they obtained in the course of their newsgathering activities.  On the other hand, New

11  York has an interest in applying its laws to matters that are relevant to claims arising under New

12  York law and that will be decided in a federal court sitting in New York.

13         As to the third inquiry, the court finds that the interests of New York would be most

14  impaired if the laws of California are applied to Giles' claim of privilege, as New York has more

15  connections to the parties and matters involved in *Feist* than California.  Accordingly, the court

16  finds that the law of New York should apply to Giles' claim of privilege.

17         **2.      The communications at issue are protected by a qualified privilege, and**

18                   **Paxfire has not made a sufficient showing to overcome that privilege**

19         As discussed above, New York's Shield Law "provides journalists . . . only a qualified

20  privilege with regard to news that is both unpublished and not obtained under a promise of

21  confidentiality." *Baker*, 669 F.3d at 107.  "Under this privilege, reporters who, for gain or

22  livelihood, [are] engaged in . . . writing . . . news intended for a newspaper are protected from

23  coerced disclosure of any unpublished news obtained or prepared . . .  in the course of gathering

24  or obtaining news . . . or the source of any such news, where such news was not obtained or

25  received in confidence." *Id.* at 107-08 (citations and internal quotation marks omitted).  Here,

26  Giles has shown that the qualified privilege applies to the communications at issue, as he claims

27  to be a journalist who obtained the communications in the course of his newsgathering activities.

28         Paxfire may obtain the communications at issue only if it overcomes the qualified

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART                    14
MOTIONS TO QUASH

privilege by making a clear and specific showing that the communications: (i) are highly material and relevant; (ii) are critical or necessary to the maintenance of a party's claim, defense or proof of an issue material thereto; and (iii) are not obtainable from any alternative source. *Id.* at 108 (citation omitted). Here, Paxfire fails to show that the communications at issue are not obtainable from any alternative source. On the contrary, Paxfire stated in its opposition to Giles' motion that it already has obtained certain documents evincing the communications from Feist's counsel. As Paxfire can discover information concerning the communications from Feist or her attorneys, Paxfire cannot overcome the qualified privilege governing the communications. Accordingly, the document subpoena Paxfire issued to Giles is quashed.

## IV. CONCLUSION

The motions to quash the subpoenas Paxfire served on seven nonparties are GRANTED IN PART AND DENIED IN PART. All of the subpoenas at issue are quashed in their entirety except for the document subpoenas that Paxfire issued to ICSI, Christian Kreibich, Vern Paxson, Nicholas Weaver, EFF, and Peter Eckersley, which are quashed in part. These nonparties must produce:

1. any nonprivileged documents generated after July 24, 2011, that concern communications with the New Scientist, a science publication, and Jim Giles, a reporter for the New Scientist (remaining documents in category (4)); and

2. any nonprivileged documents generated before July 24, 2011, that fall within categories (1), (2), (3), and (4).

The categories of documents are defined on pages 5 and 6 of this order.

The nonparties are not required to produce any documents or a privilege log for any withheld documents until sixty days after the motion to dismiss Paxfire's counterclaims is decided. The parties may file objections to this order within fourteen days of the date it is filed. FED. R. CIV. P. 72(a).

IT IS SO ORDERED.

Date: August 13, 2012

Nathanael M. Cousins
United States Magistrate Judge

Case No. 12-cv-80119 SI (NC)
ORDER GRANTING IN PART
MOTIONS TO QUASH

15

208

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

BETSY FEIST,

          Plaintiff,

  v.

RCN CORP., and PAXFIRE, INC.,

          Defendants.
_____/

No. 12-mc-80119 SI (NC)

**ORDER RELATING CASES**

      Pursuant to Northern District Civil Local Rule 3-12(c), the undersigned finds that the following cases are related to the instant case: Misc. Case No. 12-80121 JSW (EDL); Misc. Case No. 12-80135 RS (DMR); and Misc. Case No. 12-80140 JSW (KAW).  All four miscellaneous cases shall be related and reassigned to the undersigned.

      Pursuant to Northern District Civil Local Rule 72-1, as with Misc. Case No. 12-80019, the newly reassigned cases are HEREBY REFERRED to Magistrate Judge Cousins for purposes of resolving the Motions to Quash Subpoenas and all further discovery disputes in this matter.

      **IT IS SO ORDERED.**

Dated: July 2, 2012

SUSAN ILLSTON
UNITED STATES DISTRICT JUDGE

# EXHIBIT E

**TO DECLARATION OF ANDREW GROSSO IN SUPPORT OF OPPOSITION OF PAXFIRE, INC. TO MOTION OF ELECTRONIC FRONTIER FOUNDATION AND PETER ECKERSLEY TO QUASH SUBPOENAS ISSUED BY PAXFIRE, INC. AND REQUEST FOR PROTECTIVE ORDER**

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

11 CIV 5436

| | | |
|---|---|---|
| BETSY FEIST, individually, and on behalf of all others similarly situated, | ) | Case No. |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| RCN CORPORATION and PAXFIRE, INC., | ) | **CLASS ACTION COMPLAINT** |
| | ) | |
| Defendants. | ) | **JURY TRIAL DEMANDED** |
| | ) | |

Plaintiff Betsy Feist brings this action individually and on behalf of: a) a class of persons who have had their Internet searches monitored, intercepted, manipulated and/or redirected via the use of Paxfire technology, including, but not limited to, the customers of the following Internet service providers: Cavalier, Charter, Cincinnati Bell, Cogent Communications, DirecPC, Frontier, Insight Broadband, Iowa Telecom, Defendant RCN, and Wide Open West, and any others to be determined in discovery (the "Paxfire Class");[1] b) a class of all RCN customers whose Internet searches were monitored, intercepted, manipulated and/or redirected (the "RCN Class"); and c) a class of all members of the RCN and/or Paxfire Classes who are citizens and/or residents of the state of New York (the "New York Class").

This case arises from Defendants' intentional and knowing interception of data intended for Yahoo!, Bing, or Google (the "Search Engines"), via use of hardware and/or software provided by Defendant Paxfire, as well as the monitoring, manipulation, aggregation, and/or marketing of that data. This interception was done secretly, without users' consent or knowledge, in violation of federal and state laws, and in breach of RCN's agreements with its customers. Plaintiff and the Classes seek damages and equitable relief.

Plaintiff alleges the following upon personal knowledge as to her own acts, and upon information and belief based on the investigation conducted by Plaintiff's counsel, including consultation with technology experts, as to all other matters.

## NATURE OF THE ACTION

1.     Defendants violated Plaintiff's privacy, and compromised her financial interests and computer security, by knowingly and intentionally intercepting her Internet communications in order to generate income for themselves. Rather than direct Plaintiff to the websites she

---

[1] The Internet service providers are herein referred to as "the ISPs."

212

actually requested, Defendants secretly gave her computer system false information that directed Plaintiff to websites that *looked* like the websites she intended to visit, but were actually controlled by and located on servers belonging to Defendant RCN and/or Defendant Paxfire. In other instances, when Plaintiff ran searches, Defendants directed Plaintiff through advertising affiliates onto third-party commercial web pages, rather than provide Plaintiff with the requested search results. Without Plaintiff's knowledge or consent, Defendants used Paxfire's hardware and/or software to misdirect Plaintiff to these servers; impersonate the websites Plaintiff wished to view; and monitor, manipulate, and/or monetize the searches run and page-visits made by Plaintiff.

## BACKGROUND OF THE TECHNOLOGY

2.      RCN is an Internet service provider, or ISP, which is a company that provides access to the Internet and serves as a gateway to facilitate communications (of messages and other data) between a subscriber's computer and other computers and/or websites. Users of the Internet often navigate websites via a browser (e.g., Internet Explorer or Firefox). In doing so, customers type a web address, called a domain name (e.g., google.com), into the browser's address bar.[2] That domain name is sent to the ISP's server, which is a system (e.g., a computer, or some combination of software and hardware) that performs computer processing for the ISP. The ISP's server then uses a DNS ("Domain Name System") resolver, which acts like a phone book for the Internet, to translate the domain name (e.g., "google.com") into an IP address (like

---

[2] The "domain name" is the general reference to the website (e.g., "google.com" for Google), and forms part of a URL, or "Uniform Resource Locator." A URL is the unique, global address of each resource and file on the Web. A URL combines the domain name (e.g., google.com) with additional information like the protocol (e.g., http) or the path (information regarding the particular sub-part of the website). For example, the URL to reach Google's main search page is http://www.google.com. One of the URLs to reach Google's email service is http://www.google.com/mail (and "mail" is the "path" of the URL). Both of these URLs are at the same "domain name."

2

216.239.51.99). The DNS resolver serves a crucial purpose in directing an ISP customer to the website she wishes to view, not only because IP addresses for each website would be nearly impossible to remember, but also because IP addresses can change frequently.

3.    When the user types in a web address (i.e., domain name or URL), the user's system asks the ISP's DNS resolver for the location of that website. The ISP should then return the "Internet address," i.e., IP address, that has been assigned to that domain name. Defendant RCN and the other ISPs use technology provided by Defendant Paxfire to give false answers to certain of customers' requests, and to send Plaintiff and the Classes to servers either owned or controlled by Defendant Paxfire, or to servers owned by the ISP and utilizing Paxfire's services (collectively, "Paxfire-based proxy servers").[3]

4.    Researchers discovered this misconduct through use of a recently developed Internet tool called Netalyzr. Netalyzr is a publicly available network measurement, debugging, and diagnostic tool that evaluates the functionality provided by people's Internet connectivity. One of the primary focus areas of Netalyzr is DNS behavior. When users run the Netalyzr, the data gathered from the program is sent back to its developers. The creators of Netalyzr analyzed data from numerous tests and discovered cases of ISPs, including Defendant RCN, using DNS to redirect web searches to their own proxies.[4]

5.    Netalyzr, available at http://netalyzr.icsi.berkeley.edu/, was developed by Nicholas Weaver, Christian Kreibich, and Vern Paxson, researchers affiliated with the

---

[3] Defendants redirect searches run via search.yahoo.com and www.bing.com through Paxfire servers. Searches run through www.google.com are not redirected by all ISPs; when Google searches are redirected, they are sometimes redirected through Paxfire servers, and sometimes redirected through ISP-located servers that utilize Paxfire technology.

[4] A "proxy" acts as an intermediary for requests from customers seeking resources from other servers.

International Computer Science Institute (ICSI) and the University of California, Berkeley. In the course of their investigation, Plaintiff's counsel consulted with the developers of Netalyzr regarding the technological aspects of the allegations in this complaint.

**PARTIES**

6.      Plaintiff **Besty Feist** is an individual who resides in New York, NY. Plaintiff Feist is a paying customer of RCN, and uses RCN's services for Internet access, including to browse and/or search via Yahoo! (search.yahoo.com), Bing (www.bing.com), and Google (www.google.com). As discussed in detail below, Ms. Feist's searches were redirected to and intercepted by Defendants via Paxfire-based proxy servers.

7.      Defendant **Paxfire, Inc.** ("Paxfire") is incorporated in Delaware, has corporate headquarters in Sterling, Virginia, and has offices worldwide. Defendant Paxfire works with ISPs throughout the United States. Defendant Paxfire claims to be the "proven industry leader in monetizing Address Bar Search and DNS Error traffic for Network Operators . . . [It] generate[s] millions of dollars a month in new advertising revenue for our partners by enabling them to participate in the booming $20 billion a year search advertising market."

8.      Publicly, Defendant Paxfire provides its software and/or hardware to ISPs at no expense; redirects DNS errors (requests for mistyped web addresses or for websites that do not exist) to a site operated by Paxfire; and generates income via advertising on that site. Defendant Paxfire splits the revenue it generates with the ISPs, including Defendant RCN.

9.      Surreptitiously, Defendant Paxfire also generates income for itself and the ISPs by intercepting searches run by the ISPs' customers and marketing the data derived from the interception to advertisers and marketers (by selling demographic data; modifying search results to including sponsored results; directing users to pages with paid advertisements on them; and/or

4

directing users to pages run by the advertisers and affiliates). This interception is not a publicly-stated revenue source for Defendant Paxfire, and is not a necessary function to allow ISPs to use Paxfire's DNS error redirection (i.e., internet service providers are able to use Paxfire for DNS error redirection without redirecting and/or intercepting search traffic).

10.     Defendant **RCN Corporation** ("RCN") has its principle place of business in Herndon, Virginia, is incorporated in Delaware, and has subsidiaries organized and/or incorporated in Delaware, California, New York, Massachusetts, Pennsylvania, Illinois, and the District of Columbia. RCN is an ISP that employs Paxfire in connection with its domain name system ("DNS"). RCN provides Internet and phone service in and around Boston, Chicago, New York City, the Lehigh Valley of Pennsylvania, Philadelphia, and Washington, D.C.

## JURISDICTION AND VENUE

11.     This Court has subject matter jurisdiction pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(a) and 1332(d), because the amount in controversy exceeds $5,000,000.00 exclusive of interests and costs, and there is at least minimal diversity between the members of the Classes and Defendants. This Court also has federal question jurisdiction as the complaint alleges violations of, *inter alia*, the Wiretap Act, 18 U.S.C. § 1510 *et seq.* This Court also has personal jurisdiction over Defendants because a substantial portion of the wrongdoing alleged took place in this state, Defendants conduct business in this state, and Defendants have sufficient minimum contacts with this state and/or otherwise intentionally availed themselves of the markets in this state through the promotion, marketing, sale, and use of their products and services in this state.

12.     Venue for this action properly lies in this District pursuant to 28 U.S.C. § 1391 as Plaintiff is a citizen and resident of this District, Defendants conduct business and have

5

216

significant contacts with this District, Defendant RCN has offices and subsidiaries located in this

district, and a substantial portion of the events and conduct giving rise to the violations of law

complained of herein occurred in this District.

## FACTUAL ALLEGATIONS

### Defendants Paxfire and RCN Redirect and Intercept Web Traffic

13.     Defendant RCN installed Paxfire technology (either as software on its DNS

servers or as physical hardware that sits before its DNS server) to monetize (i.e., generate

revenue from) its customers' private searches. Publicly, Defendant Paxfire claims to monetize

"DNS Error traffic," which occurs when an Internet user types in a domain name that does not

exist or that contains a typo. In the case of a DNS Error, the user of an ISP that employs Paxfire

is redirected to a Paxfire-created search results page, rather than being directed to an error page

(e.g., "site not found").

14.     However, as revealed by Netalyzr, Paxfire is also being used by the ISPs to

intercept and monetize search data <u>even when the user types in the correct address</u> of an existing

domain name *or* when the user is simply running a search. Paxfire (and the ISPs) can monetize

user search data in a number of ways that fall into two major categories: monitoring and

modification. Defendant RCN and Defendant Paxfire can monitor searches and market the data

to advertisers and data aggregators interested in creating demographic profiles. Defendants can

also modify the search data (e.g., prioritize the search results differently so as to eliminate certain

websites or make others more prominent, or include sponsored/paid listings in the search

results); can modify the advertisements that appear on the page to generate income from the

traffic to the page; and can redirect the user completely, by sending him or her to an advertising

affiliate's web page, rather than providing the requested search results.

6

**How Defendants Redirect and Intercept Traffic**

15.     Defendant Paxfire intercepts, manipulates, and/or redirects traffic for three major search engines (google.com, bing.com, and search.yahoo.com (the "Search Engines")) in connection with various ISPs. Defendant RCN (using Paxfire technology) intercepts, manipulates, and/or redirects traffic for at least two of these Search Engines: bing.com and search.yahoo.com. One of the ways Defendants complete this interception is by redirecting customers' requests to a proxy server. When an RCN customer types in a web address (i.e., domain name or URL), the user's system asks the Defendant RCN's DNS resolver for the location of that website. However, when Defendants recognize a DNS request for one of the Search Engines, they provide an incorrect IP address, directing the customer to a Paxfire-based proxy server owned and controlled by Defendants. Defendants do this with no visible indication to Plaintiff or the Classes. Then, the customer's system connects to the IP address provided. (This entire procedure takes place in seconds or less).

16.     While Plaintiff and the members of the Classes *think* they are communicating directly with one of the Search Engines, they are actually communicating with a server owned and controlled by Defendant Paxfire and/or Defendant RCN. Each time a customer enters a search into the Search Engine, the search goes to the Paxfire-based proxy server, which forwards the search to the Search Engine, then receives the search results on its own proxy server, and finally forwards the results back to the customer.

//

//

//

//

7

17.   In other words:

| SEARCH WEBSITE INTERCEPTION PROCESS | |
|---|---|
| **What Should Happen:** | **What Defendants Do:** |
| 1. The user's system asks the ISP's DNS server for the address of one of the Search Engines. | 1. The user's system asks the ISP's DNS server for address of one of the Search Engines. |
| 2. The ISP returns to the user the IP Address designated for that Search Engine.<br><br>Customer Request → ISP → Search Engine[5]<br>Customer ← ISP ← Search Engine Address | 2. The ISP returns to the user a false IP address, one that designates a server run by the ISP or by Paxfire. The Search Engine the user sought to connect with is not involved in any way.<br><br>Customer request → ISP/Paxfire<br>Customer ← Paxfire/ISP |
| 3. The user's system then exchanges data directly with the server at the IP address provided-- the Search Engine. The user receives from that address the web page, which displays the search interface, and in turn the Search Engine transmits the results for the user's search terms.<br><br><br><br><br><br><br>**Customer Search → Search Engine**<br>**Customer ← Search Engine Results** | 3. The user exchanges data with the proxy server at the ISP and/or Paxfire. At the same time, the ISP/Paxfire server makes its own connection to the true Search Engine server. The ISP/Paxfire server forwards to the Search Engine the user's text (although nothing prevents the ISP/Paxfire server from altering the search) and returns to the user's system the web page and results sent by the Search Engine (but again, nothing stops the ISP/Paxfire from changing the search results or web page).<br><br>**Search → ISP/Paxfire → Search Engine**<br>**Customer ← ISP/ Paxfire ← Search Results** |

---

[5] This is a very simplified depiction of the lookup performed by the ISP in resolving the DNS (i.e., finding the appropriate IP address for the domain name), which is called "recursing." When "recursing," the ISP does not usually communicate directly with the Search Engine (or whatever website for which it may be trying to obtain an IP address). Instead, the ISP communicates with a series of servers, with increasingly narrow areas of information, until it reaches the server that holds the IP address for the requested site. For example, the ISP may seek which servers know about ".com" websites, and from there, find which server knows about sites at the "google.com" domain. When Paxfire is being used, however, the ISP does not do any recursion to locate the Search Engine's actual IP address. Instead, Paxfire, together with the ISP, unilaterally decide to return an IP address that belongs to either Paxfire, or a server at the ISP that uses Paxfire.

8

18.    In either of the above examples—even when Paxfire was being used by the ISP to intercept searches—a customer would see an image of the Search Engine page, and would interact with the page as if communicating directly with the Search Engine. Even though Defendant RCN utilized Defendant Paxfire's technology to intercept searches, Plaintiff and the Classes would not know from viewing the website, running searches, or clicking links that they were actually being directed through the ISP's or Paxfire's server. Plaintiff and the Classes were never informed by Defendants that they were working together to provide incorrect DNS results; directing Defendant to their own servers for searches; impersonating the Search Engines; and gaining the ability to monitor, manipulate, and/or market Defendants' searches and search results.

19.    Defendants also intercept and manipulate Plaintiff's searches by another means— the search bar. On many browsers, a search bar sits to the right of the address bar. Users can change the default search engine for this search bar, selecting, for example, Google, Yahoo!, or Bing. Below is a screen shot of the address bar, which shows that the user is currently visiting Yahoo!'s webpage (http://www.yahoo.com/), and the search bar, which shows (by the Google "g" logo) that the user has configured the search bar to use Google:



The search bar is visible to the user at all times, regardless of what web page the user is on.

20.    RCN and Paxfire use this search bar to intercept and monetize searches for certain "brand keywords." The researchers at ICSI have identified approximately 170 brand keywords that, when used in searches, are not only intercepted by Defendants, but are forwarded on to a third-party advertising affiliate, who redirects the user to the brand's webpage. Instead of

9

receiving search results when a brand keyword is used as a search term, Defendants intercept Plaintiff's search, and a webpage for a particular brand is displayed.

21.    For example, if class members search for "apple," they will not necessarily receive results for the term "apple," which may include links to Apple's website, information about Apple products, or information about the fruit, but may instead be directed to store.apple.com. (Searches for "mac," for which the first search result would typically be MAC Cosmetics, also direct class members to store.apple.com). Someone searching for "ca," for example, perhaps hoping to find information about California, will not receive such search results, but will be redirected to shop.ca.com, a website for CA Technologies which is a company that, ironically, sells "Internet security" software.

22.    When the ISPs (including Defendant RCN) and Defendant Paxfire intercept searches made via a search bar, a similar process happens to that which occurs when a search is run (and intercepted) via Google's, Yahoo!'s, or Bing's search website:

**SEARCH BAR INTERCEPTION PROCESS**

- First, the user types a search term in the search bar.
- Then, the browser seeks the designated Search Engine's IP address from the ISP's DNS.
- Next, Defendants intercept that request and provide the user's system with an IP address to a Paxfire-based proxy server, rather than to the Search Engine's server.
- The Paxfire-based proxy server receives the search, and analyzes whether the search is coming from a search bar, or a search website.
- If the search is coming from a search bar, the Paxfire-based proxy server analyzes whether the search is for one of the 170+ brand keywords.
- If the search is coming from a search bar, but is *not* one of the brand keywords, the Paxfire-based proxy server will return search results, acting as a proxy server for the Search Engine, and displaying the Search Engine's webpage.[6]

---

[6] This step (occurring when the search is not for one of the brand keywords) parallels the "Search Website Interception Process" discussed above. Likewise, if the Paxfire-based proxy server

10

221

- If the search *is* one of the brand keywords, the Paxfire-based proxy server will send the search to an advertising affiliate that pays Defendant Paxfire (who splits the earnings with the ISPs, including Defendant RCN) for the referral.

- Finally, the advertising affiliate directs the user to the page associated with the brand keyword (i.e., displaying apple.com if the search term was "apple" or displaying dell.com if the search term was "dell").

This entire process happens in less than a second, and is invisible to the user. Only very astute

class members would even notice that they were being directed to a brand's page, rather than

search results, when this process occurs.

[Remainder of Page Intentionally Left Blank]

---

determines that the search is not coming from a search bar, but from a search webpage, it follows the "Search Website Interception Process," and displays search results via a proxy server.

11

23.     It was not until Plaintiff used Netalyzr that she learned that her ISP, Defendant RCN, was using Paxfire technology to redirect traffic that she had intended for the Search Engines to its own servers and/or those controlled by Defendant Paxfire. Plaintiff's Netalyzr results regarding DNS redirection appeared as follows:[7]



**Defendants Profit From Their Deception at the Expense of Defendant RCN's Customers**

24.     This breach of Plaintiff's privacy and computer security is meaningful and problematic for numerous reasons, including, *inter alia*:

- it allows Defendant and Paxfire to receive, review, and compile the content of each of the user's searches, no matter how personal or private, and to share that information with and/or sell that information to third parties;

---

[7] Plaintiff's IP address has been redacted for privacy.

12

- it allows Defendant and Paxfire to manipulate Plaintiff's search terms, such that results she receives are altered;

- it allows Defendant and Paxfire to manipulate the web page returned to Plaintiff, by reordering and reprioritizing search results, eliminating search results, including paid and/or sponsored pages as search results, or altering advertising on the search page;

- it allows Defendant and Paxfire to send Plaintiff's private searches to a third-party advertising affiliate, earning money in the process, and directing Plaintiff to a brand's commercial webpage rather than to the search results she requested;

- it allows Defendant and Paxfire to know which websites the customer chooses among search results; and

- if the Plaintiff or a class member is logged in to a service connected with the Search Engine (e.g., searching on google.com while logged into Gmail, or searching on search.yahoo.com while logged into Yahoo! Mail), the customer's search history can be connected to his or her actual identity.

25.    Not only is it profitable for RCN and Paxfire to intercept searches because it allows them to redirect traffic to advertisers and marketers who pay them for this information and/or increases traffic to their own pages, the demographic data and search history of customers, like Plaintiff, is itself tremendously valuable. By collecting personal information from computers and mobile devices, "[w]ebsites and stores can, therefore, easily buy and sell information on visitors with the intention of merging behavioral with demographic and geographic data in ways that will create social categories that advertisers covet and target with ads tailored to them or people like them." Joseph Turow, Jennifer King, Chris Jay Hoofnagle, Amy Bleakley, and Michael Hennessy, *Americans Reject Tailored Advertising and Three Activities that Enable It* (Sept. 29, 2009), *available at* http://ssrn.com/abstract=1478214. Multiple marketers have touted the high market value of this information in targeting consumers based on the data mined from their computers and mobile devices giving credence to the statement, "the more information that is known about a consumer, the more a company will pay to deliver a precisely-targeted advertisement to him." Federal Trade Commission Preliminary

13

224

Staff Report, *Protecting Consumer Privacy in an Era of Rapid Change,* (Dec. 2010) at 24 ("FTC Report").

26.     One data aggregator, Audience Science, states that its work involves "recording billions of behavioral events daily and reaching over 385 million unique Internet users" and then making such data available to its clients: "web publishers, marketers, networks, exchanges, and agencies[,] to create intelligent audience segments to connect people with relevant advertising driving the transition to data-driven audience marketing online." *See* MediaPost, http://www.mediapost.com/events/?/showID/OMMAGlobalNewYork.09.NewYorkCity/type/Ex hibitor/itemID/647/OMMAGlobalNewYork-Exhibitors%20and%20Sponsors.html (last visited Aug. 3, 2011).

27.     On March 7, 2011, the *Wall Street Journal* published an article under the headline, "Web's Hot New Commodity: Privacy" in which it highlighted a company called "Allow Ltd.," one of nearly a dozen companies that offer to sell people's personal information on their behalf, and giving them 70% of the sale. One Allow Ltd. customer received payment of $8.95 for letting Allow tell a credit-card company he is shopping for new credit. *Id.* In January 2011, at the World Economic Forum in Davos, Switzerland, one discussion centered on turning personal data into an "asset class." During the course of the discussion, Michele Luzi, director at consulting firm Bain & Co. stated, "We are trying to shift the focus from purely privacy to what we call property rights." *Id.*

28.     Defendant RCN never disclosed to its customers that it shares their information with third parties, or that it allows third parties to access, monitor, or intercept customers' searches. Instead, RCN's current Customer Terms and Conditions include a "Customer Privacy Notice" which states, in relevant part:

14

225

> **At RCN, the privacy and security of your account is very important to us. That is why we have taken measures to protect the privacy of your personally identifiable account records and to comply with the federal laws and FCC regulations that govern use and disclosure of customer information.**
>
> *     *     *
>
> Internet privacy policies: RCN respects its subscribers' online privacy, and will not randomly monitor or disclose the contents of private e-mail or private chat room communications. However, as set forth fully in the RCN Internet Access Agreement, Customer agrees that RCN has the right, but not the obligation, to monitor or disclose the contents of private communication over the Internet, if RCN, in its sole discretion, reasonably believes that such action is necessary: (i) to comply with applicable law or valid legal process; (ii) to protect RCN rights or property; or (iii) in emergencies when a person's physical safety is at issue. In addition, RCN reserves the right to disclose the identity of a subscriber to third parties in response to a valid legal subpoena and to otherwise cooperate with legitimate law enforcement inquiries and lawful civil proceedings.

(Emphasis added).

29.     RCN's "Online Policies" also state, in relevant part:

> RCN's dedication to customer service means that RCN strives to maintain an Internet Access Service ("Access Service") that provides RCN customers with an enjoyable Internet experience, and an experience that is **free from interference by persons who use the Access Service in an improper or unlawful manner.**

(Emphasis added).

30.     Defendant RCN's purported privacy policies were untrue, misleading, incomplete, and deceptive, as they gave Plaintiff and members of the Classes a false sense that their information was being protected from unauthorized access to or interception by third parties or RCN itself, when in fact, Defendant RCN was actively accessing, intercepting, and manipulating its customers data, and allowing Defendant Paxfire to do the same.

31.     Defendants failed to provide adequate notice to Plaintiff regarding the nature and use of Paxfire technology and failed to provide Plaintiff an adequate opportunity to opt out of the service.

15

226

32.     Without Plaintiff's knowledge and/or consent, Defendant RCN knowingly and intentionally intercepted, monitored, marketed, and divulged to a third party Plaintiff's personal, private search history by intercepting and redirecting searches and impersonating Search Engines. In doing so, Defendant RCN breached numerous Federal and state laws that are designed to protect users' privacy, communications, and business dealings, as well as its privacy policies.

<h3 style="text-align:center">CLASS ACTION ALLEGATIONS</h3>

33.     Plaintiff brings this action pursuant to Fed. R. Civ. P. 23 on behalf of three classes, defined as follows: a) a class of persons who have had their Internet searches monitored, intercepted, altered and/or redirected via the use of Paxfire technology, including, but not limited to, the customers of the following Internet service providers: Cavalier, Charter, Cincinnati Bell, Cogent Communications, DirecPC, Frontier, Insight Broadband, Iowa Telecom, Defendant RCN, and Wide Open West, and any others to be determined in discovery (the "Paxfire Class"); b) a class of all RCN customers whose Internet searches were monitored, intercepted, altered and/or redirected (the "RCN Class"); and c) a class of all members of the RCN and/or Paxfire Classes who are citizens and/or residents of the state of New York (the "New York Class").

34.     Excluded from the classes are Defendants; any parent, subsidiary, or affiliate of Defendants or any employees, officers, or directors of Defendants; legal representatives, successors, or assigns of Defendants; and any justice, judge or magistrate judge of the United States who may hear the case, and all persons related to any such judicial officer, as defined in 28 U.S.C. § 455(b).

35.     **Numerosity**. Each of the classes' members are so numerous and dispersed nationwide and/or statewide that joinder of all members is impracticable. Upon information and

belief, the classes' members number in the hundreds of thousands, if not millions. The exact number of members in each class is unknown, but can be determined from Defendants' computerized and other records. Plaintiff reasonably estimates and believes that there are thousands of persons in each of the classes.

36. **Commonality**. There are numerous and substantial questions of law and fact that are common to all members of the Class, which predominate over any question affecting only individual class members. The members of the each class were and continue to be subjected to the same practices of the Defendants. The common questions and issues raised by Plaintiff's claims include:

(a) what information Paxfire's technology collected and what Defendants did with that information;

(b) whether class members received notice of the existence or use of Paxfire technology, and whether any such notice informed class members that their traffic would be misdirected and/or intercepted;

(c) whether consumers were provided an opportunity to decline the user of Paxfire technology;

(d) how Defendants monetized, i.e., generated revenue from, the information they monitored, intercepted, manipulated, and/or gathered;

(e) whether Defendant RCN breached its contracts, and if so, the appropriate measure of damages and remedies against Defendants for such breaches;

(f) whether Defendant RCN breached the covenants of good faith and fair dealing, and if so, the appropriate measure of damages and remedies against Defendants for such breach;

17

228

(g)     whether Defendants RCN and/or Paxfire have violated the Wiretap Act, Virginia's Consumer Protection Act; New York General Business Law § 349; and other violations of common law;

(h)     whether Plaintiff and the class members have been damaged as a result of Defendants' alleged violations as alleged herein; and, if so, the appropriate relief for Defendants' violations; and

(i)     whether Defendants have been unjustly enriched as a result of their unlawful conduct, and, if so, whether Defendants should disgorge inequitably obtained money that they have been unjustly enriched by; and, the nature and extent of any other remedies, and injunctive relief, to which Plaintiff and the Classes are entitled.

37.     **Typicality**. Plaintiff's claims are typical of the claims of all of the other members of the Class, because her claims are based on the same legal and remedial theories as the claims of the Class and arise from the same course of conduct by Defendants.

38.     **Adequacy**. Plaintiff will fairly and adequately protect the interests of all members of the class in the prosecution of this Action and in the administration of all matters relating to the claims stated herein. Plaintiff is similarly situated with, and has suffered similar injuries as, the members of the Class she seeks to represent. Plaintiff has retained counsel experienced in handling class action lawsuits. Neither Plaintiff nor her counsel have any interest that might cause them not to vigorously pursue this action.

39.     **Superiority**. A class action is superior to other available methods for the fair and efficient adjudication of the controversy, since individual joinder of the Class members is impracticable. Even if individual Class members were able to afford individual litigation, it would be unduly burdensome to the Courts in which the individual litigation would proceed.

18

229

Defendants have subjected the Class to the same violations as referenced herein. Accordingly, class certification is appropriate under Rule 23 because common issues of law and fact regarding Defendants' uniform violations predominate over individual issues, and class certification is a superior method of resolving these claims. No unusual difficulties are likely to be encountered in the management of this action as a class action. Defendants acted and continue to act in a manner that is generally applicable to all members of the Class, making final injunctive relief appropriate.

### COUNT I
**Violation of the Wiretap Act, 18 U.S.C. § 2510 *et seq.*, against All Defendants**

40.    Plaintiff incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

41.    Defendants intentionally intercepted, endeavored to intercept, and/or procured another person to intercept or endeavor to intercept a wire or electronic communication.

42.    Defendants intentionally disclosed, or endeavored to disclose, to another person the contents of a wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of the Wiretap Act.

43.    Defendants intentionally used, or endeavored to use, the contents of any wire, oral, or electronic communication, knowing or having reason to know that the information was obtained through the interception of a wire, oral, or electronic communication in violation of this subsection.

44.    Defendant RCN provided an electronic communication service to the public because it provides to its users the ability to send or receive wire communications (i.e., aural transfers made through the use of facilities for the transmission of communications by the aid of

19

230

wire, cable, or other like connection) and electronic communications. (i.e., the transfer of signs, signals, writing, images, sounds, data, or intelligence of any nature transmitted in whole or in part by a wire system that affects interstate or foreign commerce). In its capacity as an electronic communication service, Defendant RCN intentionally divulged the contents of its customers' communications while in transmission on its service to persons and entities other than an addressee or intended recipient of such communications.

45.     Neither Defendant RCN nor Defendant Paxfire was an intended recipient of Plaintiff's communications, i.e., her searches.

46.     The use of proxy servers was not necessary to the rendition of Defendant RCN's services.

47.     Defendants engaged in the foregoing acts without obtaining the lawful consent of the user. Neither Defendant was an intended party of Plaintiff's communications with the Search Engines, and only gained access to those communications through their unlawful interception thereof. Defendant RCN thus could not have provided lawful consent to Defendant Paxfire to allow it to access or intercept Plaintiff's communications.

48.     Plaintiff and the Class are entitled to equitable or declaratory relief; reasonable attorneys' fees and other litigation costs; punitive damages; and statutory damages which are the greater of (a) actual damages suffered plus any profits made by Defendants as a result of the violation and (b) statutory damages of $100 per day for each day of violation, with minimum statutory damages of $10,000.

**COUNT II**
**Violation of Virginia's Consumer Protection Act, Virginia Code § 59.1 *et seq.*,**
**against RCN**
**(On Behalf of the RCN Class)**

49.     Plaintiff hereby incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

50.     This cause of action is brought pursuant to Virginia's Consumer Protection Act, Virginia Code § 59.1 *et seq.* (the "Act").

51.     Defendant RCN's actions, representations and conduct have violated, and continue to violate the Act, because they extend to transactions that are intended to result, or which have resulted, in the sale or lease of goods or services to consumers.

52.     Plaintiff and other Class members engaged in "consumer transactions" as that term is defined by the Virginia Code § 59.1-198.

53.     Defendant RCNs' Internet service that Plaintiff (and other similarly situated Class Members) purchased from Defendant RCN were "goods" and/or "services" within the meaning of Virginia Code § 59.1-198.

54.     By engaging in the actions, representations and conduct set forth in this complaint, Defendant RCN has violated, and continues to violate, section 59.1-200(5) of the Act. Specifically, in violation of section 59.1-200(5), Defendant RCN misrepresented that its goods or services had certain quantities, characteristics, ingredients, uses, or benefits that they did not have.

55.     By engaging in the actions, representations and conduct set forth in this complaint, Defendant RCN has violated, and continues to violate, section 59.1-200(6) of the Act. Specifically, in violation of section 59.1-200(6), Defendant RCN misrepresented that its goods or services were of a particular standard, quality, grade, style, or model when they were not.

56.     By engaging in the actions, representations and conduct set forth in this Complaint, Defendant RCN has violated, and continues to violate, section 59.1-200(14) of the Act. Specifically, in violation of section 59.1-200(14), Defendant RCN's act and conduct constitute deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

57.     Pursuant to § 59.1-204(A), Plaintiff, on behalf of herself and similarly situated Class members, seeks statutory damages in an amount of $500 per person. Plaintiff will also seek to have this amount increased to $1,000 per person at trial upon a showing of Defendant RCN's willful violation of the Act.

58.     Plaintiff also requests that this Court award her costs and reasonable attorneys' fees pursuant to § 59.1-204(B).

59.     Plaintiff further requests that this Court enjoin Defendant RCN from continuing to employ the unlawful methods, acts and practices alleged herein pursuant to the Act. If Defendant RCN is not restrained from engaging in these types of practices in the future, Plaintiff, Class members and other members of the general public will continue to suffer harm.

## COUNT III
### Violation of New York General Business Law § 349 against RCN
### (On Behalf of the New York Class)

60.     Plaintiff hereby incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

61.     New York Gen. Bus. Law § 349 declares unlawful "deceptive acts or practices in the conduct of any business, trade or commerce or in the furnishing of any service in this State." Gen. Bus. Law § 349(g) provides that § 349 "shall apply to all deceptive acts or practices declared to be unlawful, whether or not subject to any other law of this State."

22

62.     Gen. Bus. Law § 349(h) provides a private right of action to any person injured by reason of a violation of that Section and authorizes the court to award reasonable attorney's fees to the prevailing plaintiff. In relevant part, it provides: "any person who has been injured by reason of any violation of this section may bring an action in his own name to enjoin such unlawful act or practice and to recover her actual damages or $50, whichever is greater. The court may, in its discretion, increase the award of damages to an amount not to exceed three times the actual damages up to $1,000 if the court finds the defendant intentionally and knowingly violated this section. The court may award reasonable attorney's fees to a prevailing plaintiff."

63.     Defendants, by their acts as alleged and described herein, have committed a violation of Gen. Bus. Law § 349 by disclosing Plaintiff's personal and confidential information without her knowledge or consent.

64.     Defendants' acts and practices in the conduct of their businesses were deceptive and material.

65.     Defendants, without authorization, disclosed Plaintiff's confidential and private information relating to Plaintiff's use of the Internet. Had she been given the choice, Plaintiff would not have disclosed her confidential and private information. Moreover, Plaintiff's confidential and private information is valuable personal property with a market value. As a result of Defendants' unlawful conduct, Plaintiff relinquished this valuable personal property without the compensation to which she was due.

## COUNT IV
### Conversion against All Defendants

66.     Plaintiff hereby incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

23

234

67. Plaintiff's personal and private search history is valuable property owned by Plaintiff.

68. Defendants unlawfully exercised dominion over said property and thereby converted Plaintiff's and the Class members' respective personal information by providing it to third parties without authorization.

69. Plaintiff and the Class were damaged thereby.

**COUNT V**
**Unjust Enrichment against All Defendants**

70. Plaintiff hereby incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

71. By engaging in the conduct described in this complaint, Defendants have knowingly obtained benefits from Plaintiff under circumstances that make it inequitable and unjust for Defendants to retain them.

72. Defendants have received a benefit from Plaintiff and Defendants have received and retained money from third parties as a result of sharing and/or allowing access to the personal information of Plaintiff and Class members without Plaintiff's knowledge or consent as alleged in this complaint.

73. Plaintiff did not expect that Defendants would seek to gain commercial advantage from third parties by using and/or sharing her personal information without her consent.

74. Defendants knowingly used Plaintiff's personal information without her knowledge or consent to gain commercial advantage from third parties and had full knowledge of the benefits they have received from Plaintiff. If Plaintiff had known Defendants were accessing and/or not keeping her personal information from third parties, she would not have consented and Defendants would not have gained commercial advantage from third parties.

24

235

75.      Defendants will be unjustly enriched if Defendants are permitted to retain the money paid to them by third parties, or resulting from the commercial advantage they gained, in exchange for Plaintiff's personal information.

76.      Defendants should be required to provide restitution of all money obtained from their unlawful conduct.

77.      Plaintiff and the members of the Class are entitled to an award of compensatory and punitive damages in an amount to be determined at trial or to the imposition of a constructive trust upon the wrongful revenues and/or profits obtained by and benefits conferred upon Defendants as a result of the wrongful actions as alleged in this complaint.

78.      Plaintiff and the Class have no remedy at law to prevent Defendants from continuing the inequitable conduct alleged in this complaint and the continued unjust retention of the money Defendants received for the wrongful actions alleged in this complaint.

**COUNT VIII**
**Breach of Contract against Defendant RCN**
**(On Behalf of the RCN Class)**

79.      Plaintiff hereby incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

80.      Defendant RCN's Privacy Policy states that Defendant RCN "will not randomly monitor or disclose the contents of private e-mail or private chat room communications." Despite this promise, Defendant RCN did in fact knowingly share users' personal information with third parties in violation of its own agreement with its users.

81.      Plaintiff never consented to the sharing of her personal information to third parties or with Defendant Paxfire.

82.      Plaintiff has performed her obligations under the contract.

25

83.     Defendant RCN materially breached its contractual obligations through its conduct as alleged herein, including intercepting Plaintiff's search requests, divulging Plaintiff's personal information and search requests to third parties, and impersonating and/or employing Paxfire in order to impersonate a Search Engine.

84.     Plaintiff and the Class have been damaged as a direct and proximate result of Defendant RCN's breach of their agreements with Plaintiff and the Members of the Class.

**COUNT IX**
**Breach of Implied Covenant of Good Faith and Fair Dealing against RCN**
**(On Behalf of the RCN Class)**

85.     Plaintiff hereby incorporates by reference the allegations contained in all of the preceding paragraphs of this complaint.

86.     A covenant of good faith and fair dealing, which imposes upon each party to a contract a duty of good faith and fair dealing in its performance, is implied in every contract, including the agreement that embodies the relationship between Defendant RCN and its users.

87.     Good faith and fair dealing is an element imposed by common law or statute as an element of every contract under the laws of every state. Under the covenant of good faith and fair dealing, both parties to a contract impliedly promise not to violate the spirit of the bargain and not to intentionally do anything to injure the other party's right to receive the benefits of the contract.

88.     Plaintiff reasonably relied upon Defendant RCN to act in good faith, both with regard to the contract and in the methods and manner in which it carries out the contract terms. Bad faith can violate the spirit of the agreement and may be overt or may consist of inaction. Defendant RCN's inaction in failing to adequately notify Plaintiff of the release of personal information to outside advertisers and application developers evidences bad faith and ill motive.

26

237

89.     The contract is a form contract, the terms of which Plaintiff is deemed to have accepted once Defendant RCN and the Class signed up with Defendant RCN. Defendant RCN is subject to an obligation to exercise its discretion regarding the contract, users' privacy, and the provision of Internet services in good faith. The covenant of good faith and fair dealing is breached when a party to a contract uses discretion conferred by the contract to act dishonestly or to act outside of accepted commercial practices. Defendant RCN breached its implied covenant of good faith and fair dealing by exercising bad faith in using its discretionary rights to deliberately, routinely, and systematically make Plaintiff's personal information available to third parties, access Plaintiff's personal information without consent, and impersonating (or allowing Paxfire to impersonate) a third party Search Engine.

90.     Plaintiff has performed all, or substantially all, of the obligations imposed on her under the contract, whereas Defendant RCN has acted in a manner as to evade the spirit of the contract, in particular by deliberately, routinely, and systematically without notifying Plaintiff of its disclosure of her personal information to third-parties. Such actions represent a fundamental wrong that is clearly beyond the reasonable expectations of the parties. Defendant RCN's disclosure of an unauthorized access to Plaintiff's information is not in accordance with the reasonable expectations of the parties and evidences a dishonest purpose.

91.     Defendant RCN's ill motive is further evidenced by its failure to obtain Plaintiff's consent to provide user information to Paxfire and/or impersonate a Search Engine to gain unauthorized access to users' data. Defendant RCN profits from revenues and traffic designed from this redirection and data mining.

92.     The obligation imposed by the implied covenant of good faith and fair dealing is an obligation to refrain from opportunistic behavior. Defendant RCN has breached the implied

27

238

covenant of good faith and fair dealing in the agreement through its policies and practices as alleged herein. Plaintiff and the Class have sustained damages and seek a determination that the policies and procedures of Defendant RCN are not consonant with Defendant RCN's implied duties of good faith and fair dealing.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff, on behalf of herself and the Class, requests the following relief:

A.    An order certifying that this action is properly brought and may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, that Plaintiff be appointed as Class Representative, and that Plaintiff's counsel be appointed Class Counsel;

B.    An award of damages;

C.    Restitution of all monies unjustly obtained or to be obtained from Plaintiff and members of the Class;

D.    Declaratory and injunctive relief;

E.    An award of reasonable attorneys' fees and costs; and

F.    Such other relief at law or equity as this court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands trial of her claims by jury to the extent authorized by law.

Dated: August 4, 2011                    Respectfully Submitted,

                                         MILBERG LLP


                                         Sanford P. Dumain
                                         Peter E. Seidman
                                         Melissa Ryan Clark
                                         Charles Slidders
                                         One Pennsylvania Plaza, 49th Floor
                                         New York, NY 10119
                                         Telephone: (212) 594-5300

28

239

Facsimile: (212) 868-1229
E-mail:sdumain@milberg.com
      pseidman@milberg.com
      mclark@milberg.com
      cslidders@milberg.com

-and-

**REESE RICHMAN LLP**
Michael E. Reese
Kim Richman
875 Avenue of the Americas, 18th Floor
New York, NY 10001
Telephone: (212) 579-4625
Facsimile: (212) 253-4272
E-mail: mreese@reeserichman.com
      krichman@reeserichman.com

***Attorneys for Plaintiff Betsy Feist***

29

240

JUDGE KOELTL

11 CIV 5436

JS 44C/SDNY
REV. 5/2010

**CIVIL COVER SHEET**

AUG 04 2011

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for use of the Clerk of Court for the purpose of initiating the civil docket sheet.

| PLAINTIFFS | DEFENDANTS |
|---|---|
| BETSY FEIST, individually, and on behalf of all others similarly situated | RCN CORPORATION and PAXFIRE, INC. |

| ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER) | ATTORNEYS (IF KNOWN) |
|---|---|
| Peter E. Seidman, Milberg LLP, One Pennsylvania Plaza, 49th Floor, New York, NY 10119 (Tel: 212-594-5300) | |

CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE)
(DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY)

28 U.S.C. §§ 1332(a) and 1332(d); Violation of the Wiretap Act, 18 U.S.C. § 2510; and other causes of action.

Has this or a similar case been previously filed in SDNY at any time? No? [✓] Yes? [ ]   Judge Previously Assigned

If yes, was this case Vol.[ ] Invol. [ ] Dismissed. No[ ] Yes [ ]  If yes, give date _____ & Case No. _____

(PLACE AN [x] IN ONE BOX ONLY)            NATURE OF SUIT

ACTIONS UNDER STATUTES

| TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| **CONTRACT** | **PERSONAL INJURY** | **PERSONAL INJURY** | [ ] 610 AGRICULTURE | [ ] 422 APPEAL | [ ] 400 STATE |
| | [ ] 310 AIRPLANE | [ ] 362 PERSONAL INJURY - | [ ] 620 OTHER FOOD & | 28 USC 158 | REAPPORTIONMENT |
| [ ] 110 INSURANCE | [ ] 315 AIRPLANE PRODUCT | MED MALPRACTICE | DRUG | [ ] 423 WITHDRAWAL | [ ] 410 ANTITRUST |
| [ ] 120 MARINE | LIABILITY | [ ] 365 PERSONAL INJURY | [ ] 625 DRUG RELATED | 28 USC 157 | [ ] 430 BANKS & BANKING |
| [ ] 130 MILLER ACT | [ ] 320 ASSAULT, LIBEL & | PRODUCT LIABILITY | SEIZURE OF | | [ ] 450 COMMERCE |
| [ ] 140 NEGOTIABLE | SLANDER | [ ] 368 ASBESTOS PERSONAL | PROPERTY | **PROPERTY RIGHTS** | [ ] 460 DEPORTATION |
| INSTRUMENT | [ ] 330 FEDERAL | INJURY PRODUCT | 21 USC 881 | | [ ] 470 RACKETEER INFLU- |
| [ ] 150 RECOVERY OF | EMPLOYERS' | LIABILITY | [ ] 630 LIQUOR LAWS | [ ] 820 COPYRIGHTS | ENCED & CORRUPT |
| OVERPAYMENT & | LIABILITY | | [ ] 640 RR & TRUCK | [ ] 830 PATENT | ORGANIZATION ACT |
| ENFORCEMENT OF | [ ] 340 MARINE | **PERSONAL PROPERTY** | [ ] 650 AIRLINE REGS | [ ] 840 TRADEMARK | (RICO) |
| JUDGMENT | [ ] 345 MARINE PRODUCT | | [ ] 660 OCCUPATIONAL | | [ ] 480 CONSUMER CREDIT |
| [ ] 151 MEDICARE ACT | LIABILITY | [ ] 370 OTHER FRAUD | SAFETY/HEALTH | **SOCIAL SECURITY** | [ ] 490 CABLE/SATELLITE TV |
| [ ] 152 RECOVERY OF | [ ] 350 MOTOR VEHICLE | [ ] 371 TRUTH IN LENDING | [ ] 690 OTHER | | [ ] 810 SELECTIVE SERVICE |
| DEFAULTED | [ ] 355 MOTOR VEHICLE | [ ] 380 OTHER PERSONAL | | [ ] 861 HIA (1395ff) | [ ] 850 SECURITIES/ |
| STUDENT LOANS | PRODUCT LIABILITY | PROPERTY DAMAGE | **LABOR** | [ ] 862 BLACK LUNG (923) | COMMODITIES/ |
| (EXCL VETERANS) | [ ] 360 OTHER PERSONAL | [ ] 385 PROPERTY DAMAGE | | [ ] 863 DIWC/DIWW (405(g)) | EXCHANGE |
| [ ] 153 RECOVERY OF | INJURY | PRODUCT LIABILITY | [ ] 710 FAIR LABOR | [ ] 864 SSID TITLE XVI | [ ] 875 CUSTOMER |
| VETERAN'S BENEFITS | | | STANDARDS ACT | [ ] 865 RSI (405(g)) | CHALLENGE |
| [ ] 160 STOCKHOLDERS SUITS | | | [ ] 720 LABOR/MGMT | | 12 USC 3410 |
| [ ] 190 OTHER CONTRACT | | | RELATIONS | | [X] 890 OTHER STATUTORY |
| [ ] 195 CONTRACT PRODUCT | | | [ ] 730 LABOR/MGMT | **FEDERAL TAX SUITS** | ACTIONS |
| LIABILITY | | | REPORTING & | | [ ] 891 AGRICULTURAL ACTS |
| [ ] 196 FRANCHISE | | | DISCLOSURE ACT | [ ] 870 TAXES (U.S. Plaintiff or | [ ] 892 ECONOMIC |
| | **ACTIONS UNDER STATUTES** | | [ ] 740 RAILWAY LABOR ACT | Defendant) | STABILIZATION ACT |
| | | | [ ] 790 OTHER LABOR | [ ] 871 IRS-THIRD PARTY | [ ] 893 ENVIRONMENTAL |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | LITIGATION | 26 USC 7609 | MATTERS |
| | [ ] 441 VOTING | | [ ] 791 EMPL RET INC | | [ ] 894 ENERGY |
| [ ] 210 LAND CONDEMNATION | [ ] 442 EMPLOYMENT | [ ] 510 MOTIONS TO | SECURITY ACT | | ALLOCATION ACT |
| [ ] 220 FORECLOSURE | [ ] 443 HOUSING/ | VACATE SENTENCE | | | [ ] 895 FREEDOM OF |
| [ ] 230 RENT LEASE & | ACCOMMODATIONS | 20 USC 2255 | **IMMIGRATION** | | INFORMATION ACT |
| EJECTMENT | [ ] 444 WELFARE | [ ] 530 HABEAS CORPUS | | | [ ] 900 APPEAL OF FEE |
| [ ] 240 TORTS TO LAND | [ ] 445 AMERICANS WITH | [ ] 535 DEATH PENALTY | [ ] 462 NATURALIZATION | | DETERMINATION |
| [ ] 245 TORT PRODUCT | DISABILITIES - | [ ] 540 MANDAMUS & OTHER | APPLICATION | | UNDER EQUAL ACCESS |
| LIABILITY | EMPLOYMENT | [ ] 550 CIVIL RIGHTS | [ ] 463 HABEAS CORPUS- | | TO JUSTICE |
| [ ] 290 ALL OTHER | [ ] 446 AMERICANS WITH | [ ] 555 PRISON CONDITION | ALIEN DETAINEE | | [ ] 950 CONSTITUTIONALITY |
| REAL PROPERTY | DISABILITIES -OTHER | | [ ] 465 OTHER IMMIGRATION | | OF STATE STATUTES |
| | [ ] 440 OTHER CIVIL RIGHTS | | ACTIONS | | |

Check if demanded in complaint:

[X] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23

DEMAND $_____  OTHER _____

Check YES only if demanded in complaint
JURY DEMAND: [✓] YES [ ] NO

DO YOU CLAIM THIS CASE IS RELATED TO A CIVIL CASE NOW PENDING IN S.D.N.Y.? IF SO, STATE:

JUDGE _____  DOCKET NUMBER _____

NOTE: Please submit at the time of filing an explanation of why cases are deemed related.

241

(PLACE AN x IN ONE BOX ONLY)      **ORIGIN**

☑ 1 Original Proceeding    ☐ 2a. Removed from State Court    ☐ 3 Remanded from Appellate Court    ☐ 4 Reinstated or Reopened    ☐ 5 Transferred from (Specify District)    ☐ 6 Multidistrict Litigation    ☐ 7 Appeal to District Judge from Magistrate Judge Judgment

☐ 2b. Removed from State Court **AND** at least one party is pro se.

(PLACE AN x IN ONE BOX ONLY)      **BASIS OF JURISDICTION**      **IF DIVERSITY, INDICATE CITIZENSHIP BELOW.** **(28 USC 1322, 1441)**

☐ 1 U.S. PLAINTIFF    ☐ 2 U.S. DEFENDANT    ☑ 3 FEDERAL QUESTION (U.S. NOT A PARTY)    DIVERSITY

CITIZENSHIP OF PRINCIPAL PARTIES (FOR DIVERSITY CASES ONLY)

(Place an [X] in one box for Plaintiff and one box for Defendant)

|  | PTF DEF |  | PTF DEF |  | PTF DEF |
|---|---|---|---|---|---|
| CITIZEN OF THIS STATE | [ ]1 [ ]1 | CITIZEN OR SUBJECT OF A FOREIGN COUNTRY | [ ]3 [ ]3 | INCORPORATED and PRINCIPAL PLACE OF BUSINESS IN ANOTHER STATE | [ ]5 [ ]5 |
| CITIZEN OF ANOTHER STATE | [ ]2 [ ]2 | INCORPORATED or PRINCIPAL PLACE OF BUSINESS IN THIS STATE | [ ]4 [ ]4 | FOREIGN NATION | [ ]6 [ ]6 |

PLAINTIFF(S) ADDRESS(ES) AND COUNTY(IES)

Betsy Feist
140 East 81st Street, Apt. 8G
New York, NY 10028
(New York County)

DEFENDANT(S) ADDRESS(ES) AND COUNTY(IES)

RCN Corporation      Paxfire , Inc.
196 Van Buren St.      45665 Willow Pond Plaza
Herndon, VA 20170      Sterling, VA 20164
(Fairfax County)      (Loudoun County)

DEFENDANT(S) ADDRESS UNKNOWN
REPRESENTATION IS HEREBY MADE THAT, AT THIS TIME, I HAVE BEEN UNABLE, WITH REASONABLE DILIGENCE, TO ASCERTAIN THE RESIDENCE ADDRESSES OF THE FOLLOWING DEFENDANTS:

Check one:    THIS ACTION SHOULD BE ASSIGNED TO:    ☐ WHITE PLAINS    ☑ MANHATTAN
(DO NOT check either box if this a PRISONER PETITION.)

DATE 8/4/2011    SIGNATURE OF ATTORNEY OF RECORD    ADMITTED TO PRACTICE IN THIS DISTRICT
[ ] NO
RECEIPT #    [x] YES (DATE ADMITTED Mo. Jan. Yr. 1996 )
Attorney Bar Code #PS-8769

MAG. JUDGE ELLIS

Magistrate Judge is to be designated by the Clerk of the Court.

Magistrate Judge _____ is so Designated.

Ruby J. Krajick, Clerk of Court by _____ Deputy Clerk, DATED _____.

UNITED STATES DISTRICT COURT (NEW YORK SOUTHERN)

# DECLARATION OF EUGENE H. SPAFFORD

I, Eugene H. Spafford, hereby declare and state as follows:

1. I am over the age of 21 and am competent to make this declaration. I reside in West Lafayette, Indiana.

2. I am currently a Professor in the Department of Computer Science of Purdue University and I am the Executive Director of the Center for Education and Research in Information Assurance and Security (CERIAS) at Purdue University. I was awarded a Ph.D. in Information and Computer Science by the Georgia Institute of Technology in 1986. I am a Fellow of the ACM, IEEE, AAAS, $(ISC)^2$, and the ISSA. Attached to this declaration is a copy of my Abridged *Curriculum Vita*.

3. I have reviewed a paper entitled "Implications of Netalyzr's DNS Measurements," authored by Nicholas Weaver and Christian Kreibich of the ICSI; Vern Paxson of the ICSI and UC Berkeley; and Boris Nechaev of HIIT and Aalto University. A copy of this paper is also attached. Also, I have personally run the copy of "Netalyzr" located at http://netalyzr.icsi.berkeley.edu (noted in the paper) and studied the output and program options.

4. I have been asked to answer several questions concerning this paper and the "Netalyzer" program described in this paper. These questions were as follows:

Does this paper, or can this device, identify what an ISP or any other company receiving Internet traffic does with that traffic, specifically: whether or not:

(1) they log such traffic;

(2) compile a history of searches by any ISP end users;

(3) sell or otherwise distribute such search histories;

(4) identify individual users by way of who they are.

5. From what I could determine from running Netalyzer and reviewing the paper, the Netalyzer is designed to run a suite of built-in tests and analyze the results. There was no monitoring function apparent where it is simply run and allowed to gather any traffic, such as the traffic from end-systems as they are used. Thus, the questions posed do not apply to Netalyzer as I understand it. As best as I *can* apply the questions, the answers are:

(1) [Can Netalyzer determine if] they log traffic? No. I saw no evidence to support this. Netalyzer might possibly reveal that some traffic is being unexpectedly routed through a 3rd-party site, which might imply logging or observation at that location. But the program itself cannot determine if logging is occurring at a particular site. Given the hop-by-hop nature of the Internet, accurate determination of what is happening within a remote site is quite limited. Logging is usually a read-only activity and would not display anything that could be observed from any other site.

(2) Compile a history of searches by any ISP end users: There is no evidence to support this. It might possibly reveal that network traffic from some systems was flowing to network addresses associated with search engines. However, to determine whether searches were being conducted, and which users were conducting them, would require capturing network packets during such searches and looking at the contents of those packets to make a detailed analysis. The text of the paper does not suggest that Netalyzer does that, and I found no option or output during my test of the software that suggested any such capture and examination.

(3) [Can Netalyzer determine if they] Sell or otherwise distribute such search histories: There is no hint of that in either the paper or the output of the program I ran. As noted, above, I

conclude that Netalyzer cannot determine if logging of search queries is performed. Any activity involved in selling an item — such as a log of search queries — would be performed as a higher level protocol than is discussed in the paper. To detect any such online activity, a piece of software would (at a minimum) need to detect the traffic associated with the sale, look inside the traffic stream to determine the parties, determine the items being sold or leased, and identify that it was a transaction. This would require full traffic interception and some sophisticated pattern matching and decoding. There is no trace of these features in the version of Netalyzer that I ran, nor are they even hinted at in the paper. Furthermore, any such features would require considerable additional code and testing beyond what was apparent in the items I examined.

Of course, any transaction conducted in the physical world is completely beyond monitoring by any software.

(4) Identify individual users by way of who they are: I interpret this question as asking whether users of an ISP can be identified by Netalyzer during operation. There are two reasons I conclude that this is not done:

a) It would require interception of packets, inspection of the contents, and storage of results to determine characteristics that could be mapped back to individual sessions being conducted on-line. As I previously stated, I saw no indication that Netalyzer does this or is capable of doing this.

b) Even if extensive capture and inspection were being performed, it would only reveal information about connection endpoints. Additional information would need to be gathered at the originating host to tie the connection to a particular user. That would need to be collected at the time of packet capture to ensure that it was a current and

3 of 3

Case 1:11-cv-05436-JGK   Document 42-1   Filed 01/14/12   Page 4 of 5

correct identification.  I saw no evidence in the paper or operation of the program that suggests this is possible or performed.

I hereby declare under the penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 8th day of January 2012, in West Lafayette, IN.

_____
Prof. Eugene H. Spafford

4 of 3

246

# EXHIBIT A

# Abridged Vita: Eugene H. Spafford

**Purdue University**

**CERIAS**
656 Oval Drive
West Lafayette, IN 47907–2086

Email: spaf@purdue.edu
URL: http://spaf.cerias.purdue.edu/
Phone: +1 (765) 494–7825

## PROFESSIONAL EXPERIENCE

| | |
|---|---|
| 1/86–8/87 | **Research Scientist II,** Software Engineering Research Center, Georgia Institute of Technology. |
| 8/87–6/93 | **Assistant Professor** of Computer Sciences, Purdue University. |
| 8/92–5/98 | **Laboratory Director,** COAST Project and Laboratory, Purdue University. |
| 7/93–8/97 | **Associate Professor** of Computer Sciences, Purdue University. |
| 8/97–present | **Professor** of Computer Sciences, Purdue University. |
| 5/98–10/03 | **Director,** Center for Education and Research in Information Assurance and Security (CERIAS), Purdue University. |
| 12/98–12/01 | **Chief Information Systems Security Officer,** Purdue University. |
| 5/00–present | **Professor of Philosophy (courtesy appointment),** Purdue University. |
| 1/03–present | **Professor of Communication (courtesy appointment),** Purdue University. |
| 9/03–6/04 | **Senior Advisor to the Office of the Assistant Director,** CISE, National Science Foundation. |
| 10/03–present | **Executive Director,** CERIAS, Purdue University. |
| 10/03–present | **Professor of Electrical and Computer Engineering (courtesy appointment; joint appointment 2004–2007),** Purdue University. |
| 01/07–05/10 | **Adjunct Professor of Computer Science and Executive Director,** Institute for Information Assurance Board of Advisors, the University of Texas at San Antonio. |

## EDUCATION

| | |
|---|---|
| 5/79 | **B.A. in Mathematics and Computer Science (summa cum laude),** State University College at Brockport (**SUNY**) |
| 9/81 | **M.S. in Information and Computer Science,** Georgia Institute of Technology |

**Thesis title:** *A Mixed-strategy Page Replacement Algorithm for a Multiprogramming Virtual Memory Computer*
Advisor: Philip H. Enslow, Jr.

| 6/86 | **Ph.D. in Information and Computer Science,** |
|------|-----------------------------------------------|

Georgia Institute of Technology

**Thesis title:** *Kernel Structures for a Distributed Operating System*

Advisors: Martin S. McKendry and Partha Dasgupta

Academic minor: Operations Research

## RESEARCH INTERESTS

Computer-related failures may be the results of accident, or they may be caused by software faults present in software that was poorly designed and inadequately tested. Moreover, failures can occur because of malicious activity by vandals and criminals, either as intruders trying to obtain information, or through the application of *vandalware* such as worms and viruses.

My research has been focused on the prevention, detection, and remediation of information system failures and misuse, with an emphasis on applied information security. This has included research in fault tolerance, software testing and debugging, intrusion detection, software forensics, and security policies. I have also been involved in issues of science and national security policy.

## MEMBERSHIPS

- American Association for the Advancement of Science (AAAS)
  - AAAS Fellow as of 1999
- Association for Computing Machinery (ACM) Life Member
  - ACM Fellow as of 1997
- Institute of Electrical and Electronics Engineers (IEEE)
  - Computer Society
- Society on Social Implications of Technology
  - IEEE Fellow as of 2001
- Sigma Xi, Life Member
- Information Systems Security Association (ISSA), Honorary Life Member
- Upsilon Pi Epsilon
- Usenix Association

## HONORS, AWARDS & RECOGNITIONS

| 1990 | Top 10 Undergraduate Teachers in Purdue School of Science. |
|------|-----------------------------------------------------------|
| 1991 | Elevated to Senior Member grade in IEEE. |
| 1992 | Inducted in Sigma Xi. |
|      | Inducted in Upsilon Pi Epsilon, the Computer Sciences honor society. |

249

Top 10 Undergraduate Teachers in Purdue School of Science.

IEEE Computer Society's Meritorious Service Certificate, "…for participating in the 1991 Curriculum Task Force."

**1995**   Named to State University of New York (SUNY) Alumni Statewide Honor Roll.

Named as a Cecil H. and Ida Green Honors Professor at Texas Christian University, Fort Worth, TX.

Named to SUNY Statewide Alumni Honor Roll.

**1996**   Awarded charter Membership in the IEEE Computer Society's *Golden Core* for distinguished service to the Computer Society during its first 50 years.

*Award of Distinguished Technical Communication* (highest award) and *Award of Merit* by the Society for Technical Communication for Practical Unix and Internet Security.

**1997**   Inducted as a *Fellow of the ACM*.

**1999**   Inducted as a *Fellow of the AAAS*.

Named as one of the "5 Most Influential Leaders in Information Security" by the readers of Information Security.

**2000**   Finalist for Indiana Information Technology Association (INITA) Cyberstar Award for Outstanding Contribution to Technology Education.

NIST/NCSC *National Computer Systems Security Award*.

Proclaimed an Honorary CISSP by (ISC)$^2$

Inducted as a *Fellow of the IEEE*.

Named Applied Computer Security Associates Distinguished Practitioner.

Named by the Washington Post as one of the most influential policy experts in information security in the US.

**2001**   Purdue University *Outstanding Undergraduate Teaching Award in Memory of Charles B. Murphy* (top university award for teaching).

Awarded *Founder's Medal* of the National Colloquium for Information Systems Security Education.

Named to the ISSA (Information Systems Security Association) *Hall of Fame*.

Named a *Fellow of Purdue University's Teaching Academy*.

**2003**   Recipient of SUNY Brockport Alumni Association *Hall of Heritage Award*.

Named to Purdue University's *Book of Great Teachers*.

Awarded U.S. Air Force medal for *Meritorious Civilian Service*.

**2004**   Awarded the IEEE Computer Society's *Taylor L. Booth Medal*.

ACM SIGCAS *Making a Difference Award*.

**2005**   Honorary D.Sc. degree from SUNY, awarded at the College at Brockport.

**2006**   IEEE Computer Society Technical Achievement Award.

Joseph J. Wasserman Award of the ISACA New York Metropolitan Chapter

Selected as an ACM Distinguished Lecturer

ACM SIGSAC Outstanding Contribution Award

Named as one of Network World's *50 Most Powerful People in Networking*.

**2007**   ACM President's Award

| 2008 | Fellow of the (ISC)². |
|------|-----------------------|
|      | <u>Information Security</u>'s *Security 7 Award*. |
| 2009 | UPE *ABACUS Award*. |
| 2009 | CRA Distinguished Service Award. |
| 2009 | Named as a *Distinguished Fellow of the ISSA* |
| 2010 | Named as a *2010 Security Visionary* by "The Everything Channel" |
| 2011 | Awarded *SANS Lifetime Achievement Award* |
| 2011 | Award in Recognition of Leadership and Outstanding Research Contributions to the Field of Information Security, by WORLDCOMP |

## SELECTED PUBLICATIONS

### Books Authored

- Eugene H. Spafford, Kathleen A. Heaphy, and D. J. Ferbrache; Computer Viruses: Dealing with Electronic Vandalism and Programmed Threats; Adapso, Arlington, VA; 123 pages; 1989.
- Simson L. Garfinkel and Gene Spafford; *Practical UNIX Security*; O'Reilly & Associates; 512 pages; May 1991.
  - 2nd edition, renamed *Practical UNIX and Internet Security*; 1000 pages, May 1996.
  - 3rd edition, with S. Garfinkel and A. Schwartz; 954 pages, February 2003.
  - Translations exist, or are in progress, into Chinese (Taiwan), Czech, German, Japanese, Polish, Russian, and Spanish.
- Simson L. Garfinkel with Gene Spafford; *Web Security & Commerce*; O'Reilly & Associates; 483 pages; 1997
  - 2nd edition, renamed *Web Security, Privacy & Commerce*; 756 pages; Jan 2002.
  - Translations exist or are in progress into Japanese, Russian and Ukrainian.

### Books Edited

- K. A. Seger, W. R. VonStorch and D. J. Icove; *Computer Crime: A Crime-Fighters Handbook*; Contributing editor; O'Reilly & Associates; 1995.
- Editorial advisor (associate editor) for section on operating systems and networks; A. B. Tucker, editor-in-chief; *CRC Handbook of Computer Science and Engineering*; CRC Press; Boca Raton, FL; 1996.

### Major Reports

- A. B. Tucker, B. H. Barnes, R. M. Aiken, K. Barker, K. M. Bruce, J. T. Cain, S. E. Conry, G. L. Engel, R. G. Epstein, D. K. Lidtke, M. C. Mulder, J. B. Rogers, E. H. Spafford, and A. J. Turner; <u>Computing Curricula 1991</u>; IEEE Press; 160 pages; Feb 1991.
- As a member of the PITAC; *Report to the President on Revolutionizing Health Care Through Information Technology*; US Government Printing Office; May 2004.

- As a member of the PITAC; *Report to the President on Cyber Security: A Crisis of Prioritization*; US Government Printing Office; February 2005.
- As a member of the PITAC; *Report to the President on Computational Science: Ensuring America's Competitiveness*; US Government Printing Office; June 2005.
- As a member of the USAF Scientific Advisory Board; *Implications of Cyber Warfare, Vols. 1-3*; SAB-TR-07-02; ed. T. Saunders and A. Levis; US Air Force; August 2007. (Note: Volumes 1 & 2 Distribution *FOUO*; Volume 3 Classified *Secret*)
- Karthik Kannan, Jackie Rees, Eugene H. Spafford; *Unsecured Economies: Protecting Vital Information*; ed. Red Consultancy; McAfee, Inc.; January 2009.

**Chapters and Monographs**

- Eugene H. Spafford; The USENET, chapter 5 (pp. 385--390) in <u>User's Guide to Computer Networks</u>; Tracy LaQuey, editor; Digital Press; 1990.
- Eugene H. Spafford; The UUCP Network, chapter 6 (pp. 391--394) in <u>User's Guide to Computer Networks</u>; Tracy LaQuey, editor; Digital Press, 1990.
- Eugene H. Spafford, Kathleen A. Heaphy and D. J. Ferbrache; A Computer Virus Primer, chapter 20 (pp. 316--355) in <u>Computers Under Attack: Intruders, Worms and Viruses</u>; Peter J. Denning, editor; ACM Press; 1990.
- Eugene H. Spafford, Kathleen A. Heaphy and D. J. Ferbrache; What is A Computer Virus?, chapter 2 (pp. 29--42) in <u>Rogue Programs: Viruses, Worms, and Trojan Horses</u>; Lance Hoffman, editor; Van Nostrand Reinhold, New York; 1990.
- Eugene H. Spafford, Kathleen A. Heaphy and D. J. Ferbrache; Further Information on Computer Viruses, chapter 15 (pp. 173--179) in <u>Rogue Programs: Viruses, Worms, and Trojan Horses</u>; Lance Hoffman, editor; Van Nostrand Reinhold, New York; 1990.
- Eugene H. Spafford; Virus, entry in the <u>Encyclopedia of Software Engineering</u>; edited by John Marciniak; John Wiley & Sons; 1994.
  - Reprinted in Internet Besieged: Countering Cyberspace Scofflaws; Dorothy and Peter Denning, eds.; Addison-Wesley, 1997.
- Eugene H. Spafford, Kathleen A. Heaphy and D. J. Ferbrache; Programmed Threats, in <u>Wprowadzenie do etyki informatycznej</u>; edited by Andrzej Kocikowski, Terrell Ward Bynum, and Krystyna Gorniak-Kocikowska; Humaniora, Adam Mickiewicz University, Poznan, Poland; 1997.
- Eugene H. Spafford, Kathleen A. Heaphy and D. J. Ferbrache; Security, in <u>Wprowadzenie do etyki informatycznej</u>; edited by Andrzej Kocikowski, Terrell Ward Bynum, and Krystyna Gorniak-Kocikowska; Humaniora, Adam Mickiewicz University, Poznan, Poland; 1997.
- Gene Kim and Eugene H. Spafford; Tripwire: A Case Study in Integrity Monitoring in <u>Internet Besieged: Countering Cyberspace Scofflaws</u>; edited by Dorothy and Peter Denning; Addison-Wesley; 1997.
- E. Eugene Schultz and Eugene H. Spafford; Intrusion Detection: How to Utilize a Still Immature Technology; in <u>Information Security Management (4th Edition)</u>; edited by H. Tipton and M. Krause; Auerbach/CRC; 2000.
- M. J. Atallah, K. N. Pantazopoulos, J. R. Rice, and Eugene H. Spafford; Secure Outsourcing of Scientific Computations; in <u>Advances in Computers</u>; Chap. 6, pp 215--272; August 2001.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 64 of 203
Case3:12-mc-80135-SI   Document42-10   Filed06/22/12   Page12 of 45
Case 1:11-cv-05436-JGK   Document 42-10   Filed 07/14/12   Page 11 of 45

- James B. D. Joshi, Walid G. Aref, Arif Ghafoor and Eugene H. Spafford; "Security and Privacy Challenges of a Digital Government"; Advances in Digital Government: Technology, Human Factors, and Policy; Eds. W. J. McIver, Jr., A. K. Elmagarmid; Kluwer Academic Publishers, 2002; pp. 121–136.

- Eugene H. Spafford; "One View of Protecting the National Information Infrastructure"; Science and Technology in a Vulnerable World; AAAS, 2002; pp. 41–50.

- Eugene H. Spafford and Annie I. Antón; The Balance Between Security and Privacy; chapter 8, pp. 152–168 in Controversies in Science and Technology, Volume II; ed. D. L. Kleinman, K. A. Cloud-Hansen, C. Matta, and J. Handelsman; Mary Ann Liebert, Inc., New York, NY; 2008.

- Bingrui Foo, Matthew W. Glause, Gaspar M. Howard, Yu-Sung Wu, Saurabh Bagchi, Eugene H. Spafford; Intrusion Response Systems: A Survey; chapter 13 in Information Assurance: Dependability and Security in Networked Systems; Morgan Kaufmann Publishers; pp 377-416; 2008.

- Fariborz Farahmand and Eugene H. Spafford; Understanding Risk and Risk-Taking Behavior in Virtual Worlds; chapter 4 in Security in Virtual Worlds, 3D Webs, and Immersive Environments: Models for Development, Interaction, and Management, edited by Alan Rea; Information Science Reference, IGI Publishing; pp. 59–71; 2011.

- Shimon Modi and Eugene H. Spafford; Future Biometric Systems and Privacy; chapter 6 in Privacy in America: Interdisciplinary Perspectives; edited by Willilam Aspray and Philip Doty; Scarecrow Press, Inc.; pp. 167–193; 2011.

## Journal Articles

- Eugene H. Spafford; The Internet Worm: Crisis and Aftermath; Communications of the ACM; v. 32(6), pp. 678–687; June 1989.
  - Reprinted (and translated into Japanese) in bit (Tokyo); Kyōritsu Publishing, Co.; Tokyo, Japan; v. 21(14) pp. 1830–1842; Dec 1989.
  - Reprinted as chapter 12 (pp. 223–243) in Computers Under Attack: Intruders, Worms and Viruses; Peter J. Denning, editor; ACM Press; 1990.
  - Reprinted in Crime, Deviance and the Computer (volume in the International Library of Criminology, Criminal Justice and Penology); R. Hollinger, editor; Dartmouth Publishing Company; Hampshire, England; 1997.

- Eugene H. Spafford; Extending Mutation Testing to Find Environmental Bugs; Software Practice & Experience, v. 20(2) pp.181–189; Feb 1990.

- Hiralal Agrawal, Richard A. DeMillo and Eugene H. Spafford; An Execution Backtracking Approach to Program Debugging; IEEE Software, pp. 21–26; May 1991.

- Eugene H. Spafford; Are Computer Break-Ins Ethical?; Journal of Systems and Software; v. 17(1) pp. 41–48; Jan 1992.
  - Reprinted (pp. 125–134) in Computers, Ethics, & Social Values; D. G. Johnson and H. Nissenbaum, editors; Prentice-Hall; 1995.
  - Reprinted in The Moral Foundations of Intellectual Property; Adam D. Moore, editor; 1997.

- - Reprinted in <u>Computers, Ethics and Society</u>; M. David Ermann, Mary B. Williams, and Michele S. Shauf, eds.; Oxford University Press; 1997.
  - - Reprinted in the <u>Encyclopedia of Applied Ethics</u>; Ruth Chadwick, editor; pp. 571–577; Academic Press; 1997.
  - - Reprinted in <u>Internet Besieged: Countering Cyberspace Scofflaws</u>; Dorothy and Peter Denning, editors; pp. 73–95; Addison-Wesley, 1997.
  - - Reprinted in <u>Computer Ethics: The International Library of Essays in Public and Professional Ethics; Ashgate Publishing</u>; John Weckert, editor; 2007.

- Eugene H. Spafford; OPUS: Preventing Weak Password Choices; Computers & Security; v. 11(3) pp. 273–278; May 1992.

- Hiralal Agrawal, Richard A. DeMillo and Eugene H. Spafford; Debugging with Dynamic Slicing and Backtracking; <u>Software Practice & Experience</u>; v. 23(6) pp. 589–616; June 1993.

- Eugene H. Spafford and Stephen A. Weeber; Software Forensics: Tracking Code to its Authors; <u>Computers & Security</u>; v. 12(6) pp. 585–595; Dec. 1993.

- Eugene H. Spafford; Computer Viruses as Artificial Life; <u>Journal of Artificial Life</u>; v. 1(3) pp. 249–265; 1994.

  - - Reprinted (pp. 249–266) in <u>Artificial Life: An Overview</u>; ed Chris Langton; 1995.

- Steve J. Chapin and Eugene H. Spafford; Support for Implementing Scheduling Algorithms Using MESSIAHS; <u>Scientific Programming</u>; volume 3, pp. 325–340; 1994.

- Ivan Krsul and Eugene H. Spafford; Authorship Analysis: Identifying the Author of a Program; Computers & Security; v. 16(3) pp. 248–259; 1997.

- Simson Garfinkel and Eugene H. Spafford; Cryptography and the Web; <u>World Wide Web Journal</u>; v. 2(3) pp. 113–126; Summer 1997.

- Simson Garfinkel and Eugene H. Spafford; Secure CGI/API Programming; <u>World Wide Web Journal</u>; v. 2(3) pp. 187–200; Summer 1997.

- Steve J. Chapin and Eugene H. Spafford; Dissemination of State Information in Distributed, Autonomous Systems; Computer Communications; v. 21(11), pp. 969–979, Oct 1998.

- Christoph Schuba, Berry Kercheval, and Eugene H. Spafford; Prototyping Experiences with Classical IP and ARP over Signaled ATM Connections; <u>Journal of Systems and Software</u>; #44, pp. 31–43; April 1998.

- Thomas E. Daniels and Eugene H. Spafford; Identification of Host Audit Data to Detect Attacks on Low-level IP Vulnerabilities; <u>Journal of Computer Security</u>; v. 7(1). pp. 3–35; 1999.

- Eugene H. Spafford and Diego Zamboni; Intrusion Detection Using Autonomous Agents; in <u>Computer Networks</u> (Elsevier); v. 34(4) pp. 547–570; 2000.

- James Joshi, Arif Ghafoor, Walid G. Aref and Eugene H. Spafford; Digital Government Security Infrastructure Design Challenges; in <u>IEEE Computer</u>; v. 34(2) pp. 66–72; 2001.

- James B. D. Joshi, Walid G. Aref, Arif Ghafoor and Eugene H. Spafford; Security Models of Web-Based Applications; in <u>Communications of the ACM</u>; v. 44(2) pp. 38–44; 2001.

- Florian Kerschbaum, Eugene H. Spafford, and Diego Zamboni; Embedded Sensors and Detectors for Intrusion Detection; <u>Journal of Computer Security</u>; v. 10(1/2) pp. 23–70; 2002.

254

- Jackie Rees, Shubho Bandyopadhyay, and Eugene H. Spafford; *A Policy Framework for Information Security*; in <u>Communications of the ACM</u>; v. 46(7); pp. 101–106; July 2003.

- Brian Carrier and Eugene H. Spafford; *Getting Physical with the Digital Investigation Process*; <u>International Journal of Digital Evidence</u>; v. 2(2); Fall 2003.

- Brian Carrier and Eugene H. Spafford; *Defining Digital Event Reconstruction of Digital Crime Scenes*; <u>Journal of Forensic Sciences</u>; v 49(6), Nov. 2004.

- Florian Buchholz and Eugene H. Spafford; *On the Role of File System Metadata in Digital Forensics;* <u>Digital Investigation</u>; Elsevier; v. 1(4); pp. 298–309; Dec. 2004.

- Brian Carrier and Eugene H. Spafford; *Categories of Digital Investigation Analysis Techniques Based On the Computer History Model*; in <u>Digital Investigation</u>; Elsevier; v. 3(S), pp. 121–130, Aug. 2006.

- Paul Williams and Eugene H. Spafford; *CuPIDS: An Exploration of Highly Focused, Coprocessor-based Information System Protection;* <u>Computer Networks</u>; Elsevier; v 51(5); pp. 1284-1298; April 2007.

- Yu-Sung Wu, Bingrui Foo, Yu-Chun Mao, Saurabh Bagchi, Eugene H. Spafford; *Automated Adaptive Intrusion Containment in Systems of Interacting Services;* <u>Computer Networks</u>; Elsevier; v 51(5); pp. 1334-1360; April 2007.

- Florian Buchholz and Eugene H. Spafford; *Run-time Label Propagation for Forensic Audit Data*; <u>Computers & Security</u>; Elsevier; 26(7-8); pp. 496-513; Dec 2007.

- Xuxian Jiang, Florian Buchholz, Aaron Walters, Dongyan Xu, Yi-Min Wang, Eugene H. Spafford, *Tracing Worm Break-in and Contaminations via Process Coloring: A Provenance-Preserving Approach;* <u>IEEE Transactions on Parallel and Distributed Systems</u>; 19(7); pp. 890-902; Jul 2008.

- Travis D. Breaux, Annie I. Antón, and Eugene H. Spafford; *A Distributed Requirements Management Framework For Legal Compliance And Accountability;* <u>Computers & Security</u>; Elsevier; 28(1); pp. 8-17; Jan 2009.

- Benjamin A. Kuperman and Eugene H. Spafford; *Audlib: A Configurable, High-Fidelity Application Audit Mechanism;* <u>Software Practice & Experience;</u> John Wiley & Sons; 40(11); pp. 989–1005; Oct. 2010.

- Fariborz Farahmand and Eugene H. Spafford; *Understanding Insiders: An Analysis of Risk-Taking Behavior*; Information Systems Frontiers; Springer; to appear.

- Fariborz Farahmand, Mikhail Atallah, and Eugene H. Spafford; *Incentive Alignment and Risk Perception: An Information Security Application;* IEEE Transactions on Engineering Management; to appear.

**Refereed Conference Papers**

- Richard A. DeMillo and Eugene H. Spafford; The MOTHRA Software Testing Environment; <u>Proceedings of the 11th Annual Software Engineering Workshop</u>; NASA Goddard; Dec 1986.

- C. Bullard and Eugene H. Spafford; Testing Experience with MOTHRA; <u>Proceedings of 25th Southeast ACM Conference</u>; pp. 242–248; Apr 1987.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 67 of 203
Case 3:12-mc-89035-SI Document 21-10 Filed 06/22/12 Page 15 of 46
Case 1:11-cv-05436-JGK Document 42-10 Filed 07/14/12 Page 14 of 45

- Hiralal Agrawal and Eugene H. Spafford; An Execution Backtracking Approach to Program Debugging; <u>Proceedings of the 6th Pacific Northwest Software Quality Conference</u>; pp. 283–300; Oct. 1988.

- B. Choi, Richard A. DeMillo, E. W. Krauser, R. J. Martin, Aditya Mathur, A. Jefferson Offutt IV, Hsin Pan and Eugene H. Spafford; The MOTHRA Tool Set; <u>Proceedings of the 22nd Hawaii International Conference on System Science (HICSS)</u>; pp. 274–285, Vol. II; Jan 1989.

- Eugene H. Spafford; Some Musings on Ethics and Computer Break-ins (invited paper); <u>Proceedings of the Winter 1989 Usenix Conference</u>; Usenix Association; pp. 305–311; Feb 1989.

- Eugene H. Spafford; An Analysis of the Internet Worm; <u>Proceedings of the European Software Engineering Conference 1989 (Lecture Notes in Computer Science #387)</u>; Springer-Verlag; pp. 446–468; Sep 1989.
    - Reprinted in <u>Proceedings of the 3rd Annual DPMA Computer Virus Workshop</u>; pp. 24–46; 14–15 Feb 1990.
    - Reprinted as chapter 18 in <u>Rogue Programs: Viruses, Worms, and Trojan Horses</u>; Lance Hoffman, editor; Van Nostrand Reinhold, New York; 1990.
    - Reprinted in <u>Datapro Reports on Information Security</u>; McGraw-Hill Information Services Company; pp. 101–116; Jul 1990.

- Eugene H. Spafford; Computer Viruses: A Form of Artificial Life? (invited contribution); <u>Artificial Life II, Studies in the Sciences of Complexity, vol. XII</u>, eds. D. Farmer, C. Langton, S. Rasmussen, and C. Taylor; Addison-Wesley; pp. 727–747; 1991.

- Mehmet Şahinoğlu and Eugene H. Spafford; A Sequential Statistical Procedure in Mutation-Based Testing; <u>Proceedings of the 28th Reliability Spring Seminar of the Central New England Council of IEEE</u>; pp. 127–148; Apr 1990.

- Dan Farmer and Eugene H. Spafford; The COPS Security Checker System; <u>Proceedings of the Summer 1990 Usenix Conference</u>; Usenix Association; pp. 165–170; Jun 1990.

- Mehmet Şahinoğlu and Eugene H. Spafford; A Bayes Sequential Statistical Procedure for Approving Software Products; <u>Proceedings of the IFIP Conference on Approving Software Products (ASP–90)</u>; Elsevier Science; pp. 43–56; Sep 1990.

- Eugene H. Spafford; Preventing Weak Password Choices; <u>14th National Computer Security Conference</u>; pp. 446–455; Oct 1991.

- Hiralal Agrawal, Richard A. DeMillo and Eugene H. Spafford; Dynamic Slicing in the Presence of Pointers, Arrays, and Records; <u>Proceedings of the 4th ACM Symposium on Testing, Analysis, and Verification</u>; ACM Press; pp. 60–73; Oct 1991.

- Mehmet Şahinoğlu, I. Baltaci, and Eugene H. Spafford; Monte Carlo Simulation on Software Mutation Testcase Adequacy; <u>Proceedings of COMPSTAT '92, International Association of Statistical Computing</u>; Springer-Verlag; pp. 47–52; Aug 1992.

- Eugene H. Spafford; Observing Reusable Password Choices; <u>3rd Usenix UNIX Security Symposium</u>; Usenix Association; pp. 299–312; 14–16 Sep 1992.

- Eugene H. Spafford and Stephen A. Weeber; Software Forensics: Can We Track Code to its Authors?; <u>15th National Computer Security Conference</u>; pp. 641–650; Oct 1992.

256

- Hsin Pan and Eugene H. Spafford; Towards Automatic Localization of Software Faults; <u>Proceedings of the 10th Pacific Northwest Software Quality Conference</u>; pp. 192–209; Oct 1992.
- Sandeep Kumar and Eugene H. Spafford; A Generic Virus Scanner in C++; <u>Proceedings of the 8th Computer Security Applications Conference</u>; IEEE Press; pp. 210–219; Dec 1992.
- Steve J. Chapin and Eugene H. Spafford; Constructing Distributed Schedulers Using the Messiahs Interface Language; <u>Proceedings of the 27th Hawaii International Conference on Systems and Software HICSS</u>; IEEE Press; pp. 425–434, Vol. II; 1994.
- Gene H. Kim and Eugene H. Spafford; Experiences With Tripwire: Using Integrity Checkers for Intrusion Detection; <u>Proceedings of the SANS III: System Administration, Networking, and Security Conference</u>; Open Systems Board, SAGE and Usenix; Usenix Association; April 1994.
- Gene H. Kim and Eugene H. Spafford; Writing, Supporting, and Evaluating Tripwire: A Publicly Available Security Tool; <u>Proceedings of the USENIX Unix Applications Development Symposium</u>; Usenix Association; pp. 89–107; 1994.
- Steve J. Chapin and Eugene H. Spafford; Support for Security in Distributed Systems Using MESSIAHS; <u>Proceedings of the National Computer Security Conference</u>; pp. 339–447; Oct. 1994.
- Sandeep Kumar and Eugene H. Spafford; A Pattern-Matching Model for Intrusion Detection; <u>Proceedings of the National Computer Security Conference</u>; pp. 11–21; Oct. 1994.
- Gene H. Kim and Eugene H. Spafford; The Design and Implementation of Tripwire: A File System Integrity Checker; <u>Proceedings of the 2nd ACM Conference on Computer and Communications Security</u>; ACM PRESS; 1994.
- Sandeep Kumar and Eugene H. Spafford; A Software Architecture to Support Misuse Intrusion Detection; <u>Proceedings of the 18th National Information Security Conference</u>; pp. 194–204; Oct, 1995.

    - Reprinted in DATAPRO GTAC[3] Series on Security, McGraw-Hill, Delran NJ, 1996.
- Mark Crosbie and Eugene H. Spafford; Active Defense of Computer Systems Using Autonomous Agents; <u>Proceedings of the 18th National Information Security Conference</u>; Oct, 1995.

    - Reprinted in DATAPRO <u>GTAC[3] Series on Security</u>, McGraw-Hill, Delran NJ, 1996.
- Ivan Krsul and Eugene H. Spafford; Authorship Analysis: Identifying the Author of a Program; <u>Proceedings of the 18th National Information Security Conference</u>; Oct, 1995.

    - Reprinted in DATAPRO <u>GTAC[3] Series on Security</u>, McGraw-Hill, Delran NJ, 1996.
- Mark Crosbie and Eugene H. Spafford; Genetic Programming Applied to Intrusion Detection; <u>Proceedings of the AAAI Genetic Programming Symposium</u>; November 1995.
- Richard A. DeMillo, Hsin Pan, and Eugene H. Spafford; Critical Slicing for Software Fault Localization; <u>Proceedings of the International Symposium on Software Testing and Analysis (ISSTA) 96</u>; pp. 121–134; Jan 1996.
- Mark Crosbie and Eugene H. Spafford; <u>Evolving Event-Driven Programs</u>; <u>Proceedings of the First Annual Conference on Genetic Programming</u>; pp. 273–278; July 1996.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 69 of 203
Case3:12-mc-80135-SI Document42-10 Filed06/22/12 Page17 of 46
Case 1:11-cv-05436-JGK Document42-10 Filed 01/14/12 Page 16 of 45

- Taimur Aslam, Ivan Krsul and Eugene H. Spafford; A Taxonomy of Security Vulnerabilities; Proceedings of the 19th National Information Systems Security Conference; pp. 551–560; Oct 1996.
- Steve Lodin, Bryn Dole, and Eugene H. Spafford; Misplaced Trust: Kerberos 4 Random Session Keys; Proceedings of Internet Society Symposium on Network and Distributed System Security; pp. 60–70; Feb 1997.
- Christoph Schuba, Ivan Krsul, Markus G. Kuhn, Eugene H. Spafford, Aurobindo Sundaram, Diego Zamboni; Analysis of a Denial of Service Attack on TCP; Proceedings of the 1997 IEEE Symposium on Security and Privacy; pp. 208–233; May 1997.
- Hsin Pan, Richard A. DeMillo, and Eugene H. Spafford; Failure and Fault Analysis for Software Debugging; Proceedings of COMPSAC 97; 1997.
- Mohd A. Bashar, Ganesh Krishnan, Markus G. Kuhn, Eugene H. Spafford, and S. S. Wagstaff, Jr.; Low-Threat Security Patches and Tools; Proceedings of the 1997 IEEE International Conference on Software Maintenance; pp. 306–313; Oct 1997.
- Christoph Schuba and Eugene H. Spafford; A Reference Model for Firewall Technology; Proceedings of the 13th IEEE Computer Security Applications Conference; pp. 133–145; Dec 1997.
- Eugene H. Spafford and Diego Zamboni; AAFID: Autonomous Agents for Intrusion Detection; RAID'98 Workshop; September, 1998.
- Jai Sundar Balasubramaniyan, Jose Omar Garcia-Fernandez, David Isacoff, Eugene H. Spafford, and Diego Zamboni; An Architecture for Intrusion Detection using Autonomous Agents; Proceedings of the 14th IEEE Computer Security Applications Conference; pp. 13–24; Dec 1998.
- Christoph Schuba and Eugene H. Spafford; Modeling Firewalls Using Hierarchical Colored Petri Nets; NATO Symposium on Protecting Information Systems in the 21st Century; October 1999.
- Eugene H. Spafford and Diego Zamboni; New directions for the AAFID architecture; RAID'99 Workshop; September, 1999.
- Thomas E. Daniels and Eugene H. Spafford; Network Traffic Tracking Systems: Folly in the Large?; Proceedings of the New Security Paradigms Workshop 2000; Sep 2000.
- Thomas E. Daniels and Eugene H. Spafford; Subliminal Traceroute in TCP/IP; Proceedings of the National Information Systems Security Conference; Sep 2000.
- Thomas E. Daniels, Benjamin A. Kuperman and Eugene H. Spafford; Penetration Analysis of XEROX Docucenter DC 230ST: Assessing the Security of a Multi-Purpose Office Machine; Proceedings of the National Information Systems Security Conference; Sep 2000.
- Florian Kerschbaum, Eugene H. Spafford and Diego Zamboni; Using embedded sensors for detecting network attacks; Proceedings of the 1st ACM Workshop on Intrusion Detection Systems; Nov 2000.
- Eugene H. Spafford and Diego Zamboni; Design and implementation issues for embedded sensors in intrusion detection; RAID'2000 Workshop; October, 2000.
- Thomas E. Daniels and Eugene H. Spafford; A Network Audit System for Host-based Intrusion Detection (NASHID) in Linux; Proceedings of the 16th Annual Computer Security Applications Conference; Dec 2000.

258

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 70 of 203
Case 3:12-mc-80135-SI   Document 42-10   Filed 06/22/12   Page 18 of 46
Case 1:11-cv-05436-JGR   Document 42-10   Filed 01/14/12   Page 17 of 45

- Eric Bryant, James Early, Rajeev Gopalakrishna, Gregory Roth, Eugene H. Spafford, Keith Watson, Paul Williams and Scott Yost; Poly$^2$ Paradigm: A Secure Network Service Architecture; Proceedings of the 19th Annual Computer Security Applications Conference; Dec 2003.

- Brian Carrier and Eugene H. Spafford; Digital Crime Scene Reconstruction. Proceedings of the American Academy of Forensic Sciences (AAFS) Annual Meeting, February 2004.

- Brian Carrier and Eugene H. Spafford; An Event-Based Digital Forensic Investigation Framework; Proceedings of the Digital Forensics Research Workshop; 2004.

- Rajeev Gopalakrishna, Eugene H. Spafford, and Jan Vitek; Efficient Intrusion Detection Using Automaton Inlining; Proceedings of the IEEE Symposium on Security & Privacy; Oakland, CA; pp. 18–31; May 2005.

- Saurabh Bagchi, Bingrui Foo, Yu-Sung Wu, Yu-Chun Mao and Eugene H. Spafford; ADEPTS: Adaptive Intrusion Response using Attack Graphs in an E-Commerce Environment; Proceedings of the DSN-DCC Symposium 2005; Yokohama, Japan; June 2005.

- Paul D. Williams and Eugene H. Spafford; CuPIDS Enhances StUPIDS: Exploring a Coprocessing Paradigm Shift in Information System Security; Proceedings of the IEEE Workshop on Information Assurance and Security; West Point, NY; June 2005.

- X. Jiang, D. Xu, H. J. Wang, and E. H. Spafford; Virtual Playgrounds for Worm Behavior Investigation; RAID 2005 Symposium; Seattle, WA; Sept 2005.

- Brian Carrier and Eugene H. Spafford; Automated Digital Evidence Target Definition Using Outlier Analysis and Existing Evidence; Digital Forensics Research Workshop (DRFWS); Aug. 2005.

- X. Jiang, A. Walters, F. Buchholz, D. Xu, Y. Wang, and E. H. Spafford; Provenance-Aware Tracing of Worm Break-ins and Contaminations: A Process Coloring Approach; Proceedings of the IEEE International Conference on Distributed Computing Systems (ICDCS 2006); Lisbon, Portugal, July 2006.

- Eugene H. Spafford; Some Challenges in Digital Forensics; in Research Advances in Digital Forensics – II – Proceedings of the IFIP Conference on Digital Forensics; Springer; Aug 2006.

- Yu-Sung Wu, Bingrui Foo, Gaspar Modelo-Howard, Saurabh Bagchi, and Eugene H. Spafford; The Search for Efficiency in Automated Intrusion Response for Distributed Applications; Proceedings of the 27th IEEE Symposium on Reliable and Distributed Systems (SRDS 2008); October 2008; Napoli, Italy.

- Fariborz Farahmand and Eugene H. Spafford; *Insider Behavior: An Analysis of Decision under Risk;* First International Workshop on Managing Insider Security Threats, International Federation for Information Processing (IFIP) International Conference on Trust Management, Jun 2009, Purdue University.

**Significant Published Correspondence**

- Thomas Narten and Eugene H. Spafford; Beyond Worms (A response to Bryan Kocher); Communications of the ACM, ACM Forum; v. 32(6) pp. 673–674; June 1989.

- Reprinted in <u>Computers Under Attack: Intruders, Worms and Viruses</u>; p. 522; 1990; Peter J. Denning, editor; ACM Press.
- Eugene H. Spafford; On Hiring Hackers; <u>Communications of the ACM</u>, ACM Forum; v. 33(10) p. 14; Oct 1990.
- Eugene H. Spafford; Keeping a lock on Pandora's Box (A response to Bruce Henricksen); <u>Science News</u>; v. 139(20) p. 315; 18 May 1991.
- Eugene H. Spafford; Response to Fred Cohen's "Contest"; <u>The Sciences</u>; Jan/Feb 1991.

**Educational Video**

- Featured contribution to Computer Ethics in the Computer Science Curriculum, videotape #1 in the series <u>A Starter Kit on Teaching Computer Ethics</u>, produced by the Research Center on Computers and Society, Southern Connecticut State University, September 1992.
- Featured contribution to Teaching Computer Ethics: Strategies and Cases, videotape #3 in the series <u>A Starter Kit on Teaching Computer Ethics</u>, produced by the Research Center on Computers and Society, Southern Connecticut State University, September 1992.
- Featured contribution to Network Security, produced by the BBC Open University. Originally aired Sept. 9, 1996.

**Other Scholarly Contributions**

- Eugene H. Spafford; Is a Computer Break-in Ever Ethical?; <u>Information Technology Quarterly</u>; Harvard Office of Information Technology; v. IX(2) pp. 9–14; summer 1990.
- Eugene H. Spafford; The United States vs. Craig Neidorf: A Debate on Electronic Publishing, Constitutional Rights, and Hacking (commentary on Dorothy Denning's statement); <u>Communications of the ACM</u>; v. 31(3) pp. 36–38; Mar 1991.
- A. B. Tucker, B. H. Barnes, R. M. Aiken , K. Barker, K. Bruce, J. T. Cain, S. E. Conry, G. L. Engel, R. G. Epstein, D. K. Lidtke, M. Mulder, J. B. Rogers, E. H. Spafford, and A. J. Turner; Computing Curricula 1991; <u>Communications of the ACM</u>; v. 34(6) pp. 69–84; Jun 1991.
- A. Gargaro, R. Rada, J. Moore, G. S. Carson, J. De Blasi, D. Emery, C. Haynes, J. Klensin, I. Montanez, and E. H. Spafford; The Power of Standards; Communications of the ACM; v 36(8); pp. 11-12; Aug 1993.
- A. Gargaro, R. Rada, J. Moore, G. S. Carson, J. De Blasi, D. Emery, C. Haynes, J. Klensin, I. Montanez, and E. H. Spafford; ACM Technical Standards Committee: A New Advocacy Power; <u>Computer Standards & Interfaces</u>; v. 16 pp. 139–142; 1994.
- Eugene H. Spafford; UNIX and Security: The Influences of History; <u>Information Systems Security</u>; Auerbach Publications; v. 4(3) pp. 52–60; Fall 1995.
- Eugene H. Spafford; Hacker Challenges: Boon or Bane?; <u>IEEE Cipher</u>; electronic issue #12; Feb 1996.
- Eugene H. Spafford; System Intrusions and Law Enforcement; <u>EDP Audit, Control, and Security Newsletter</u>; volume XXIV, #2; Aug 1996.
- Eugene H. Spafford; One View of a Critical National Need: Support for Information Security Education and Research; in <u>Briefing Before the Committee on Science Subcommittee on</u>

Technology, U.S. House of Representatives, One Hundred Fifth Congress, First Session, No. 1; U.S. Government Printing Office; pp. 29–38; 11 Feb 1997.

- E. H. Spafford; *An Illustration of why security is more than technology*; in Computer Graphics; v. 34(4); pp 22-23; Nov 2000.
- Eugene H. Spafford; *Protecting Personal Information in Academia*; in Computing Research Association News; v. 13, #3; pp. 3, 4, 12; May 2001.
- Mahesh Tripunitara and Gene Spafford; *Connectivity provisioning with security attributes*; in Software Focus; v. 2, #3; pp. 112–116; fall 2001.
- Eugene H. Spafford; *Statement on the State of Information Security*; in Briefing Before the Committee on Science, U.S. House of Representatives, One Hundred Seventh Congress; U.S. Government Printing Office; 10 October 2001.
- Eugene H. Spafford; *Spaf's Crystal Ball*, in Information Security; v 5, #11; p. 100; Nov. 2002.
- Barbara Simons and Eugene H. Spafford; *Risks of Total Surveillance*; Inside Risks in Communications of the ACM; v. 46, #3; p 120; March 2003.
- *A Failure to Learn from the Past;* invited classic paper in proceedings of ACSAC 2003; IEEE Press; Dec 2003.
- *Perceptions of Information Security Risks and Implications for Public Policy*; Fariborz Fahrimand, Eugene H. Spafford and Melissa J. Dark; 4th Annual Symposium on Financial Information Systems and Cybersecurity: A Public Policy Perspective; College Park, MD; May 2007
- Eugene H. Spafford; *Voter Assurance*; invited paper in The Bridge; v 37(2), summer 2007; pp. 28–34.
- Richard Ford and Eugene H. Spafford; *Happy Birthday, Dear Viruses;* Science; 13 July 2007; 317: 210-211.
- Eugene H. Spafford; *Industry Progress and Attitudes*; Information Security; Oct 2008.
- Eugene H. Spafford; *USACM's Policy Role*; Communications of the ACM; Feb 2009; 52(2); p. 5.
- Eugene H. Spafford; *Answering the Wrong Questions Is No Answer*; Communications of the ACM; June 2009; 52(6); p. 22-24.
- Eugene H. Spafford; *Remembrances of Things Pest*; Communications of the ACM; Aug 2010; 53(8); p. 35-37.

**Patents**

- U.S. Patent 6725378, Network protection for denial of service attacks
- U.S. Patent 6941463, Secure Computational Outsourcing Techniques

**Significant Software Projects**

- Contributing author, Georgia Tech Software Tools (SWT) 1980–1984. Package of software tools, including editor and command interpreter, to provide UNIX-like environment under

the PRIMOS operating system. Many of the ideas embodied in this package were later released with Revision 19 PRIMOS.

- Sole author, Georgia Tech Sendmail Kit, 1982–1984. Widely-used package of additions and configuration tools for use with the standard BSD UNIX distribution of *sendmail*. Many of these modifications were later integrated into vendor releases, and into the IDA *sendmail* release.

- Lead author, Clouds I, 1986. An experimental, distributed multicomputer operating system with support for passive objects and fault-tolerance.

- Contributing author, Mothra I, 1986. Prototype Fortran mutation system using AT&T *dmd*-style displays.

- Lead author and maintenance, Mothra II, 1986–1991. Experimental Fortran mutation system using the X Window System and integrated software tools.

- Lead author, Purdue X Speedups, 1988–1989. Set of modifications to X Window System Release 11.3, to speed up server process 25%–80%. Most of these ideas were later integrated into the Release 11.4 server from MIT.

- Director, Computer Oracle and Password System (COPS), 1989–1990. A very widely-used security verification tool for UNIX systems.

- Director, Spyder, 1988–1993. A window-based debugging tool for use on ANSI-C programs including dynamic slicing, backtracking, and a heuristic critic system.

- Designer and director of Tripwire: A Unix File Integrity Monitor, 1992. A security tool for monitoring unauthorized modifications (e.g., by viruses) and intrusions to UNIX systems.

- Director of IDIOT, (Intrusion Detection In Our Time), 1995. A software tool for monitoring intrusive activity on UNIX systems.

- Director of AAFID & ESP, (Autonomous Agents for Intrusion Detection, Embedded Sensors for Protection), 1997-2003. Agent–based intrusion detection systems.

- Director of Poly$^2$, an enhanced architecture for secure servers, 2001--on.

## PROFESSIONAL ACTIVITIES

### As Editor

- Associate Editor, Computing Systems, 1992–1994.
- Academic Editor, Computers & Security, 1998–2009.
- Associate Editor, ACM Transactions on Computing Education, 2009–present.
- Editor-in-Chief, Computers & Security, Elsevier, 2010–present.

### As Editorial Board Member

- Charter Member, editorial board of Computing Systems,1987–1992.
- Charter member of software engineering editorial board, International Journal of Computer and Software Engineering, 1990–1996.
- Editorial board member, Virus Bulletin (England), 1991–1997.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 74 of 203
Case 3:12-mc-80135-SI Document 42-10 Filed 06/22/12 Page 22 of 46
Case 1:11-cv-05436-SGR Document 42-10 Filed 01/14/12 Page 21 of 45

- Charter member of advisory board, Journal of Information Systems Security, 1991–1998.
- Charter member of editorial board, VNR: Virus News and Reviews, 1992–1993.
- Charter member of  editorial board, Journal of Artificial Life, 1993–2002.
- Charter member of the editorial advisory board, Network Security, 1994–present.
- Charter member of advisory board, Network Security Observations, 1994–1996.
- Member of editorial board, Computers & Security, 1995–present.
- Member of editorial board, ACM Transactions on Information and System Security, 1999–2004.
- Member of editorial taskforce for *IEEE CS Security,* 2002.
- Charter member of the editorial board, International Journal of Information and Computer Security, 2004–present.
- Charter member of the editorial board, International Journal on Critical Infrastructure Protection (Elsevier), 2007–present.
- Member of editorial board of ACM Journal on Educational Resources in Computing (JERIC)/Transactions on Computing Education, 2007–2010.

**Guest editor**

- Special issue of <u>Computing Systems</u>, v. 3(1), Winter, 1990, Experiences with Distributed and Multiprocessor Systems.
- Special issue of <u>Computing Systems</u>, v. 4(3), Fall, 1991, Experiences with Distributed and Multiprocessor Systems II.

**Advisory/Supervisory Boards**

- Member, Advisory Board for the National Bulletin Board Project at the University of Wisconsin, Madison  (1988–1991).
- Member, Reference Group of the European Dependability Development Support Initiative (2001–2002).
- Member, National Advisory Board of the Research Center on Computing and Society, 1989–2000.
- Member, CERT (Computer Emergency Response Team) Advisory Board, 1994.
- Member, Software Engineering Institute (SEI) Trustworthy Systems Program Advisory Board, 1995–1996.
- Member, Department of Defense Open Networks Security Working Group (ONSWG), 1995–1996.
- Member, IBM Emergency Response Service Board of Technical Advisors, 1996–1998.
- Member, Sun User Group Board of Directors, 1996–1997.
- Member, Executive Board of 1997 National Colloquium for InfoSec Education.
- Member, Information Security Science and Technology Study Group of the InfoSec Research Council.  1997–1998.
- Member, CIC ICAMP Study Advisory Board, 1997–2000.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 75 of 203
Case3:12-mc-80135-SI Document42-10 Filed06/22/12 Page23 of 45
Case 1:11-cv-05436-JGK Document42-10 Filed 01/14/12 Page 22 of 45

- Member, Board of Directors of the Computing Research Association (CRA), 1998–2007.
- Member, Advisory Board to NSF CISE, 1998–2000.
- Member, U.S. Air Force Scientific Advisory Board, 1999–2003.
- USSPACECOMM Independent Science Advisory Group, 1999–2002.
- Augmentee to President's Committee of Advisors on Science and Technology (PCAST) for the Institute for Information Infrastructure Protection ($I^3P$), 2000.
- ACM Advisory Committee on Security and Privacy, 2001–2003.
- Member, Board of Advisors for the FBI Regional Cybercrime Forensic Laboratory Program, 2003–2005.
- U.S. GAO (General Accountability Office) Executive Council on Information Management and Technology, 2003–present.
- Member, Microsoft's Trustworthy Computing Academic Advisory Board, 2003–2005.
- Member, President's Information Technology Advisory Committee (PITAC), 2003–2005.
- Computer Incident Factor Analysis and Categorization Project Advisory Board, 2003–2006.
- Member, National Advisory Board of The Privacy Place, NCSU/GaTech, 2004–current.
- NSA IAD Advisory Group for the Global Information Grid, 2004–2005.
- Member of the NRC Panel on Survivability and Lethality Analysis, for the Army Research Laboratory Technical Assessment Board, ARLTAB), 2005.
- NSF CISE Assistant Director Screening Committee, 2006.
- Los Alamos National Laboratories CCN Division Review Committee, 2006–2010.
- Member, ACM Education Council, 2006–present.
- Member, External IT Research Review Panel for MITRE Board of Directors, 2006.
- Advisor/consultant to Air Force Scientific Advisory Board; *Implications of Cyber Warfare*; 2007.
- Advisor/consultant to Air Force Scientific Advisory Board; *Defending and Operating in a Contested Cyber Domain*; 2008.
- US Air Force Cyber Advisory Council, 2008.
- US Air Force University Board of Visitors, 2009-present.
- AAAS Consortium of Affiliates for Security Policy (CASP) member, representing CRA, 2010–present.
- US Naval Academy Center for Cyber Security Studies Advisory Board, 2011–present.

**Committee Chair**

- ACM Self-Assessment Committee, 1990–1996.
- ACM Awards Committee for the International Science and Engineering Fair, 1992–1994.
- IFIP Technical Committee 11's Working Group 4, Network Security, 1993–1996.
- ACM US Public Policy Committee, 1998–present.
- ACM Advisory Committee on Security and Privacy, 2001–2003.

- NRC/CSTB Committee on Depicting IT in Innovation, 2009–2010.

**Committee/taskforce member**

- ACM/IEEE-CS Joint Taskforce on Undergraduate Curricula, 1988–1991.
- ACM Educational Activities Board, 1990–1991.
- ACM Awards Committee for the International Science and Engineering Fair, 1990–1993.
- FIRST (Forum of Incident Response and Security Teams) Steering Committee, 1992–1994.
- ACM SIG Technical Standards Committee charter member, 1992–1996.
- ACM Awards Committee, 1992–1994.
- IFIP Technical Committee 11 for Security Protection in Information Processing Systems, 1993–present.
- IFIP Technical Committee 11's Working Group 8, Information Security Education and Training, 1993–1997.
- ACM U.S. Public Policy Committee (USACM), 1996–present.
- Infosec Research Council Hard Problems List Committee, 2003–2004.
- IFIP Technical Committee 11's Working Group 9, Digital Forensics, 2006–present.
- Research Associate of the Software Engineering Ethics Research Institute (SEERI), 2006–present.
- Computing Research Association Governmental Affairs Committee, 2005–present.
- Member, AAAS Electorate Nominating Committee: Section Information, Computing and Communications, 2012–2014.

**Conference chair**

- Program Chair and General Co-chair, Usenix Workshop on Experiences Building Distributed and Multiprocessor Systems; (Ft. Lauderdale, FL, 5–6 Oct 1989). Cosponsored by Purdue/Florida SERC, in association with ACM SIGOPS, SIGCOMM and SIGSOFT, and with IEEE-CS TCDS, TCSE and TCOS.
- Program Chair and General Co-chair, Usenix Symposium on Experiences with Building Distributed and Multiprocessor Systems (SEDMS II); (Atlanta, GA, 21–22 Mar 1991). Cosponsored by Purdue/Florida SERC, in association with ACM SIGOPS, SIGCOMM And SIGSOFT, and with IEEE-CS TCDS, TCSE and TCOS.
- Program Chair and General Co-chair, Usenix Symposium on Experiences with Building Distributed and Multiprocessor Systems (SEDMS III); (Newport Beach, CA, 26–27 Mar 1992). Cosponsored by Purdue/Florida SERC, in association with ACM SIGOPS, SIGCOMM And SIGSOFT, and with IEEE-CS TCDS, TCSE and TCOS.
- Tutorial Chair and Program Co-chair, 5th FIRST Workshop on Computer Security Incident Response, St Louis, IL (Aug 1993).
- Student Paper Competition Chair, 3rd ACM/IEEE Conference on Computers, Freedom and Privacy, Chicago, IL (Mar 1994).
- Program Chair, IEEE Workshop on Security in Large-Scale Distributed Systems, conjoined with IEEE Symposium on Reliable Distributed Systems, W. Lafayette, IN (Oct 1998).

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 77 of 203
Case3:12-md-02135-SI Document42-10 Filed06/22/12 Page25 of 45
Case 1:11-cv-05436-JGK Document42-10 Filed 01/14/12 Page 24 of 45

- General Chair, Research Advances in Intrusion Detection (RAID) 99, W. Lafayette, IN (Sept 1999).
- General Chair, Symposium on Requirements Engineering for Information Security; Indianapolis, IN (Mar 5–6, 2001). In cooperation with NCSU, NIST, ACM SIGSAC, and ACM SIGSOFT.
- Chair, CRA Grand Challenges Conference on Information Security, fall 2003.
- Co-Chair, 3rd SREIS Symposium, in conjunction with the IEEE Conference on Requirements Engineering, Paris France, Sept. 2005.
- Co-chair, Workshop on Web Intelligence for Information Security (WIISe), Lyon, France, August 22, 2011.
- Honorary Conference Chair, ARES 2011, Vienna, Austria, Aug 22-Aug 26, 2011.

**Program committee member**

- ACM Computer Science Conference (ACM CSC), Feb 1988.
- Winter Usenix Conference, Jan 1989.
- IEEE-CS Special Workshop on Experimental Distributed Systems, Oct 1990.
- 4th DPMA Computer Virus Symposium, Mar 1991. Cosponsored by ACM SIGACT and IEEE-CS.
- 1st National Conference on Computing and Values, sponsored by the Research Center on Computers and Society, Aug 1991.
- 4th ACM Testing, Analysis, and Verification (TAV) Conference, Oct 1991.
- 2nd ACM/IEEE-CS International Symposium on Environments and Tools for ADA (SETA2), Jan 1992.
- 1st ACM Conference on Computer and Communications Security Fall 1993.
- ACM/IEEE-CS Computers, Freedom and Privacy 94 conference (CFP-94), Mar 1994.
- IEEE-CS Workshop on Services in Distributed and Networked Environments (SDNE), Jun 1994.
- Computer Misuses and Anomaly Detection Gurus Workshop, Jan 1995.
- Usenix Symposium on Computer Security, June 1995.
- 2nd IEEE-CS Workshop on Services in Distributed and Networked Environments (SDNE), June 1995.
- 7th FIRST Conference and Workshop on Computer Incident Handling, 1995.
- 16th IEEE International Conference on Distributed Computing Systems (ICDCS-16), May 1996.
- 8th FIRST Conference and Workshop on Computer Incident Handling, 1996.
- The Advances in Parallel and Distributed Systems Conference, Oct 1996.
- 3rd International Conference on Reliability, Quality and Safety of Software-Intensive Systems (ENCRESS '97), Sept 1997.
- Third Working Conference on Communications and Multimedia Security, 1997.
- Sam Nunn/NationsBank Policy Forum, April 1998.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 78 of 203
Case 3:12-mc-80135-SI Document 42-10 Filed 06/22/12 Page 26 of 46
Case 1:11-cv-05436-JGK Document 42-10 Filed 01/14/12 Page 25 of 45

- European Symposium on Research in Computer Security 1998 (ESORICS 98), Sept 1998.
- Workshop on Recent Advances in Intrusion Detection (RAID 1998), Sept 1998.
- 1998 Information Survivability Workshop (ISW '98), Oct 1998.
- 1999 ACM Conference on Computer and Communications Security, Nov 1999.
- ACM Workshop on Scientific Aspects of Cyber Terrorism, Nov 2002.
- First IEEE International Information Assurance Workshop, Mar 2003.
- 18th IFIP International Informational Security Conference (SEC-2003), May 2003.
- Second IEEE International Information Assurance Workshop, Mar 2004.
- First International Conference on Intelligence Analysis Methods and Tools, May 2005.
- Third IEEE International Information Assurance Workshop, Mar 2005.
- 2005 NSF Cybersecurity Summit Workshop, San Diego, Dec. 2005.
- ICSE 06 Emerging Results Track, May 2006.
- ACM SAC 2006, Computing Ethics and Human Values Track; Dijon France, April 2006.
- 2nd International Conference on Global E-Security; London, England; April 2006.
- Workshop on Research Directions for Security and Networking in Critical Real-Time and Embedded Systems; San Jose, CA; April 2006.
- The International Conference on Network Security; Reston, VA; April 2006.
- 10th National Colloquium on Information Systems Security Education; Adelphi, MD; June 2006.
- International Conference on Security of Information and Networks; Gazimagusa, Cyprus; May 2007
- 7th Digital Forensics Research Workshop (7-DFRWS); Pittsburgh, PA; August 2007.
- Steering committee for SREIS 2008; Barcelona, Spain; March 2008.
- 2nd Interdisciplinary Studies in Information Privacy and Security, 2008; New Brunswick, NY; May 2008.
- 8th Digital Forensics Research Workshop (8-DFRWS); Baltimore, MD; August 2008.
- 9th DFRWS Conference; Montreal, Canada; August 2009.
- First International Workshop on Requirements Engineering and Law (RELAW); September 2008; Barcelona, Spain
- 2nd ACM International Conference on Security of Information and Networks (SIN 2009); Oct 2009; Famagusta, Cyprus.
- 2nd International ICST Conference on Digital Forensics & Cyber Crime (ICDF2C); Oct 2010; Abu Dhabi.
- 2011 Workshop on Grid and Cloud Security (IEEE WGC-Sec); May 2011; Anchorage, AK
- 2011 Conference on Digital Forensics and Computer Crime (ICDF2C 2011); October 2011; Dublin, Ireland.

**Standards activities**

- Balloting member, IEEE Draft Standard for Information Technology – Portable Operating System Interface (POSIX) – Security Interface, P1003.6; 1991–1993.
- Charter member, ACM Technical Standards Committee; 1992–1996.
- Balloting member, IEEE Draft Standard for Recommended Practice for Internet practices — Web Page Engineering — Intranet/Extranet Applications, P2001; 1998.
- Balloting member, IEEE Draft Software Engineering Code of Ethics and Professional Practice 1998.
- Expert committee, ISC² Common Body of Knowledge Editing Committee, 2007–present.

**Miscellaneous activities**

- Maintainer and publisher of Usenet on-line documentation and control postings (1981–1993).
- Founding Member, Atlanta Unix User's Group (1985).
- Member, Select Advisory Panel on Software Engineering Education in Ethics, at the Software Engineering Institute, Pittsburgh PA, Jun 1989.
- Advisor to U.S. Attorney's office, FBI, Secret Service, Australian Federal Police, NY State Police, and Columbus (Ohio) Police Computer Crime Unit, (on-going).
- Consultant to U.S. Department of Defense, including the National Security Agency (on-going).
- Consultant to the U. S. Justice Department (on-going).
- Testimony before U. S. House of Representatives, Committee on Science, 11 Feb 1997.
- Brief to Congressional staff on IT issues, March 1999.
- Testimony before U. S. House of Representatives, Committee on Science, 10 Oct 2001.
- Testimony before U. S. House of Representatives, Armed Services Committee Subcommittee on Terrorism, Unconventional Threats and Capabilities, 24 July 2003.
- Testimony before U. S. House of Representatives, Government Reform Committee Subcommittee on Technology, Information Policy, Intergovernmental Relations and the Census, 17 Sep 2003.
- Celebrity judge for "2004 Women of Influence Awards" presented by the Executive Women's Forum and CSO Magazine.
- Testimony before U. S. House of Representatives, Armed Services Committee, 27 Oct 2005.
- TRUST STC Distinguished External Advisory Board Member, 2006–current.
- Reviewer of NRC reports on cyber security and privacy; 2006-2008.
- Testimony before U. S. House of Representatives, Committee on Veterans' Affairs, 22 Jun 2006.
- IEEE Computer Society Taylor Booth Award Committee, 2007.
- Testimony before U.S DHS Data Privacy and Integrity Advisory Committee, El Paso, 12 Mar 2008.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 80 of 203
Case 3:12-mc-80135-SI Document 21-10 Filed 06/22/12 Page 29 of 46
Case 1:11-cv-05436-JGK Document 42-10 Filed 01/14/12 Page 27 of 45

- Testimony before U. S. House of Representatives, Ways and Means Committee, May 6, 2008.
- Testimony before U.S. Senate Committee on Commerce, Science, and Transportation, March 19, 2009.
- Member, ISSA International Awards Committee, 2010–2011.
- Member IEEE Education Awards Committee 2010–2012.
- Member ACM SIGSAC Awards Committee 2011.
- Member CRA Distinguished Service Awards Committee 2011.

## SELECTED PRESENTATIONS

### Keynote Addresses
- Viruses, Worms, and Things That Go "Bump" in the Net at 3rd Annual DPMA Virus Conference; New York, NY; Mar 1990.
- Programmed Threats and a Practical View of Computer Security at National Institutes of Health Computer Security Awareness Seminar; Bethesda, MD; Mar 1990.
- Unix and Security at Austrian Unix Users Group annual conference; Vienna, Austria; Oct 1991.
- Big Brother May Not Be Watching But He Wants to Listen at 23rd Virginia Computer Users Conference; Virginia Tech, Blacksburg, VA; Oct 1993.
- The Human Role in Computing at Science Scholars Day; SUNY Brockport, Brockport NY; Apr 1994.
- Above All, Do No Harm: The Changing Role of Security Incident Response at 5th FIRST Workshop on Incident Response; Boston, MA; June 1994.
- Balancing Rights With Responsibilities in the On-Line Community at Case Western Reserve University Campus Ethics Day Keynote Lecture; Cleveland, OH; Feb 1995.
- The Future of Crime and Security on the Internet at INFOSEC Network Security Conference; London, UK; May 1996.
- How to Tell If Management is Serious About Security at 20th DOE Infosec Security Conference; St. Petersburg, FL; April 1998.
- The Future of Information Security at COMPSEC 1998; London, UK; Nov 1998.
- The Importance of Information Security at Computer Security Day Conference; Mexico City, MX; December 1997.
- Why Was Y2K a Bust? at the Network and Distributed Systems Security Conference; San Diego, CA; Feb 2000.
- Why Open Source Software Only Seems More Secure at the Danish Open Systems Conference; Copenhagen, Denmark; March 2000.
- Why Security Requires Quality Assurance at Quality Week 2000; San Francisco, CA; June 2000.
- *A Small Dose of Infosec* at Supercomputing 2000; Dallas, TX; Nov 2000.

- Convener for The Internet and State Security Forum, Cambridge Review of International Affairs, Cambridge University, May 2001.
- *The Future of Information Security*, IEEE Workshop on Reliability, US Military Academy, West Point, NY, June 2001.
- *The State of Forensics* at the First Workshop on Computer Forensics, Rome, NY, August 2001.
- *The Hidden Meta-Requirements of Security and Privacy,* 5th IEEE International Symposium on Requirements Engineering (RE'01), Toronto, ON, Aug 2001.
- *Thinking Strategically About Information Systems Defense*; AUSCERT 2002; Gold Coast, Australia; May 2002.
- *The State of Information Security*, CSI 29th Annual Computer Security Conference, Chicago IL, Nov 2002.
- *Relating Information Security and Software Engineering*, International Conference on Software Engineering (ICSE), Portland OR, May 2003.
- *Assigning Blame for Poor Computer Security*, Fifth Annual Conference on Computer Ethics-Philosophical Enquiry (CEPE 2003), Boston, MA, June 2003.
- *The Internet Worm: 15 Years Later*; Classic Paper Presentation; 19th Annual Computer Security Applications Conference; Las Vegas, NV; Dec. 2003.
- *What Is Information Security?*; ACM SIGCSE Annual Conference; Norfolk, VA; Mar 2004.
- *Grand Challenges in Information Security*; AUSCERT 2004; Gold Coast, Australia; May 2004.
- *Thoughts on CNA*; (classified) internal conference, National Security Agency; Ft. Meade, MD; Jan 2006.
- *Research in Challenges in Digital Forensics*; IFIP WG 11.9 Annual Conference; Orlando FL; Jan 2006.
- *Challenges and Opportunities in Digital Forensics*; Innovations in Digital Forensic Practice Conference; March 2006.
- *Information Security: Insanity Rules*; AUSCERT 2006; Gold Coast, Australia; May 2006.
- *The "Big Picture" of Cyber Security*; NCISE 2006; College Park, MD; June 2006.
- *Security on the Horizon*, Motorola Security Conference, Itasca IL, Sept. 2006.
- *Information Security: Insanity Rules*, IEEE MetroCon, Fort Worth, TX, Oct. 2006.
- *Current Challenges in Information Security*, Norwich University Infosec Commencement Conference, Northfield VT, June 2008.
- *Information Security: Some Past Successes, Some Future Challenges*, Innaugural Founder's Day Symposium Keynote, University of Texas San Antonio Institute for Cyber Security, San Antonio, TX, Nov 2008.
- *Questioning What You Think You Know,* TRUST 2009 Conference, Oxford England, Mar. 2009.
- *Thinking Outside the Box*, Twelfth SDPS Transdisciplinary Conference - Workshop on Integrated Systems, Design & Process Science, Montgomery AL, Oct 2009.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 82 of 203
Case 3:12-mc-80135-SI Document 42-10 Filed 06/22/12 Page 39 of 45
Case 1:11-cv-05436-JGK Document 42-10 Filed 01/14/12 Page 29 of 45

- *Buzzwords: New Doesn't Always Mean Better*, Indiana Bankers Association, Rising Sun, IN, Oct 2009.
- *Thinking outside the Box*, ARES 2010 Conference, Krakow Poland, Feb 2010.
- *Soup to Nuts; CSIT Symposium;* Mountain View, CA; July 12, 2010.
- *International Cybercrime Challenges*; 2nd International ICST Conference on Digital Forensics & Cyber Crime (ICDF2C); Abu Dhabi, Oct. 2010. (Was unable to attend)
- *The Nature of Cyber Security*; Worldcomp'11; Las Vegas, NV; July 18, 2011.
- *Meaningful Cyber Security Research*; ARES 2011 Conference; Vienna Austria; August 2011.

**Distinguished Lecture Series**

- *Programmed Threats to Computer Security* at NASA Advances in Computational Science seminar series; Greenbelt, MD; Jan 1990.
- *Ethics, Viruses, and Computer "Vandalware"* at Rose-Hulman/ GTE Foundation lecture series on Computers and Ethics; Terre Haute, IN; Oct 1990.
- *Scenarios in Computer Ethics* at Rose-Hulman/ GTE Foundation lecture series on Integrating Ethics into Technical Education; Terre Haute, IN; March 1993.
- *What's So New About Cyberspace?* at University of Idaho/ GTE Foundation lecture series on Crime and Ethics in Computing; Moscow, ID; April 1993.
- *Surviving the Internet, by Analogy* at Bellcore General Colloquium Series; Morristown, NJ; October 1995.
- *Internet: Threat or Menace? Some Observations on Crime on the Internet* at University of Florida Barr Systems Distinguished Lecture Series; Gainesville, FL; November 1995.
- *Information Security: Far More than Computer Security* at HP/Royal Holloway Security Distinguished Lecture Series; Egham, UK; December 1999.
- *Musings on Disclosure and Vulnerabilities* as the Distinguished Lecture at the Applied Computer Security Conference (ACSAC); New Orleans; Dec 2000.
- *The Future of Information Security*, Troy State Distinguished IT Lecture Series, Montgomery, AL, March 2001.
- *The Challenge of Secure Software,* GTISC (Georgia Tech Information Security Center) Distinguished Lecture Series, Atlanta, GA, October 2001.
- *Why is Information Security Difficult?*, LLNL Lab Director's Lecture Series, Livermore, CA, May 2001.
- *The Challenge of Producing Secure Software*, NSF CISE Distinguished Lecture Series, Arlington, VA, December 2001.
- *Looking to the Future of Information Assurance,* NASA Information Science and Technology Colloquium, NASA Goddard SFC, MD, April 2002.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, University of Delaware CS Distinguished Lecture Series, October 2002.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, University of Pittsburgh, CS 30th Anniversary Distinguished Lecture Series, November 2002.

- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, Colorado State University ISTEC Distinguished Lecture Series, November 2002.
- *Challenging Conventional Wisdom*, Colorado State University BMAC Distinguished Lecture Series, November 2002.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, Air Force Institute of Technology, Dayton OH, January 2003.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, Indiana Chief Security Officer's Summit, Fishers IN, January 2003.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, Silicon Flatirons Telecommunications Program, University of Colorado, January 2003.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, University of Chicago Distinguished Lecture Series, January 2003.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, Louisiana State University CS Distinguished Lecture Series, March 2003.
- *Myths, Fads, and False Economies: How NOT to Get Secure Systems*, Dartmouth College Jones Seminar Series, May 2003.
- *The Role of Academia in Cyber Security*; Texas A&M University; University Fall Colloquium; Commerce, TX; Sept 2004.
- *Grand Challenges in Information Security*; St. Michael's College; Centennial Address; Nov 2004.
- *Grand Challenges in Information Security*; Los Alamos National Laboratories; Director's Colloquium; Nov 2004.
- *Information Security: Past, Present and Future*; Southern Methodist University; Distinguished Lecture Series; Nov 2004.
- *Information Security: Past, Present and Future*; University of Texas, Dallas; Distinguished Lecture Series; Feb 2005.
- *Information Security: Past, Present and Future*; Eastern Tennessee State University; Distinguished Lecture Series; Feb 2005.
- *The Cyber Security Crisis*; NTNU Distinguished Lecture Series, Trondheim, Norway; Oct. 2005.
- *The Cyber Security Crisis*, SUNY Buffalo Distinguished Lecture Series, Apr 2006.
- *The Cyber Security Crisis*, Tufts University Distinguished Lecture Series, Apr 2006.
- *The Cyber Security Crisis*, Fermilab Distinguished Lecture Series, May 2006.
- *Cyber Security: A Crisis of Prioritization*, Distinguished Seminar Series, Korean Information Security Agency, Seoul Korea, Sept 2006.
- *The Cyber Security Crisis,* Distinguished Visitor Lecture, National Security Research Institute, Daejeong, Korea, Sept 2006.
- *Trends in the Security Landscape,* DSRC Distinguished Lecture, KAIST, Korea, Sept 2006.
- *Challenges in Cyber Forensics*, University College Lecture Series, Dublin Ireland, Oct., 2006.

- *Cyber Security: Insanity Rules*, University of Delaware Distinguished Lecture Series, University of Delaware, Dec 2006.
- *Cyber Security: Insanity Rules*, Temple University Distinguished Lecture Series, Philadelphia Apr 2007.
- *The Value in Questioning What You Think You Know*; Indiana University Distinguished Lecture Series; Nov 2007.
- *The Value in Questioning What You Think You Know*; Kansas State University Distinguished Lecture Series; Dec 2007.
- *The Value in Questioning What You Think You Know*; Institute for Human-Machine Computation Distinguished Lecture Series; Jan 2008.
- *The Value in Questioning What You Think You Know*; Florida Institute of Technology Distinguished Lecture Series; Feb 2008.
- *Thinking Outside the Box*, Tufts University, Sep 2009.
- *Thinking Outside the Box*, Virginia Tech University, Oct 2009.

**Invited conference addresses**

- *Integrating Debugging and Testing* at NSIA/NASA/NIST/ASQC/SSQ/AIA/EIA Joint Conference on Software Defects; Alexandria VA; Mar 1989.
- *Anatomy of Worms and Viruses* at 2nd Annual DPMA Virus Workshop; New York NY; Mar 1989.
- *Worms, Viruses, and Computer Break-ins* at Computer Security Institute Spring Conference; Chicago, IL; May 1989.
- *Worms, Viruses, and Computer Break-ins* at SHARE IBM conference; Denver, CO; May 1989.
- *Worms, Viruses, and Computer Break-ins* at Ameritech Computer and Network Security Conference; Cleveland, OH; Jun 1989.
- *Computer Ethics* at American MENSA Annual Meeting; Atlanta, GA; Jul 1989.
- *The Internet Worm: Crisis and Aftermath* at SHARE European Association (SEAS) Anniversary Meeting; Amsterdam, Netherlands; Sep 1989.
- Anatomy of Computer Viruses at Second Conference on Artificial Life; Santa Fe, NM; Feb 1990.
- *The Internet Worm: How did it happen? Can it happen again?* at North American Data Security Symposium; Toronto, ON; Oct 1990.
- *Securing Unix* at Virus Bulletin International Conference on Security; Jersey, UK; Sep 1991.
- *Policies and Planning Can Prevent Security Incidents* at Fourth FIRST Workshop on Computer Security Incident Handling; Denver, CO; Aug 1992.
- *Trojans, Virus, Worms and Tools to Contain Them* at American Society for Industrial Security, Annual Conference; Baltimore, MD; May 1993.
- *The Pros and Cons of Disclosure* at USENIX Conference on Systems Administration and Network Security (SANS); Washington DC; May 1995.

- *Cops and Robbers on the Information Superhighway* at AFCEA Binannual Conference; San Antonio, TX; May 1996.
- *Network Intrusion Detection and Response* at INFOSEC Conference on Network Security; London, UK; May 1996.
- *A New View of Incident Response* at USENIX Conference on Systems Administration and Network Security (SANS); Washington DC; May 1996.
- *The Hacker Threat* at Department of Energy Information Systems Security Conference; Germantown, MD; October 1997.
- *Some Observations on Vulnerabilities* at CompSec 97; London, UK; November 1997.
- *The Computer Security Threat* at XWIT Workshop on Electronic Threats; San Francisco, CA; March 1998.
- *The Computer Security Threat* at Sam Nunn Forum; Atlanta, GA; April 1998.
- *The Nature of Information Security Education* at the NCISSE; James Madison University, VA; May 1998.
- *How to Tell if Management is Serious About Information Security* at COMPSEC 1998; London, UK; Nov 1998.
- *Network Risk Management Post-Y2K* at NETSEC 1999; Utrecht, Netherlands; Oct 1999.
- *Information Security Requires Assurance,* Quality Week 200, San Francisco, CA, Jun 2000.
- *A Small Dose of Infosec,* Supercomputing 2000, Dallas, TX, Nov 2000.
- *The State of Cybersecurity,* DoE WWW Conference, Los Alamos, NM, Feb 2001.
- *Open Source vs. Security,* Extreme Linux Conference, Santa Fe, NM, Feb 2001.
- *Summary Comments on Security,* Cambridge Review Internet and State Security Forum, Cambridge UK, May 2001.
- *Legal Challenges in the Cyber Future*, National Association of Attorneys General, Oxford, MS, Sep 2003.
- *What Comes Next in Cybersecurity Research?*, at the Cybersecurity Symposium, Colorado Springs, CO, Sep 2003.
- *The State of Information Security*, at the Los Alamos Computer Security Institute, Santa Fe, NM, Oct 2003.
- *Challenges in Cybercrime Investigation*, DoD Cybercrime Investigator's Conference, Las Vegas, NV, Dec 2003.
- *A Failure to Learn from the Past*, ACSAC 2003 Classic Paper, Las Vegas, NV, Dec 2003.
- *Why We Don't Have Secure Systems Yet*; Online ISSA IT Security E-Symposium; Nov. 2005.
- *Future Threats*; Executive Security Action Forum (RSA Conference); San Jose, CA; Feb 2006.
- *The Past and Future of Information Security*; AAAS Annual Conference; Feb 2006.
- *Putting IT All Together*, The Security Standard/Vortex Conference, Sept. 2006.
- *Cybersecurity Challenges*, ISSA & Georgetown Conference on Cybersecurity and the Law, Nov. 2006.

274

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 86 of 203
Case3:12-mc-80135-SI Document42-10 Filed06/22/12 Page33 of 45
Case 1:11-cv-05436-JGK Document 42-10 Filed 01/14/12 Page 33 of 45

- Panel on Emerging Threats in the Symposium on Emerging Trends in Information Security & the Law: "Plausible Deniability is Dead"; Georgetown Law School; Washington, DC; Nov. 2006.
- *Are we on track?*; luncheon address at the NSF Cyber Trust PI meeting; Atlanta, GA; Jan 2007.
- *Evoting Assurance*; National Academy of Engineering Symposium in Honor of Bill Wulf; Irvine CA; Feb 2007.
- *The Balance Between Security and Privacy*; 2nd Interdisciplinary Studies in Information Privacy and Security, 2008; New Brunswick, NY; May 2008.
- TBD; ARES 2011; Vienna, Austria; Aug 2011.

## THESIS STUDENTS

### Ph.D. Advisees

- Hiralal Agrawal; 1991; Towards Automatic Debugging of Computer Programs. (Co-advisor with R. A. DeMillo).
  – Currently with Telcordia Technologies.
- Hsin Pan; 1993; Debugging with Dynamic Instrumentation and Test-Based Information. (Co-advisor with R. A. DeMillo).
  – Currently with RFCyber Corporation.
- Steve J. Chapin; 1993; Scheduling Support for an Internetwork of Heterogeneous, Autonomous Processors.
  – Currently on the faculty at Syracuse University, NY.
- Chonchanok Viravan; 1994; Fault Investigation and Trial.
  – Currently with the Bank of Asia, Thailand.
- Sandeep Kumar; 1995; Classification and Detection of Computer Intrusions.
  – Currently with Google, India..
- Christoph Schuba; 1997; On the Modeling, Design, and Implementation of Firewall Technology.
  – Currently with Sun Microsystems Laboratories.
- Ivan Krsul; 1998; Classification and Analysis of Computer Vulnerabilities.
  – Currently with Arte Xacta in La Paz, Bolivia.
- Diego Zamboni; 2001; Intrusion Detection Using Internal Sensors and Embedded Detectors.
  – Currently with IBM Research, Zurich.
- Wenliang Kevin Du; 2001; Privacy-Preserving Cooperative Computations.
  – Currently on the faculty at Syracuse University, NY.
- Thomas Daniels; 2002; Reference Models for the Concealment and Observation of Origin Identity in Store and Forward Networks.
  – Currently on the faculty at Iowa State University, IA.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 87 of 203
Case3:12-mc-80135-SI Document42-10 Filed06/22/12 Page35 of 46
Case 1:11-cv-05436-JGK Document42-10 Filed 01/14/12 Page 34 of 45

- Ben Kuperman; 2004; A Categorization of Computer Security Monitoring Systems and the Impact on the Design of Audit Sources.
  – Currently on the faculty at Oberlin College, OH.
- Florian Buchholz; 2005; Pervasive Binding of Labels to System Processes.
  – Currently on the faculty at James Madison University, VA.
- James Early; 2005; Behavioral Feature Extraction for Network Anomaly Detection.
  --Currently on the faculty of SUNY Oswego, NY.
- Paul D. Williams, 2005; CUPIDS: Increasing Information System Security Through the Use of Dedicated Coprocessing.
  --Currently receiving advanced officer training prior to being assigned a command.
- Brian Carrier; 2006; A Hypothesis-Based Approach to Digital Forensic Investigations.
  —Currently with Basis Technology, Cambridge MA.
- Rajeev Gopalakrishna; 2006; Improving Software Assurance Using Lightweight Static Analysis (co-advisor with J. Vitek).
  —Currently with Intel Corporation.
- Serdar Cabuk; 2006; Network Covert Channels: Design, Analysis, Detection, And Elimination; (co-advisor with C. Brodley; ECE).
  —Currently with HP Laboratories, Bristol, UK
- Maja Pusara , 2007; An Examination of User Behavior for User Re-authentication; (co-advisor with C. Brodley; ECE)
  — Currently with ABINITO, Boston MA.

**Ph.D. Committees**

- Shirley V. Browne; 1990; Quorum-Based Recovery in Replicated Database Systems.
- Shy-Renn Lian; 1990; On Increasing Reliability and Availability in Distributed Database Systems.
- Enrique Mafla; 1990; Experimental Studies in Distributed Transaction Processing.
- ByoungJu Choi; 1990; Software Testing Using High-Performance Computers.
- James Griffioen; 1991; A Virtual Memory Operating System for a Distributed Workstation Environment.
- Kenneth R. Rodemann; 1991; Route Adaption and Persistence in Networks.
- Abdelsalam Helal; 1991; Adaptability to Failures in Distributed Systems.
- Edward W. Krauser; 1991; Compiler-Integrated Software Testing.
- Wei Jen Yeh; 1993; Controlling State Explosion in Reachability Analysis.
- Lih-Chyun Shu; 1994; Concurrency Control and Scheduling for Hard Real-Time Systems.
- Paul C. Clark at George Washington University; 1994; BITS: A Smartcard Protected Operating System.
- Lt. Col. Christopher Feudo at George Washington University; 1994; Feasibility of Computer Viruses as an Electronic Warfare Tool.
- James B. Armstrong in Purdue EE; 1994; Selected Software Issues for Mapping Tasks onto Parallel Processing Systems.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 88 of 203
Case 3:12-mc-80135-SI Document 2-10 Filed 06/22/12 Page 36 of 46
Case 1:11-cv-05436-JGK Document 42-10 Filed 01/14/12 Page 35 of 45

- Xu Lu; 1995; Two-Dimensional Program Debugging.
- Abdelaziz Mounji at University of Namur, Belgium; 1997; Languages and Tools for Rule-Based Distributed Intrusion Detection.
- Steven A. Hofmeyr at the University of New Mexico; 1999; An Immunological Model of Distributed Detection and Its Application to Computer Security.
- Terran Lane; 2000 in Purdue ECE; Machine Learning Techniques for the Computer Security Domain of Anomaly Detection.
- Hoi Chang; 2003; Building Self-Protecting Software with Active and Passive Defenses.
- James Joshi at Purdue ECE; 2003; A Generalized Temporal Role-Based Access Control Model for Developing Secure Systems.
- Xuxian Jiang; 2006; Enabling Internet Worms and Malware Investigation and Defense Using Virtualization.
- Mahesh Tripunitara; 2006; A Theory Based on Security Analysis for Comparing the Expressive Power of Access Control Models.
- Bradley Schatz, Queensland Institute of Technology, Australia, 2007, as external examiner; Digital Evidence: Representation and Assurance.
- William Speirs; 2007; Dynamic Cryptographic Hash Functions.
- Abhilasha Bhargav Spantzel; 2007; Protocols and Systems for Privacy Preserving Protection of Digital Identity.
- Roman Chertov; 2008; A Device Independent Router Model: From Measurements to Simulations.
- Svein Yngvar Willassen, NTNU, Trondheim, Norway, 2008, (as external disputas committee member); Methods for Enhancement of Timestamp Evidence in Digital Investigations.
- Hyojeong Kim; 2008; Memory Balancing for Large-Scale Network Simulation in Power-Law Simulation.
- Lorraine G. Kisselburgh at Purdue COMM, 2008; The Social Structure and Construction of Privacy in Sociotechnical Realms.
- Travis D. Breaux; North Carolina State University, 2009; Frame-Based Requirements Analysis Method.
- Ryan Riley; 2009; Architectural Approaches for Code Injection Defense at the User and Kernal Levels.
- Ziqing Mao, 2009; Improving Real-World Access Control Systems by Indentifying the True Origins of a Request.
- Mummoorthy Murugesan, 2010; Privacy Through Deniable Search.
- Junghwan Rhee, 2011; Data-Centric Defenses to Kernal Malware Defense.
- Zhiqiang Lin, 2011; Reverse Engineering of Data Structures from Binary.
- Sundararaman Jeyaraman, 2011; Practical Automatic Determination of Causal Relationships in Software Execution Traces.
- Robert Winkworth, Purdue TECH; 2011 (expected).
- Amiya Kumar Maji, Purdue ECE, 2012 (expected).

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 89 of 203
Case 3:12-mc-80135-SI Document 21-10 Filed 06/22/12 Page 37 of 45
Case 1:11-cv-05436-JGK Document 42-10 Filed 01/14/12 Page 36 of 45

- Bhagyalaxmi Bethala, 2012 (expected); Scalable Containment of Zero-Day Worm Attacks.
- Jacques Thomas; 2012 (expected); Mandatory Access Control.

**MS Thesis Advisees**

- Christoph Schuba; 1993; Addressing Weaknesses in the Domain Name System Protocol.
- Ivan Krsul; 1994; Authorship Analysis: Identifying the Author of a Program.
- Taimur Aslam; 1995; A Taxonomy of Security Faults in Operating Systems.
- Katherine E. Price; 1997; Host-Based Misuse Detection and Conventional Operating Systems' Audit Data Collection.
- David L. Wilson; 2004; Risk Perception and Trusted Computer Systems: Is Open Source Software Really More Secure Than Proprietary Software?; (co-advisor with Josh Boyd).
- William A. Frauenhofer; 2004; Privacy and Technology Definition and Policy.
- Courtney A. Falk; 2005; The Ethics of Cryptography.

**MS Thesis Committees**

- Christoph Schäfers; 1989; Analysis of a Congestion Control and Avoidance Algorithm for a High-Speed Packet Switched Network.
- Steven J. Varnau; 1991; Requirements and Specifications for an Integrated Software Engineering Environment Kernel.
- Mark G. Reith at Air Force Institute of Technology; 2003; Searching System Call Information for Clues: The Effects of Intrusions on Processes.
- James Hinde; 2004; Trusted Computing: the Debate Over Making Cyberspace Safe For Commerce.
- Nipoon Malhotra; 2004; Robust Location Determination in Wireless Ad-Hoc Networks
- Matthew L. Meyers; 2005; Computer Forensics: Towards Creating a Certification Framework.
- Vinita N. Apte; 2006; Distributed Intrusion Detection for Voice-Over-IP Environments.

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 90 of 203
Case3:12-mc-80135-SI   Document21-10   Filed06/21/12   Page39 of 46
Case 1:11-cv-05436-JGK   Document 42-1   Filed 01/14/12   Page 37 of 45

# EXHIBIT B

Case: 12-17506, 12/26/2013, ID: 8917170, DktEntry: 26-4, Page 91 of 203
Case 3:12-mc-80135-SI Document 21-10 Filed 06/22/12 Page 39 of 45
Case 1:11-cv-05436-JGK Document 42-10 Filed 01/14/12 Page 38 of 45

# Implications of Netalyzr's DNS Measurements

Nicholas Weaver
ICSI

Christian Kreibich
ICSI

Boris Nechaev
HIIT & Aalto University

Vern Paxson
ICSI & UC Berkeley

*Abstract—Netalyzr* is a widely used network measurement and diagnosis tool. To date, it has collected 198,000 measurement sessions from 146,000 distinct IP addresses. One of the primary focus areas of *Netalyzr* is DNS behavior, including DNS resolver properties, common name lookups, NXDOMAIN wildcarding, lookup performance, and on-the-wire manipulations. Additional tests detect and categorize the behavior of any DNS proxies in the users' gateways or firewalls. In this paper we report on DNS-specific insights from *Netalyzr*'s growing dataset. We identify significant problems in the existing DNS infrastructure, including unreliability of IP-level fragmentation, several kinds of result wildcarding, surprisingly poor lookup performance, and deliberate in-path DNS message manipulations. As these observations affect implementers of the DNS protocol as well as developers using common DNS APIs, we offer recommendations on common pitfalls and highlight likely impediments to the deployment of upcoming DNS technologies.

## I. INTRODUCTION

The *ICSI Netalyzr* is a widely used network diagnosis and debugging tool, available at http://netalyzr.icsi.berkeley.edu. This publicly available service enables the user to obtain a detailed analysis of the operational envelope of their Internet connectivity, serving both as a source of information for the curious as well as an extensive troubleshooting diagnostic should users find anything amiss with their network experience. *Netalyzr* tests a wide array of properties of users' Internet access, from the network layer to applications. Its tests include IP address use and translation, IPv6 support, DNS resolver fidelity and security, TCP/UDP service reachability, proxying and firewalling, antivirus intervention, content-based download restrictions, content manipulation, HTTP caching prevalence and correctness, network and protocol-level latencies, and access-link buffering.

In this paper we report on DNS-specific findings from *Netalyzr*'s longitudinal dataset, including sessions recorded in the six months since we first published *Netalyzr*'s results [18] as well as results from tests we only implemented recently. We focus particularly on findings that affect implementers of DNS protocols, and on those that software authors using DNS should be aware of.

Our measurements lead to three main conclusions. First, we observe significant complications for the deployment of DNSSEC and other size-sensitive DNS features. These rely on message sizes large enough to require IP fragmentation (which works only suboptimally in practice) and, potentially, TCP failover (which thankfully works well). Second, we find recursive resolvers untrustworthy in practice, with frequent NXDOMAIN wildcarding, limited cases of Internet Service Providers (ISPs) using DNS to redirect web search traffic



Fig. 1. *Netalyzr*'s conceptual architecture. ❶ The user visits the *Netalyzr* website. ❷ When starting the test, the front-end redirects the session to a randomly selected back-end node. ❸ The browser downloads and executes the applet. ❹ The applet conducts test connections to various *Netalyzr* servers on the back-end, as well as DNS requests that are eventually received by the main *Netalyzr* DNS server on the front-end. ❺ We store the test results and raw network traffic for later analysis. ❻ *Netalyzr* presents a summary of the test results to the user.

to their own proxies, and malicious resolvers that inject advertisements or block system updates. Third, we note that buggy or restrictive DNS proxy implementations are common in today's home-network gateways, imposed upon users as part of a gateway's DHCP service. We find such DNS proxies frequently refuse to process AAAA, EDNS0, TXT, and non-standard resource records (RRs).

We next briefly review *Netalyzr*'s architecture before discussing our findings and their implications in more detail.

## II. SYSTEM DESIGN & IMPLEMENTATION

When designing *Netalyzr* we had to strike a balance between a tool with sufficient flexibility to conduct a wide range of measurements and tests, and a simple interface that non-technical users would find usable. To this end, we decided to base our approach on a Java applet ($\approx$ 5,000 lines of code) to drive the bulk of the test communication with custom servers ($\approx$ 12,000 lines of code), since (i) Java applets run automatically within most major web browsers, (ii) applets can engage in raw TCP and UDP flows to arbitrary ports (though not with altered IP headers), (iii) if the user approves trusting the applet, it can contact hosts outside the same-origin policy, (iv) Java applets come with intrinsic security guarantees for users (e.g., no host-level file system access allowed by default runtime policies), (v) Java's fine-grained permissions model

allows us to adapt gracefully if a user declines to fully trust our applet, and (*vi*) no alternative technology matches this level of functionality, security, and convenience.

Figure 1 shows the *Netalyzr* architecture. For more details, we refer the reader to our prior work [18], and here only reiterate the setup's conceptual separation into front- and backends. For our DNS-related tests, we operate DNS servers running identical code ($\approx 2,800$ lines) on both. We developed a custom implementation because our server deliberately strays from the DNS standards, including replying to corrupted requests, manipulating glue, and keeping state across queries. This implementation also facilitates extensive logging. The Java applet uses a combination of the runtime's DNS API and direct UDP requests for which we craft the DNS PDUs ourselves, particularly for our recent DNS test additions.

The applet can run either in *trusted* or *untrusted* mode. Depending on the browser, the Java applet runtime presents a message to the user at applet startup that asks whether the user trusts the applet, showing the applet's signature as an indication as to the origin of the code. If the user confirms trust, the applet is allowed to conduct a more extensive set of tests. Details depend on the runtime's configuration. However, we can identify the extent to which we are allowed to engage in network I/O by catching Java's security exceptions.

The DNS tests are generally driven by client-side requests; these come in the form of queries containing test directives as part of the name that the applet looks up, such as *testname* . *nonce* .netalyzr.icsi.berkeley.edu. When mentioning test names, we will generally only show the relevant part of the queried name. For tests with Boolean outcomes, we return the IP address of the applet's origin server to encode "true," and another address for "false." For example, a name starting with has_edns triggers a scan of the request message for EDNS support, returning "true" or "false" as appropriate. Note that this Boolean approach works within the confines of Java's default same-origin policy, so we can employ it even when the applet runs untrusted. In this mode, Java only allows the applet to contact the IP address of the server that provided the applet, but the applet can still attempt to look up arbitrary names. The runtime enforces restrictions on the DNS responses: if the response contains the IP address of the applet's origin server, the response is delivered; otherwise, Java generates a security exception. On the client, receipt of the origin server's IP address thus signals "true," while a security exception indicates "false." In trusted mode, we can also perform tests that encode numeric values in the returned A records.

We note that our measurements have some skew regarding who decided to run *Netalyzr*, with a bias towards more technologically-aware users. In particular, we observe a large number of OpenDNS and Comcast users, mainly because a major technology news site featured *Netalyzr* in context of coverage of Comcast's DNS policy. Our data collection is generally prone to such "flash crowds," resulting from exposure the tool receives on technical blogs and news sites. Another skew comes from *Netalyzr*'s adoption as a debugging

tool by the on-line game League of Legends, which has resulted in 14,700 sesions to date.

## III. IN-GATEWAY DNS PROXIES

The user's NAT or gateway device plays a key role with respect to the correct functioning of the DNS path. Home gateways often provide DHCP leases that configure the gateway's own IP address as the LAN's DNS recursive resolver. Doing so allows the gateway to support a functioning LAN independently of the global DHCP lease (which also includes DNS configuration) that the gateway acquires from the ISP. It also enables the user to access the gateway's administrative interface via custom DNS (such as www.routerlogin.net for Netgear devices, or gateway.2wire.net for 2Wire systems).

**DNS proxy detection.** *Netalyzr* does not try to determine the gateway's IP address via intrusive scanning, so we cannot definitively check whether a system is configured to use a DNS proxy. However, we can detect the existence of a potential DNS proxy by sending requests to common gateway addresses directly and seeing whether they elicit a response. If *Netalyzr* detects that the client is behind a NAT, it probes a set of typical gateway IP addresses. Initially, we only tried the .1 address within the local subnet (e.g., given local IP address 192.168.1.24, *Netalyzr* probed 192.168.1.1). More recently, it came to our attention that 2Wire and some other devices instead use .254, which we then added to the test. The 73% of sessions behind a NAT in which we identify an in-gateway DNS proxy thus reflect a lower bound. Since 88% of sessions are behind NATs, the behavior of these DNS proxies is crucial, as these are the DNS "resolvers" seen by a large fraction of Internet users.[1]

**Proxy behavior.** We recently broadened our DNS tests to determine how these gateways behave, including whether they can correctly process: (*i*) AAAA lookups (96% of sessions),[2] (*ii*) TXT records (92% of sessions), (*iii*) unknown RRs (RTYPE 1169) per RFC 3597 [13] (91% of sessions), and (*iv*) EDNS0 requests (91%).

**External DNS functionality.** To our surprise, a significant number of NATs have *externally* usable DNS proxies, as evidenced by 5.3% of the clients' global IP addresses. Not only do these proxies provide access to the ISP's DNS resolution path to unintended third parties, these proxies can be used to launch reflector attacks [22], where the attacker uses small spoofed query to generate large responses launched at the target. As a 100B DNS request can elicit a 4000B (enabled by EDNS0) reply, attackers can obtain 40-fold message size amplification for spoofed-source reflectors. Even without DNS, DNS replies of 512B can provide 5-fold amplification. Arbor Networks

---

[1] Unfortunately, we did not check whether the end user's system is configured to use the gateway's proxy, or if the gateway's DHCP server will instead return the IP address of the recursive DNS resolver it receives from its own DHCP lease [11].

[2] Silent failures in this manner can prove problematic for some Linux systems that perform A and AAAA lookups in parallel, and require that both lookups complete or time out before returning a record from gethostbyname(), even when the system lacks routable IPv6 connectivity.

reports that many of the largest DDoS attacks include DNS reflectors [3].

**Other aberrations.** We have also noticed specific aberrations with subtle effects. When debugging one of our home networks, we observed that a 2Wire gateway would prepend `gateway.2wire.net` to the DNS search path, but responded to `*.gateway.2wire.net` with SERVFAIL rather than NXDOMAIN errors. Our browser repeatedly retried these lookups before moving on to the next element of the search path, which stalled web searches conducted by typing a word into the location bar by up to 30 sec.

Finally, we have seen a small number of cases where NATs (likely D-Link products [4]) confuse AAAA and A records. When the user's system queries for both A and AAAA records for a name and the AAAA record exists but the A record does not (e.g., because the name reflects an IPv6-only site), the A record request instead returns the first 4 bytes of the AAAA record. This behavior can also manifest if the reply for the A record request is simply unduly delayed.

### IV. FRAGMENTATION, PATH MTU, AND FILTERING

DNS primarily relies on UDP for transmission. With the EDNS0 [24] extension mechanism for DNS, replies may exceed the common 1500B Ethernet MTU, requiring the underlying IP fragmentation mechanism to work correctly in order for DNS PDUs to survive the transfer. Therefore, *Netalyzr* tests the client's MTU on the path to our server. The MTU test consists of two parts: fragmentation and path MTU discovery.

**Fragmentation.** We test fragmentation by attempting to send 2000B UDP datagrams from the client (for the client → server path) and the server (server → client path). Such datagrams are naturally fragmented, as their size exceeds the 1500B Ethernet MTU. If the reassembled original datagram does not arrive as expected, the system cannot handle fragmented IP traffic correctly. Unfortunately this is quite common: 8% of the sessions cannot send fragmented UDP, and, more importantly for DNS, 9% cannot receive fragmented UDP.

Fortunately, TCP remains an option for most of these clients. While 5% of the systems cannot contact a DNS server over TCP, only 0.16% of the sessions both fail to receive IP fragments and lack the ability to contact DNS servers using TCP. DNS's TCP failover, coupled with strategies for detecting and mitigating fragmentation failures, should therefore work fairly well in practice.

**Path MTU.** As expected, the path MTUs are commonly, but not exclusively, that of Ethernet. We discover the precise path MTU only in the server → client direction, as the required IP "Don't Fragment" (DF) bit is not accessible via the Java API. 78% of our sessions report the full Ethernet MTU of 1500B, while 16% show the PPP-over-Ethernet [20] MTU of 1492B. Only 2% indicate an MTU of less than 1450B.

Sessions with an MTU less than Ethernet's do not reliably trigger ICMP Destination Unreachable messages with code "Too Big:" only 60% of such sessions included these. Systems

that employ path MTU discovery via UDP by default (such as recent Linux versions) can in such situations frustrate the developer, as the combination of unintended IP DF bits and the failure of the ICMP mechanism conspire to create MTU "black holes" or spurious application-level exceptions.[3]

**Filtering.** We have also encountered numerous firewalls and gateways that filter, block, or modify DNS over UDP. We detect these by performing both correctly and incorrectly formatted DNS queries to our server. Content-aware devices may block incorrectly formatted queries, while leaving proper queries unaffected.

99% of clients were able to access our DNS server over UDP with legitimate queries. Sometimes this ability is controlled by the gateway: 1.4% of sessions showed evidence of DNS traffic being proxied or modified by the network. Thus the request never actually was sent out over the network to the intended recipient server, but was instead redirected to a recursive resolver which processed the request.

10% of clients could access our DNS server directly with correct requests but not when using ill-formed requests, suggesting that a firewall or gateway enforced DNS semantics on requests. This includes cases where a mandatory DNS proxy blocked the invalid request, as well as those behind firewalls which only block ill-formed requests.

For the results reported in [18], *Netalyzr* included tests to detect whether direct EDNS requests to our server are allowed. We subsequently added tests to check for filtering of AAAA records, TXT records, and requests for unknown RRs. 98.3% of sessions succeeded at fetching AAAA records, 98.3% for TXT records, 98.5% for retrieving records using EDNS0, and 95.8% for 1400B records using EDNS0. To test for retrieval of unknown RRs, we arbitrarily used RTYPE 169, finding 97.2% of sessions could successfully retrieve these.

Recent DNS proposals suggest encoding data of various novel types into TXT records. For example, the Sender Policy Framework [25] recommends that SPF-enabled domains should provide both a record of RTYPE 99 and an equivalent TXT record textually encoding equivalent information. We find little benefit in this redundancy, since the capability to receive TXT records highly correlates with being able to receive arbitrary RTYPE RRs: only 1.2% of sessions could only retrieve one of the two types.

### V. RECURSIVE RESOLVER PROPERTIES

*Netalyzr* includes extensive tests of the recursive resolver. Because of limitations the Java runtime imposes on applets, we were unable to obtain the IP address of the recursive resolver configured on the client directly. We thus conduct our tests of the recursive resolver *indirectly*, by querying regular names

---

[3]If the ICMP "Too Big" message is not received, the application naturally has no immediate way of knowing that delivery failed; if it is received, related exceptions may be unexpected by the application developer because there was no reason to assume sensitivity to message sizes.

using getbyname() and related API calls that return A or AAAA records.[4]

**EDNS MTUs.** The path problems observed for clients also apply to many recursive resolvers. When we detect that the resolver uses EDNS0 (55% of sessions), *Netalyzr* captures the EDNS0 MTU using a name lookup that encodes the advertised MTU in the lower 16 bits of the response A record. *Netalyzr* then verifies that the resolver indeed supports this claimed MTU.

We initially used three names whose lookups triggered responses padded to $\approx$ 300B, 1350B, and 1800B, respectively, using unrelated CNAME records in the Additional field. Since these records are almost always stripped by the recursive resolver when returned to the client, these lookups serve to test whether the resolver indeed supports its advertised MTU.

Of those sessions in which the resolver claimed the ability to receive an 1800B response, only 87% could actually process the large reply, while 98.5% could process the medium sized reply. This finding suggests that a common failure mode for these queries arises from networks that cannot handle fragmentation.

Accordingly, we recommend that resolvers both detect this condition and fail over to using a smaller (1400B) EDNS0 MTU when it occurs. BIND [15] has supported a slightly different failover strategy since version 9.5: when a request times out, BIND will retry with an EDNS0 MTU of 512B and, if successful, use the smaller MTU for communication with the server. We believe that first a 1400B MTU failover should be used and, if several servers all fail with a larger MTU but succeed with a 1400B MTU, the resolver should assume that the problem lies in a local firewall rather than with the remote servers and adjust its MTU accordingly.

**TCP failover.** We recently added a TCP failover test to *Netalyzr*. The name truncate always returns a result with the DNS truncation bit (TC) set when using UDP, but a normal (different) result via TCP. Queries for this name can determine whether the resolver properly fails over to TCP. Only 2% of the sessions that included this test failed. 0.35% of the sessions exhibited resolvers that ignored the truncation bit, instead returning the value from the UDP datagram. 0.51% of sessions showed both an inability of the recursive resolver to handle large EDNS0 responses while advertising a large MTU, and a failure to respond to truncation requests. These results suggest that TCP failover can effectively compensate for UDP fragmentation problems.

**Port randomization.** We find DNS port randomization widespread but not universal. We released *Netalyzr* one year after cache poisoning attacks received widespread press coverage [6]. We observe that 4% of sessions still do not evince DNS source port randomization by the recursive resolver. Most of these sessions reflect home networks running a local resolver on the NAT or end-system; in 24% of these non-

randomized sessions we find the global IP address for general traffic matches the address that issues DNS requests to our server, compared to 3% of the sessions where the identified recursive resolver does not match the end-system's global IP address. Thus, although lack of randomization remains an issue for some users, most ISPs and institutions have fixed this problem.

**Lookup latencies.** We measure name lookup latency for uncached names for each *Netalyzr* execution, and cached-name latency whenever the recursive resolver accepts glue records. We find the generally poor performance seen by many clients striking. In 10% of sessions it took 300ms longer to look up a DNS record from our server than a round-trip of a UDP packet to our back-end server. We crudely estimate that up to 100ms are due to the different server locations: the front-end server, which hosts the DNS authority, is located at ICSI in Berkeley, while the back-end servers are located at Amazon's East coast EC2 location. 4.4% of sessions required an additional 600ms or more.

Perhaps more surprisingly, even cached lookups are often slow. For uncached lookups, distributions center just below 100ms with the exception of the slightly faster SBC and the slightly slower Google. DNS providers do not appear obviously faster. A second modality is frequently present around 25ms. As expected cached latencies are faster throughout, but with differing variances.

**Miscellaneous tests.** We employ a series of tests probing the recursive resolver to infer its glue-handling policy. More specifically, we test the ability to cache glue records that appear in either the Authoritative or Additional field. These tests use a different A record when included in the Additional field than returned by a direct lookup. We find caching of Additional records in 15% of sessions, but 44% of sessions cache glue included in Authoritative records.

We do not observe widespread implementation of 0x20 [8] (only 4.0% of sessions), but 94% of resolvers either propagate capitalization unmodified, or directly implement 0x20. Thus, this defense holds solid promise.

We find significant EDNS0 usage, with 55% of sessions exhibiting a recursive resolver that supports it. Most of the usage occurs in the context of requesting DNSSEC data (95% of the sessions). The most common EDNS0 MTU (92% of the sessions) is the 4096B BIND MTU, with other MTUs including 512B (2.2%), 1280B (0.5%), and 2048B (1.3%).

We recently added a test for whether resolvers support AAAA-only glue records. 5.1% were able to generate requests to IPv6-only DNS servers.

---

[4]We subsequently learned that a Sun Java extension exists that can obtain the IP address of the recursive resolver. The next release of Netalyzr will use this information to probe the recursive resolvers directly when the extended API is available.



Fig. 2.   Probability densities for uncached and cached DNS lookup latencies, for the largest ISPs (top two rows) and DNS providers (bottom row). Y-axis scaling is identical across all plots.

## VI. LOOKUP RESULT FIDELITY

A striking finding from the *Netalyzr* sessions regards widespread manipulation of results by recursive resolvers.

**Result wildcarding.** 27% of sessions show NXDOMAIN error wildcarding, where the recursive resolver masks query errors with artificial, valid responses that usually direct browsers to a third-party site showing advertising or search engine results potentially related to the original query. *Netalyzr*'s dataset has a bias towards Comcast (which now wildcards) and OpenDNS (which has always wildcarded). Even excluding these, 24% of the sessions show wildcarding. Many of these resolvers do not only wildcard names that begin with www, but instead act as though *all* name lookups returning errors stemmed from queries generated by web browsers. Excluding Comcast (which only wildcards www) and OpenDNS (which wildcards universally), 42% of such sessions wildcard all NXDOMAINs. Going further, 6% of sessions (1% excluding OpenDNS users) wildcard SERVFAIL in addition, an ill-advised practice because it transforms the semantics of transient error conditions.

While controversial, NXDOMAIN wildcarding remains a commercial reality. Like others [7], we argue that its implementation should strive to minimize collateral damage, viewed through the lens that only web surfing provides revenue opportunity for those implementing NXDOMAIN wildcarding in its current form.

We observe two other forms of wildcarding. In the first, the resolver masks a valid name's response with a different IP protocol family. We discovered this behavior inadvertently, while adding IPv6 functionality tests. In this form of wildcarding, a query for an IPv6-only name receives in response an IPv4 address generated by the wildcarding logic. This change undermines any IPv6-only names (e.g., ipv6.google.com). Of the sessions including this test, 5% (1.0% excluding OpenDNS) will wildcard to an IPv4 address where there only exists an IPv6 address. In the second form, the resolver treats responses that confirm the server as authoritative but that omit additional Answer RRs (e.g., because a query was performed for an A record but the given name only has an MX or AAAA record associated with it) as NXDOMAIN errors, and wildcards them similarly. We have observed this behavior in sessions using OpenDNS, and alerted them to the problem.

**Target-dependent redirection.** Other forms of result manipulation exist. As we reported previously, *Netalyzr* identified multiple ISPs that use DNS to redirect web searches for popular sites, such as www.google.com, search.yahoo.com, and www.bing.com [18]. Instead of visiting the intended search engines' IP addresses, the user winds up redirected to proxy servers. Some ISPs only manipulate Yahoo and Bing, while others manipulate all three.

The proxy servers appear to operate as an outsourced service, with each ISP redirecting Yahoo and Bing to an ISP-

unique address in one of two prefixes `8.15.228/24` or `69.25.212/24`. The redirection occurs via the ISP's DNS resolver, rather than via interception of DNS requests within the network itself, since users who use third-party resolvers do not experience redirection.

Some ISPs that redirect Google use the same outsourced proxy for it too, while others redirect Google to an ISP-controlled proxy running apparently the same software. This software has a recognizable signature in terms of the particular headers it when queried for hosts it does not proxy, and in particular regarding the HTML page it returns in response to ill-formed HTTP requests. A request for an unproxied host returns a HTTP 302 redirect to `http://255.255.255.255/` with a banner indicating the Squid software version. Ill-formed requests include a HTML page with a note that the page was generated by `phishing-warning-site.com`, a parked domain rather than an actual live site.

Offending ISPs include Cavalier, Charter, Cincinnati Bell, Cogent Communications, DirecPC, Frontier, Insight Broadband, Iowa Telecom, RCN, and Wide Open West. Cursory inspection of the search result pages shows no evidence of obvious content or header manipulation.

**Malware.** Finally, 141 sessions showed signs of malware tampering with the resolver configuration, as observed previously by Dagon et al. [9]. These changes direct DNS requests to malicious resolvers that can then control responses at will, such as by injecting advertisements [12] or deliberately disabling the resolution of `windowsupdate.microsoft.com` in order to prevent system updates.

In summary, our findings demonstrate that we cannot in general treat today's recursive resolvers as trustworthy systems, as they are prone to manipulation. As recursive resolvers also play a key role in DNSSEC validation, we argue that here they also pose a trust problem. Ideally, end systems would only trust DNSSEC validations they perform themselves, bypassing the recursive resolver to conduct queries. Clearly, such an approach would incur significant implementation complexity, as well as diminished caching efficacy due to lack of broader sharing of cached results.

## VII. SUMMARY OF RECOMMENDATIONS

*Netalyzr*'s ongoing operations for over 1.5 years has allowed us to gather a diverse set of measurements regarding the capabilities of today's end systems when interacting with DNS. Based on our analysis of this data, we can make several recommendations to DNS implementers and users of DNS APIs.

**DNS client software** such as web browsers should not rely on correct reporting of NXDOMAIN or SERVFAIL errors. Non-cryptographic protocols such as HTTP can test for error reliability by attempting a few known-to-fail and known-to-succeed queries, using the results to check for wildcarding. For cryptographic protocols, a failure to establish a connection should catch faulty wildcarding before the user is informed

that a problem exists, in order to prevent false alarms that might trip up even savvy users [10].

If client software wishes to use novel RRs or TXT records to encode newly defined types, the client software may need to include its own DNS library in order to bypass the host's stub resolver, as the latter is often configured to use the gateway's not-fully-functional DNS proxy. The same applies to DNSSEC validation, though here the situation is exacerbated by the fact that current stub resolvers will not necessarily perform validations, and validations performed by the recursive resolver cannot be trusted. Thus, the Authenticated Data (AD) bit should be considered to hold little weight.

**Stub resolvers and resolver libraries** should accommodate failure modes such as that (*i*) the configured "recursive" resolver provided by the DHCP server may not support the full DNS specification, (*ii*) such resolvers cannot be fully trusted, and (*iii*) the network may impinge on UDP DNS traffic, including filtering or blocking of fragments. Implementations must support TCP failover and should include routines to detect and respond to filter-induced failures, including blocked EDNS, blocked RRs, blocked large DNS replies, and blocked fragments.

Performance-oriented stub libraries might also benefit from bypassing the recursive resolver if testing indicates that it is slow to return cached responses. Since 19% of sessions require at least 100ms to fetch a *cached* item, a significant number of clients benefit only marginally from caching.

**DNS proxies in gateways** should be tested for handling of unknown resource records, à la RFC 3597. The easiest mechanism for ensuring correct operation is for proxies to act as forwarders, relaying unknown messages unchanged (as done e.g. by DNSMask [17]). Likewise, such proxies should not respond to external requests. Unfortunately, correcting the existing installation base of improperly implemented NATs will at best likely take significant time, so we require software to work around these problems explicitly.

ISPs may find it advisable to manage DNS port 53 traffic not just outbound [21] but also *inbound*, perhaps similarly to how they handle outbound SMTP today, in order to detect open DNS proxies and prevent contributing to DNS reflector attacks.

**Recursive resolvers** commonly face transport issues with fragmented UDP, making it advisable to add an additional fallback mechanism to the normal EDNS failure chain, where the resolver retries requests with a 1400B EDNS0 MTU before reverting to 512B. Luckily, TCP fallback generally works well.

If the resolver performs wildcarding, it should not wildcard SERVFAIL or valid names that simply lack an A record, as such behavior can prove disruptive, and also does not help with driving traffic to the advertising portal.

**Authorities** might, in a similar vein, consider always using a 1400B EDNS0 MTU and attempting to keep replies below this limit. This recommendation may prove controversial, as it will cause more TCP failovers; but one could argue that consistent results are preferable to unpredictable timeouts.

**Software developers** under Linux need to consider the UDP

PMTU behavior. If they do not disable PMTU discovery on a given socket, they may encounter spurious exceptions if a path MTU bottleneck generates ICMP too-big messages, and path MTU "black holes" at bottlenecks if they do not send ICMP too-big messages. If a software developer does not wish to do TCP-like PMTU failure detection in software, they should disable PMTU discovery. In terms of resolver support, we see little advantage in encoding data in TXT records when compared to defining new resource records. We would thus encourage developers to define a new RR type when justified.

## VIII. RELATED WORK

There exists a significant body of related work dedicated to measuring the DNS infrastructure. In 2002, Jung et al. studied DNS traces recorded at MIT and KAIST [16] and found significant error rates, including 23% of requests remaining unanswered and 13% returning error codes. In the same year, Brownlee et al. reported on the traffic arriving at one of the DNS root servers [5], finding request caching sorely lacking and 14% of queries completely broken/bogus. Ager et al. are conducting an ongoing measurement study using DNS probing tools driven entirely by the client [2]. They see similar performance artifacts on lookup time, as well as significant performance degradation from using third-party resolvers such as OpenDNS. They have also observed load balancers that inhibit response caching completely. Dagon et al. performed a survey of open recursive resolver behavior, including analyzing why so many open such resolvers exist and their characteristics [9].

Lukie et al. have recently reported on path MTU behavior from the server's vantage point [19]. They see comparable, if somewhat lower, failure rates for path MTU discovery where servers have a path MTU bottleneck.

Hatonen et al. [14] are actively cataloging and probing home gateways. Their checks include whether the gateway responds to DNS requests over TCP or UDP, whereas *Netalyzr* currently only tries UDP. Dietrich [11] measured commonly available gateways in Germany for support of unknown RR types, the ability to proxy requests with EDNS0 and DO bits set, and the ability to route requests directly to the network. He observed a set of common failures similar to ours, and also reports that most gateways will always return their proxy address rather than the ISP's resolver for DHCP replies. DNS-OARC [1] has a DNS reply-size tester that checks for resolver transport problems. The Root DNS servers also reported a significant increase in TCP failover after the introduction of DURZ (Deliberately Unverifiable Root Zone) signatures [23].

## IX. CONCLUSIONS

In 18 months of ongoing operation, the *Netalyzr* network diagnosis and debugging tool has collected a wide range of measurements of the Internet's edge networks in general, and their DNS properties in particular. The picture emerging from 198,000 sessions from 146,000 distinct IP addresses is diverse. We find basic DNS functionality working well, but observe significant DNS implementation shortcomings in many gateway DNS proxies, in-network filtering of DNS traffic, widespread result wildcarding, ISP-driven manipulation of DNS results, and general difficulty in using IP fragmentation. Many of these problems affect future upgrades to the DNS protocol, since the existing edge network infrastructure is entrenched and problems will require significant time to repair. To this end we have provided a set of first recommendations to DNS implementers and developers using DNS APIs, for which we welcome the community's feedback.

## X. ACKNOWLEDGEMENTS

We are deeply grateful to the *Netalyzr* users for enabling this study and to our beta-testers for the insightful comments and feedback. We would particularly like to thank Mark Allman, Paul Barford, Scott Bradner, John Brzozowski, Randy Bush, Niels Bakker, Richard Clayton, Chris Cowart, Keith Dawson, Adrian Dimcev, Holger Dreger, Brandon Enright, Kevin Fall, Carrie Gates, Andrei Gurtov, Mark Handley, Theodore Hong, Kelly Kane, Simon Kelley, Matthew Kogan, Keith Medcalf, Thomas Narten, Michael Ross, Chris Switzer, Wooter Wijngaards, and Richard Woundy. We thank Amazon for supporting our EC2 deployment. This work was supported by the National Science Foundation under grants NSF CNS-0722035, NSF-0433702, and CNS-0905631, with additional support from Google and Comcast.

## REFERENCES

[1] "OARC's DNS Reply Size Test Server," https://www.dns–oarc.net/oarc/services/replysizetest.

[2] B. Ager, W. Mühlbauer, G. Smaragdakis, and S. Uhlig, "Comparing DNS Resolvers in the Wild," in *Internet Measurement Conference (IMC)*, 2010.

[3] Arbor Networks, "Worldwide Infrastructure Security Report," http://www.arbornetworks.com/report, 2010.

[4] ARIN IPv6 Wiki, "Customer problems that could occur," http://getipv6.info/index.php/Customer_problems_that_could_occur#D–Link.

[5] N. Brownlee, K. Claffy, and E. Nemeth, "DNS measurements at a root server," in *IEEE Global Telecommunications Conference (GLOBE-COM)*, 2002, pp. 1672–1676.

[6] CERT, "Vulnerability Note VU#800113, Multiple DNS implementations vulnerable to cache poisoning."

[7] T. Creighton, C. Griffiths, J. Livingood, and R. Weber, "DNS Redirect Use by Service Providers," Internet draft, work in progress.

[8] D. Dagon, M. Antonakakis, P. Vixie, T. Jinmei, and W. Lee, "Increased DNS Forgery Resistance Through 0x20-bit Encoding," in *Proceedings of Cryptography and Computer Security (CCS)*, 2008.

[9] D. Dagon, N. Provos, C. Lee, and W. Lee, "Corrupted DNS Resolution Paths: The Rise of a Malicious Resolution Authority," in *Proceedings of the Network And Distributed Security Symposium (NDSS)*, 2008.

[10] DarkTangent, "DEFCON SSL Compromise? NO! – Defcon Forums," https://forum.defcon.org/showthread.php?t=9805.

[11] T. Dietrich, "DNSSEC Support by Home Routers in Germany," in *RIPE-60*, 2010.

[12] M. Fauenfelder, "How to get rid of Vimax ads," http://boingboing.net/2009/01/16/how–to–get–rid–of–vi.html, January 2009.

[13] A. Gustafsson, "Handling of Unknown DNS Resource Record (RR) Types," RFC 3597 (Proposed Standard), Tech. Rep. 3597, Sep. 2003, updated by RFCs 4033, 4034, 4035, 5395.

[14] S. Hatonen, A. Nyrhinen, L. Eggert, S. Strowes, P. Sarolahti, and M. Kojo, "An Experimental Study of Home Gateway Characteristics," in *Internet Measurement Conference (IMC)*, 2010.

[15] Internet Systems Consortium, "BIND," http://www.isc.org/software/bind.

[16] J. Jung, E. Sit, H. Balakrishnan, and R. Morris, "DNS Performance and the Effectiveness of Caching," *Networking, IEEE/ACM Transactions on*, vol. 10, no. 5, pp. 589–603, 2002.

[17] S. Kelley, "DNSMasq—A DNS Forwarder for NAT Firewalls," http://www.thekelleys.org.uk/dnsmasq/doc.html.

[18] C. Kreibich, N. Weaver, B. Nechaev, and V. Paxson, "Netalyzr: Illuminating the edge network," in *Internet Measurement Conference (IMC)*, 2010.

[19] M. Luckie and B. Stasiewicz, "Measuring Path MTU Discovery Behavior," in *Internet Measurement Conference (IMC)*, 2010.

[20] L. Mamakos, K. Lidl, J. Evarts, D. Carrel, D. Simone, and R. Wheeler, "A Method for Transmitting PPP Over Ethernet (PPPoE)," IETF, RFC 2516, February 1999.

[21] Messaging Anti-Abuse Working Group (MAAWG), "Overview of DNS Security - Port 53 Protection," http://www.maawg.org/sites/maawg/files/news/MAAWG_DNSPort53V1.0_2010-06.pdf, June 2010.

[22] V. Paxson, "An Analysis of Using Reflectors for Distributed Denial-of-Service Attacks," *Computer Communication Review*, vol. 31, 2001.

[23] "Root DNSSEC," http://www.root-dnssec.org.

[24] P. Vixie, "Extension Mechanisms for DNS (EDNS0)," RFC 2671 (Proposed Standard), Internet Engineering Task Force, Aug. 1999.

[25] M. Wong and W. Schlitt, "Sender Policy Framework (SPF) for Authorizing Use of Domains in E-Mail, Version 1," http://www.ietf.org/rfc/rfc4408.txt, IETF, RFC 4408, April 2006.

287

# EXHIBIT J

**TO DECLARATION OF ANDREW GROSSO IN SUPPORT OF OPPOSITION OF PAXFIRE, INC. TO MOTION OF ELECTRONIC FRONTIER FOUNDATION AND PETER ECKERSLEY TO QUASH SUBPOENAS ISSUED BY PAXFIRE, INC. AND REQUEST FOR PROTECTIVE ORDER**

288

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| **BETSY FEIST**, individually, and on behalf of all others similarly situated, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | **CASE NO. 11 CV 5436 (JGK)** |
| **RCN CORPORATION** and **PAXFIRE, INC.**, | ) ) ) | |
| Defendants. | ) ) | |

## FIRST AMENDED ANSWER, AFFIRMATIVE DEFENSES, AND COUNTERCLAIMS OF DEFENDANT PAXFIRE, INC., TO PLAINTIFF'S CLASS ACTION COMPLAINT

Defendant PAXFIRE, INC. ("Paxfire"), by its undersigned attorney, answers the Class Action Complaint of Plaintiff BETSY FEIST and asserts Affirmative Defenses to such Complaint. Further, acting as Counterclaim Plaintiff, Paxfire brings against Counterclaim Defendant BETSY FEIST the following claims under New York law: tortious interference in Paxfire's contracts with its corporate customers and tortious interference with Paxfire's business relationships with its corporate customers, these being Internet Service Providers; and defamation; all for the purpose of damaging and destroying Paxfire and its business model.

Paxfire seeks compensatory and punitive damages for these intentional torts in an amount in excess of FIFTY MILLION DOLLARS ($50,000,000).

Paxfire states as follows:

289

# ANSWER

1.    Denied.

2.    Paxfire admits that RCN is in part an Internet Service Provider; that Internet

Service Providers ("ISPs") often provide access to the Internet for their customers (known as

"End Users" or "Users"); that Users often use browsers when accessing the Internet; and that IP

addresses can change frequently.   Paxfire denies all remaining allegations in this paragraph.

3.    Denied.

4.    Paxfire denies that it was involved in any misconduct.  Paxfire lacks sufficient

knowledge or information to admit or deny the remaining allegations in this paragraph.

5.    Paxfire lacks sufficient information to admit or deny the allegations in this

paragraph.

6.    Paxfire does not dispute that Betsy Feist is an individual who resides in New

York.  Paxfire denies that any searches of Ms. Feist were redirected or intercepted by Paxfire via

Paxfire-based proxy servers.  Paxfire lacks sufficient information to admit or deny the remaining

allegations in this paragraph

7.    Paxfire admits that it is incorporated in Delaware, and has corporate headquarters

in Sterling, Virginia.  Paxfire also admits that it provides hardware and software devices to ISPs

within the United States ("Paxfire technology"), as part of the services provided by those ISPs to

their customers.  Paxfire admits that its webpage contains the following post:

> Paxfire is the proven industry leader in monetizing Address Bar Search
> and DNS Error traffic for Network Operators. Through our carrier-grade
> technology, we generate millions of dollars a month in new advertising revenue
> for our partners by enabling them to participate in the booming $20 billion a year
> search advertising market. Our service improves the end-user browsing
> experience and can be deployed rapidly across all network types at no cost to the
> Network Operator.

Paxfire denies all remaining allegations in this paragraph.

2

8.    Paxfire admits that it provides its services to ISPs at no upfront expense to the ISPs; that it processes mistyped uniform resource locators ("urls"), and urls that do not resolve to Internet Protocol addresses ("IP addresses") that exist on the Internet, using hardware and software devices, and that it shares revenue generated by such means with those ISPs to which it provides its technology.  Paxfire denies all remaining allegations in this paragraph.

9.    Denied.

10.    Paxfire admits that Defendant RCN provides Internet service.  Paxfire lacks sufficient knowledge or information to admit or deny all remaining allegations in this paragraph.

11.    Paxfire admits that the Plaintiff purports to assert federal causes of action, and that the Court has federal-question jurisdiction over those causes of action.  Paxfire denies all remaining allegations in this paragraph.

12.    Denied.

13.    Paxfire admits that it provided its technology to Defendant RCN.  Paxfire denies all remaining allegations in this paragraph.

14.    Denied.

15.    Denied.

16.    Denied.

17.    Denied.

18.    Denied.

19.    Denied.

20.    Denied.

21.    Denied.

22.    Denied.

23.     Paxfire lacks sufficient knowledge or information to admit or deny the allegations in this paragraph.

24.     Denied.

25.     The quoted and referenced language from Joseph Turow, Jennifer King, Chris Hoofnagle, Amy Bleakley, and Michael Hennessy, Americans Reject Tailored Advertising and Three Activities that Enable it (Sept. 29, 2009), and the Federal Trade Commission Preliminary Staff Report, Protecting Consumer Privacy in an Era of Rapid Change at 24 (Dec. 1020) are immaterial to all issues in this Complaint and require no response from Paxfire; and Paxfire has moved to strike this language.  To the extent that any response is necessary to any allegations in this paragraph, Paxfire denies all such allegations.

26.     The allegations in this paragraph are immaterial to all issues in this Complaint and require no response from Paxfire; and Paxfire has moved to strike this language.  To the extent that any response is necessary to any allegations in this paragraph, Paxfire denies all such allegations.

27.     The allegations in this paragraph are immaterial to all issues in this Complaint and require no response from Paxfire; and Paxfire has moved to strike this language.  To the extent that any response is necessary to any allegations in this paragraph, Paxfire denies all such allegations.

28.      Paxfire admits that the Customer Privacy Notice posted by Defendant RCN at any time has been what RCN posted on its website at such time.  Paxfire lacks sufficient knowledge or information to admit or deny the allegations in this paragraph pertaining to the internal practices of RCN.  Paxfire denies all remaining allegations in this paragraph.

29.     Paxfire admits that the Online Policies posted by Defendant RCN at any time has been what RCN may have posted on its website at such time.  Paxfire denies all remaining allegations in this paragraph.

30.      Denied.

31.     Denied.

32.     Denied.

33.      The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire admits that Plaintiff purports to bring this action on behalf of three classes, but denies the factual existence of and legal sufficiency of each of such classes; and Paxfire denies all remaining allegations in this paragraph.

34.     Paxfire admits that the Plaintiff excludes from her purported classes the persons described in this paragraph.

35.     Paxfire admits that the classes, as defined by the Plaintiff, include thousands of members.  Paxfire denies that the class definitions are appropriate, and denies all remaining allegations in this paragraph.

36.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

37.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

38.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

39.     The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

40.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

41.     Denied.

42.     Denied.

43.     Denied.

44.     Denied.

45.     Denied.

46.     Denied.

47.     Denied.

48.     Denied.

49.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

50.     Paxfire admits that the Plaintiff purports to bring this action against Defendant RCN under the Virginia Consumer Protection Act, but denies the applicability of this Act to the conduct of RCN and otherwise to this action.  To the extent that a response is required from Paxfire for any additional allegation in this paragraph, Paxfire denies all such allegations.

51.     Denied.

52.     Denied.

53.     Denied.

54.     Denied.

55.    Denied.

56.    Denied.

57.    Paxfire admits that the Plaintiff and the putative class members, if any, seek the relief specified in this paragraph, but denies the applicability of any such relief.

58.    Paxfire admits that the Plaintiff and the putative class members, if any, seek the relief specified in this paragraph, but denies the applicability of any such relief.

59.    Paxfire admits that the Plaintiff and the putative class members, if any, seek the relief specified in this paragraph, but denies the applicability of any such relief.

60.    Paxfire incorporates the above answers to allegations as if fully set forth herein.

61.    The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

62.    The allegations in this paragraph comprise legal conclusions and require no response from Paxfire.  To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

63.    Denied.

64.    Denied.

65.    Denied.

66.    Paxfire incorporates the above answers to allegations as if fully set forth herein.

67.    Denied.

68.    Denied.

69.    Denied.

70.    Paxfire incorporates the above answers to allegations as if fully set forth herein.

71.    Denied.

72.     Denied.

73.     Denied.

74.     Denied.

75.     Denied.

76.     Denied.

77.     Denied.

78.     Denied.

79.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

80.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

81.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

82.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

83.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

84.     The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

85.     Paxfire incorporates the above answers to allegations as if fully set forth herein.

86. The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

87. The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

88. The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

89. The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

90. The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

91. The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

92. The allegations in this paragraph do not address any claims pertaining to Paxfire, and require no response from Paxfire. To the extent that a response is required from Paxfire for any allegation in this paragraph, Paxfire denies all such allegations.

297

## AMENDED AFFIRMATIVE DEFENSES

### First Affirmative Defense
(Consent: ECPA)

Under 18 U.S.C. § 2511(d), Defendant Paxfire is not liable for any violations of the Electronic Communications Privacy Act because all customers ("Users") of Defendant RCN Corporation ("RCN") and other Internet Service Providers ("ISPs") using Paxfire technology had given prior express or implied consent to the use of Paxfire technology. The privacy policies of RCN and such other ISPs informed customers that their Internet traffic, comprised of electronic communications, could be used to deliver or facilitate the delivery of web pages of trademark holders and of targeted advertising; and provided customers with the ability to opt out of the use of Paxfire technology.

### Second Affirmative Defense
(Waiver: ECPA)

Defendants are not liable for any alleged violations of the Electronic Communications Privacy Act, because Users waived any such claims arising from the use of Paxfire technology. The privacy policies of Defendant RCN and all other ISPs that used Paxfire technology informed customers that their Internet traffic could be used to deliver or facilitate the delivery of web pages of trademark holders and of targeted advertising; and provided customers with the ability to opt out of the use of Paxfire technology.

### Third Affirmative Defense
(Ordinary Course of Business: ECPA)

Pursuant to 18 U.S.C. § 2510(5)(a)(ii), Defendant Paxfire is not liable for any alleged violations of the Electronic Communications Privacy Act because the use of Paxfire technology, and any use of that technology to process communications of Users, or to deliver or facilitate the

298

delivery of web pages of trademark holders and of targeted advertising, was in the ordinary

course of business of Defendant RCN and all other ISPs that used Paxfire technology.

**Fourth Affirmative Defense**
(No Intent: ECPA)

Pursuant to 18 U.S.C. § 2511(1), Defendant Paxfire is not liable for any alleged

violations of the Electronic Communications Privacy Act because the use of Paxfire technology,

and any use of that technology to process the electronic communications of Users, was done

without the intention to intercept such communications.

**Fifth Affirmative Defense**
(Consent: Conversion, Unjust Enrichment, N.Y. Gen. Business Law)

The claims of Plaintiff and putative class members, if any, for conversion, unjust

enrichment, and violation of the New York General Business Law are barred, in whole or in part,

by consent. The privacy policies of Defendant RCN and all other ISPs that used Paxfire

technology informed customers that their Internet traffic could be used to deliver or facilitate the

delivery of web pages of trademark holders and of targeted advertising; and provided customers

with the ability to opt out.

**Sixth Affirmative Defense**
(Waiver: Conversion, Unjust Enrichment, N.Y. Gen. Business Law)

Defendant Paxfire is not liable for any alleged conversion, unjust enrichment, and

violation for invasion of the New York General Business Law, because Users waived any such

claims arising from the use of Paxfire technology. The privacy policies of Defendant RCN and

all other ISPs that used Paxfire technology informed customers that their Internet traffic could be

used to deliver or facilitate the delivery of web pages of trademark holders and of targeted

advertising; and provided customers with the ability to opt out.

11

**Seventh Affirmative Defense**
(Disclaimer of Liability)

The claims of Plaintiff and putative class members, if any, are barred, in whole or in part, by a disclaimer of liability in the Acceptable Use Policies and other agreements (or the equivalents thereof) of Defendant RCN and all other ISPs that used Paxfire technology, which limits claims in any way connected to the networks of RCN and such other ISPs.

**Eighth Affirmative Defense**
(Preemption)

The claims of Plaintiff and putative class members, if any, of conversion, unjust enrichment, and any violation of the New York General Business Law are barred by preemption. The Electronic Communications Privacy Act, 18 U.S.C. ¶ 2510 *et al.*, sets forth the exclusive remedy for conduct that it covers.

**Ninth Affirmative Defense**
(Statute of Limitations)

The claims of Plaintiff and putative class members, if any are barred by the applicable statute of limitations.

**Tenth Affirmative Defense**
(Laches)

The claims of Plaintiff and putative class members, if any are barred by the doctrine of laches.

**Eleventh Affirmative Defense**
(No Interception: ECPA)

Defendant Paxfire is not liable for any violations of the Electronic Communications Privacy Act, because all electronic communications received or processed in any manner by Paxfire were provided to Paxfire by Defendant RCN Corporation ("RCN") and other Internet

300

Service Providers ("ISPs"), each of which had lawful possession and control of such communications and were lawfully authorized to provide such communications to Paxfire.

### Twelfth Affirmative Defense
(No Vicarious Liability)

Defendant Paxfire is not liable for any violations of the Electronic Communications Privacy Act, conversion, unjust enrichment, or any violations of the New York General Business Law engaged in or done by Defendant RCN Corporation ("RCN") and other Internet Service Providers ("ISPs").

### Thirteenth Affirmative Defense
(Good Faith)

Defendant Paxfire is not liable for any violations of the Electronic Communications Privacy Act, conversion, unjust enrichment, or any violations of the New York General Business Law because at all times it acted in good faith, in that all electronic communications received or processed in any manner by Paxfire were provided to Paxfire by Defendant RCN Corporation ("RCN") and other Internet Service Providers ("ISPs"), under conditions and circumstances where Paxfire believed that RCN and such other ISPs were each properly and lawfully providing such communications to Paxfire.

### Fourteenth Affirmative Defense
(Failure to State a Claim)

Plaintiff and putative class members, if any, fail to State a Claim for Relief because they fail to state that any identifiable electronic communication was intercepted by Paxfire, and that any identifiable personal information was collected or sold by Paxfire.

### Fifteenth Affirmative Defense
(Lack of Standing)

Plaintiff and putative class members, if any, lack standing to bring any claims against Paxfire because they failed to suffer any damages from Paxfire's conduct.

13

301

## Sixteenth Affirmative Defense
(Lack of Privity)

Plaintiff and putative class members, if any, are not entitled to any relief on any claim inasmuch as there was no business relationship, contractual or otherwise, between Plaintiff and any class member and Paxfire.

## Seventeenth Affirmative Defense
(General Denial)

Paxfire denies generally Plaintiff's allegations and denies that Plaintiff and putative class members, if any, are entitled to any relief on their claims.

## Eighteenth Affirmative Defense
(Legal Impossibility: ECPA)

To the extent that the Plaintiff's allegations are based upon the processing of information placed by an End User in the search bar located in a border of such user's Internet browser, any processing, capture or redirection of such information is not an "interception" between the End User and any third party search engine for the purposes of the Electronic Communications Privacy Act, as such search bar (unlike the search box located in the web page of a search engine) is a link for communication between the End User and such user's ISP, and not between the End User and any search engine.

14

302

## AMENDED COUNTERCLAIMS

Paxfire brings counterclaims against Betsy Feist under New York law, and states as follows:

## PARTIES AND CONSPIRATORS

1.     Counterclaim Plaintiff Paxfire, Inc. ("Paxfire") is a Delaware corporation with its principal place of business located in Sterling, in the Commonwealth of Virginia. Paxfire's primary business is the provision of technology, that is, services based upon hardware and software devices, to Internet Service Providers ("ISPs"). Paxfire has no place of business in the State of New York.

2.     Upon information and belief, Counterclaim Defendant Betsy Feist ("Feist") resides in the Southern District New York State, in the State of New York.

3.     Counterclaim Defendant Feist has never been a customer or otherwise had a direct business relationship with Paxfire.

4.     At all times pertinent to this Complaint, the Electronic Frontier Foundation ("EFF") was and is an organization based in San Francisco, California, primarily involved in investigating, lobbying, and publicizing issues involving electronic privacy and civil liberties.

5.     At all times pertinent to this Complaint, the International Computer Science Institute ("ICSI") was and is an organization based in Berkeley, California, whose self-styled mission is listed on its website as: "'Furthering computer science research through international collaboration. Furthering international collaboration through computer science research.'"

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over these Counterclaims pursuant to 28 U.S.C. § 1332(1), as the parties are citizens of different states and the amount in controversy is in excess

15

303

of seventy-five thousand dollars ($75,000); and pursuant to 28 U.S.C. § 1367, as the

Counterclaims here alleged are so related to the original claims brought by the Plaintiff in her

Class Action Complaint that they form part of the same case or controversy under Article III of

the United States Constitution.

      7.     This Court has personal jurisdiction over Counterclaim Defendant Feist as she

resides in this District and has brought the original action as alleged in her Class Action

Complaint in this District

      8.     Venue is appropriate in this District pursuant to 28 U.S.C. § 1391, as the

Counterclaim Defendant Feist, who is the only counterclaim defendant named herein, resides in

this District.

## PAXFIRE'S BUSINESS

### A. Paxfire's Business Arrangements

      9.     At all times pertinent to these Counterclaims, Paxfire was involved in the business

of generating advertising revenues from address bar error traffic generated by End Users who

were customers of those Internet Service Providers that had contracted with Paxfire to provide

such services ("Error Traffic services") for their customers.

      10.    Beginning in 2008, Paxfire also provided direct navigation to the websites of

certain trademark holders for End Users who entered trademarks into address bars, and, in 2010,

into search boxes embedded in their web browsers, where such End Users were customers of

Internet Service Providers that had contracted with Paxfire to provide such services ("Direct

Navigation services") for their customers.

      11.    Paxfire, through and with the ISPs with which it contracted, gave notice to End

Users who were customers of such ISPs that the above described Error Traffic and Direct

304

Navigation services were being provided, and allowed such End Users to opt out of such services.

12.     At all times pertinent to these Counterclaims, when such Error Traffic and Direct Navigation services were provided through Paxfire to an End User, the resulting web page presented to the End User was clear in format and substance as being: (a) for Error Traffic, a page resulting from an error entered into the address bar, suggesting sites and url links that the End User might choose to visit; and (b) for Direct Navigation, a page belonging to the holder of the trademark entered by the End User in his or her address bar or search box embedded in the End User's web browser.

13.     At all times pertinent to these Counterclaims, those ISPs that contracted with Paxfire incorporated Paxfire's Error Traffic services, Paxfire's Direct Navigation services, or both into their networks as part of the ordinary course of their businesses; and provided such services to their End Users in the ordinary course of their businesses.

14.     At no time did Paxfire's Error Traffic and Direct Navigation services violate any federal or state law in the manner or means by which Paxfire provided such services; and, more specifically, at no time did Paxfire engage in wiretapping under any federal or state law.

15.     At all times pertinent to these Counterclaims, Paxfire held contracts, and had ongoing business relationships, to provide Error Traffic services or Direct Navigation services, or both, with the following ISPs, among others: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West; and these contracts and business relationships had economic value for Paxfire.

16.     At all times pertinent to these Counterclaims, Paxfire held agreements, and had ongoing business relationships, to provide Direct Navigation services with the following

Trademark Holders, among others: Ebay and Amazon.com; and these agreements and business relationships had economic value for Paxfire.

17.    At all times pertinent to these Counterclaims, Paxfire held contracts, and had ongoing business relationships with companies ("Trademark Aggregators") that themselves had agreements with third party trademark holders to provide advertising; such contracts and relationships between Paxfire and the Trademark Aggregators required Paxfire to provide Direct Navigation services for the third party trademark holders; such Trademark Aggregators included Commission Junction, LinkShare, and Google, among others; and these contracts and business relations had economic value for Paxfire.

18.    At all times pertinent to these Counterclaims, Paxfire held contracts and had ongoing business relationships with companies ("Affiliate Program Aggregators") that themselves had agreements with third party trademark holders, with which they had other ongoing business relationships, to provide advertising; such contracts and relationships required Paxfire to provide Direct Navigation services for the third party trademark holders; such Affiliate Program Aggregators included Ebay and Amazon.com; and these contracts and business relations had economic value for Paxfire.

### B. Paxfire's Privacy Policies

19.    At no time did Paxfire, know, identify, or record the person who was an End User and engaged in searches using the Internet.

20.    At no time did Paxfire collect or compile information about End Users of ISPs in any manner that constituted profiling of such End Users, or of the searches of such End Users.

21.    At no time did Paxfire share information about End Users of ISPs, or of their searches, with third parties.

306

22.     At no time did Paxfire sell information about End Users of ISPs, or of their searches.

23.     At no time did Paxfire allow third parties to access information about End Users of ISPs.

24.     At no time did Paxfire allow third parties to access searches by End Users of ISPs.

25.     At no time did Paxfire allow third parties to monitor searches by End Users of ISPs.

26.     At no time did Paxfire allow third parties to intercept searches by End Users of ISPs.

27.     At not time did Paxfire disclose confidential or private information relating to the use of the Internet by End Users of ISPs.

28.     At no time did Paxfire convert personal information of End Users of ISPs, including search histories, by providing such to third parties.

29.     At no time did Paxfire receive or retain money from third parties as a result of sharing and/or allowing access to the personal information of End Users of ISPs.

30.     At no time did Paxfire impersonate the webpage or website of any Internet search engine.

31.     At all time pertinent to this Complaint, Paxfire protected any and all information generated through the use of its services by subscribers of ISPs.

## THE CONSPIRACY

### A. Lack of Knowledge: The "Known Unknowns"

32.     At no time did Counterclaim Defendant Feist, EFF, or the ICSI have any information about the privacy practices of Paxfire regarding the use or protection of the search

histories and practices of End Users of ISPs; and they then knew that they did not know about such privacy practices.

33.     At no time did Counterclaim Defendant Feist, EFF or the ICSI make any effort to inquire of Paxfire about its aforesaid privacy practices.

34.     At no time did Counterclaim Defendant Feist, EFF, or the ICSI have any information about the practices of Paxfire regarding its use of proxy servers, and whether or not such use could give rise to the appearance that Paxfire impersonated website of other entities; and they then knew that they did not know about such practices regarding the use of proxy servers.

35.     At no time did Counterclaim Defendant Feist, EFF or the ICSI make any effort to inquire of Paxfire about its aforesaid practices regarding the use of proxy servers.

### B. Improper Motives and the Manner and Means

36.     At all times pertinent to these Counterclaims, Counterclaim Defendant Feist, EFF and the ICSI, collectively and individually, knew that Paxfire held contracts, or had ongoing business relationships, for Error Traffic services, Direct Navigation services, or both, with the following ISPs: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West; and knew that these contracts and business relationships had economic value for Paxfire.

37.     At all times pertinent to these Counterclaims, EFF and the ICSI opposed Paxfire's business practices of providing Error Traffic and Direct Navigation services to these and other ISPs as part of the services ISPs provided for their End Users.  Quoting Peter Eckersley, the Technology Projects Director for EFF, EFF considered Paxfire's business practices to be

308

"troubling," and "a deep violation of users' trust and expectations on how the Internet is supposed to function."

38.　　EFF and the ICSI opposed Paxfire's aforesaid business practices for the following reasons, among others: (a) EFF and the ICSI held the view that Internet users expect the Internet to function without recourse to services and technology implemented by Paxfire, and that changes affecting such expectations should be "opt-in" rather than "opt-out"; and (b) EFF and the ICSI feared that Paxfire's theoretical capabilities to directly monitor all searches made by End Users, and to modify such users' underlying Internet traffic, was the actual conduct in which Paxfire engaged, conduct which EFF and the ICSI opposed.　The EFF and the ICSI wanted to stop, prevent, and deter such direct monitoring and such modification of Internet traffic, regardless of whether or not Paxfire, or any ISP, actually engaged in or intended to engage in such conduct, and regardless of whether such conduct was or was not lawful; and to impose or encourage a rule that all implementation of services and technology similar to that implemented by Paxfire be done only after an "opt-in" selected by each End-User, in disregard of the fact that no legal requirement for such rule existed.

39.　　The EFF and ICIS were also concerned about, both, the privacy and network neutrality implications of Paxfire's business practices, despite no legal requirement existing that prohibited Paxfire's business practices.

40.　　In furtherance of the aforesaid purpose, EFF and the ICSI agreed to act as vigilantes, that is, as self-appointed enforcement officials policing the Internet to deter conduct to which they objected, whether or not such conduct was actually occurring.

41.　　Among the Manner and Means whereby EFF and the ICSI carried out the aforesaid agreement were the following:

(a) Assume the worst-case scenarios concerning the conduct in which Paxfire, and the ISPs that were its customers, might be involved;

(b) Knowingly avoid making any attempt to verify whether or not such conduct was actually occurring by not making inquiry of Paxfire, or of any ISP that was its customer, before taking overt action;

(c) Publish directly, and cause to be published through third parties, the worst-case allegations, presenting them as facts and by innuendo, on websites, blogs, and other electronic media;

(d) Induce a third party individual to bring a class action lawsuit against Paxfire, and at least one ISP that was its customers, incorporating the aforesaid unverified, worst-case scenarios based upon unverified representations and innuendo;

(e) In all material regards, "blindside" Paxfire and the ISPs that were then its customers with regard to the execution of the plan that EFF and the ICSI had agreed upon.

42.     Also among the Manner and Means whereby EFF and the ICSI carried out the aforesaid agreement were the following:

(a) making use of a software package known as the "Netalyzr" to purportedly identify how Internet searches were routed;

(b) falsely attributing the Netalyzr as having determined that Paxfire logged, compiled, profiled and sold search histories of individual End Users, matched to the personal identity of each such End User, something that the Netalyzr could not do and which they then knew it could not do.

43.     By the aforesaid manner and means, EFF and the ICSI pursued the goals of: damaging and destroying Paxfire and its business model; causing ISPs that were then customers of Paxfire to terminate or curtail their contracts and business relationships with Paxfire; and

discouraging ISPs and other companies from engaging in the same business model and practices as Paxfire and its ISP customers.

### C. The Role of Betsy Feist

44.     At an unknown time prior to August 1, 2011, Counterclaim Defendant Betsy Feist agreed with EFF and the ICSI to participate in the aforesaid scheme, directly and through her attorneys, and in each of its manner and means, and to serve as the necessary third party plaintiff for the purpose of bringing the class action lawsuit to accomplish the agreement's goals; and she agreed to serve as the "legal front" for the scheme agreed upon by and between EFF, the ICSI, and Counterclaim Defendant Betsy Feist.

45.     At no time prior to the filing of her Class Action Complaint did Counterclaim Defendant Betsy Feist contact Paxfire to inform Paxfire of her opposition, if any, to the business practices of Paxfire or of the ISP that was providing her access to the Internet and which was then a customer of Paxfire, this ISP being the RCN Corporation; and at no time did Feist opt-out of such services.

46.     At no time prior to the filing of her Class Action Complaint did Counterclaim Defendant Betsy Feist verify or attempt to verify that the allegations that she brought in her Complaint were in fact true and correct.

47.     At no time prior to the filing of her Class Action Complaint did Counterclaim defendant Betsy Feist contact Paxfire or the RCN Corporation to determine whether her allegations were correct; to seek changes in Paxfire's business model, generally or with respect to her own Internet activities; or to propose compensation for alleged damages that she had incurred *in lieu* of commencing litigation.

311

48.     Prior to filing her lawsuit, Counterclaim Defendant Betsy Feist used and operated the Netalyzr on her own Internet searches, using her personal Internet user-account.  This use and operation of the Netalyzr could not and did not demonstrated to her whether Paxfire could or did compile, profile or sell search histories of individual End Users, including herself, whether anonymously or by name; and did not demonstrate to her whether Paxfire logged such search histories either by name or anonymously.

### D. Overt Acts

49.     In furtherance of and to effect the purposes of this conspiracy, EFF, the ICSI, and Counterclaim Defendant Betsy Feist engaged in and executed the following overt acts in furtherance of their conspiracy:

(a) On or about August 1, 2011, Christian Kriebich of the ICSI sent an email to the attorneys for Counterclaim Defendant Feist and to Jim Giles of the New Scientist, a media outlet on the Internet (Exhibit 1).  This email reads in pertinent part:

> Allow me to introduce you to Jim Giles, the reporter at New Scientist who's currently working on a story on the Paxfire affair.  Jim, meet the legal front!  Jim has been investigating Paxfire's search redirections for quite some time now and is fully up to date on our findings, so it seems helpful for all of you to have each other's contact information.

(b) Sometime during the period August 1 to noon on August 4, 2011, Eastern Time, Counterclaim Defendant Betsy Feist, directly or through her agents and attorneys, communicated with Jim Giles of the New Scientist (Exhibit 2), informing him that Counterclaim Defendant Betsy Feist was filing a Class Action Complaint on August 4, 2011 and making numerous false and defamatory statements about Paxfire.  These statements were made by Ms. Feist, directly or through her agents and attorneys, to the New Scientist for the purpose of causing an article with

these statements to be published and republished on the Internet and elsewhere.  Among these false and defamatory statements were the following:

(i)  that Paxfire "hijacked" searches of millions of Internet users;

(ii)  that Paxfire violated numerous statutes, including wiretapping laws; and

(ii) that Paxfire violated "privacy safeguards enshrined" in the 1968 Wiretap Act.

(c) On August 4, at or before 12:40 pm, Eastern Time, Counterclaim Betsy Feist, directly or through her agents and attorneys, caused the New Scientist to publish an article on the Internet stating, falsely, that Paxfire's business practices violated numerous statutes, including wiretapping laws affecting the subscribers of its ISP customers; and stating that she had filed a Class Action Complaint with such allegations.  Among the false and defamatory statements about Paxfire are the above statements, previously made by Ms. Feist, directly or through her agents and attorneys, to the New Scientist, for the purpose of and causing such article to be published and republished on the Internet and elsewhere.

(d) On August 4, EFF and ICSI published on the EFF website and blog an article alleging, among other false and misleading representations:

(i) That Paxfire's proxies collected a user's web searches and the corresponding web search results; whereas in truth and in fact, Paxfire's proxies only logged a small subset of search queries that were entered into a browser search box, related to certain trademark holders with whom Paxfire had a direct or indirect (through a Trademark Aggregator or Program Affiliate Aggregator) business contract or relationship, doing so anonymously, without identifying individual End Users; and

(ii) That Paxfire's practices allowed Paxfire and/or its ISP customers to directly monitor all searches made by the ISPs' End Users and to build up corresponding profiles; whereas, in truth and fact, while Paxfire's code examined queries and responses, it

selected out and logged only those that were of relevance to its business for accounting and debugging purposes, maintained the confidentiality of such logs from any and all third parties, and did so anonymously, without identifying individual End Users.

(e) On August 4, at 3:39 pm, Eastern Time, Counterclaim Betsy Feist, directly or through her agents and attorneys, filed the instant Class Action Complaint naming Paxfire and the RCN as defendants.

50.     Counterclaim Defendant Feist stated and alleged in her Class Action Complaint, which statements and allegations (hereinafter "statements") were false, that directly or indirectly (by enabling one or more of the ISPs to which it provided its services to do the same):

a)      Paxfire identified persons who were End Users and engaged in searches using the Internet;

b)      Paxfire collected and compiled information about End Users of ISPs in a manner that constituted profiling of such End Users, or of the searches of such End Users;

c)      Paxfire shared information about End Users of ISPs, or of their searches, with third parties;

d)      Paxfire sold information about End Users of ISPs, or of their searches;

e)      Paxfire allowed third parties to access information about End Users of ISPs;

f)      Paxfire allowed third parties to access searches by End Users of ISPs;

g)      Paxfire allowed third parties to monitor searches by End Users of ISPs;

h)      Paxfire allowed third parties to intercept searches by End Users of ISPs;

i)      Paxfire disclosed confidential or private information relating to the use of the Internet by End Users of ISPs;

j)      Paxfire converted personal information of End Users of ISPs, including search histories, by providing such to third parties;

314

k)     Paxfire received or retained money from third parties as a result of sharing and/or allowing access to the personal information of End Users of ISPs;

l)     Paxfire impersonated the webpages and websites of Internet search engines; and

m)     Paxfire engaged in violation of wiretap statutes affecting subscribers of its ISP customers.

51.     At the time that Counterclaim Defendant Betsy Feist published these statements in her Class Action Complaint, they were false; and Counterclaim Defendant Feist made these statements knowing that they were defamatory and that she did not have evidence as to the truth or falsity of such statements.

52.     At the time that Counterclaim Defendant Feist filed her Class Action Complaint, she knew that she had insufficient basis to make such statements; and she had purposely avoided making inquiry of Paxfire so as not to learn the truth regarding these statements and allegations.

53     At the time that Counterclaim Defendant Betsy Feist filed her Class Action Complaint, she purportedly based these defamatory statements on the results of the Netalyzr, and on conclusions purportedly reached by ICSI and EFF from their use of the Netalyzr; whereas in truth and fact, as she then well knew, she had no basis for making these statements as: (a) she had personally used the Netalyzr; and (b) by using the Netalyzr, one could not determine the truth of these statements.

54.     The publication by Counterclaim Defendant Betsy Feist of all of the above false and defamatory statements, individually and collectively, in her Class Action Complaint and in communicating with the New Scientist, resulted in damage to Paxfire's business relationships and reputation.

55.     Counterclaim Defendant Betsy Feist knew that her publication of these false and defamatory statements would result in damage to Paxfire's business relationships and reputation; and she intended such result.

56.     The improper motive of Counterclaim Defendant Feist in the filing of her Class Action Complaint and in communicating with the New Scientist was to act in concert with and as the "legal front" for the EFF and the ICSI to generate additional publicity of these false, defamatory, and unfounded allegations, all for the purpose of interfering with, obstructing, and destroying Paxfire's contracts, agreements, and ongoing business relationships with the aforesaid ISPs and other businesses; and compelling Paxfire to stop and shut down its Error Traffic and Direct Navigation services.

57.     At all times pertinent to this Complaint, for the reasons set forth above, the Class Action Complaint filed by Counterclaim Defendant Betsy Feist was a sham.

### COUNT ONE
### (Tortious Interference with Contracts: ISPs)

58.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through fifty-seven of these Counterclaims and further alleges:

59.     At all times pertinent to these Counterclaims, Paxfire had a valid contract with each of the following ISPs: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West.

60.     At all times pertinent to these Counterclaims, Counterclaim Defendant Feist, EFF, and the ICSI knew, individually and collectively, that Paxfire had a valid contract with each of the aforesaid ISPs.

316

61.     By and through the scheme described above, executed in concert by the co-conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist intentionally procured, directly and vicariously through her co-conspirators, a breach of Paxfire's contract with the RCN Corporation.

62.     Counterclaim Defendant Feist procured this breach intentionally and without justification.

63.     As a result of this breach, Paxfire suffered actual damages.

## COUNT TWO
### (Tortious Interference with Business Relationships: ISPs)

64.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through sixty of these Counterclaims and further alleges:

65.     At all times pertinent to these Counterclaims, Paxfire had an ongoing business relationship with each of the following ISPs: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, and Wide Open West.

66.     At all times pertinent to these Counterclaims, Counterclaim Defendant Feist, EFF, and the ICSI knew, individually and collectively, that Paxfire had an ongoing business relationship with each of the aforesaid ISPs.

67.     By and through the scheme described above, executed in concert by the co-conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist intentionally interfered, directly and vicariously through her co-conspirators, with Paxfire's ongoing business relationships with each of these aforesaid ISPs, causing the following ISPs to reduce, suspend, or terminate business with Paxfire: XO Communications, RCN Corporation, Wide Open West, and Direct PC (Hughes Network).

68.     Counterclaim Defendant Feist procured the above described reduction, suspension, and termination of Paxfire's business relationships through wrongful means, including misrepresentations and her civil class action lawsuit, as part of the scheme described above.

69.     As a result of this interference, Paxfire's business relationships with each of these ISPs were injured.

70.     As a result of such injury, Paxfire has suffered actual damages.

**COUNT THREE**
**(Tortious Interference with Business Relationships: Trademark Holders)**
**(Withdrawn)**

**COUNT FOUR**
**(Tortious Interference with Contracts: Advertising Aggregators)**
**(Withdrawn)**

**COUNT FIVE**
**(Tortious Interference with Business Relationships: Advertising Aggregators)**
**(Withdrawn)**

**COUNT SIX**
**(Defamation: Slander)**

71.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through seventy of these Counterclaims and further alleges:

72.     At all times pertinent to these Counterclaims, Paxfire had a contract and an ongoing business relationship with each of the following ISPs, among others: RCN Corporation, Cavalier, Cincinnati Bell, Cogent Communications, Frontier Communications, Insight

Broadband, Iowa Telecom, DirectPC (Hughes Network), XO Communications, Wide Open

West; Global Crossing, Sprint, LocalNet, Earthlink, and Verizon Business.

73.     At all times pertinent to these Counterclaims, Paxfire had a contract and an

ongoing business relationship with each of the following Trademark Aggregators and Affiliate

Program Aggregators, among others: Commission Junction, LinkShare, Google, Amazon.com,

and Ebay.

74.     At all times pertinent to this Complaint, Paxfire had a contract and an ongoing

business relationship with each of the following Trademark Holders, among others:

Amazon.com, and Ebay.

75.     At all times pertinent to this Complaint, Paxfire was in negotiations with

Xerocole, Inc., an Internet company, for the sale of Paxfire to such company; and such company

intended to make an offer during the week of August 11, 2011, of at least $10 million plus

additional monetary considerations, for Paxfire's assets or equity, or for both.

76.     At all times pertinent to this Complaint, Paxfire was in negotiations with

AdKnowledge, Inc., an Internet company, for the sale of Paxfire to such company; and such

company intended to make a monetary offer for Paxfire's assets or equity, or for both.

77.  During 2009, a foreign Internet company had made an offer for the purchase of

Paxfire, and its assets or equity, or both, valuing such at forty-million dollars.

78.     By and through the scheme described above, executed in concert by the co-

conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist

directly, and vicariously through her co-conspirators, slandered Paxfire by verbally publishing to

the New Scientist the above described false statements, including that Paxfire's business

practices violated wiretapping laws; doing so for the purpose of causing the New Scientist to

publish such statements in an article on the Internet.

79.     Neither Counterclaim Defendant Feist, nor EFF and the ICSI, was privileged or authorized to publish such statements to the New Scientist.

80.     Counterclaim Defendant Feist acted with negligence as to the truth of such statements.

81.     Counterclaim Defendant Feist further acted with malice, in that she intended to publish false, defamatory and unfounded statements; or that intended to publish such statements with knowledge that she did not know the truth about such statements.

82.     The statements of Counterclaim Defendant Feist damaged the reputation of Paxfire, which resulted in special harm, including the following:

(a) the termination of contracts with the following ISPs: Global Crossing, Sprint, RCN Corporation, XO Communications, and LocalNet;

(b) the reduction or suspension of business relationships with the following ISPs: Wide Open West, PCDirect (Hughes Network), Earthlink, and Verizon Business;

(c) the termination of contracts and business relationships with the following Trademark Aggregators, Affiliate Program Aggregators, and Trademark Holders: Commission Junction, LinkShare, Google, Amazon.com, and Ebay;

(d) the termination of discussions for a pending business relationship with Trademark Aggregator Catalog.com;

(e) the refusal of these and other ISPs, Trademark Aggregators, Affiliate Program Aggregators, and Trademarks Holders, to do additional business with Paxfire; and

(f) the termination of negotiations with the aforementioned Internet company for the sale of Paxfire's assets, equity, or both; and

(g) the loss of value of Paxfire's name, reputation, good will and trademark.

83.     The statements of Counterclaim Defendant Feist damaged the reputation of Paxfire, which resulted in special harm, as specified above.

84.     The aforesaid defamatory statements of Counterclaim Defendant Feist comprised defamation *per se*, as they included allegations of criminal conduct under the Wiretap Act and the Electronic Communications Privacy Act.

85.     As a result of such injury, Paxfire has suffered actual damages.

## COUNT SEVEN
### (Defamation: Libel)

86.     Counterclaim Plaintiff Paxfire realleges and reincorporates by reference the allegations contained in paragraphs one through eighty-five of these Counterclaims and further alleges:

87.     By and through the scheme described above, executed in concert by the co-conspirators Counterclaim Defendant Feist, EFF and the ICSI, Counterclaim Defendant Feist directly, and vicariously through her co-conspirators, libeled Paxfire by publishing on the EFF website and blog, in the instant Class Action Complaint, and to the New Scientist by email, and causing the New Scientist to publish in an article on the Internet, the aforesaid false, defamatory, and unfounded statements.

88.     Neither Counterclaim Defendant Feist, nor EFF and the ICSI, was privileged or authorized to publish such statements.

89.     Counterclaim Defendant Feist acted with intent to publish such false, defamatory and unfounded statements; or acted with knowledge that she did not know the truth about such statements; or acted with negligence as to the truth of such statements.

90.     The statements of Counterclaim Defendant Feist damaged the reputation of Paxfire, which resulted in special harm, as specified above.

33

91.     The aforesaid defamatory statements of Counterclaim Defendant Feist comprised

defamation *per se*, as they included allegations of criminal conduct under the Electronic

Communications Privacy Act.

92.     As a result of such injury, Paxfire has suffered actual damages.

**REQUEST FOR RELIEF**

Defendant Paxfire asks for judgment in its favor as follows:

1.     Plaintiff's Class Action Complaint be dismissed with prejudice and Judgment be

entered in favor of Defendant Paxfire;

2.     No class is certified, but in the event that a class is certified, that Judgment on

Plaintiff's Class Action Complaint be entered against Plaintiff and putative class members and in

favor of Defendant Paxfire;

3.     Judgment be entered against Plaintiff and in favor of Defendant Paxfire on

Paxfire's Counterclaims, in the amount of thirty million dollars ($30,000,000) for compensatory

and special damages and fifty million dollars ($50,000,000) in punitive damages;

4.     Defendant Paxfire be awarded attorneys' fees costs, and expenses; and

5.     Such other and further relief as the Court deems just and proper.

**JURY TRIAL DEMAND**

Defendant Paxfire requests trial by jury of all claims that may be tried in the United

States District Court for the Southern District of New York.


Respectfully Submitted,

/s/Andrew Grosso
Andrew Grosso, Esq.
ANDREW GROSSO & ASSOCIATES
GEORGETOWN PLACE
1101 THIRTIETH STREET, NW, SUITE
300
WASHINGTON, D.C.  20007
(202) 298-6500 Tel.
(202) 298-5599 Fax
Agrosso@acm.org Email

Dated: February 13, 2012

# EXHIBIT 1

| From: | Christian Kreibich |
|---|---|
| To: | Giles, Jim; Seidman, Peter; Clark, Melissa; Michael Reese; Kim Richman; |
| CC: | |
| Subject: | Introduction |
| Date: | Monday, August 01, 2011 6:24:40 PM |
| Attachments: | |

Hello everyone,

Allow me to introduce you to Jim Giles, the reporter at New Scientist who's currently working on a story on the Paxfire affair. Jim, meet the legal front! Jim has been investigating Paxfire's search redirections for quite some time now and is fully up to date on our findings, so it seems helpful for all of you to have each other's contact information.

Best,
Christian

# EXHIBIT 2

| | |
|---|---|
| **From:** | Jim Giles |
| **To:** | Seidman, Peter; Clark, Melissa; Michael Reese; Kim Richman; |
| **CC:** | |
| **Subject:** | Re: Introduction |
| **Date:** | Monday, August 01, 2011 7:41:15 PM |
| **Attachments:** | |

Hi All,

How are you fixed tomorrow? It would be great if someone could spare a few minutes to discuss your thinking regarding Paxfire's activities.

Best,

Jim

On Mon, Aug 1, 2011 at 3:24 PM, Christian Kreibich <christian@icir.org> wrote:

> Hello everyone,
>
> Allow me to introduce you to Jim Giles, the reporter at New Scientist
> who's currently working on a story on the Paxfire affair. Jim, meet the
> legal front! Jim has been investigating Paxfire's search redirections
> for quite some time now and is fully up to date on our findings, so it
> seems helpful for all of you to have each other's contact information.
>
> Best,
> Christian

--
+1 415 894 0032

327

www.jimgiles.net
twitter.com/jimgiles

**CERTIFICATE OF SERVICE**

I hereby certify that on the 13th day of February 2012, I sent the foregoing by the Court's electronic notice system (PACER) to the following counsel of record:

Sanford P. Dumain
Peter E. Seidman
Melissa Ryan Clark
Charles Slidders
Milberg LLP
One Pennsylvania Plaza, 49th Floor
New York, NY 10119
*Counsel for Plaintiff-Counterclaim*
*Defendant Betsy Feist*

Peter C. Neger, Esq.
Derek Care, Esq.
Bingham McCutchen LLP
399 Park Avenue
New York, N.Y. 10022
*Counsel for Defendant RCN Corporation*

and by email to the following:

Michael E. Reese, Esq.
  mreese@reeserichman.com
Kim Richman, Esq.
  krichman@reeserichman.com
Reese Richman LLP
875 Avenue of the Americas, 18th Floor
New York, NY 20001
*Counsel for Plaintiff-Counterclaim*
*Defendant Betsy Feist*

/s/ Andrew Grosso
Andrew Grosso

329

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
     A Limited Liability Partnership
2     Including Professional Corporations
    JAMES M. CHADWICK, Cal. Bar No. 157114
3   TENAYA RODEWALD, Cal. Bar No. 248563
    379 Lytton Avenue
4   Palo Alto, California 94301-1479
    Telephone:    650.815.2600
5   Facsimile:    650.815.2601
    Email:        jchadwick@sheppardmullin.com
6                 trodewald@sheppardmullin.com

7   Attorneys for Non-Parties, ELECTRONIC
    FRONTIER FOUNDATION and PETER
8   ECKERSLEY

9                    UNITED STATES DISTRICT COURT

10       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12
    BETSY FEIST,                          Case No. C-12-80135-RS (DMR)
13
                  Plaintiff,              **NOTICE OF RELATED CASES**
14
           v.
15                                        The Hon. Donna M. Ryu
    RCN CORP. and PAXFIRE, INC.,          United States Magistrate Judge
16
                  Defendants.
17

18

19

20

21

22

23

24

25

26

27

28

Case No. C-12-80135-RS (DMR)                          NOTICE OF RELATED CASES
SMRH:405594062.2

330

**TO THE HONORABLE COURT, ALL PARTIES, AND THEIR COUNSEL:**

**NOTICE IS HEREBY GIVEN**, pursuant to Local Civil Rules 3-12 and 3-13, that the actions listed below may be related to the above-captioned matter, and that they all arise from an action pending in another court. Notice is given in lieu of the filing of an administrative motion to consider whether these cases should be related because the non-party witnesses who are providing this notice, the Electronic Frontier Foundation and Peter Eckersley, are not parties to the earliest-filed case among those that may be deemed related.

The actions below and the instant action seek to quash subpoenas issued by this Court and served by Paxfire, Inc. ("Paxfire"), a Defendant in *Feist v. RCN Corp. and Paxfire, Inc.*, No. 11-cv-5436 (S.D.N.Y., filed Aug. 4, 2011). The instant action, filed June 6, 2012, seeks to quash or limit Paxfire's document and deposition subpoenas to non-parties Electronic Frontier Foundation and Peter Eckersley. The following actions seek to quash or limit the specified Paxfire subpoenas:

1.  Notice of Motion and Motion to Quash Subpoena and Request for Protective Order by Jim Giles, *Feist v. RCN Corp. and Paxfire, Inc.*, Misc. Case No. 12- 80119 SI (NC) (N.D. Cal., filed May 15, 2012), seeks to quash Paxfire's document subpoena to non-party Jim Giles;

2.  Notice of Motion and Motion of Betsy Feist to Quash Subpoenas to Consultants and Request for Protective Order, *Feist v. RCN Corp. and Paxfire, Inc.*, Misc. Case No. 12-80121 JSW (EDL) (N.D. Cal., filed May 23, 2012) ("Plaintiff's Motion to Quash Subpoenas"), seeks to quash Paxfire's document and deposition subpoenas to non-parties the International Computer Science Institute, Christian Kreibich, the Electronic Frontier Foundation and Peter Eckersley;

3.  Notice of Motion and Motion of Non-Parties International Computer Science Institute and Christian Kreibich to Quash Subpoenas and Request for Protective

Case No. C-12-80135-RS (DMR)                    -1-                    NOTICE OF RELATED CASES
SMRH:405594062.2

331

1    Order, *Feist v. RCN Corp. and Paxfire, Inc.*, Misc. Case No. 12-80140 JSW

2    (KAW) (N.D. Cal., filed June 13, 2012), seeks to quash Paxfire's document and

3    deposition subpoenas to non-parties International Computer Science Institute and

4    Christian Kreibich.

5

6    Dated:  June 20, 2012              SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

7

8                                By     */s/  Tenaya Rodewald*
                                      _____
9                                       TENAYA M. RODEWALD
                                        Attorneys for Non-parties
10                                      ELECTRONIC FRONTIER FOUNDATION and
                                        PETER ECKERSLEY
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Case No. C-12-80135-RS (DMR)            -2-                NOTICE OF RELATED CASES
SMRH:405594062.2

332

**PROOF OF SERVICE**

At the time of service, I was over 18 years of age and **not a party to this action**.  I am employed in the County of Santa Clara, State of California.  My business address is 379 Lytton Avenue, Palo Alto, CA 94301-1479.

On June 20, 2012, I served true copies of the following document(s) described as **NOTICE OF RELATED CASES** on the interested parties in this action as follows:

Daniel J. Bergeson                                        *For Defendant PAXFIRE, INC.*
Melinda M. Morton
Jaideep Venkatesan
BERGESON, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712
Telephone: (408) 291-6200
Facsimile: (408) 297-6000
dbergeson@be-law.com
mmorton@be-law.com
jvenkatesan@be-law.com

Andrew Grosso
ANDREW GROSSO & ASSOCIATES
Georgetown Place
1101 Thirtieth St., NW, Suite 300
Washington, D.C. 20007
Telephone: (202) 298-6500
Facsimile: (202) 298-5599
Agrosso@acm.org

Sanford P. Dumain                                        *For Plaintiff BETSY FEIST*
Peter E. Seidman
Melissa Ryan Clark
Adam Bobkin
MILBERG LLP
One Pennsylvania Plaza
New York, NY 10119
Telephone: (212) 594-5300
Facsimile: (212) 868-1229
sdumain@milberg.com
pseidman@milberg.com
mclark@milberg.com
abobkin@milberg.com

Michael R. Reese
Kim Richman
REESE RICHMAN LLP
875 Avenue of the Americas, 18th Floor
New York, NY 10001
Telephone: (212) 579-4625
Facsimile: (212) 253-4272
mreese@reeserichman.com
krichman@reeserichman.com

333

| | | |
|---|---|---|
| 1 | Sharon R. Smith<br>Christopher J. Banks | *For the INTERNATIONAL COMPUTER*<br>*SCIENCE INSTITUTE and* |
| 2 | MORGAN, LEWIS & BOCKIUS LLP<br>One Market, Spear Street Tower | *CHRISTIAN KREIBICH* |
| 3 | San Francisco, California 94105-1126<br>Telephone: 415.442.1754 | |
| 4 | Facsimile: 415.442.1001<br>srsmith@morganlewis.com | |
| 5 | cbanks@morganlewis.com | |

6 | David Jacobs | *For JIM GILES*
Amy B. Messigian
7 | EPSTEIN BECKER & GREEN, P.C.
1925 Century Park East, Suite 500
8 | Los Angeles, California 90067-2506
Telephone: 310.556.8861
9 | Facsimile: 310.553.2165
djacobs@ebglaw.com
10 | amessigian@ebglaw.com

11 | Peter Neger | *For Defendant RCN CORP.*
Derek Care
12 | BINGHAM MCCUTCHEN, LLP
399 Park Ave.
13 | New York, NY 10022
Telephone: 212.705.7000
14 | Facsimile: 212.752.5378
peter.neger@bingham.com
15 | derek.care@bingham.com

16

17       **BY MAIL:** I enclosed the document(s) in a sealed envelope or package addressed to the persons at the addresses listed in the Service List and placed the envelope for collection and mailing, following our ordinary business practices. I am readily familiar with the firm's practice
18 for collecting and processing correspondence for mailing. On the same day that the correspondence is placed for collection and mailing, it is deposited in the ordinary course of
19 business with the United States Postal Service, in a sealed envelope with postage fully prepaid.

20       **BY E-MAIL OR ELECTRONIC TRANSMISSION:** I caused a copy of the document(s) to be sent from e-mail address rregnier@sheppardmullin.com to the persons at the e-
21 mail addresses listed in the Service List. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful.
22

       I declare under penalty of perjury under the laws of the United States of America that the
23 foregoing is true and correct and that I am employed in the office of a member of the bar of this Court at whose direction the service was made.
24

       Executed on June 20, 2012, at Palo Alto, California.
25

26

27                                            Robin Regnier

28

334

# EXHIBIT M

## TO DECLARATION OF ANDREW GROSSO IN SUPPORT OF OPPOSITION OF PAXFIRE, INC. TO MOTION OF BETSY FEIST TO QUASH SUBPOENAS TO CONSULTANTS AND REQUEST FOR PROTECTIVE ORDER

335

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| **BETSY FEIST,** individually, and on behalf of all others similarly situated, | ) ) ) Case No. 11-cv-5436 (JGK) |
| Plaintiff, | ) ) ) |
| vs. | ) ) |
| **RCN CORPORATION** and **PAXFIRE, INC.,** | ) ) ) |
| Defendants. | ) ) |

## DECLARATION OF PETER ECKERSLEY

336

## DECLARATION OF PETER ECKERSLEY

I, Peter Eckersley, declare as follows:

1. I am the Technology Projects Director for the Electronic Frontier Foundation. I submit

   this declaration in regard to Paxfire's counterclaims in the matter of *Feist vs. RCN*

   *Corporation and Paxfire, Inc.* I am not a consultant or expert for plaintiff in this case, and

   I have not received and will not receive compensation for providing this declaration.

2. In Paragraph 36 of its counterclaims, Paxfire alleges that:

   "On or prior to August 4, 2011, and prior to filing her Class Action Complaint,
   Counterclaim Defendant Feist directly or through her agents and attorneys,
   communicated with media outlets such as the New Scientist and the Electronic Frontier
   Foundation, and informed them, falsely, of the following, and that she was about to file
   her Class Action Compliant alleging the following, all for the purpose of having them
   publish such allegations: . . . ."

   This assertion is wrong on several grounds:

3. First, Paxfire's claims assert that the EFF obtained the information in our August 4, 2011

   blog post from Ms. Feist or her agents or attorneys. This is false. In fact, we learned

   about the existence of search redirection systems at US ISPs when researchers at

   Berkeley ICSI contacted me about the results of their Netalyzr network neutrality testing

   experiments, and parallel findings by a group at Microsoft Research and the Polytechnic

   Institute of NYU. We subsequently determined that these search redirection systems

   were being operated by Paxfire via my own investigations and parallel work by the ICSI

   group.

4. Second, Paxfire implies that the Electronic Frontier Foundation's (EFF) blog post about

   Paxfire was written at the behest of Ms. Feist. This is false. The EFF regularly

   investigates and publishes information about the way the Internet works for the benefit of

   our members and the general public and as part of our advocacy work. Paxfire's business

337

practices, as revealed by the ICSI researchers to me, raise serious privacy and network neutrality concerns. I believe they are of great public importance and of interest to our members and others regardless of whether litigation exists. Having learned of Paxfire's troubling business practices before litigation was even contemplated, we would certainly have published a blog post about them even if no litigation ensued.

5. Third, Paxfire asserts that the ICSI/EFF research and blog post is based on a class action complaint. This is also false. The blog post is based on the research results. In fact, Ms. Feist's agents and attorneys learned about these research results from EFF and the researchers, not the other way round.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed on September 26, 2011, at San Francisco, California.

Peter Eckersley

338

# EXHIBIT N

**TO DECLARATION OF ANDREW GROSSO IN
SUPPORT OF OPPOSITION OF PAXFIRE,
INC. TO MOTION OF BETSY FEIST TO
QUASH SUBPOENAS TO CONSULTANTS
AND REQUEST FOR PROTECTIVE ORDER**

1 │ SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
  │   A Limited Liability Partnership
2 │   Including Professional Corporations
  │ JAMES M. CHADWICK, Cal. Bar No. 157114
3 │ TENAYA RODEWALD, Cal. Bar No. 248563
  │ 379 Lytton Avenue
4 │ Palo Alto, California 94301-1479
  │ Telephone:     650.815.2600
5 │ Facsimile:     650.815.2601
  │ Email:         jchadwick@sheppardmullin.com
6 │                trodewald@sheppardmullin.com

7 │ Attorneys for Non-Parties, ELECTRONIC
  │ FRONTIER FOUNDATION and PETER
8 │ ECKERSLEY

9 │                UNITED STATES DISTRICT COURT

10 │       NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11 │

12 │ BETSY FEIST,                          Case No. CV 12 80 135 MISC

13 │              Plaintiff,

14 │                                       DECLARATION OF PETER
   │       v.                              ECKERSLEY IN SUPPORT OF MOTION
15 │                                       TO QUASH SUBPOENAS ISSUED BY
   │ RCN CORP. and PAXFIRE, INC.,          DEFENDANT PAXFIRE, INC. AND
16 │                                       REQUEST FOR PROTECTIVE ORDER

   │              Defendants.
17 │                                       Date:
   │                                       Time:
18 │                                       Crtrm.:

19 │                                       The Hon.

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

340

1    I, Peter Eckersley, declare as follows:

2    1.    I am the Technology Projects Director for Non-Party Electronic Frontier

3    Foundation ("EFF"). I am a computer scientist who works on a wide range of Internet policy

4    issues, including copyright, freedom of speech, privacy, innovation and network neutrality. I have

5    personal knowledge of the following matters and if called as a witness, I could and would

6    competently testify to the facts stated herein.

7    **EFF and My Work As Technology Projects Director**

8    2.    Conversations with researchers and technologists, both inside and outside of

9    corporations, about technilogical matters of possible public policy and legal concern are a

10   common occurrence in my role at EFF. Often these conversations begin speculatively; they cover

11   a wide range of phenomena related to computers and the Internet; evidence and causes for these

12   phenomena; and policy concerns. Potential responses or solutions are also discussed and

13   explored. Sometimes these conversations come to nothing, but on other occasions (a couple of

14   which I note below) they lead to news stories, blog posts, white papers, software projects,

15   legislative action, activist campaigns, EFF legal cases, cases brought by others, or some

16   combination of the above. It can be difficult to determine at the outset which of these paths will be

17   the right one, and often the actual policy goals and outcomes are not formulated until after the

18   technical landscape is clear.

19   3.    It is common for these conversations to be implicitly or explicitly confidential.

20   Even where no trade secret or other proprietary material is at issue, confidentiality in these

21   conversations is an essential protection for conducting technical research; for forming and

22   developing tentative opinions without later being attacked for them; and for protecting sources

23   who feel they have important public policy issues to raise, but do not have the freedom to discuss

24   them publicly. For instance, I personally have had conversations with former employees of

25   casinos who wish to raise alarms about privacy-intrusive technologies used by those casinos but

26   who fear that they will lose their employment and no longer be hired in that industry, or be

27   subjected to other consequences, if they are publicly identified; with employees of

28   telecommunications companies about various systems they had built internally that had not been

W02-WEST:1TER1\405533740.3                    -1-
SMRH:405533740.2                    ECKERSLEY DECLARATION ISO MOTION TO QUASH SUBPOENAS

1 | publicly disclosed; with software engineers about the data their employers collect from their users'
2 | systems; with technology companies about important design decisions in forthcoming products
3 | that have not yet been announced, and the civil liberties implications of those designs; with
4 | members of federal and state regulatory agencies about potential investigations or methods of
5 | investigation; with representatives of non-profits and human rights organizations about specific
6 | computer security threats those organizations face and how to defend against them; and with staff
7 | at some of the world's largest financial firms about those companies' security practices,
8 | weaknesses in those practices, and the implications for the design of Internet protocols more
9 | generally.

10 |     4.    The loss of the ability to have such conversations in confidence, free from
11 | subsequent subpoenas or other discovery processes, would mean that many if not most of them
12 | would not occur or would occur in a very different form, limiting the information that I can
13 | receive and limiting EFF's ability to bring to the public, to legislators, and to the courts important
14 | issues affecting user privacy and other rights. This would greatly impede many aspects of EFF's
15 | work.

16 |     5.    Similarly, inside EFF we have robust conversations and deliberations both among
17 | my fellow technologists (EFF has three staff technologists) and between the EFF technologists and
18 | EFF's policy, activism and legal teams. In those conversations we freely discuss and debate
19 | technological issues, the various possible policy and legal strategies in response to technical
20 | issues, the strengths and weaknesses of potential arguments in support of or in opposition to
21 | positions EFF may take, further technical and legal development needed, and approaches to the
22 | implementation of strategies for addressing these issues. These deliberations are often wide
23 | ranging, as we decide whether a matter is best addressed through litigation, legislation, agency
24 | action (EFF sometimes files complaints with the Federal Trade Commission, for instance), public
25 | awareness, or otherwise. These discussions, which form the heart of our advocacy strategy and
26 | implementation, would be greatly chilled if they could be subpoenaed in subsequent litigation.

27
28

**This Case**

6.    For the last several years EFF has been a leading organization concerned with issues of "network neutrality," that is, in the words of a leading law professor Tim Wu, the principle that "a maximally useful public information network aspires to treat all content, sites, and platforms equally." In essence, net neutrality involves ensuring that online service providers and others do not interfere with their customers' access to any part of the Internet, or with the ecosystem of innovation and competition that has made the Internet so useful today. This issue has been the subject of legal and regulatory action by the Federal Communications Commission, multiple court cases, and much public debate and discussion. For example, in 2007, I, my colleague Seth Schoen, and a researcher named Robb Topolski had performed "network neutrality" oriented network testing experiments that obtained the first controlled evidence that Comcast was interfering with its customers internet traffic in violation of that principle. Specifically, Comcast was using forged TCP reset packets to interfere with BitTorrent and other kinds of traffic (some intentional, some apparently accidental) sent and received its customers on its cable networks. This research was a significant factor leading the Federal Communications Commission to institute legal action against Comcast and was also a factor in spurring the FCC to institute a formal rulemaking. I met Dr. Weaver at conferences and workshops discussing network measurement and testing tools, and we conversed about network congestion and other traffic phenomena, as well as methods for conducting research into the neutrality or otherwise of deployed networks.

7.    I first became aware the issues presented by Plaintiff's claims in the lawsuit against Paxfire, specifically the DNS-based redirection of search traffic on U.S. residential ISP networks, when I was contacted by Nicholas Weaver, Vern Paxson, and Christian Kriebich, researchers at the International Computer Science Institute (ICSI) affiliated with University of California at Berkeley, in April 2011.

8.    In April, 2011, Dr. Weaver and his colleagues told me that the Netalyzr network testing project had discovered that on a number of U.S. ISPs' networks, customers were receiving false Domain Name System (DNS) responses for the domains: www.bing.com, search.yahoo.com,

W02-WEST:1TER1\405533740.3
SMRH:405533740.2

-3-

ECKERSLEY DECLARATION ISO MOTION TO QUASH SUBPOENAS

1 | and sometimes www.google.com, the domains for the largest English language search engines

2 | The DNS is responsible for turning the human-readable domain names that we use every day (like

3 | "www.google.com" or "www.bing.com") into the Internet Protocol (IP) address (like

4 | "74.125.225.105" or "50.63.71.1") that computers actually use to route Internet traffic to the

5 | correct destination. Netalyzr had discovered that sometimes a customer's computer would request

6 | the IP address for "google.com," for example, and the customer would receive back an IP address

7 | that wasn't actually associated with "google.com." This would be like calling directory assistance

8 | for Google, Inc.'s phone number and being told the wrong number. You would dial the number,

9 | thinking you were calling Google, even though you were calling someone else. Similarly, when a

10 | user's computer receives a DNS response with an IP address that isn't a correct address for that

11 | domain name, the user's computer will still try and communicate with that domain name, but it

12 | will make connections and send data to the wrong machines on the Internet.

13 |     9.    If the phenomenon of false DNS responses had occurred by accident, users would

14 | experience error messages or incongruous results (such as the wrong web page loading for

15 | www.google.com). This would be like calling the number you had been given for Google, Inc.,

16 | and being told the number wasn't in service or that you had reached someone's home answering

17 | machine. Something would be obviously wrong. Alternatively, you might dial the incorrect

18 | number you were given and someone might answer "hello, this is Google." Similarly, when a

19 | user's computer tried to communicate using an incorrect IP address, the computers it contacted

20 | might act like the real search engine, sending back pages of results that were identical or similar to

21 | those the user expected. For a large and complicated website like a search engine, this would most

22 | feasibly be performed by relaying the user's search queries on to the real search engine, and

23 | transmitting the results pages back to the user. The results might be either completely unchanged

24 | or changed in ways that the relayer requests (here it appeared that there were changed responses

25 | when the user typed in some terms that also match to particular brand names).

26 |     10.    Computer scientists commonly call this arrangement, where a computer has

27 | injected itself as an unauthorized and unexpected party to a communication, a "man-in-the-

28 |

W02-WEST:1TER1\405533740.3         -4-

SMRH:405533740.2          ECKERSLEY DECLARATION ISO MOTION TO QUASH SUBPOENAS

1 | middle." There was extensive evidence that this was happening on the networks flagged by the
2 | Netalyzr experiment.

3 |     11.    The ICSI researchers had published one preliminary paper about this phenomenon.
4 | Another research team, at Microsoft Research and New York Polytechnic University, had also
5 | discovered it and had published a paper conjecturing about its causes.

6 |     12.    The widespread occurrence of this phenomenon on residential ISPs' networks
7 | raised a number of serious policy issues for me and EFF. These included privacy concerns,
8 | because the "man in the middle" devices would receive all of the affected users' search terms and
9 | corresponding search results, apparently without the knowledge of the users. Obviously this can
10 | include extremely sensitive information, as users increasingly use search engines to research and
11 | find information about their health, finances, sexual relations, religion, politics and many other
12 | intimate topics. Even a history of the brand names searched for by a particular individual or
13 | household might be sensitive under some circumstances.

14 |     13.    The policy issues also included concerns about network neutrality and the integrity
15 | and trustworthiness of the network itself. The development and improvement of network
16 | protocols, applications and systems on top of the Internet is only possible if programmers can
17 | count on the Internet transmitting data in predictable ways. "Man in the middle" devices of the
18 | sort that Netalyzr had discovered in this case pose a serious threat to that innovation process,
19 | because they are necessarily engineered with a set of assumptions about the semantics of data
20 | being sent over the network. If every ISP on the planet installed different sets of traffic rerouting,
21 | inspection and modification equipment, innovation in Internet protocols would be greatly
22 | impeded, because newly invented protocols, or new variants of existing protocols, would prove to
23 | be incompatible with different subsets of that equipment.

24 |     14.    The privacy, network neutrality, and complication of innovation issues were our
25 | main policy and legal concerns, although we also feared that the introduction of "man in the
26 | middle" systems would make search engines less reliable to users, and that consumers would
27 | incorrectly blame Google, Microsoft, or Yahoo! if one of these mysterious "man in the middle"
28 | systems was broken. There was evidence that such breakage had occurred from time to time.

15.     Given the serious public policy, privacy and consumer protection issues, implicated by the Netalyzr observations, and consistent with EFF's network neutrality concerns and overall concern with consumer protection, privacy, and the health of the Internet, we were deeply concerned about the findings of the research. We wanted to assist in developing it, bringing the results to the public, and possibly with the pursuit of legal action.

16.     We decided, in conjunction with the ICSI researchers, to expose the redirection in an article (a "blog post") published on EFF's website. As explained in the blog post, it had been determined that Paxfire was redirecting the search engine traffic. Attached hereto as Exhibits A and B, respectively, are copies of the blog post and a post explaining certain revisions we made to the blog post after being contacted by Paxfire's counsel.

17.     As part of preparing the blog post, I talked to both the ICSI researchers and other sources, all with the intention and understanding that the discussions and/or the names of the sources themselves remain confidential. I also conducted my own research. My investigations were done from California, where I live and work. The ICSI researches and all of the other sources I talked to were also located in California. Communications I had with employees of Google, Yahoo!, Microsoft or others regarding Paxfire, if any, were undertaken as part of these investigations, and I implicitly or explicitly promised my sources confidentiality.

18.     We developed the blog post through a drafting process that included a number of drafts exchanged between EFF and the ICSI researchers.

19.     As the blog post was being developed, EFF decided not to bring litigation itself. Yet we were still concerned about the behavior of Paxfire and the ISPs. As a result, and as part of EFF's consumer and civil rights advocacy, I contacted Plaintiff's counsel to tell them about the results of the research and offered, if counsel decided to bring suit based on the information, to provide advice and to consult regarding issues in a lawsuit. EFF and I had assisted Plaintiff's counsel with previous litigation arising from other violations of network neutrality and other privacy issues as a paid consultant. As a result of that experience, I believed that they would understand the complex technical issues and also believed that they would seek a resolution that protected internet users.

1    20.    At some point during these conversations, it was decided that I would not act as a

2 paid expert consultant in this particular matter. As a result, neither EFF nor I were retained as paid

3 consultants by Plaintiff's counsel. However, Plaintiff's counsel consulted me and EFF in our

4 capacity as experts in the technology at issue, industry practices, and related law and policy.

5    **Importance of Confidentiality**

6    21.    As the above indicates, EFF developed and acquired information about the issues

7 raised by the conduct of Paxfire and the ISPs involve in the underlying lawsuit; discussed the

8 matter with the ICSI researchers as part of our further investigations and in developing and

9 drafting the blog post; edited the blog post; engaged in internal discussions about what to do with

10 the information, how to develop the information further, and whether to undertake litigation

11 directly or refer the matter out; and discussed the underlying issues and potential approaches to

12 litigation with Plaintiff's counsel. All of those communications were understood to be

13 confidential, and were intended to remain confidential.

14    22.    The disclosure of EFF's external discussions concerning Paxfire's redirection of

15 user search results and other activities through the document and deposition subpoenas at issue

16 will result in a chilling effect on me and others outside EFF. To be fair to those who approach me

17 in the future with information that might become the subject of litigation and to ensure that neither

18 I nor EFF would be subject to legal claims by sources, I would be compelled to tell them that I

19 might be forced to reveal our communications and that this may include revealing it to the very

20 company or other entity that they are concerned about or even employed by. I would also need to

21 tell them that the information may end up on the public record. This will result in fewer people

22 bringing their concerns to EFF or sharing information with us.

23    23.    Additionally, when I am researching topics for publication, and reaching out to or

24 interviewing sources, I will no longer be able to offer my sources meaningful assurances of

25 confidentiality. This will severely impair my ability gather news and information to publish in

26 articles and blog posts. I regularly rely on my contacts in the technology industry, in government,

27 and in other sectors to provide information and insight for work that I intend to publish. Many

28

W02-WEST:1TER1\405533740.3                     -7-
SMRH:405533740.2
                                        ECKERSLEY DECLARATION ISO MOTION TO QUASH SUBPOENAS

1 | people who act as sources would be unwilling to do so if their employers or others could discover
2 | that they had shared information with me.

3 |     24.    Similarly, the revelation of EFF's internal discussions will result in a sharp chilling
4 | effect inside the organization as we deliberate about the best ways to use the information that we
5 | have developed or received to help protect users online. It will be difficult if not impossible to
6 | engage in frank discussions of sensitive technological issues and potential strategies if records of
7 | those discussions can be obtained through discovery in litigation.

8 |     25.    The effect on both our internal and external discussions will be to greatly
9 | undermine and harm EFF's ability to participate effectively in public debate, in litigation, and in
10 | the legislative and administrative processes with critical technical information and a legal or
11 | policy strategy that is timely and appropriate. Ultimately, the effect will be that EFF will be far
12 | less able to stand up for users of technology and serve its role as a public watchdog.

13 |     I declare under penalty of perjury under the laws of the United States of America that the
14 | foregoing is true and correct. Executed on June 5, 2012.

15 |
16 |
17 |                                    _____
18 |                                        PETER ECKERSLEY
19 |
20 |
21 |
22 |
23 |
24 |
25 |
26 |
27 |
28 |

348





## ELECTRONIC FRONTIER FOUNDATION
DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD

SEARCH

| HOME | ABOUT | OUR WORK | DEEPLINKS BLOG | PRESS ROOM | TAKE ACTION | SHOP |



AUGUST 4, 2011 | BY PETER ECKERSLEY

# Widespread Hijacking of Search Traffic in the United States

*By ICSI researchers Christian Kreibich, Nicholas Weaver and Vern Paxson, with Peter Eckersley.*

**UPDATE, 8/25/11: There are a couple of revisions to this post which are marked inline below, and explained further here.**

Earlier this year, two research papers reported the observation of strange phenomena in the Domain Name System (DNS) at several US ISPs. On these ISPs' networks, some or all traffic to major search engines, including Bing, Yahoo! and (sometimes) Google, is being directed to mysterious third party proxies.

A report in New Scientist today documents that the traffic is being rerouted through a company called Paxfire. This blog post, coauthored with one of the teams that discovered the phenomenon, will explain the situation in more detail.

### Who is rerouting this search traffic?

The published research papers did not identify the controller of the proxy servers that were receiving the traffic, but parallel investigations by the ICSI Networking Group and EFF have since revealed a company called Paxfire as the main actor behind this interception. Paxfire's privacy policy says that it may retain copies of users' "queries", a vague term that could be construed to mean either the domain names that they look up or the searches they conduct, or both. The redirections mostly occur transparently to the user and few if any of the affected ISP customers are likely to have ever heard of Paxfire, let alone consented to this ~~collection~~ rerouting and occasional logging and alteration of their communications with search engines.

The proxies in question are operated either directly by Paxfire, or by the ISPs using web proxies provided by Paxfire. Major users of the Paxfire system include Cavalier, Cogent, Frontier, Fuse, DirecPC, RCN, and Wide Open West. Charter also used Paxfire in the past, but appears to have discontinued this practice.

### Why do they do this?

In short, the purpose appears to be monetization of users' searches. ICSI Networking's investigation has revealed that Paxfire's HTTP proxies selectively siphon search requests out of the proxied traffic flows and redirect them through one or more affiliate marketing programs, presumably resulting in commission payments to Paxfire and the ISPs involved. The affiliate programs involved include Commission Junction, the Google Affiliate Network, LinkShare, and Ask.com. When looking up brand names such as "apple", "dell", "groupon", and "wsj", the affiliate programs direct the queries to the corresponding brands' websites or to search assistance pages instead of providing the intended search engine results page.

### What can I do about it?

If you want to know if the network you're currently on is subject to this type of traffic redirection, you can run a Netalyzr test. And the best protection against the privacy and security risks created by this type of hijacking is to visit sites using HTTPS rather than HTTP, which can easily be achieved using EFF's HTTPS Everywhere Firefox extension.

More technical details below...

### A detailed explanation

For most users of the World Wide Web, visiting a website equals clicking on a link to the site or entering the site's name into their browser, and receiving the corresponding page from the site. Users generally assume that the site's name is identical to the site itself, and essentially trust the site's authenticity if it looks as usual and the browser does not pop up phishing warnings or other signs of trouble. Paxfire's misdirection of search traffic undermines this trust.

The ICSI Networking group develops and operates the ICSI Netalyzr, a tool that tests the characteristics of users' Internet connections. Netalyzr's measurements show that approximately a dozen US Internet Service Providers (ISPs), including DirecPC, Frontier,

### Stay in Touch

Email Address

Zip Code (optional)

SIGN UP NOW

### Follow EFF

Is Israel's search of visitors' email accounts legal? Analysis from lawyer @JonKlinger
https://eff.org/r.4acA
JUN 6 @ 1:08PM

LinkedIn iOS app caught leaking user meeting details back to their servers, says @nytimes https://eff.org/r.2ac7
JUN 5 @ 6:00PM

Twitter  Facebook  Identi.ca

### Projects

HTTPS Everywhere

Bloggers' Rights

Coders' Rights

FOIA Project

Follow EFF

Free Speech Weak Links

Global Chokepoints

Patent Busting

Surveillance Self-Defense

Takedown Hall of Shame

Teaching Copyright

Ways To Help

Hughes, and Wide Open West, deliberately and with no visible indication route thousands of users' entire web search traffic via Paxfire's web proxies.

To explain these redirections further, we first need to delve into the workings of the Internet a bit. Since the Internet does not route traffic to names but to network addresses, contacting a website involves translating the site's name (say "www.google.com") to the IP address (say 74.125.224.49) of a computer that runs Google's web server. It is to this address that the browser actually sends its request. The Domain Name System (DNS) is in charge of facilitating this mapping of names to addresses. It is the Internet's equivalent of telephone books.

Usually, ISPs provide DNS servers (directory assistance, essentially) for their users. When a user's computer asks to map a name to an IP address, the user's system contacts the ISP's DNS server, which looks up the correct IP address for the name and returns it to the user. As currently implemented, this process does not provide any guaranteed correctness. In essence, users must trust their ISP's DNS servers to correctly return IP addresses that indeed belong to the site the user intends to visit. In some instances, however, this trust may not be warranted.

For a while now, a number of ISPs have worked in cooperation with Paxfire and similar businesses like Barefruit and Golog to profit from mistakes that users make when typing names into their browsers. Paxfire provides a product for ISPs that rewrites DNS errors (effectively conveying "the name you asked for doesn't exist") to responses sending users to search pages that host advertisements, for which Paxfire then shares the corresponding ad-related revenue with the ISPs. This practice has already been controversial.

Rerouting of requests to and responses from search engines

Paxfire's product also includes an optional, unadvertised, and more alarming feature that drastically expands Paxfire's window into users' traffic. Instead of activating only upon error, this product redirects the customers' *entire* web search traffic destined for Yahoo!, Bing, and sometimes Google, to a small number of separate web traffic proxies.

These proxies ~~collect~~ receive, examine and process all search terms and results, but only log a small subset of search queries that were entered into a browser search box and are related to major trademark holders, ~~the users' web searches and the corresponding search results,~~ mostly forwarding ~~them~~ the rest to and from the intended search engines. This allows ~~Paxfire and/or the ISPs to directly monitor all searches made by the ISPs' customers~~ Paxfire's code to examine the queries and responses, selecting out those that are of relevance to its business. ~~and build up corresponding profiles, a process on which Paxfire holds a patent.~~ It also puts Paxfire in a position to modify the underlying traffic if it decides to.

Under specific conditions, the Paxfire proxies do not merely relay traffic to and from the search engines. When the user initiates searches for specific keywords from the browser's URL bar or search bar, the proxy no longer relays the query to the intended search engine, but instead redirects the browser's request through affiliate networks, as the equivalent of a click on advertisements. Using the names of popular websites, we have so far identified 170 brand-related keywords that trigger redirections via affiliate programs and result either on the brands' sites or on search assistance pages unrelated to the intended search engine results page.

The subset of customers affected varies from temporally localized deployments to apparently entire customer bases. The DNS-based redirection operates in a surgical fashion, affecting only search engines but not other services such as Google Maps or Yahoo! Mail, and remains completely invisible to the user. The treatment of Google queries varies. Charter and Cogent appear to redirect only Bing and Yahoo, while DirecPC, Frontier and Wide Open West also used to redirect Google to Paxfire proxies located within their own networks. Google has recently put significant pressure (see the answer to the question) on the ISPs to get them to stop redirecting Google searches. As of August 2011, all major ISPs involved have stopped proxying Google, but they still proxy Yahoo and Bing.

Net Neutrality  Privacy

**MORE DEEPLINKS POSTS LIKE THIS**

AUGUST 2011
An update on Paxfire and search redirection

AUGUST 2006
How To Keep Your Search History Private

AUGUST 2011
Website Blocking – Off The Table in the UK (For Now)

JUNE 2010
European Privacy Officials: Google, Yahoo, and Microsoft Are Still Breaking

**RECENT DEEPLINKS POSTS**

JUN 4, 2012
EFF Tells CA Supreme Court Warrantless DNA Collection Unconstitutional

JUN 1, 2012
CA Location Privacy Bill Advances, Similar DC Bill Finally Gets a Hearing

JUN 1, 2012
Congressional Witnesses Agree: Multistakeholder Processes Are Right for Internet Regulation

MAY 31, 2012
Trojan Hidden in Fake Revolutionary

| European Privacy Law | Documents Targets Syrian Activists |
|---|---|
| MARCH 2008 | MAY 31, 2012 |
| Software for Keeping ISPs Honest | No Copyrights on APIs: Judge Defends Interoperability and Innovation |

## DEEPLINKS TOPICS

Analog Hole
Anonymity
Anti–Counterfeiting Trade Agreement
Biometrics
Bloggers Under Fire
Bloggers' Rights
Broadcast Flag
Broadcasting Treaty
CALEA
CDA 230
Cell Tracking
Coders' Rights Project
Content Blocking
Copyright Trolls
Council of Europe
Cyber Security Legislation
CyberSLAPP
Development Agenda
Digital Books
Digital Radio
Digital Video
DMCA
DMCA Rulemaking
Do Not Track
DRM
E–Voting Rights
EFF Europe

EFF Software Projects
FAQs for Lodsys Targets
File Sharing
FOIA
Free Speech
FTAA
Health Privacy
Hollywood v. DVD
How Patents Hinder Innovation (Graphic)
Innovation
Intellectual Property
International
International Privacy Standards
Internet Blacklist Legislation
Internet Governance Forum
Locational Privacy
Mandatory Data Retention
Mandatory National IDs and Biometric Databases
Mass Surveillance Technologies
National Security Letters
Net Neutrality
No Downtime for Free Speech
NSA Spying
OECD
Online Behavioral Tracking
Patent Busting Project
Patent Trolls

Patents
PATRIOT Act
Pen Trap
Policy Analysis
Printers
Privacy
Reading Accessibility
Real ID
RFID
Search Engines
Search Incident to Arrest
Security
Social Networks
Terms Of (Ab)Use
Test Your ISP
The Global Network Initiative
Trans–Pacific Partnership Agreement
Transparency
Travel Screening
Trusted Computing
Uncategorized
Video Games
Wikileaks
WIPO
Broadcast Flag

Thanks | RSS Feeds | Copyright Policy | Privacy Policy | Contact EFF





**ELECTRONIC FRONTIER FOUNDATION**
DEFENDING YOUR RIGHTS IN THE DIGITAL WORLD

[ SEARCH ]

| HOME | ABOUT | OUR WORK | DEEPLINKS BLOG | PRESS ROOM | TAKE ACTION | SHOP |

AUGUST 25, 2011 | BY

## An update on Paxfire and search redirection

By ICSI researchers Christian Kreibich, Nicholas Weaver and Vern Paxson, with Peter Eckersley and Cindy Cohn.

Two weeks ago, EFF published an analysis with researchers at Berkeley ICSI about the redirection of search traffic at a number of US ISPs. The company involved, Paxfire, contacted us to discuss its practices, and based upon those discussions and some further analysis we have a number of clarifications and updates to report. These clarifications are of course our own, and not Paxfire's.

Overall, Paxfire admits that it sends users' searches through its proxy servers (we call this redirection; Paxfire disagrees), and that while the proxies look at the searches for specific things, Paxfire maintains that it does not retain logs of these queries unless the user is searching for specific trademark terms using the search box in the browser. In those cases, the search and IP address are logged and the user is sent to the brand's website directly, rather than to the search engine, and Paxfire and the ISP collect a fee for the referral. Thus, while the Paxfire technology examines and processes users' queries and sometimes sends users a response different than the search engine results page they might have expected (and that is often even branded as a search engine in their browser), Paxfire strongly denies collecting or using any of that information for any purpose other than conducting its affiliate marketing businesses.

Based upon their representations, and assuming for these purposes that they are correct (a pending lawsuit may delve into the matter further), we agree that the blog post wasn't clear enough about the possible differences between the fact that this data is redirected to Paxfire's proxies and what Paxfire says it actually retains, and is limited to retaining by its contracts with ISPs. We do think that the post should have been clearer on that issue. Accordingly, our blog post will be revised as follows:

1. In our post we said that Paxfire "collects" copies of all search terms and results. Taking Paxfire at its word, it would be more precise to say that it "receives, examines and processes all search terms and results, but only logs a small subset of search queries that were entered into a browser search box and are related to major trademarked brands."

2. We said that "this allows Paxfire and/or the ISPs to directly monitor all searches made by the ISPs' customers and build up corresponding profiles, a process on which Paxfire holds a patent." Paxfire first disputes our characterization of "monitoring" and "profiles." We should clarify that while the code on Paxfire's proxy servers examines and processes all affected users' searches, Paxfire maintains that its employees do not. And while it is true that Paxfire's proxies could be reconfigured to do more invasive monitoring of searches, Paxfire says that it does not do this and that its contracts with the ISPs do not allow it to do so. Again, for purposes of this blog post, we take them at their word and have removed these terms, but we will be watching the situation closely as it develops in the lawsuit and elsewhere.

3. Paxfire next disputes the characterization of one of their patents as describing the construction of profiles from searches. Accordingly, we have read that patent more closely. As with many software patents, it is a complicated and ambiguous document. There is no question that the patent overall describes tracking and profiling of Internet users. For instance, it says:

   > "In certain embodiments, the Internet appliance may return customer-specific, geographically-relevant, and/or time-relevant content based upon a profile stored for that particular requesting computer or ISP.", and

   > "In addition, the result page may be built dynamically in real time and/or on-the-fly based upon profile information stored for the ISP or based upon the IP Address of the requester. The IP Address may be used to localize the requester all the way down to a known individual user and/or provide information about the geo-location of the requesting computer."



[ Donate to EFF ]

[ Join EFF ]

**Stay in Touch**

Email Address

Zip Code (optional)

[ SIGN UP NOW ]

**Follow EFF**

Is Israel's search of visitors' email accounts legal? Analysis from lawyer @jonklinger
https://eff.org/r.4acA
JUN 6 @ 1:08PM

LinkedIn iOS app caught leaking user meeting details back to their servers, says @nytimes https://eff.org /r.2ac7
JUN 5 @ 6:00PM

[ Twitter ] [ Facebook ] [ Identi.ca ]

**Projects**

HTTPS Everywhere

Bloggers' Rights

Coders' Rights

FOIA Project

Follow EFF

Free Speech Weak Links

Global Chokepoints

Patent Busting

Surveillance Self-Defense

Takedown Hall of Shame

Teaching Copyright

Ways To Help

However the actual claims in the patent are only about DNS-based profiling. Accordingly, in mentioning the patent, our post should have said that this Paxfire patent has patent **claims** only about DNS-based profiling, and not search-term based profiling. Paxfire also asserts that this particular patent has nothing to do with its current business activities. As a result, we're removing the reference to the patent entirely.

4. Paxfire has told us that it believes it has consent from the affected Internet users to perform the search redirections (and the typo-redirections, which is Paxfire's other service) via ISPs' privacy policies and terms of service. Paxfire also claims that ISPs allow users to opt-out. We have a couple of things to say about this:

   1. We have read a number (although not all) of the privacy policies and terms of service of the ISPs that use Paxfire, and we respectfully disagree that they create anything resembling informed consent for Paxfire's behavior by users. In most instances, subscribers reading these documents would have no idea that Yahoo!, Bing or Google searches in their browser are actually not going to those search engines directly and, in some cases, aren't going to the search engines at all.

   2. If ISPs intend to make significant deviations from the way that Internet users expect the network to function, these changes should be opt-in, especially when the goal (as Paxfire makes crystal clear in its website come-on to ISPs) is not to serve customers as much as to leverage customer activities to create revenue for the ISP and Paxfire. This sort of business model needs to be made especially clear to the customers it affects.

Overall, while we believe these changes to our original blog post are appropriate, we remain deeply concerned by both the privacy and the network neutrality implications of Paxfire's business. We also still strongly recommend HTTPS Everywhere for users who don't want to have to read the fine print of their ISP privacy policy in order to ensure that they are actually talking to the sites they think they are.

Privacy   Net Neutrality

## MORE DEEPLINKS POSTS LIKE THIS

AUGUST 2011
Widespread Hijacking of Search Traffic in the United States
OCTOBER 2011
Google Encrypts More Searches
FEBRUARY 2006
Subpoenas and Your Privacy
JANUARY 2010
12 Trends to Watch in 2010
MARCH 2012
Dangerously Vague Cybersecurity Legislation Threatens Civil Liberties

## RECENT DEEPLINKS POSTS

JUN 4, 2012
EFF Tells CA Supreme Court Warrantless DNA Collection Unconstitutional
JUN 1, 2012
CA Location Privacy Bill Advances, Similar DC Bill Finally Gets a Hearing
JUN 1, 2012
Congressional Witnesses Agree: Multistakeholder Processes Are Right for Internet Regulation
MAY 31, 2012
Trojan Hidden in Fake Revolutionary Documents Targets Syrian Activists
MAY 31, 2012
No Copyrights on APIs: Judge Defends Interoperability and Innovation

## DEEPLINKS TOPICS

Analog Hole
Anonymity
Anti-Counterfeiting Trade Agreement
Biometrics
Bloggers Under Fire
Bloggers' Rights
Broadcast Flag
Broadcasting Treaty
CALEA
CDA 230
Cell Tracking
Coders' Rights Project
Content Blocking
Copyright Trolls
Council of Europe
Cyber Security Legislation
CyberSLAPP
Development Agenda
Digital Books
Digital Radio

EFF Software Projects
FAQs for Lodsys Targets
File Sharing
FOIA
Free Speech
FTAA
Health Privacy
Hollywood v. DVD
How Patents Hinder Innovation (Graphic)
Innovation
Intellectual Property
International
International Privacy Standards
Internet Blacklist Legislation
Internet Governance Forum
Locational Privacy
Mandatory Data Retention
Mandatory National IDs and Biometric Databases

Patents
PATRIOT Act
Pen Trap
Policy Analysis
Printers
Privacy
Reading Accessibility
Real ID
RFID
Search Engines
Search Incident to Arrest
Security
Social Networks
Terms Of (Ab)Use
Test Your ISP
The Global Network Initiative
Trans-Pacific Partnership Agreement
Transparency
Travel Screening
Trusted Computing

fire-and-search-redirection

Digital Video
DMCA
DMCA Rulemaking
Do Not Track
DRM
E-Voting Rights
EFF Europe

Mass Surveillance
Technologies
National Security Letters
Net Neutrality
No Downtime for Free Speech
NSA Spying
OECD
Online Behavioral Tracking
Patent Busting Project
Patent Trolls

Uncategorized
Video Games
Wikileaks
WIPO
Broadcast Flag

Thanks | RSS Feeds | Copyright Policy | Privacy Policy | Contact EFF

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | | |
|---|---|---|
| BETSY FEIST | ) | |
| *Plaintiff* | ) | Civil Action No.   11 CIV 5436 (JGK) |
| v. | ) | |
| RCN CORP. and PAXFIRE, INC. | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Southern District of New York            ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Custodian of Records, Electronic Frontier Foundation, 454 Shotwell Street, San Francisco, California 94110

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

| Place: Duane Morris, LLP, Attn: Joseph Burton, Esq. Suite 2200, One Market Plaza, Spear Tower San Francisco, CA 94105 | Date and Time: 05/23/2012 0:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:   04/22/2012

*CLERK OF COURT*                          OR

_____
*Signature of Clerk or Deputy Clerk*

Andrew Grosso
Digitally signed by Andrew Grosso
DN: cn=Andrew Grosso, o=Andrew Grosso & Associates, ou, email=Agrosso@acm.org, c=US
Date: 2012.04.22 16:07:20 -04'00'

_____
*Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*  Paxfire, Inc., Defendant and Counterclaim Plaintiff _____ , who issues or requests this subpoena, are:

Andrew Grosso; Andrew Grosso & Associates, Georgetown Place, Suite 300, 1101 Thirtieth Street, NW, Washington, D.C. 20007; (202) 298-6446; Agrosso@acm.org

357

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   11 CIV 5436 (JGK)

## PROOF OF SERVICE
*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

_____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____          _____
                                                      *Server's signature*

                                            _____
                                                      *Printed name and title*

                                            _____
                                                      *Server's address*

Additional information regarding attempted service, etc:

358

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

(1) *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

(2) *Command to Produce Materials or Permit Inspection.*

(A) *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

(B) *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

(i) At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

(ii) These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

(3) *Quashing or Modifying a Subpoena.*

(A) *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

(i) fails to allow a reasonable time to comply;

(ii) requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

(iii) requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

(iv) subjects a person to undue burden.

(B) *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

(i) disclosing a trade secret or other confidential research, development, or commercial information;

(ii) disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

(iii) a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

(C) *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

(i) shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

(ii) ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

(1) *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

(A) *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

(B) *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

(C) *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

(D) *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

(2) *Claiming Privilege or Protection.*

(A) *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

(i) expressly make the claim; and

(ii) describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

(B) *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

**SUBPOENA TO EFF**

**DEFINITIONS AND INSTRUCTIONS**

A. The term "Ms. Feist" refers to the Plaintiff-Counterclaim Defendant Betsy Feist, and to her attorneys and agents, including her attorneys in this matter: Milberg, LLP, Reese Richman, LLP, and all attorneys in such firms.

B. The term "Paxfire" refers to the Defendant-Counterclaim Plaintiff Paxfire, Inc. and every employee, agent or other person acting or purporting to act on its behalf.

C. The term "RCN" means defendant RCN Telecom Services, LLC and any division, parent, subsidiary, affiliate, licensee, franchisee, successor, predecessor in interest, assignee or other related business entity, and the predecessors of any of them and every employee, agent or other person acting or purporting to act on its behalf.

D. The term "RCN Network" refers to the network through which RCN provides its end users or subscribers access to the Internet.

E. The term "RCN Subscriber" refers to any individual who purchased access to the RCN Network during any period from April 1, 2007 to the present.

F. The term "Paxfire Technology" refers to hardware or software created or disseminated by Paxfire.

G. The term "Device" refers to any computer, telephone, tablet, handheld computer or other hardware capable of, and used for the purpose of, accessing the Internet.

H. The term "EFF" refers to the Electronic Frontier Foundation and its employees,
agents or other persons acting or purporting to act on its behalf, including but not limited to Lee Tien, Attorney, and Peter Eckersley, Technology Projects Director, EFF.

I. The term "ICSI" refers to the International Computer Science Institute and its employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to ICSI researchers Nicholas Weaver, Christian Kreibich and Vern Paxson, or any other individual involved in the use or development of Netalyzr.

J. The term "Poly NYU" refers to the Polytechnic Institute of NYU and its employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to Poly NYU researchers Chao Zhang, Keith W. Ross, or any other individual involved in the use or development of the DNS Echo Experiment or the Netalyzr.

1

360

K. The term "Milberg" refers to the law firm Milberg LLP and its attorneys, employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to Sanford Dumain, Peter Seidman, Charles Slidders, and Melissa Clark.

L. The term "Reese Richman" refers to the law firm Reese Richman LLP and its attorneys, employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to Kim Richman and Michael E. Reese.

M. The term "Microsoft Research" refers to Microsoft Research and its employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to Microsoft Research researchers Cheng Huang, David Maltz, Jin Li, or any other individual involved in the use or development of the DNS Echo Experiment or the Netalyzr.

N. The term "Microsoft" refers to the Microsoft Corporation and any division, parent, subsidiary, affiliate, licensee, franchisee, successor, predecessor in interest, assignee or other related business entity, including Microsoft Research and Bing, and the predecessors of any of them and every employee, agent or other person acting or purporting to act on its behalf.

O. The term "Google" refers Google, Inc. and any division, parent, subsidiary, affiliate, licensee, franchisee, successor, predecessor in interest, assignee or other related business entity, and the predecessors of any of them and every employee, agent or other person acting or purporting to act on its behalf.

P. The term "Yahoo!" refers to Yahoo!, Inc. and any division, parent, subsidiary, affiliate, licensee, franchisee, successor, predecessor in interest, assignee or other related business entity, and the predecessors of any of them and every employee, agent or other person acting or purporting to act on its behalf.

Q. The term "document" shall be construed in its broadest possible sense under Federal Rule of Civil Procedure 34 and Rule 26.3 of the Local Rules of this Court, and includes, without limitation, any tangible thing in EFF's possession, custody or control, wherever located, whether sent or received or neither, whether an original or a copy, including, without limitation, any written, typed, punched, encoded, printed, recorded, magnetic, graphic or photographic materials, however produced or reproduced, any mechanical recording of any oral material or any sound or visual reproduction, or any drawing, sketch or schematic rendering or other descriptive materials or any retrievable data or information, however stored, recorded or coded, or any electronic mail. In all cases where originals and/or non-identical copies are not available, the term "document" also means identical copies of original documents and copies of non-identical copies.

R. The term "electronic mail" means all original and any non-identical copies of documents sent or received as electronic mail (including all electronic mail attachments), whether in printed or electronic form of any kind, including without limitation data stored

2

361

on hard disks, floppy disks, servers, magnetic tape, personal or handheld computers or
devices (such as, but not limited to, Palm or BlackBerry devices), in random access
memory or in read-only memory. For purposes of this definition, the electronic version of
any electronic mail is deemed to be an original, irrespective of the existence or creation
of a hard copy print out of that electronic mail, and you are required to produce all
responsive documents stored in electronic format. "Electronic mail" includes all
electronic mail in your possession, and is not limited to electronic mail stored in the
senders' or recipients' files or computers, and includes any electronic mail that has been
deleted from the senders' or recipients' computers.

S. The term "concerning" means relating, referring, describing, evidencing or
constituting.

T. The term "communication" includes, without limitation, any conversation,
meeting, visit, correspondence, cable, telex, facsimile, telephone call, electronic mail,
computer message, signal or other transmission of information or data in any form or
manner.

U. The term "including" means "including without limitation."

V. Each of the terms "each" and "any" and "all" shall be construed inclusively to
mean "each and any and all."

W. Whenever the terms "and" or "or" are used, including but not limited to when
used within any of the foregoing defined terms, they are to be construed both
disjunctively and conjunctively as necessary to bring within the scope of these requests
responses that might otherwise be construed to be outside their scope.

X. The use, including but not limited to in any of the foregoing defined terms, of
the singular form of any word includes the plural and vice versa.

Y. References to one gender shall apply equally to the other gender.

Z. In answering these requests, even though the requests may be directed to the
"New Scientist," you shall furnish all information available to the New Scientist,
including information in the possession of EFF's attorneys or investigators, or which
were prepared on their behalf.  If EFF cannot respond to any of the following requests in
full after exercising due diligence to secure the requested information, please state an
explanation to the extent possible, specifying EFF's inability to respond to the remainder
and stating whatever information or knowledge you have concerning the portions that
have been left unanswered in whole or in part.

AA. To the extent that any of the following requests call for information that
allegedly is subject to a claim of privilege or attorney's work-product, answer so much of
each request without disclosing privileged or confidential information. With respect to
those portions of the discovery requests that do request privileged or confidential

3

information, set forth the basis for your claim of privilege or any other objection you may have.

BB. If any document covered by these requests is withheld or not produced on the basis of a claim of privilege or any other objection, EFF shall provide Paxfire with a log listing the following information for each of the documents:

(i) The reason(s) for withholding production of the document and any supporting facts;

(ii) The subject matter of the document;

(iii) The names of each individual to whom copies were distributed;

(iv) The date the document was prepared;

(v) The name, employment, position and address of the author(s) and/or preparer(s) of the document;

(vi) A brief description of the document; and

(vii) The number of the request under which each document would otherwise be produced.

CC. Unless otherwise set forth in any specific request, these requests apply to the time period beginning January 1, 2007 to the present.

DD. These requests are continuing in nature and EFF is required to supplement its production herein upon receipt or discovery of additional documents pertinent to any of these requests.

4

**Documents Commanded to Be Produced**

1. For the period 2008 until the present: All documents identifying or referencing Betsy Feist, Milberg LLP, or Reese Richman LLP.

2. For the period 2008 until the present: All remuneration, including donations, from Betsy Feist, Milberg LLP, or Reese Richman LLP

3. For the period 2008 until the present: All documents pertaining to any lawsuit, investigation or other judicial or administrative proceeding in which EFF or any person associated with EFF participated, as a party, witness, expert witness, consultant, advisor or otherwise, where a law firm involved in any way in such proceeding was Milberg LLP or Reese Richman LLP.

4. For the period January 1, 2011 until the present, all correspondence and communications, including but not limited to email, and all documentation and records pertaining to any such correspondence or communications, including those authored, received, forwarded or otherwise transmitted by EFF or Peter Eckersely, pertaining to (including but not limited to those to, from, or otherwise communicated with ICSI or Poly NYU):

    (a) Betsy Feist,

    (b) Milberg LLP, Richman Reese LLP, or any attorney or other employee of Milberg LLP or Richman Reese LLP:

    (c) Paxfire;

    (d) RCN Corporation, Cavalier, Charter, Cincinnati Bell, Cogent Communications, DirectPC (Hughes Network), Frontier, Insight Broadband, Iowa Telecom, or Wide Open West;

    (e) the New Scientist or Jim Giles;

    (f) Poly NYU; or

    (g) the Netalyzr or the DNS Echo Experiment.

5. For the period April 1, 2011 until the present, all articles, including all drafts and all comments concerning drafts and final versions of articles, authored, received, forwarded, or otherwise transmitted by EFF, pertaining to:

    (a) Betsy Feist,

5

364

(b) Milberg LLP, Richman Reese LLP, or any attorney or other employee of Milberg LLP or Richman Reese LLP:

(c) Paxfire;

(d) RCN; or

(e) the Netalyzr or the DNS Echo Experiment.

6. All research results and communications, including raw data, final conclusions, publications, peer review, and internal discussions, concerning Paxfire or RCN.

7. All correspondence, including but not limited to email mentioning or otherwise pertaining to Paxfire, to, from, or otherwise communicated with Google, Microsoft, or Yahoo.

6

365

EXHIBIT B

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
### Northern District of California

| | |
|---|---|
| BETSY FEIST | ) |
| *Plaintiff* | ) |
| v. | ) Civil Action No.   11 CIV 5436 (JGK) |
| RCN CORP. and PAXFIRE, INC. | ) |
| | ) (If the action is pending in another district, state where: |
| *Defendant* | )        Southern District of New York        ) |

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:  Peter Eckersley

☑ *Production:* **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

| Place: Duane Morris, LLP, Attn: Joseph Burton, Esq. Suite 2200, One Market Plaza, Spear Tower San Francisco, CA 94105 | Date and Time:        05/23/2012 0:00 am |
|---|---|

☐ *Inspection of Premises:* **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  ___04/22/2012___

| | |
|---|---|
| *CLERK OF COURT* | OR    Andrew Grosso *[Digitally signed by Andrew Grosso. DN: cn=Andrew Grosso, o=Andrew Grosso & Associates, ou, email=Agrosso@acm.org, c=US. Date: 2012.04.22 16:02:03 -04'00']* |
| _____ | _____ |
| *Signature of Clerk or Deputy Clerk* | *Attorney's signature* |

The name, address, e-mail, and telephone number of the attorney representing *(name of party)* Paxfire, Inc., Defendant and Counterclaim Plaintiff _____ , who issues or requests this subpoena, are:

Andrew Grosso; Andrew Grosso & Associates, Georgetown Place, Suite 300, 1101 Thirtieth Street, NW, Washington, D.C. 20007; (202) 298-6446; Agrosso@acm.org

AO 88B (Rev. 06/09) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No.   11 CIV 5436 (JGK)

## PROOF OF SERVICE

*(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)* _____

was received by me on *(date)* _____ .

☐ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

☐ I returned the subpoena unexecuted because: _____

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

368

K.  The term "Milberg" refers to the law firm Milberg LLP and its attorneys, employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to Sanford Dumain, Peter Seidman, Charles Slidders, and Melissa Clark.

L.  The term "Reese Richman" refers to the law firm Reese Richman LLP and its attorneys, employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to Kim Richman and Michael E. Reese.

M.  The term "Microsoft Research" refers to Microsoft Research and its employees, agents, affiliates or other persons acting or purporting to act on its behalf, including but not limited to Microsoft Research researchers Cheng Huang, David Maltz, Jin Li, or any other individual involved in the use or development of the DNS Echo Experiment or the Netalyzr.

N.  The term "Microsoft" refers to the Microsoft Corporation and any division, parent, subsidiary, affiliate, licensee, franchisee, successor, predecessor in interest, assignee or other related business entity, including Microsoft Research and Bing, and the predecessors of any of them and every employee, agent or other person acting or purporting to act on its behalf.

O.  The term "Google" refers Google, Inc. and any division, parent, subsidiary, affiliate, licensee, franchisee, successor, predecessor in interest, assignee or other related business entity, and the predecessors of any of them and every employee, agent or other person acting or purporting to act on its behalf.

P.  The term "Yahoo!" refers to Yahoo!, Inc. and any division, parent, subsidiary, affiliate, licensee, franchisee, successor, predecessor in interest, assignee or other related business entity, and the predecessors of any of them and every employee, agent or other person acting or purporting to act on its behalf.

Q.  The term "document" shall be construed in its broadest possible sense under Federal Rule of Civil Procedure 34 and Rule 26.3 of the Local Rules of this Court, and includes, without limitation, any tangible thing in EFF's possession, custody or control, wherever located, whether sent or received or neither, whether an original or a copy, including, without limitation, any written, typed, punched, encoded, printed, recorded, magnetic, graphic or photographic materials, however produced or reproduced, any mechanical recording of any oral material or any sound or visual reproduction, or any drawing, sketch or schematic rendering or other descriptive materials or any retrievable data or information, however stored, recorded or coded, or any electronic mail. In all cases where originals and/or non-identical copies are not available, the term "document" also means identical copies of original documents and copies of non-identical copies.

R.  The term "electronic mail" means all original and any non-identical copies of documents sent or received as electronic mail (including all electronic mail attachments), whether in printed or electronic form of any kind, including without limitation data stored

2

369

on hard disks, floppy disks, servers, magnetic tape, personal or handheld computers or devices (such as, but not limited to, Palm or BlackBerry devices), in random access memory or in read-only memory. For purposes of this definition, the electronic version of any electronic mail is deemed to be an original, irrespective of the existence or creation of a hard copy print out of that electronic mail, and you are required to produce all responsive documents stored in electronic format. "Electronic mail" includes all electronic mail in your possession, and is not limited to electronic mail stored in the senders' or recipients' files or computers, and includes any electronic mail that has been deleted from the senders' or recipients' computers.

S. The term "concerning" means relating, referring, describing, evidencing or constituting.

T. The term "communication" includes, without limitation, any conversation, meeting, visit, correspondence, cable, telex, facsimile, telephone call, electronic mail, computer message, signal or other transmission of information or data in any form or manner.

U. The term "including" means "including without limitation."

V. Each of the terms "each" and "any" and "all" shall be construed inclusively to mean "each and any and all."

W. Whenever the terms "and" or "or" are used, including but not limited to when used within any of the foregoing defined terms, they are to be construed both disjunctively and conjunctively as necessary to bring within the scope of these requests responses that might otherwise be construed to be outside their scope.

X. The use, including but not limited to in any of the foregoing defined terms, of the singular form of any word includes the plural and vice versa.

Y. References to one gender shall apply equally to the other gender.

Z. In answering these requests, even though the requests may be directed to the "New Scientist," you shall furnish all information available to the New Scientist, including information in the possession of EFF's attorneys or investigators, or which were prepared on their behalf. If EFF cannot respond to any of the following requests in full after exercising due diligence to secure the requested information, please state an explanation to the extent possible, specifying EFF's inability to respond to the remainder and stating whatever information or knowledge you have concerning the portions that have been left unanswered in whole or in part.

AA. To the extent that any of the following requests call for information that allegedly is subject to a claim of privilege or attorney's work-product, answer so much of each request without disclosing privileged or confidential information. With respect to those portions of the discovery requests that do request privileged or confidential

3

370

information, set forth the basis for your claim of privilege or any other objection you may have.

BB. If any document covered by these requests is withheld or not produced on the basis of a claim of privilege or any other objection, EFF shall provide Paxfire with a log listing the following information for each of the documents:

(i) The reason(s) for withholding production of the document and any supporting facts;

(ii) The subject matter of the document;

(iii) The names of each individual to whom copies were distributed;

(iv) The date the document was prepared;

(v) The name, employment, position and address of the author(s) and/or preparer(s) of the document;

(vi) A brief description of the document; and

(vii) The number of the request under which each document would otherwise be produced.

CC. Unless otherwise set forth in any specific request, these requests apply to the time period beginning January 1, 2007 to the present.

DD. These requests are continuing in nature and EFF is required to supplement its production herein upon receipt or discovery of additional documents pertinent to any of these requests.

4

371

## Documents Commanded to Be Produced

1. For the period 2008 until the present: All documents identifying or referencing Betsy Feist, Paxfire, RCN, Milberg LLP, or Reese Richman LLP, including but not limited to consulting agreement and expert witness agreements.

2. For the period 2008 until the present: All remuneration, including consulting fees and expert witness fees, from Betsy Feist, Milberg LLP, or Reese Richman LLP

3. For the period 2008 until the present: All documents pertaining to any lawsuit, investigation or other judicial or administrative proceeding in which you or any person associated with EFF participated, as a party, witness, expert witness, consultant, advisor or otherwise, where a law firm involved in any way in such proceeding was Milberg LLP or Reese Richman LLP.

4. For the period January 1, 2011 until the present, all correspondence and communications, including but not limited to email, and all documentation and records pertaining to any such correspondence or communications, including those authored, received, forwarded or otherwise transmitted by EFF or Peter Eckersley, pertaining to (including but not limited to those to, from, or otherwise communicated with ICSI or Poly NYU):

  (a) Betsy Feist;

  (b) Milberg LLP, Richman Reese LLP, or any attorney or other employee of Milberg LLP or Richman Reese LLP:

  (c) Paxfire;

  (d) RCN Corporation, Cavalier, Charter, Cincinnati Bell, Cogent Communications, DirectPC (Hughes Network), Frontier, Insight Broadband, Iowa Telecom, or Wide Open West;

  (e) the New Scientist or Jim Giles;

  (f) Poly NYU; or

  (g) the Netalyzr or the DNS Echo Experiment.

5. For the period April 1, 2011 until the present, all articles, including all drafts and all comments concerning drafts and final versions of articles, authored, received, forwarded, or otherwise transmitted by Peter Eckersley, pertaining to:

  (a) Betsy Feist,

5

(b) Milberg LLP, Richman Reese LLP, or any attorney or other employee of Milberg LLP or Richman Reese LLP:

(c) Paxfire;

(d) RCN; or

(e) the Netalyzr or the DNS Echo Experiment.

6.  All research results and communications, including raw data, final conclusions, publications, peer review, and internal discussions, concerning Paxfire or RCN.

7.  All correspondence, including but not limited to email mentioning or otherwise pertaining to Paxfire, to, from, or otherwise communicated with Google, Microsoft, or Yahoo.

APPEAL,CLOSED,REFDIS

# U.S. District Court
## California Northern District (San Francisco)
### CIVIL DOCKET FOR CASE #: 3:12-mc-80135-SI

Feist v. RCN Corporation et al
Assigned to: Hon. Susan Illston
Referred to: Magistrate Judge Nathanael M. Cousins
Case in other court: 12-17506

Date Filed: 06/07/2012
Date Terminated: 11/07/2012

**Plaintiff**

**Betsy Feist**

V.

**Defendant**

**RCN Corporation**                    represented by **Devin M. McDonell**
                                        Bingham McCutchen LLP
                                        3 Embarcadero Center
                                        San Francisco, CA 94111
                                        (415) 393-2358
                                        Fax: (415) 393-2286
                                        Email: devin.mcdonell@bingham.com
                                        *ATTORNEY TO BE NOTICED*

**Defendant**

**Paxfire, Inc.**                       represented by **Andrew Grosso**
                                        Andrew Grosso & Associates
                                        Georgetown Place
                                        1101 Thirtieth Street, NW
                                        Suite 300
                                        Washington, DC 20007
                                        202-298-6500
                                        Fax: 202-298-5599
                                        Email: agrosso@acm.org
                                        *LEAD ATTORNEY*
                                        *ATTORNEY TO BE NOTICED*

                                        **Daniel J. Bergeson**
                                        Bergeson, LLP
                                        303 Almaden Boulevard, Suite 500
                                        San Jose, CA 95110-2712
                                        408-291-6200
                                        Fax: 408-297-6000
                                        Email: dbergeson@be-law.com

*TERMINATED: 02/19/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melinda Mae Morton**
Bergeson, LLP
303 Almaden Blvd., Suite 500
San Jose, CA 95110-2712
408-291-6203
Fax: (408) 297-6000
Email: mmorton@be-law.com
*TERMINATED: 02/19/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaideep Venkatesan**
Bergeson, LLP
303 Almaden Boulevard
Suite 500
San Jose, CA 95110-2712
408-291-6200
Fax: 408-297-6000
Email: jvenkatesan@be-law.com
*TERMINATED: 02/19/2013*
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Electronic Frontier Foundation**          represented by **James M. Chadwick**
Sheppard Mullin Richter & Hampton,
LLP
379 Lytton Avenue
Palo Alto, CA 94301
650-815-2600
Fax: 650-815-2601
Email: jchadwick@sheppardmullin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tenaya M Rodewald**
Sheppard Mullin Richter & Hampton
379 Lytton Avenue
Palo Alto, CA 94301
650-815-2600
Fax: 650-815-2601
Email: trodewald@sheppardmullin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Peter Eckersley**                    represented by **James M. Chadwick**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Tenaya M Rodewald**
                                                      (See above for address)
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 06/06/2012 | 1 | MOTION to Quash Subpoenas filed by Peter Eckersley, Electronic Frontier Foundation. Responses due by 6/20/2012. Replies due by 6/27/2012. (ga, COURT STAFF) (Filed on 6/6/2012) Fee Paid $46.00, Receipt #34611074972 (Entered: 06/07/2012) |
| 06/06/2012 | 2 | Declaration of Arvind Narayanan in Support of 1 MOTION to Quash filed byPeter Eckersley, Electronic Frontier Foundation. (ga, COURT STAFF) (Filed on 6/6/2012) (Entered: 06/07/2012) |
| 06/06/2012 | 3 | Declaration of Cindy Cohn in Support of 1 MOTION to Quash filed byPeter Eckersley, Electronic Frontier Foundation. (ga, COURT STAFF) (Filed on 6/6/2012) (Entered: 06/07/2012) |
| 06/06/2012 | 4 | Declaration of JesseBurns in Support of 1 MOTION to Quash filed byPeter Eckersley, Electronic Frontier Foundation. (ga, COURT STAFF) (Filed on 6/6/2012) (Entered: 06/07/2012) |
| 06/06/2012 | 5 | Declaration of Nicholas Croyle Weaver in Support of 1 MOTION to Quash filed byPeter Eckersley, Electronic Frontier Foundation. (ga, COURT STAFF) (Filed on 6/6/2012) (Entered: 06/07/2012) |
| 06/06/2012 | 6 | Declaration of Peter Eckersley in Support of 1 MOTION to Quash filed byPeter Eckersley, Electronic Frontier Foundation. (ga, COURT STAFF) (Filed on 6/6/2012) (Entered: 06/07/2012) |
| 06/06/2012 | 7 | Declaration of Tenaya M. Rodewald in Support of 1 MOTION to Quash filed byPeter Eckersley, Electronic Frontier Foundation. (ga, COURT STAFF) (Filed on 6/6/2012) (Entered: 06/07/2012) |
| 06/06/2012 | 8 | Request for Judicial Notice re 1 MOTION to Quash filed byPeter Eckersley, Electronic Frontier Foundation. (ga, COURT STAFF) (Filed on 6/6/2012) (Entered: 06/07/2012) |
| 06/08/2012 | 9 | ORDER REFERRING CASE to Magistrate Judge for Discovery purposes. Signed by Judge Richard Seeborg on 6/8/12. (cl, COURT STAFF) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/08/2012 |  | CASE REFERRED to Magistrate Judge Donna M. Ryu for Discovery (ahm, COURT STAFF) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/08/2012 | 10 |  |

376

| | | CERTIFICATE OF SERVICE by Peter Eckersley, Electronic Frontier Foundation re 2 Declaration in Support, 5 Declaration in Support, 1 MOTION to Quash, 3 Declaration in Support, 6 Declaration in Support, 7 Declaration in Support, 8 Request for Judicial Notice, 4 Declaration in Support (Chadwick, James) (Filed on 6/8/2012) (Entered: 06/08/2012) |
|---|---|---|
| 06/08/2012 | 11 | ORDER re 1 MOTION to Quash filed by Electronic Frontier Foundation, Peter Eckersley. Discovery Hearing set for 7/12/2012 11:00 AM in Courtroom 4, 3rd Floor, Oakland before Magistrate Judge Donna M. Ryu. Signed by Magistrate Judge Donna M. Ryu on 6/8/2012. (dmrlc2, COURT STAFF) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/08/2012 | 12 | ORDER re 11 Order, Set Hearings. Signed by Magistrate Judge Donna M. Ryu on 6/8/2012. (dmrlc2, COURT STAFF) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/08/2012 | 13 | CERTIFICATE OF SERVICE by Peter Eckersley, Electronic Frontier Foundation re 11 Order, Set Hearings,, 12 Order (Chadwick, James) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/19/2012 | 14 | STIPULATION WITH PROPOSED ORDER *to Extend Briefing Schedule re Motion 1* filed by Paxfire, Inc.. (Attachments: # 1 Venkatesan Decl ISO) (Venkatesan, Jaideep) (Filed on 6/19/2012) (Entered: 06/19/2012) |
| 06/20/2012 | 15 | NOTICE by Peter Eckersley, Electronic Frontier Foundation *OF RELATED CASES* (Rodewald, Tenaya) (Filed on 6/20/2012) (Entered: 06/20/2012) |
| 06/21/2012 | 16 | Order by Magistrate Judge Donna M. Ryu granting 14 Stipulation and Resetting Motion Hearing Date. (dmrlc2, COURT STAFF) (Filed on 6/21/2012) (Entered: 06/21/2012) |
| 06/21/2012 | 17 | MOTION for attorney Andrew Grosso leave to appear in Pro Hac Vice ( Filing fee $ 305, receipt number 34611075487.) Filing fee previously paid on 6/21/12 filed by Paxfire, Inc.. (Attachments: # 1 Proposed Order)(ga, COURT STAFF) (Filed on 6/21/2012) (Entered: 06/22/2012) |
| 06/22/2012 | 18 | ORDER GRANTING APPLICATION FOR ADMISSION OF ATTORNEY ANDREW GROSSO PRO HAC VICE. by Judge Richard Seeborg (cl, COURT STAFF) (Filed on 6/22/2012) (Entered: 06/22/2012) |
| 06/22/2012 | 19 | ORDER TO SHOW CAUSE Re: Related Cases. Show Cause Response due by 6/26/2012. Order Signed on 6/22/12 by Judge Illston (tfS, COURT STAFF) (Filed on 6/22/2012) (Entered: 06/22/2012) |
| 06/22/2012 | 20 | Administrative Motion to File Under Seal filed by Paxfire, Inc.. (Attachments: # 1 Venkatesan Decl. ISO, # 2 Proposed Order)(Venkatesan, Jaideep) (Filed on 6/22/2012) (Entered: 06/22/2012) |
| 06/22/2012 | 21 | RESPONSE (re 1 MOTION to Quash ) filed byPaxfire, Inc.. (Attachments: # 1 Grosso Decl. ISO, # 2 Ex A, # 3 Ex B, # 4 Ex C, # 5 Ex D, # 6 Ex E, # 7 Ex F, # 8 Ex G, # 9 Ex H - Public, # 10 Ex I, # 11 Ex J, # 12 Ex K)(Venkatesan, Jaideep) (Filed on 6/22/2012) (Entered: 06/22/2012) |
| 06/26/2012 | 22 | |

377

| | | RESPONSE (re 20 Administrative Motion to File Under Seal ) filed byRCN Corporation. (Attachments: # 1 Exhibit A to Response, # 2 Declaration Peter D. Jacoby, # 3 Exhibit A to Jacoby Declaration, # 4 Proposed Order)(McDonell, Devin) (Filed on 6/26/2012) (Entered: 06/26/2012) |
|---|---|---|
| 07/02/2012 | 23 | ORDER RELATING CASES (Illston, Susan) (Filed on 7/2/2012) (Entered: 07/02/2012) |
| 07/03/2012 | 24 | ORDER SETTING HEARING ON MOTION TO QUASH 1 . Motion Hearing set for 8/1/2012 09:00 AM in Courtroom A, 15th Floor, San Francisco before Magistrate Judge Nathanael M. Cousins. Signed by Judge Nathanael M. Cousins on 7/3/12. (nclc1, COURT STAFF) (Filed on 7/3/2012) (Entered: 07/03/2012) |
| 07/03/2012 | 25 | ORDER GRANTING ADMINISTRATIVE MOTION TO FILE UNDER SEAL 20 . Signed by Magistrate Judge Nathanael M. Cousins. (This is a text-only docket entry) (nclc1, COURT STAFF) (Filed on 7/3/2012) (Entered: 07/03/2012) |
| 07/03/2012 | 26 | REPLY (re 1 MOTION to Quash ) filed byPeter Eckersley, Electronic Frontier Foundation. (Rodewald, Tenaya) (Filed on 7/3/2012) (Entered: 07/03/2012) |
| 07/05/2012 | | CASE REFERRED to Magistrate Judge Nathanael M. Cousins for Discovery (ahm, COURT STAFF) (Filed on 7/5/2012) (Entered: 07/05/2012) |
| 07/05/2012 | 27 | DOCUMENT E-FILED UNDER SEAL re 25 Order on Administrative Motion to File Under Seal re 20 by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 7/5/2012) (Entered: 07/05/2012) |
| 07/13/2012 | 28 | ORDER REASSIGNING CASE. Case reassigned to Judge Hon. Susan Illston for all further proceedings. Judge Hon. Richard Seeborg no longer assigned to the case.. Signed by Executive Committee on 7/13/12. (as, COURT STAFF) (Filed on 7/13/2012) (Entered: 07/13/2012) |
| 07/19/2012 | | Set/Reset Deadlines as to 1 MOTION to Quash. Motion Hearing set for 8/8/2012 09:00 AM in Courtroom A, 15th Floor, San Francisco before Magistrate Judge Nathanael M. Cousins. (nclc1, COURT STAFF) (Filed on 7/19/2012) (Entered: 07/19/2012) |
| 08/06/2012 | 29 | ORDER VACATING HEARING ON MOTIONS TO QUASH SET FOR 8/8/12. The motions are appropriate for determination without oral argument and are under submission. Signed by Judge Nathanael M. Cousins on 8/6/12. (This is a text-only docket entry) (nclc1, COURT STAFF) (Filed on 8/6/2012) (Entered: 08/06/2012) |
| 08/13/2012 | 30 | ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO QUASH. Signed by Judge Nathanael M. Cousins. (nclc1, COURT STAFF) (Filed on 8/13/2012) (Entered: 08/13/2012) |
| 08/27/2012 | 31 | NOTICE by Paxfire, Inc. Motion for Relief from Nondispositive Pretrial Order of Magistrate Judge (Order Dkt. 30) (Attachments: # 1 Grosso Decl. ISO & Ex A-C, # 2 Proposed Order)(Venkatesan, Jaideep) (Filed on 8/27/2012) (Entered: 08/27/2012) |
| | | |

378

| 08/27/2012 | 32 | MOTION De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 30 Order on Motion to Quash filed by Peter Eckersley, Electronic Frontier Foundation. Motion Hearing set for 10/19/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 9/10/2012. Replies due by 9/17/2012. (Attachments: # 1 Proposed Order)(Rodewald, Tenaya) (Filed on 8/27/2012) (Entered: 08/27/2012) |
|---|---|---|
| 09/07/2012 | 33 | STIPULATION WITH PROPOSED ORDER *to Extend Briefing Schedule* filed by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 9/7/2012) (Entered: 09/07/2012) |
| 09/07/2012 | 34 | ORDER to Extend Briefing Schedule by Judge Susan Illston granting 33 Stipulation (tfS, COURT STAFF) (Filed on 9/7/2012) (Entered: 09/07/2012) |
| 09/12/2012 | 35 | RESPONSE (re 32 MOTION De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 30 Order on Motion to Quash ) filed byPaxfire, Inc.. (Venkatesan, Jaideep) (Filed on 9/12/2012) (Entered: 09/12/2012) |
| 09/12/2012 | 36 | NOTICE by Paxfire, Inc. *Administrative Motion to Request the Court to Strike the Motion of Non-Parties EFF & Eckersley for De Novo Determination of Dispositive Matter Referred to Magistrate Judge* (Attachments: # 1 Venkatesan Decl ISO & Ex A-B, # 2 Proposed Order)(Venkatesan, Jaideep) (Filed on 9/12/2012) (Entered: 09/12/2012) |
| 09/17/2012 | 37 | NOTICE by Peter Eckersley, Electronic Frontier Foundation re 36 Notice (Other), *Opposition to Paxfire's Administrative Motion to Strike EFF's Motion for De Novo Determination* (Rodewald, Tenaya) (Filed on 9/17/2012) (Entered: 09/17/2012) |
| 09/21/2012 | 38 | REPLY (re 32 MOTION De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 30 Order on Motion to Quash ) filed byPeter Eckersley, Electronic Frontier Foundation. (Attachments: # 1 Declaration Rodewald Declaration ISO Reply, # 2 Declaration Cohn Declaration ISO Reply)(Rodewald, Tenaya) (Filed on 9/21/2012) (Entered: 09/21/2012) |
| 09/24/2012 | 39 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byPaxfire, Inc.. (Related document(s) 35 ) (Venkatesan, Jaideep) (Filed on 9/24/2012) (Entered: 09/24/2012) |
| 09/28/2012 | 40 | OBJECTIONS to re 32 MOTION De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 30 Order on Motion to Quash *Objections to EFF & Eckersley's Evidence ISO Reply* by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 9/28/2012) (Entered: 09/28/2012) |
| 10/04/2012 | 41 | ORDER DENYING MOTION TO STRIKE (Illston, Susan) (Filed on 10/4/2012) (Entered: 10/04/2012) |
| 10/05/2012 | 42 | RESPONSE to re 40 Objection, by Peter Eckersley, Electronic Frontier Foundation. (Rodewald, Tenaya) (Filed on 10/5/2012) (Entered: 10/05/2012) |
| 10/12/2012 | 43 | CLERKS NOTICE Continuing Motion Hearing, Set/Reset Deadlines as to 32 MOTION De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 30 Order on Motion to Quash . Motion Hearing set for 10/23/2012 10:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan |

| | | |
|---|---|---|
| | | Illston. THIS IS A DOCKET TEXT ENTRY ONLY, THERE IS NO DOCUMENT ASSOCIATED WITH THIS NOTICE. (tfS, COURT STAFF) (Filed on 10/12/2012) (Entered: 10/12/2012) |
| 10/12/2012 | 44 | STIPULATION WITH PROPOSED ORDER re 32 MOTION De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 30 Order on Motion to Quash *Stipulation and Proposed Order re Continuing Hearing* filed by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 10/12/2012) (Entered: 10/12/2012) |
| 10/16/2012 | 45 | STIPULATION AND ORDER Continuing 32 MOTION De Novo Determination. Motion Hearing set for 11/6/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Signed by Judge Susan Illston on 10/16/2012. (tmi, COURT STAFF) (Filed on 10/16/2012) (Entered: 10/16/2012) |
| 10/17/2012 | 46 | CLERKS NOTICE : Counsel for the Electronic Frontier Foundation is directed to e.file document numbers 6 and 7 immediately. 06/06/2012- Declaration of Tenaya M. Rodewald in Support of 1 MOTION to Quash filed by Peter Eckersley, Electronic Frontier Foundation. 06/06/2012 view8 Request for Judicial Notice re 1 MOTION to Quash filed by Peter Eckersley, Electronic Frontier Foundation. This is a docket text entry only, there is no document associated with this notice. (tfS, COURT STAFF) (Filed on 10/17/2012) (Entered: 10/17/2012) |
| 10/17/2012 | 47 | Declaration of Tenaya M. Rodewald in Support of 46 Clerks Notice,, 7 Declaration in Support *of Motion to Quash* filed byPeter Eckersley, Electronic Frontier Foundation. (Attachments: # 1 Exhibit A-I)(Related document(s) 46 , 7 ) (Rodewald, Tenaya) (Filed on 10/17/2012) (Entered: 10/17/2012) |
| 10/17/2012 | 48 | Request for Judicial Notice re 46 Clerks Notice,, 8 Request for Judicial Notice *in Support of Motion to Quash* filed byPeter Eckersley, Electronic Frontier Foundation. (Attachments: # 1 Exhibit A-H)(Related document(s) 46 , 8 ) (Rodewald, Tenaya) (Filed on 10/17/2012) (Entered: 10/17/2012) |
| 11/05/2012 | 49 | ORDER VACATING HEARING (Illston, Susan) (Filed on 11/5/2012) (Entered: 11/05/2012) |
| 11/06/2012 | 50 | ORDER ON MOTION FOR REVIEW 22 in case 3:12-mc-80119-SI; 36 in case 3:12-mc-80121-SI; 32 3:12-mc-80135-SI; 37 in case 3:12-mc-80140-SI (Illston, Susan) (Filed on 11/6/2012) (Entered: 11/06/2012) |
| 11/08/2012 | 51 | NOTICE OF APPEAL to the 9th CCA Paxfire, Inc..(Appeal fee of $455 receipt number 0971-7260229 paid.) (Venkatesan, Jaideep) (Filed on 11/8/2012) (Entered: 11/08/2012) |
| 11/09/2012 | 52 | Statement re 51 Notice of Appeal *Representation Statement* by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 11/9/2012) (Entered: 11/09/2012) |
| 11/09/2012 | 53 | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 51 Notice of Appeal (gaS, COURT STAFF) (Filed on 11/9/2012) (Entered: 11/09/2012) |
| 11/15/2012 | 54 | |

380

| | | |
|---|---|---|
| | | NOTICE by Paxfire, Inc. *Re Reporter's Transcript Pursuant to Circuit Rule 10-3.1(C)* (Venkatesan, Jaideep) (Filed on 11/15/2012) (Entered: 11/15/2012) |
| 11/20/2012 | 55 | MOTION for Sanctions *per FRCP 45(c)(1) and Civil Local Rule 7-8* filed by Peter Eckersley, Electronic Frontier Foundation. Motion Hearing set for 1/11/2013 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 12/4/2012. Replies due by 12/11/2012. (Attachments: # 1 Declaration of James Chadwick, # 2 Exhibit A, # 3 Exhibit B, # 4 Exhibit C, # 5 Exhibit D, # 6 Exhibit E, # 7 Exhibit F, # 8 Exhibit G, # 9 Exhibit H, # 10 Exhibit I, # 11 Exhibit J, # 12 Exhibit K, # 13 Proposed Order) (Chadwick, James) (Filed on 11/20/2012) (Entered: 11/20/2012) |
| 12/04/2012 | 56 | RESPONSE (re 55 MOTION for Sanctions *per FRCP 45(c)(1) and Civil Local Rule 7-8* ) filed byPaxfire, Inc.. (Attachments: # 1 Grosso Decl. ISO, # 2 Ex A, # 3 Ex B, # 4 Ex C, # 5 Ex D, # 6 Ex E, # 7 Ex F, # 8 Ex G)(Venkatesan, Jaideep) (Filed on 12/4/2012) (Entered: 12/04/2012) |
| 12/10/2012 | 57 | USCA Case Number 12-17506 for 51 Notice of Appeal filed by Paxfire, Inc.. (gaS, COURT STAFF) (Filed on 12/10/2012) (Entered: 12/10/2012) |
| 12/11/2012 | 58 | REPLY (re 55 MOTION for Sanctions *per FRCP 45(c)(1) and Civil Local Rule 7-8* ) filed byPeter Eckersley, Electronic Frontier Foundation. (Attachments: # 1 Declaration of James Chadwick)(Chadwick, James) (Filed on 12/11/2012) (Entered: 12/11/2012) |
| 12/17/2012 | 59 | SUGGESTION OF BANKRUPTCY Upon the Record by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 12/17/2012) (Entered: 12/17/2012) |
| 01/08/2013 | 60 | ORDER TO SHOW CAUSE (Illston, Susan) (Filed on 1/8/2013) (Entered: 01/08/2013) |
| 01/11/2013 | 61 | MOTION to Withdraw as Attorney *(as to Bergeson, LLP)* filed by Paxfire, Inc.. Motion Hearing set for 2/22/2013 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 1/25/2013. Replies due by 2/1/2013. (Attachments: # 1 Venkatesan Decl ISO, # 2 Proposed Order) (Venkatesan, Jaideep) (Filed on 1/11/2013) (Entered: 01/11/2013) |
| 01/14/2013 | 62 | MOTION to Withdraw as Attorney *(as to Bergeson, LLP) (corrects Docket (61))* filed by Paxfire, Inc.. Motion Hearing set for 2/22/2013 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 1/28/2013. Replies due by 2/4/2013. (Attachments: # 1 Corrected Venkatesan Decl ISO, # 2 Proposed Order)(Venkatesan, Jaideep) (Filed on 1/14/2013) (Entered: 01/14/2013) |
| 01/22/2013 | 63 | RESPONSE TO ORDER TO SHOW CAUSE by Peter Eckersley, Electronic Frontier Foundation . (Rodewald, Tenaya) (Filed on 1/22/2013) (Entered: 01/22/2013) |
| 02/15/2013 | 64 | ORDER of USCA as to 51 Notice of Appeal filed by Paxfire, Inc. (gaS, COURT STAFF) (Filed on 2/15/2013) (Entered: 02/15/2013) |
| 02/19/2013 | 65 | ORDER by Judge Susan Illston granting 61 Motion to Withdraw as Attorney. ; granting in part and denying in part 62 Motion to Withdraw as Attorney. (tfS, COURT STAFF) (Filed on 2/19/2013) (Entered: 02/19/2013) |

| 02/19/2013 | 66 | ORDER STAYING CASE 55 (Illston, Susan) (Filed on 2/19/2013) (Entered: 02/19/2013) |
| 11/01/2013 | 67 | ORDER of USCA (farS, COURT STAFF) (Filed on 11/1/2013) (Entered: 11/01/2013) |

| PACER Service Center | | | |
|---|---|---|---|
| Transaction Receipt | | | |
| 12/11/2013 09:13:55 | | | |
| PACER Login: | ag0180 | Client Code: | PXFM |
| Description: | Docket Report | Search Criteria: | 3:12-mc-80135-SI |
| Billable Pages: | 7 | Cost: | 0.70 |

CASREF,CLOSED,REFDIS,STAYED

## U.S. District Court
## California Northern District (San Francisco)
## CIVIL DOCKET FOR CASE #: 3:12-mc-80121-SI

Feist v. RCN Corporation et al                    Date Filed: 05/23/2012
Assigned to: Hon. Susan Illston                   Date Terminated: 11/07/2012
Referred to: Magistrate Judge Nathanael M. Cousins

**Plaintiff**

**Betsy Feist**                    represented by   **Adam Bobkin**
                                                    Milberg LLP
                                                    One Pennsylvania Plaza
                                                    New York, NY 10119
                                                    212-594-5300
                                                    Fax: 212-868-1229
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Kim E. Richman**
                                                    Gutride Safier LLP
                                                    230 Park Avenue, Suite 963
                                                    New York, NY 10169
                                                    (212) 687-8291
                                                    Fax: (212) 687-8292
                                                    Email: krichman@reeserichman.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Melissa Ryan Clark**
                                                    Milberg LLP
                                                    One Pennsylvania Plaza
                                                    49th Floor
                                                    New York, NY 10119
                                                    212-946-9344
                                                    Email: mclark@milberg.com
                                                    *LEAD ATTORNEY*
                                                    *ATTORNEY TO BE NOTICED*

                                                    **Michael Robert Reese**
                                                    Reese Richman LLP
                                                    875 Avenue of the Americas, 18th
                                                    Floor
                                                    New York, NY 10001
                                                    212-643-0500
                                                    Fax: 212-253-4272

383

Email: mreese@reeserichman.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Peter E. Seidman**
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119-0165
212-594-5300
Email: pseidman@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sanford P. Dumain**
Milberg LLP
One Pennsylvania Plaza
New York, NY 10119-0165
212-594-5300
Fax: 212-868-1229
Email: sdumain@milberg.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**RCN Corporation**                 represented by **Devin M. McDonell**
                                                   Bingham McCutchen LLP
                                                   3 Embarcadero Center
                                                   San Francisco, CA 94111
                                                   (415) 393-2358
                                                   Fax: (415) 393-2286
                                                   Email: devin.mcdonell@bingham.com
                                                   *ATTORNEY TO BE NOTICED*

**Defendant**

**Paxfire, Inc.**                   represented by **Andrew Grosso**
                                                   Andrew Grosso & Associates
                                                   Georgetown Place
                                                   1101 Thirtieth Street, NW
                                                   Suite 300
                                                   Washington, DC 20007
                                                   202-298-6500
                                                   Fax: 202-298-5599
                                                   Email: agrosso@acm.org
                                                   *LEAD ATTORNEY*
                                                   *ATTORNEY TO BE NOTICED*

384

**Daniel J. Bergeson**
Bergeson, LLP
303 Almaden Boulevard, Suite 500
San Jose, CA 95110-2712
408-291-6200
Fax: 408-297-6000
Email: dbergeson@be-law.com
*TERMINATED: 02/19/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Melinda Mae Morton**
Bergeson, LLP
303 Almaden Blvd., Suite 500
San Jose, CA 95110-2712
408-291-6203
Fax: (408) 297-6000
Email: mmorton@be-law.com
*TERMINATED: 02/19/2013*
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jaideep Venkatesan**
Bergeson, LLP
303 Almaden Boulevard
Suite 500
San Jose, CA 95110-2712
408-291-6200
Fax: 408-297-6000
Email: jvenkatesan@be-law.com
*TERMINATED: 02/19/2013*
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**The Electronic Frontier Foundation**          represented by **James M. Chadwick**
Sheppard Mullin Richter & Hampton, LLP
379 Lytton Avenue
Palo Alto, CA 94301
650-815-2600
Fax: 650-815-2601
Email: jchadwick@sheppardmullin.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Tenaya M Rodewald**
Sheppard Mullin Richter & Hampton
379 Lytton Avenue
Palo Alto, CA 94301

650-815-2600
Fax: 650-815-2601
Email: trodewald@sheppardmullin.com
*ATTORNEY TO BE NOTICED*

**Miscellaneous**

**Peter Eckersley**                  represented by   **James M. Chadwick**
                                                     (See above for address)
                                                     *LEAD ATTORNEY*
                                                     *ATTORNEY TO BE NOTICED*

                                                     **Tenaya M Rodewald**
                                                     (See above for address)
                                                     *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 05/23/2012 | 1 | MOTION to Quash filed by Betsy Feist. Responses due by 6/6/2012. Replies due by 6/13/2012. (ga, COURT STAFF) (Filed on 5/23/2012) (Fee Paid $46.00, Receipt #34611074386) (Entered: 05/24/2012) |
| 05/23/2012 | 2 | Declaration of Kim E.Richman in Support of 1 MOTION to Quash filed byBetsy Feist. (ga, COURT STAFF) (Filed on 5/24/2012) (Entered: 05/24/2012) |
| 05/23/2012 | 3 | CERTIFICATE OF SERVICE by Betsy Feist re 2 Declaration in Support, 1 MOTION to Quash (ga, COURT STAFF) (Filed on 5/23/2012) (Entered: 05/24/2012) |
| 05/23/2012 | 4 | Proposed Order re 1 MOTION to Quash by Betsy Feist. (ga, COURT STAFF) (Filed on 5/22/2012) (Entered: 05/24/2012) |
| 05/25/2012 | 5 | ORDER REFERRING CASE to a randomly assigned Magistrate Judge. Signed by Judge Jeffrey S. White on 5/25/12. (jjoS, COURT STAFF) (Filed on 5/25/2012) (Entered: 05/25/2012) |
| 05/25/2012 | | CASE REFERRED to Magistrate Judge Elizabeth D. Laporte for Discovery (ahm, COURT STAFF) (Filed on 5/25/2012) (Entered: 05/25/2012) |
| 05/30/2012 | 6 | ORDER Setting Hearing on Motion 1 MOTION to Quash : Motion Hearing set for 7/3/2012 09:00 AM in Courtroom E, 15th Floor, San Francisco before Magistrate Judge Elizabeth D. Laporte. Signed by Judge Elizabeth D Laporte on 5/30/2012. (Attachments: # 1 Certificate/Proof of Service)(kns, COURT STAFF) (Filed on 5/30/2012) (Entered: 05/30/2012) |
| 06/04/2012 | 7 | MOTION to Quash *Deposition Subpoenas to Consultants and Request for Protective Order* filed by Betsy Feist. Responses due by 6/18/2012. Replies due by 6/25/2012. (Attachments: # 1 Exhibit Exhibits A-B, # 2 Exhibit Exhibit C, # 3 Proposed Order, # 4 Certificate/Proof of Service)(Reese, Michael) (Filed on 6/4/2012) (Entered: 06/04/2012) |
| 06/05/2012 | 8 | |

https://ecf.cand.uscourts.gov/cgi-bin/DktRpt.pl?52277055083684-L_1_0-1          11/19/2013

386

| | | STIPULATION WITH PROPOSED ORDER re 1 MOTION to Quash filed by Paxfire, Inc.. (Attachments: # 1 Venkatesan Decl. ISO)(Venkatesan, Jaideep) (Filed on 6/5/2012) (Entered: 06/05/2012) |
|---|---|---|
| 06/07/2012 | 9 | STIPULATION AND ORDER re 8 STIPULATION re 1 MOTION to Quash filed by Paxfire, Inc. Replies due by 6/18/2012. Responses due by 6/11/2012. Motion Hearing set for 7/10/2012 09:00 AM in Courtroom E, 15th Floor, San Francisco before Magistrate Judge Elizabeth D. Laporte. Signed by Judge Elizabeth D Laporte on 6/6/2012. (Attachments: # 1 Certificate/Proof of Service)(kns, COURT STAFF) (Filed on 6/7/2012) (Entered: 06/07/2012) |
| 06/08/2012 | 10 | MOTION for attorney Andrew Grosso leave to appear in Pro Hac Vice ( Filing fee $ 305, receipt number 34611075038.) Filing fee previously paid on 6/8/12 filed by Paxfire, Inc.. (Attachments: # 1 Proposed Order)(ga, COURT STAFF) (Filed on 6/8/2012) (Entered: 06/08/2012) |
| 06/11/2012 | 11 | ORDER by Judge Jeffrey S. White granting 10 Motion for Pro Hac Vice for Andrew Grosso (jjoS, COURT STAFF) (Filed on 6/11/2012) (Entered: 06/11/2012) |
| 06/11/2012 | 12 | Administrative Motion to File Under Seal filed by Paxfire, Inc.. (Attachments: # 1 Declaration, # 2 Proposed Order, # 3 Stipulation)(Venkatesan, Jaideep) (Filed on 6/11/2012) Modified on 6/26/2012 (kns, COURT STAFF). (Entered: 06/11/2012) |
| 06/11/2012 | 13 | RESPONSE (re 1 MOTION to Quash ) filed byPaxfire, Inc.. (Attachments: # 1 Public: Grosso Decl ISO, # 2 Ex A, # 3 Ex B, # 4 Ex C, # 5 Ex D, # 6 Ex E, # 7 Ex F, # 8 Ex G, # 9 Ex H, # 10 Ex I, # 11 Ex J, # 12 Ex K, # 13 Ex L, # 14 Ex M, # 15 Ex N, # 16 Public: Ex O, # 17 Ex P, # 18 Ex Q, # 19 Ex R, # 20 Ex S, # 21 Ex T, # 22 Ex U, # 23 Ex V)(Venkatesan, Jaideep) (Filed on 6/11/2012) (Entered: 06/11/2012) |
| 06/12/2012 | 14 | NOTICE by Paxfire, Inc. *Notice of Errata [re Opposition to Feist Motion to Quash Subpoenas to Consultants and Request for Protective Order]* (Venkatesan, Jaideep) (Filed on 6/12/2012) (Entered: 06/12/2012) |
| 06/12/2012 | 15 | RESPONSE (re 1 MOTION to Quash ) *[Correction to the] Opposition to Feist Motion to Quash Subpoenas to Consultants and Request for Protective Order* filed byPaxfire, Inc.. (Venkatesan, Jaideep) (Filed on 6/12/2012) (Entered: 06/12/2012) |
| 06/15/2012 | 16 | RESPONSE (re 12 Administrative Motion to File Under Seal ) filed byRCN Corporation. (Attachments: # 1 Declaration of Jacoby In Support of Response, # 2 Exhibit A to Jacoby Decl., # 3 Proposed Order Granting Paxfire Administrative Motion, # 4 Certificate/Proof of Service)(McDonell, Devin) (Filed on 6/15/2012) (Entered: 06/15/2012) |
| 06/18/2012 | 17 | ***PLEASE SEE DOCUMENT 23*** ORDER GRANTING DEFENDANT PAXFIRE, INC.'S ADMINISTRATIVE MOTION FOR LEAVE TO FILE UNDER SEAL. Signed by Judge Elizabeth D Laporte on 6/12/2012. (Filed on 6/18/2012) Modified on 6/26/2012 (kns, COURT STAFF). Modified on 6/26/2012 (kns, COURT STAFF). (Entered: 06/18/2012) |

387

| 06/18/2012 | 18 | ORDER RE STIPULATION IN DOCUMENT 12-3. Signed by Judge Elizabeth D Laporte on 6/13/2012. (kns, COURT STAFF) (Filed on 6/18/2012) (Entered: 06/18/2012) |
|---|---|---|
| 06/18/2012 | 19 | RESPONSE (re 7 MOTION to Quash *Deposition Subpoenas to Consultants and Request for Protective Order* ) filed byPaxfire, Inc.. (Attachments: # 1 Grosso Decl. ISO, # 2 Exhibits 1-8)(Venkatesan, Jaideep) (Filed on 6/18/2012) (Entered: 06/18/2012) |
| 06/18/2012 | 20 | REPLY (re 1 MOTION to Quash ) filed byBetsy Feist. (Reese, Michael) (Filed on 6/18/2012) (Entered: 06/18/2012) |
| 06/22/2012 | 21 | ORDER TO SHOW CAUSE Re: Related Cases. Show Cause Response due by 6/26/2012. Signed by Judge Susan Illston on 6/22/12. (tfS, COURT STAFF) (Filed on 6/22/2012) (Entered: 06/22/2012) |
| 06/25/2012 | 22 | REPLY (re 7 MOTION to Quash *Deposition Subpoenas to Consultants and Request for Protective Order* ) filed byBetsy Feist. (Reese, Michael) (Filed on 6/25/2012) (Entered: 06/25/2012) |
| 06/26/2012 | 23 | ORDER granting 12 Administrative Motion to File Under Seal; signed by Judge Elizabeth D Laporte (kns, COURT STAFF) (Filed on 6/26/2012) (Entered: 06/26/2012) |
| 06/27/2012 | 24 | DOCUMENT E-FILED UNDER SEAL re 23 Order on Administrative Motion to File Under Seal *Exhibit O to Grosso Decl. ISO Opposition to Motion to Quash Subpoenas* by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 6/27/2012) (Entered: 06/27/2012) |
| 07/02/2012 | 25 | CLERKS NOTICE Continuing Motion Hearings, Reset Deadlines as to 7 MOTION to Quash *Deposition Subpoenas to Consultants and Request for Protective Order*, 1 MOTION to Quash. Motion Hearing set for 7/31/2012 09:00 AM in Courtroom E, 15th Floor, San Francisco before Magistrate Judge Elizabeth D. Laporte. (Attachments: # 1 Certificate/Proof of Service) (kns, COURT STAFF) (Filed on 7/2/2012) (Entered: 07/02/2012) |
| 07/02/2012 | 26 | ORDER RELATING CASES (Illston, Susan) (Filed on 7/2/2012) (Entered: 07/02/2012) |
| 07/03/2012 | 27 | ORDER SETTING HEARING ON MOTIONS TO QUASH 1 7 . Motion Hearing set for 8/1/2012 09:00 AM in Courtroom A, 15th Floor, San Francisco before Magistrate Judge Nathanael M. Cousins. Signed by Judge Nathanael M. Cousins on 7/3/12. (nclc1, COURT STAFF) (Filed on 7/3/2012) (Entered: 07/03/2012) |
| 07/05/2012 | | CASE REFERRED to Magistrate Judge Nathanael M. Cousins for Discovery (ahm, COURT STAFF) (Filed on 7/5/2012) (Entered: 07/05/2012) |
| 07/13/2012 | 28 | ORDER REASSIGNING CASE. Case reassigned to Judge Hon. Susan Illston for all further proceedings. Judge Hon. Jeffrey S. White no longer assigned to the case.. Signed by Executive Committee on 7/13/12. (as, COURT STAFF) (Filed on 7/13/2012) (Entered: 07/13/2012) |
| 07/19/2012 | 29 | |

388

| | | CLERK'S NOTICE: Hearing on motions to quash continued to 8/8/12. (nclc1, COURT STAFF) (Filed on 7/19/2012) (Entered: 07/19/2012) |
|---|---|---|
| 07/19/2012 | | Set/Reset Hearing Motion Hearing set for 8/8/2012 09:00 AM in Courtroom A, 15th Floor, San Francisco before Magistrate Judge Nathanael M. Cousins. (nclc1, COURT STAFF) (Filed on 7/19/2012) (Entered: 07/19/2012) |
| 07/23/2012 | 30 | MOTION for attorney Melissa Ryan Clark leave to appear in Pro Hac Vice ( Filing fee $ 305, receipt number 34611076733.) Filing fee previously paid on 7/24/12 filed by Betsy Feist. (Attachments: # 1 Proposed Order)(ga, COURT STAFF) (Filed on 7/23/2012) (Entered: 07/25/2012) |
| 07/26/2012 | 31 | ORDER by Judge Susan Illston granting 30 Application for Pro Hac Vice as to Melissa Ryan Clark (tfS, COURT STAFF) (Filed on 7/26/2012) (Entered: 07/26/2012) |
| 08/06/2012 | 32 | MOTION to Appear by Telephone *(Request of Peter E. Seidman To Attend By Telephone)* filed by Betsy Feist. (Clark, Melissa) (Filed on 8/6/2012) (Entered: 08/06/2012) |
| 08/06/2012 | 33 | ORDER VACATING HEARING ON MOTIONS TO QUASH SET FOR 8/8/12. The motions are appropriate for determination without oral argument and are under submission. Signed by Judge Nathanael M. Cousins on 8/6/12. (This is a text-only docket entry)(nclc1, COURT STAFF) (Filed on 8/6/2012) (Entered: 08/06/2012) |
| 08/06/2012 | | ORDER terminating motion to appear by telephone 32 as moot. (This is a text-only docket entry)(nclc1, COURT STAFF) (Filed on 8/6/2012) (Entered: 08/06/2012) |
| 08/13/2012 | 34 | ORDER GRANTING IN PART AND DENYING IN PART MOTIONS TO QUASH. Signed by Judge Nathanael M. Cousins. (nclc1, COURT STAFF) (Filed on 8/13/2012) (Entered: 08/13/2012) |
| 08/27/2012 | 35 | NOTICE by Paxfire, Inc. *Motion for Relief from Nondispositive Pretrial Order of Magistrate Judge (Order Dkt 34)* (Attachments: # 1 Grosso Decl. ISO & Ex A-C, # 2 Proposed Order)(Venkatesan, Jaideep) (Filed on 8/27/2012) (Entered: 08/27/2012) |
| 08/27/2012 | 36 | MOTION for De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 34 Order on Motion to Quash, filed by The Electronic Frontier Foundation, Peter Eckersley. Motion Hearing set for 10/19/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 9/10/2012. Replies due by 9/17/2012. (Attachments: # 1 Proposed Order)(Rodewald, Tenaya) (Filed on 8/27/2012) (Entered: 08/27/2012) |
| 09/07/2012 | 37 | STIPULATION WITH PROPOSED ORDER *to Extend Briefing Schedule* filed by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 9/7/2012) (Entered: 09/07/2012) |
| 09/07/2012 | 38 | ORDER to Extend Briefing Schedule by Judge Susan Illston granting (23) Stipulation in case 3:12-mc-80119-SI; granting (37) Stipulation in case 3:12- |

| | | mc-80121-SI; granting (38) Stipulation in case 3:12-mc-80140-SI (tfS, COURT STAFF) (Filed on 9/7/2012) (Entered: 09/07/2012) |
|---|---|---|
| 09/12/2012 | 39 | RESPONSE (re 36 MOTION for De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 34 Order on Motion to Quash, ) filed byPaxfire, Inc.. (Venkatesan, Jaideep) (Filed on 9/12/2012) (Entered: 09/12/2012) |
| 09/12/2012 | 40 | NOTICE by Paxfire, Inc. *Administrative Motion to Request the Court to Strike the Motion of Non-Parties EFF & Eckersley for De Novo Determination of Dispositive Matter Referred to Magistrate Judge* (Attachments: # 1 Venkatesan Decl ISO & Ex A-B, # 2 Proposed Order)(Venkatesan, Jaideep) (Filed on 9/12/2012) (Entered: 09/12/2012) |
| 09/17/2012 | 41 | NOTICE by Peter Eckersley, The Electronic Frontier Foundation re 40 Notice (Other), *Opposition to Paxfire's Administrative Motion to Strike EFF's Motion for De Novo Determination* (Rodewald, Tenaya) (Filed on 9/17/2012) (Entered: 09/17/2012) |
| 09/21/2012 | 42 | REPLY (re 36 MOTION for De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 34 Order on Motion to Quash, ) filed byPeter Eckersley, The Electronic Frontier Foundation. (Attachments: # 1 Declaration Rodewald Declaration ISO Reply, # 2 Declaration Cohn Declaration ISO Reply)(Rodewald, Tenaya) (Filed on 9/21/2012) (Entered: 09/21/2012) |
| 09/24/2012 | 43 | STATEMENT OF RECENT DECISION pursuant to Civil Local Rule 7-3.d filed byPaxfire, Inc.. (Related document(s) 39 ) (Venkatesan, Jaideep) (Filed on 9/24/2012) (Entered: 09/24/2012) |
| 09/28/2012 | 44 | OBJECTIONS to re 36 MOTION for De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 34 Order on Motion to Quash, *Objections to EFF & Eckersley's Evidence ISO Reply* by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 9/28/2012) (Entered: 09/28/2012) |
| 10/05/2012 | 45 | RESPONSE to re 44 Objection, by Peter Eckersley, The Electronic Frontier Foundation. (Rodewald, Tenaya) (Filed on 10/5/2012) (Entered: 10/05/2012) |
| 10/12/2012 | 46 | CLERKS NOTICE Continuing Motion Hearing, Set/Reset Deadlines as to (36 in 3:12-mc-80121-SI) MOTION for De Novo Determination of Dispositive Matter Referred to Magistrate Judge re (34) Order on Motion to Quash, , (37 in 3:12-mc-80140-SI) MOTION for De Novo Determination of Dispositive Matter Referred to Magistrate Judge re (35) Order on Motion to Quash, Order on Motion for Protective Order . Motion Hearing set for 10/23/2012 10:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. This is a docket text entry only, there is no document associated with this notice.(tfS, COURT STAFF) (Filed on 10/11/2012) (Entered: 10/11/2012) (tfS, COURT STAFF) (Filed on 10/12/2012) (Entered: 10/12/2012) |
| 10/12/2012 | 47 | STIPULATION WITH PROPOSED ORDER re 36 MOTION for De Novo Determination of Dispositive Matter Referred to Magistrate Judge re 34 Order on Motion to Quash, *Stipulation and Proposed Order re Continuing Hearing Date* filed by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 10/12/2012) (Entered: 10/12/2012) |

390

CAND-ECF
Page 9 of 9

| 10/16/2012 | 48 | STIPULATION AND ORDER Continuing 36 MOTION for De Novo Determination. Motion Hearing set for 11/6/2012 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Signed by Judge Susan Illston on 10/16/2012. (tmi, COURT STAFF) (Filed on 10/16/2012) (Entered: 10/16/2012) |
|---|---|---|
| 11/06/2012 | 49 | ORDER ON MOTION FOR REVIEW 22 in case 3:12-mc-80119-SI; 36 in case 3:12-mc-80121-SI; 32 3:12-mc-80135-SI; 37 in case 3:12-mc-80140-SI (Illston, Susan) (Filed on 11/6/2012) (Entered: 11/06/2012) |
| 12/17/2012 | 50 | SUGGESTION OF BANKRUPTCY Upon the Record by Paxfire, Inc.. (Venkatesan, Jaideep) (Filed on 12/17/2012) (Entered: 12/17/2012) |
| 01/11/2013 | 51 | MOTION to Withdraw as Attorney *(as to Bergeson, LLP)* filed by Paxfire, Inc.. Motion Hearing set for 2/22/2013 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 1/25/2013. Replies due by 2/1/2013. (Attachments: # 1 Venkatesan Decl ISO, # 2 Proposed Order) (Venkatesan, Jaideep) (Filed on 1/11/2013) (Entered: 01/11/2013) |
| 01/14/2013 | 52 | MOTION to Withdraw as Attorney *(as to Bergeson, LLP) (corrects Docket (51))* filed by Paxfire, Inc.. Motion Hearing set for 2/22/2013 09:00 AM in Courtroom 10, 19th Floor, San Francisco before Hon. Susan Illston. Responses due by 1/28/2013. Replies due by 2/4/2013. (Attachments: # 1 Corrected Venkatesan Decl ISO, # 2 Proposed Order)(Venkatesan, Jaideep) (Filed on 1/14/2013) (Entered: 01/14/2013) |
| 02/19/2013 | 53 | ORDER by Judge Susan Illston granting 51 Motion to Withdraw as Attorney. ; granting 52 Motion to Withdraw as Attorney. (tfS, COURT STAFF) (Filed on 2/19/2013) (Entered: 02/19/2013) |
| 02/19/2013 | 54 | ORDER STAYING CASE. Signed by Judge Susan Illston on 2/19/13. (tfS, COURT STAFF) (Filed on 2/19/2013) (Entered: 02/19/2013) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 11/19/2013 12:54:35 | | |
| **PACER Login:** ag0180 | **Client Code:** | PXFM |
| **Description:** Docket Report | **Search Criteria:** | 3:12-mc-80121-SI |
| **Billable Pages:** 7 | **Cost:** | 0.70 |

391

**CERTIFICATE OF SERVICE**

I hereby certify that on December 26, 2013, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.


s/        Stephen Moore