CASE NO. 12-17506

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———————

BETSY FEIST

*Plaintiff,*

v.

RCN CORPORATION AND PAXFIRE, INC.

*Defendants.*

———————

ELECTRONIC FRONTIER FOUNDATION and PETER ECKERSLEY

*Third-Party Appellees,*

and

PAXFIRE, INC.

*Appellant.*

———————

**THIRD PARTY APPELLEES ELECTRONIC FRONTIER FOUNDATION'S and PETER ECKERSLEY'S SUPPLEMENTAL EXCERPTS OF RECORD IN SUPPORT OF ANSWERING BRIEF VOLUME II**

———————

On Appeal From The United States District Court
For The Northern District of California
District Court Case 3:12-mc-80135-SI
The Honorable Susan Illston, Presiding

———————

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
James M. Chadwick, Cal. Bar No. 157114
Tenaya Rodewald, Cal. Bar No. 248563
379 Lytton Avenue
Palo Alto, California 94301-1479
TEL: 650.815.2600

*Attorneys for Third-Party Appellees*
*ELECTRONIC FRONTIER FOUNDATION and PETER ECKERSLEY*

## TABLE OF CONTENTS

| Tab | Date | Description | Pages |
|-----|------|-------------|-------|
| 16. | 06/22/12 | Excerpts of Exhibit G to Declaration Of Andrew Grosso In Support Of Opposition Of Paxfire, Inc. To Motion Of Electronic Frontier Foundation And Peter Eckersley To Quash Subpoenas Issued By Paxfire, Inc. And Request For Protective Order<br><br>Transcript of Deposition of Betsy Feist [Document 21-8, N.D. Cal. Case No. 3:12-mc-80135] | SER-242 through SER-442 |
| 17. | 06/06/12 | Declaration Of Jesse Burns In Support Of Motion To Quash Subpoenas Issued By Defendant Paxfire, Inc. And Request For Protective Order [Document 4, N.D. Cal. Case No. 3:12-mc-80135] | SER-443 through SER-447 |
| 18. | 06/06/12 | Declaration Of Arvind Narayanan In Support Of Motion To Quash Subpoenas Issued By Defendant Paxfire, Inc. And Request For Protective Order [Document 2, N.D. Cal. Case No. 3:12-mc-80135] | SER-448 through SER-452 |
| 19. | 06/06/12 | Declaration Of Nicholas Croyle Weaver In Support Of Motion To Quash Subpoenas Issued By Defendant Paxfire, Inc. And Request For Protective Order [Document 5, N.D. Cal. Case No. 3:12-mc-80135] | SER-453 through SER-455 |
| 20. | 09/05/12 | Letter From Melissa Ryan Clark, Counsel for Betsy Feist, To The Honorable Ronald L. Ellis, United State Magistrate Judge For The Southern District of New York in SDNY Case No. 1:11-cv-05436 | SER-456 through SER-461 |
| 21. | 10/02/12 | Letter From Kim Richman, Counsel for Betsy Feist, To The Honorable Ronald L. Ellis, United State Magistrate Judge For The Southern District of New York in SDNY Case No. 1:11-cv-05436 | SER-462 through SER-467 |

# Tab 16

to
THIRD PARTY APPELLEES
ELECTRONIC FRONTIER FOUNDATION'S
and PETER ECKERSLEY'S
SUPPLEMENTAL EXCERPTS OF RECORD
IN SUPPORT OF ANSWERING BRIEF
Volume I

# EXHIBIT G

**TO DECLARATION OF ANDREW GROSSO IN
SUPPORT OF OPPOSITION OF PAXFIRE,
INC. TO MOTION OF ELECTRONIC
FRONTIER FOUNDATION AND PETER
ECKERSLEY TO QUASH SUBPOENAS
ISSUED BY PAXFIRE, INC. AND REQUEST
FOR PROTECTIVE ORDER**

Betsy Feist                                    April 13, 2012

                                                          1

                UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF NEW YORK


                BETSY FEIST, individually,)
        and on behalf of all       )
                others similarly situated,)
                                   )
                        Plaintiffs,  )
                                   )
                        vs.          ) No. 11 Civ 5436
                                   )
                RCN CORPORATION and      )
        PAXFIRE, INC.,             )
                                         )
                Defendants.  )
                ------------------------)



                        VIDEOTAPED
                DEPOSITION OF BETSY FEIST
                  New York, New York
                    April 13, 2012






        Reported by:
                PAMELA J. MAZZELLA
        JOB NO. 326759

Betsy Feist                                    April 13, 2012

                                                              2

                         April 13, 2012
                          9:40 a.m.


              Deposition of BETSY FEIST, held at
         the offices of Bingham McCutchen LLP, 399
         Park Avenue, New York, New York, pursuant
         to Notice, before Pamela J. Mazzella, a
         Notary Public of the State of New York.

Betsy Feist                                        April 13, 2012

                                                                3

1

2          A P P E A R A N C E S:

3

4        MILBERG LLP

5        Attorneys for Plaintiff

6               One Pennsylvania Plaza - 49th Floor

7               New York, New York 10119

8        BY:   PETER E. SEIDMAN, ESQ.

9        AND:  MELISSA RYAN CLARK, ESQ.

10                    -and-

11       REESE RICHMAN LLP

12              875 Avenue of the Americas

13              18th Floor

14              New York, New York 10001

15       BY:   MICHAEL R. REESE, ESQ.

16

17       BINGHAM McCUTCHEN LLP

18       Attorneys for Defendant RCN

19              399 Park Avenue

20              New York, New York 10022-4689

21       BY:   DEREK CARE, ESQ.

22       AND:  ALICIA REED, ESQ.

23

24

25

Betsy Feist                                    April 13, 2012

                                                          4

     A P P E A R A N C E S:   (Cont'd.)

          ANDREW GROSSO & ASSOCIATES
          Attorneys for Defendant Paxfire, Inc.
               1101 Thirtieth Street, NW
               Suite 300
               Washington, D.C. 20007
          BY:   ANDREW GROSSO, ESQ.

     ALSO PRESENT:
          RICHARD RAMOS - Videographer

Betsy Feist                                    April 13, 2012

5

1

2           THE VIDEOGRAPHER:   Good morning,

3      we are on the record.  This is tape

4      number 1 of the videotaped deposition of

5      Betsy Feist in the matter of Betsy

6      Feist, individually, and on behalf of

7      all others similarly situated versus RCN

8      Corporation and Paxfire, Inc. in the

9      United States District Court, Southern

10     District of New York.

11          This deposition is being held at

12     Bingham McCutchen, LLP, located at 399

13     Park Avenue, New York, New York, 10022,

14     on April 13, 2012 at approximately 9:40

15     a.m.

16          My name is Richard Ramos and I'm

17     the legal video specialist.  The court

18     reporter today is Pam Mazzella.

19          Will counsel please introduce

20     themselves beginning with the party

21     noticing this proceeding.

22          MR. GROSSO:   My name is Andrew

23     Grosso, I represent Paxfire

24     Incorporated, which is the defendant,

25     and also the counterclaim plaintiff in

Betsy Feist                                    April 13, 2012

6

1                        Betsy Feist

2            this case.

3                    MR. CARE:   And my name is Derek

4            Care from the law firm of Bingham

5            McCutchen and we represent RCN Telecom

6            Services LLC, and with me today is my

7            colleague Alicia Reed.

8                    MR. REESE:   And my name is Michael

9            Reese, I represent the plaintiff.

10                   MR. SEIDMAN:   Peter Seidman with

11           Milberg, I also represent the plaintiff.

12                   MS. CLARK:   Melissa Clark with

13           Milberg for the plaintiff.

14                   THE VIDEOGRAPHER:   Will the court

15           reporter please swear in the witness.

16

17            B E T S Y   F E I S T , called as a

18       witness, having been duly sworn by a Notary

19       Public, was examined and testified as

20       follows:

21       EXAMINATION BY

22       MR. GROSSO:

23                   Q.   Miss Feist, as I said, my name is

24       Andrew Grosso, I represent Paxfire.  We're

25       here for your deposition, it's being

Betsy Feist                                    April 13, 2012

                                                         70
1                     Betsy Feist
2      telling me from comparing Exhibits 2, 3 with
3      Exhibit 4 that it gives you the capacity to
4      do all of these things.
5          Q.   Let's take a look at count 5 which
6      is on page 24.
7          A.   I think maybe after this question I
8      would like to take a little break.
9          Q.   Do you want to do it now because
10     sometimes one question leads to another,
11     leads to another.
12         A.   Okay, let's do it now.
13              THE VIDEOGRAPHER:   The time is
14         11:15 and we're off the record.
15                   (Recess taken.)
16              THE VIDEOGRAPHER:   The time is
17         11:31 and this begins tape number 2 of
18         the videotaped deposition of Betsy
19         Feist.
20     BY MR. GROSSO:
21         Q.   Paragraph 72 of page 24 of your
22     complaint, Exhibit 1, it reads "Defendants
23     have received the benefit from Plaintiff" --
24     well, I'm not sure that reads correctly, but
25     this is what it says.  "Defendants have

Betsy Feist                                    April 13, 2012

71

1                    Betsy Feist
2       received the benefit from Plaintiff and
3       Defendants have received and retained money
4       from third parties as a result of sharing
5       and/or allowing access to personal
6       information of Plaintiff and Class Members
7       without Plaintiff's knowledge or consent as
8       alleged in this complaint."
9              I want to focus on the words
10      "Defendants have received and retained money
11      from third parties as a result of sharing
12      and/or allowing access to the personal
13      information of Plaintiff and Class Members."
14             Which third parties?
15             MR. REESE:   Objection to form,
16         vague and ambiguous, and compound.
17         A.   I don't know which third parties.
18         Q.   How much money?
19             MR. REESE:   Objection to form,
20         vague and ambiguous, compound.
21         A.   Excuse me.   I don't know how much
22      money.
23         Q.   How do you know that Paxfire
24      received or retained money from third parties
25      as a result of sharing your personal

Betsy Feist                                      April 13, 2012

                                                              72

                          Betsy Feist

1   information with them?

2                MR. REESE:   Objection to form,

3           vague and ambiguous, and

4           mischaracterizes the complaint.

5        A.   I think I said before I read

6   through so many documents and seen so many

7   things, but, you know, so I cannot at this

8   particular moment point to a particular

9   place.  But I relied on information that was

10  available to me and my lawyers.

11       Q.   Now, you -- I don't want to

12  mischaracterize your testimony, but my

13  recollection is that you earlier said that

14  you spoke with your attorneys, you used

15  Netalyzr and you read this article.

16               Is there anything else?

17       A.   Actually, I know that I said

18  earlier that I also did a Google search and

19  learned information that way.  And what I may

20  have neglected to say earlier is that there

21  is a lot of documentation, the company, the

22  various documents that, you know, have passed

23  back and forth, and I read them.

24       Q.   What documents are they?

Betsy Feist                                    April 13, 2012
                                                              73
1                      Betsy Feist
2              MR. REESE:   Objection to form.
3         A.   I cannot at this time point to
4    specific documents where a specific thing was
5    said.  I read page after page after page of
6    multiple documents.
7         Q.   What type of documents were these?
8              MR. REESE:   Objection to form.
9         A.   I think there were -- I mean I
10   shouldn't say that because I'm not absolutely
11   sure what type of documents received
12   contained what type of information.  I'm just
13   going to say I don't know.
14        Q.   Did you read this information
15   before or after you filed your complaint?
16             MR. REESE:   Objection to form.
17        A.   Some before, some after.
18        Q.   Which ones, if you can recall, did
19   you read before you filed your complaint?
20             MR. REESE:   Objection to form,
21        vague and ambiguous.
22        A.   I cannot recall everything.  I know
23   I read Exhibit 4.  I know I did a Google
24   search.  I don't remember what I found that
25   might have been of use.  One place I looked

Betsy Feist                                    April 13, 2012

74

1                       Betsy Feist

2       was Paxfire's website.  Of course we did not

3       immediately Google Paxfire at such a moment,

4       but I cannot be more specific than that.

5           Q.    Now let's return to the Netalyzr

6       and its results.

7                 Why did you use the Netalyzr?

8           A.    To, to find out whether or not this

9       was happening on my computer, my searches.

10          Q.    What prompted you to use the

11      Netalyzr?

12                MR. REESE:   Objection to form,

13              asked and answered.

14          A.    I had a conversation with Kim

15      Richman about the possibility that this was

16      happening and he --

17                MR. REESE:   I don't think he wants

18              you to disclose the conversation, so...

19                THE WITNESS:   Okay, thank you.

20          A.    That's all, I had a conversation.

21      I already said before he did E-mail me the

22      link, which is what I was going to add.

23          Q.    Now, where did you -- on what

24      computer did you use the Netzlyzr?

25          A.    On my computer.

Betsy Feist                                    April 13, 2012

                                                                    75

1                          Betsy Feist
2              Q.    Where was that?
3              A.    In my living room.
4              Q.    Who else, if anyone, was present?
5              A.    Nobody.
6              Q.    Who, if anyone, explained to you
7       how to use the Netalyzr?
8              A.    Nobody.
9              Q.    How did you learn how to use the
10      Netalyzr?
11             A.    I clicked on the link and it
12      happened.
13             Q.    Who did you, if anybody, discuss
14      the Netalyzr results with after you did this?
15             A.    Kim Richman.
16             Q.    Now let's take a look at Exhibit
17      Number 4.  This is the --
18                   MR. REESE:   An article.
19             Q.    There are four people mentioned, I
20      have already read their names.
21                   Have you ever spoken with Nicholas
22      Weaver?
23             A.    No.
24             Q.    Have you ever spoken with Christian
25      Kreibich?

Betsy Feist                                    April 13, 2012

                                                          76

1                    Betsy Feist

2          A.    No.

3          Q.    Have you ever spoken with Boris,

4    the name I can't pronounce?

5          A.    No.

6          Q.    Have you ever spoken with Vern

7    Paxson?

8          A.    No.

9          Q.    Have you ever received any

10   information, directly or indirectly, about

11   Paxfire from any of these four persons?

12         A.    Well, I read their article.

13         Q.    Other than that?

14         A.    No.

15         Q.    Did you ever hire any of these

16   individuals?

17         A.    No.

18         Q.    Do you know whether or not these

19   individuals have been hired to assist in this

20   case by you or your lawyers?

21         A.    I, I am not certain which

22   individuals were hired, but I know there were

23   individuals who, with expert knowledge who

24   were hired.

25               MR. GROSSO:   This is Exhibit

Betsy Feist                                          April 13, 2012

                                                                77

1                      Betsy Feist

2          Number 5.

3                (Defendant's Exhibit 5, two-page

4          letter dated April 10, 2012, marked for

5          identification, as of this date.)

6          Q.   This is a letter on Milberg

7     letterhead signed by Melissa Ryan Clark.

8                She's one of your lawyers; is that

9     correct?

10         A.   That's correct.

11         Q.   Have you seen this letter before?

12         A.   Yes, I have.

13         Q.   This is Number 5.  Under the first

14    caption Deposition of Consultants and

15    Experts, "To the extent that you intend to

16    notice depositions for Peter Eckersley,

17    Christian Kreibich, Vern Paxson, or Nicholas

18    Weaver, please note that Federal Rule Civil

19    Procedure 26(b)(4)(D) prohibits the use of

20    interrogatories or a deposition to discover

21    facts or opinions of an expert who has been

22    retained by another party in anticipation of

23    the litigation."

24                Have any of these individuals to

25    your knowledge been retained by you or your

Betsy Feist                                    April 13, 2012

                                                              78

                          Betsy Feist
 1
 2      lawyers in anticipation of litigation?
 3                  MR. REESE:   Objection to form.
 4           A.   I have no knowledge of that I don't
 5      think.
 6           Q.   At the time that you received this
 7      phone call from Mr. Richman and then used the
 8      Netalyzr were you aware of whether or not any
 9      of these individuals had been hired --
10           A.   I did -- oh, excuse me.
11           Q.   -- by, by any of your lawyers?
12                  MR. REESE:   Objection to form.
13           A.   I was not even aware of the
14      individual's existence.
15           Q.   Do you know how much money was paid
16      to these individuals by your lawyers as
17      experts or consultants in anticipation of
18      litigation?
19                  MR. REESE:   Objection to form.
20           A.   No.
21           Q.   The following questions go to
22      possible bias.
23                  How much -- how do you expect, if
24      any, to be compensated as a result of this
25      lawsuit?

Betsy Feist                                         April 13, 2012

79

1                      Betsy Feist

2              MR. REESE:   Objection to form,

3          vague and ambiguous, and the preface to

4          saying possible bias.

5          A.   I have no specific expectations.

6          Q.   Do you have a retainer agreement

7      with your lawyers?

8          A.   Yes.

9          Q.   Are you to receive a share of any

10     recovery in this lawsuit?

11         A.   This is -- I actually don't

12     remember the specifics of the retainer

13     agreement, but to the degree that retainers

14     or this kind of thing do specify that, yeah.

15         Q.   Do you recall the percentage that

16     you are to get?

17             MR. REESE:   Object to the form.

18         Assumes facts not in evidence.

19         A.   No.

20             MR. GROSSO:   It's an answer.

21         A.   I don't even --

22             MR. GROSSO:   It's not the answer I

23         wanted to hear, but it's an answer.

24         Q.   Let's go back to Exhibit 1 which is

25     the complaint.  Let's take a look at page --

Betsy Feist                                        April 13, 2012

                                                                80

1                     Betsy Feist
2        it doesn't have a page number on it.  The
3        second page, if you turn --
4                 MR. REESE:   Page 2 of 30 at the
5            top?
6                 MR. GROSSO:   I don't have that
7            copy, but yes.
8            A.   The first actual page of text.
9            Q.   Right.  The first paragraph reads,
10       in part, "Plaintiff Betsy Feist brings this
11       action individually on behalf of:  A, a class
12       of persons who have had their internet
13       searches monitored, intercepted, manipulated
14       and/or redirected via the use of Paxfire
15       technology, including, but not limited to,
16       the customers of the following internet
17       service providers:  Cavalier, Charter,
18       Cincinnati Bell, Cogent Communications,
19       DirecPC, Frontier, Insight Broadband, Iowa
20       Telecom, Defendant RCN, and Wide Open West."
21                 What information did you have that
22       Paxfire was involved in Cavalier's internet
23       service?
24           A.   None.
25                 MR. REESE:   Objection to form.

**SER-259**

Betsy Feist                                      April 13, 2012

                                                              81
1                        Betsy Feist
2           Q.   What information do you have that
3      Paxfire was involved in Charter's internet
4      service?
5                MR. REESE:   Objection to form,
6           vague and ambiguous.
7           A.   None.
8           Q.   What information do you have that
9      Paxfire was involved in Cincinnati Bell's
10     internet service?
11               MR. REESE:   Objection to form,
12          vague and ambiguous.
13          A.   None.
14          Q.   What information do you have that
15     Paxfire was involved in Cogent Communications
16     internet service?
17               MR. REESE:   Objection to form,
18          vague and ambiguous.
19          A.   None.
20          Q.   What information do you have that
21     Paxfire was involved in DirecPC's internet
22     service?
23               MR. REESE:   Objection to form,
24          vague and ambiguous.
25          A.   None.

Betsy Feist                                    April 13, 2012

                                                        82

1                   Betsy Feist

2       Q.   What information do you have that

3    Paxfire was involved in Frontier's internet

4    service?

5           MR. REESE:   Objection to the form,

6       vague and ambiguous.

7       A.   None.

8       Q.   What information do you have that

9    Paxfire was involved in Insight Broadband's

10   internet service?

11          MR. REESE:   Objection to form,

12      vague and ambiguous.

13      A.   None.

14      Q.   What information do you have that

15   Paxfire was involved in Iowa Telecom's

16   internet service?

17          MR. REESE:   Objection to form,

18      vague and ambiguous.

19      A.   None.

20      Q.   What information do you have that

21   Paxfire was involved in Wide Open West

22   internet service?

23          MR. REESE:   Objection to form,

24      vague and ambiguous.

25      A.   None.

Betsy Feist                                    April 13, 2012

83

                        Betsy Feist

1        Q.    I want to turn to Frontier.  Have

2    you ever used Frontier's internet service?

3        A.    No.

4        Q.    Have you ever heard the term

5    "splash page," S-P-L-A-S-H?

6        A.    Not that I can remember.

7        Q.    Do you know how Frontier implements

8    Paxfire's internet service?

9             MR. REESE:   Objection to form,

10            vague and ambiguous.

11       A.    No.

12       Q.    Let's go to page 2, page 2, the

13    number on the bottom.  Unless I say

14    otherwise, when I use a page number it's the

15    number at the bottom.

16            It says "Defendants secretly gave

17    her computer system false information that

18    directed Plaintiff to websites that look like

19    the websites she intended to visit."

20            What is your understanding of what

21    Paxfire did in order to make, as you allege,

22    a webpage look like the page you went to,

23    even when you didn't go there?

24            MR. REESE:   Objection to form,

84

                    Betsy Feist

1

2          vague and ambiguous, unintelligible.

3          A.   What do you mean by that?  I don't

4     understand that.

5          Q.   Let me ask you this:  What do you

6     mean by the phrase or allegation "The

7     Defendant secretly gave her computer system

8     false information and directed Plaintiff to

9     websites that look like the websites that she

10    intended to visit"?

11         A.   What I mean by that is what I saw

12    on my monitor, was a website that I expected

13    to visit, but I know from what the Netalyzr

14    and whatever other documents relate to that,

15    that that's not really where I was.  There

16    would be no other way of knowing that.

17         Q.   How do you know you really weren't

18    there, you just were being passed there

19    through Paxfire's proxy?

20              MR. REESE:  Objection to form,

21         vague and ambiguous, and existential as

22         well.

23         A.   I know it because experts have,

24    experts whose -- experts have told me that's

25    in fact what happened, otherwise I couldn't

Betsy Feist                                            April 13, 2012

                                                                    85

                            Betsy Feist

1

2       know it.

3               Q.    Which experts told you that?

4               A.    Well, here we go back to the fact

5       that I have read and heard, you know, a great

6       deal over many, many months and am really

7       unable to point to any specific place at this

8       particular moment.

9               Q.    Now, you didn't -- you told us you

10      didn't speak to any of those four

11      individuals?

12              A.    No.

13              Q.    How about Peter Eckersley, have you

14      spoken with him?

15              A.    No.

16              Q.    What other experts have you spoken

17      with?

18              A.    Well, okay, the expert, my expert

19      knowledge came indirectly, I mean came from

20      things I read and indirectly from things I

21      heard from my laywers I guess.

22                    MR. REESE:    And I don't think you

23              want to go into those communications; is

24              that correct?  You're not asking for

25              attorney-client --

Betsy Feist                                    April 13, 2012

                                                            86

1                    Betsy Feist

2            MR. GROSSO:    Let me ask my

3        questions.

4                MR. REESE:    Fair enough.  I

5        withdraw that.

6    BY MR. GROSSO:

7        Q.   This sentence, "Defendants secretly

8    gave her computer system false information

9    that directed Plaintiff to websites that

10   looked like the websites she intended to

11   visit."

12            Is it correct to say that you

13   haven't spoken with personally, no expert who

14   has told you that Paxfire gave your computer

15   system false information that directed

16   plaintiff to websites that looked like the

17   websites you intended to visit --

18                MR. REESE:    Objection.

19       Q.   -- but were actually controlled and

20   located on servers belonging to the Defendant

21   RCN or Defendant Paxfire?

22                MR. REESE:   Object to the form,

23        mischaracterizes the witness' testimony.

24        Go ahead and answer the question.

25        A.   As I understand what you're saying,

Betsy Feist                                    April 13, 2012

                                                          87

1                        Betsy Feist
2         yeah, I have not spoken to anyone personally,
3         any experts about this or anything else.
4              Q.   What did you rely upon to make this
5         allegation?
6                   MR. REESE:   Objection to form.
7              A.   I relied upon the information from
8         the Netalyzr, the information from the
9         article that's already an exhibit, and I saw
10        other articles, both from my own independent
11        research online.  And there are other things
12        in that great big pile of papers over there
13        I'm sure that have passed through, you know,
14        my hands, but I cannot on any particular
15        point tell you where I found it.
16                  MR. GROSSO:   This is going to be
17             Exhibit Number 6.
18                  (Defendant's Exhibit 6,
19             Plaintiff-Counterclaim Defendant Betsy
20             Feist's Responses to
21             Defendant-Counterclaim Plaintiff Paxfire,
22             Inc.'s First Set of Requests For
23             Production of Documents, marked for
24             identification, as of this date.)
25             Q.   Now, this is captioned

Betsy Feist                                    April 13, 2012

                                                              88

1                       Betsy Feist

2          "Plaintiff-Counterclaim Defendant Betsy

3          Feist's Responses to Defendant-Counterclaim

4          Plaintiff Paxfire, Inc.'s First Set of

5          Requests For Production of Documents."  This

6          is where Paxfire asked for you to produce all

7          the documents that are identified in these

8          various requests.

9                   Now, at the bottom of page 28 there

10         is -- it's the top of page 28, there is a

11         signature of Kim Richman.  He is one of your

12         lawyers, correct?

13              A.    That's correct.

14              Q.    I'd like to ask you if you could

15         tell me where in any of the documents here

16         that have been cited in response to our

17         document request, there is any document

18         identified that Paxfire provided to your

19         view, or your computer, false information

20         that made it look like the page was where you

21         wanted to go but it was really Paxfire's

22         page.

23                   MR. REESE:  Objection to form,

24              vague and ambiguous.  To the extent

25              asked and answered as well.

Betsy Feist                                    April 13, 2012

                                                              89

1                       Betsy Feist
2          A.    I guess in order to tell you
3     specifically where in the documents, I will
4     have to take the time to read this document.
5          Q.    Okay.
6               MR. REESE:   And documents have
7          been produced in response to this
8          request as well.
9               MR. GROSSO:   Where?
10              MR. REESE:   There was an E-mail.
11              MS. CLARK:   Didn't you see the
12         Netalyzr results came from our
13         responses?
14              MR. GROSSO:   But that doesn't say
15         Paxfire -- I mean is there anything more
16         than that?
17              MR. REESE:   I thought you produced
18         documents.
19              MS. CLARK:   Yeah, we produced
20         documents yesterday and the day before.
21              MR. GROSSO:   Which -- okay.  Let's
22         not waste time here.
23              MR. REESE:   Nobody's wasting time.
24              MR. GROSSO:   If there is any
25         document that you have provided to me

Betsy Feist                                          April 13, 2012

                                                                  90

1                      Betsy Feist
2          that supports that specific allegation I
3          read concerning false information,
4          making your computer present a webpage
5          that Paxfire is not the search engine,
6          will you provide the specific number of
7          the document?
8               MR. REESE:   We'll take that under
9          consideration.
10              MR. GROSSO:   That will save me
11         from having to go through this.
12              MS. CLARK:   If a document exists
13         that establishes part of the complaint,
14         you want me to provide the Bates number?
15              MR. GROSSO:   Yes.
16              MS. CLARK:   Okay, which?   Right
17         now?
18              MR. GROSSO:   No.
19              MS. CLARK:   Okay.
20              MR. GROSSO:   As long as you --
21              MS. CLARK:   If a document exists,
22         sure, send us an E-mail and the exact
23         language and we'll give you a Bates
24         number.
25              MR. GROSSO:   Okay, because I've

Betsy Feist                                    April 13, 2012

                                                              91

                         Betsy Feist

1          looked at it and I haven't seen any and

2          she says it exists.

3               MS. CLARK:   I don't know that she

4          testified to that, but I understand what

5          you're saying.

6               MR. GROSSO:   I don't need to go

7          any further.

8     BY MR. GROSSO:

9          Q.   Now, you have said -- let me see if

10    I can find it.  Let's take a look at

11    paragraph 22 on page 10.

12         A.   Of which document?

13         Q.   Your complaint, Exhibit Number 1.

14              MR. REESE:   Paragraph 22?

15              MR. GROSSO:   Paragraph 22, it

16         begins on page 10.

17         Q.   Now, I don't want to read this

18    entire paragraph into the record, so would

19    you please read it to yourself?

20         A.   Okay.  I assume you're including

21    the bullet list.

22         Q.   The bullet list all the way down to

23    the next page.

24         A.   Okay.

Betsy Feist                                    April 13, 2012

                                                              91

                         Betsy Feist

1          looked at it and I haven't seen any and

2          she says it exists.

3               MS. CLARK:   I don't know that she

4          testified to that, but I understand what

5          you're saying.

6               MR. GROSSO:   I don't need to go

7          any further.

8     BY MR. GROSSO:

9          Q.   Now, you have said -- let me see if

10    I can find it.  Let's take a look at

11    paragraph 22 on page 10.

12         A.   Of which document?

13         Q.   Your complaint, Exhibit Number 1.

14              MR. REESE:   Paragraph 22?

15              MR. GROSSO:   Paragraph 22, it

16         begins on page 10.

17         Q.   Now, I don't want to read this

18    entire paragraph into the record, so would

19    you please read it to yourself?

20         A.   Okay.  I assume you're including

21    the bullet list.

22         Q.   The bullet list all the way down to

23    the next page.

24         A.   Okay.

Betsy Feist                                         April 13, 2012

                                                              92
1                    Betsy Feist

2         Q.    Tell us when you're done.

3         A.    Okay.

4         Q.    I'm just going to read one bullet

5    point here.  This is the last one on page 10.

6    No, I take that back.  Top, first bullet

7    point on top of page 11.  "If the search is

8    one of the brand keywords, the Paxfire-based

9    proxy server will send the search to an

10   advertising affiliate that pays Defendant

11   Paxfire (who splits the earnings with the

12   ISPs, including the Defendant RCN) for the

13   referral."

14              And I'll read the next bullet.

15   "Finally, the advertising affiliate directs

16   the user to the page associated with the

17   brand keyword (i.e., displaying Apple.com if

18   the search term was Apple or displaying

19   Dell.com if the search word is Dell)."

20              Now, would you explain to me in

21   your own words what it is you're complaining

22   about with regard to Paxfire's conflicts in

23   these, in this paragraph?

24              MR. REESE:   Objection to form,

25        compound, vague and ambiguous, and the

Betsy Feist                                    April 13, 2012

                                                            93

1                      Betsy Feist
2           document speaks for itself.
3           A.    That's -- that's such an enormous
4      question I don't even know how to respond to
5      it.
6           Q.    Well, what is your allegation about
7      the brand names on the list?
8                MR. REESE:    Same objection, vague
9           and ambiguous.
10          A.    Well, I think --
11               MR. REESE:    Unintelligible.
12          A.    -- my allegation is you redirect
13     searches to those pages.  I mean --
14          Q.    So you put a trademark or --
15               MR. REESE:    Objection to form.
16          That wasn't a question.
17               THE WITNESS:    I'm sorry.
18          Q.    Is it fair to say that your
19     complaint is that if you put the word "Apple"
20     or one of another 170 or so brand names into
21     the search bar, that you will be directed to
22     the webpage of the trade holder or brand name
23     holder of that word rather than to a Google,
24     Yahoo! or Bing search page?
25               MR. REESE:    Objection to form,

Betsy Feist                                          April 13, 2012

                                                                    94

                         Betsy Feist

1

2        vague and ambiguous, and overly broad.

3            A.    I don't think I could say that

4    every single instance where I would use one

5    of those words that it would always happen, I

6    really don't know that.  I just know that the

7    system is built so that is what can -- there

8    is a process to make that happen.  I don't

9    think I said that very well, but it's --

10   that's the best I can do.

11           Q.    How did you learn that?

12           MR. REESE:   Objection to form,

13       vague and ambiguous, asked and answered

14       at this point several times.

15           A.    I relied on information that, you

16   know, came from experts.

17           Q.    How many times have you -- not in

18   preparation for this case, but just in your

19   normal search practices how many times have

20   you entered a word in the search bar and been

21   sent to the home page of the trademark

22   holder?

23           MR. REESE:   Object to form.

24       Overly broad.

25           A.    I don't know.

Betsy Feist                                April 13, 2012

95

                        Betsy Feist

1

2       Q.   Which trademark or other brand

3   names have you entered into the search bar of

4   a search engine and had the result be the

5   webpage of the trademark or the brand name

6   holder?

7            MR. REESE:   Objection, vague and

8        ambiguous, compound, overly broad.

9       A.   I don't remember.

10      Q.   I'm going to read the last

11  paragraph or the last two sentences of this

12  paragraph.  "This entire process happens in

13  less than a second and is invisible to the

14  user."  Only a very astute class -- "Only

15  very astute class members would even notice

16  that they were being directed to a brand's

17  page rather than search results when this

18  process occurs."

19           What difference is there between

20  the brand page, the brand's page and search

21  results?

22           MR. REESE:   Objection to form,

23       vague and ambiguous.

24      A.   Well, search results, if it's

25  Google search -- well, whatever the

Betsy Feist                                    April 13, 2012

```
                                                          96
 1                    Betsy Feist
 2      particular search engine that I used, it
 3      would say on the top that that's what it is.
 4      And usually, I mean I guess there could be
 5      times when you only got one link, but usually
 6      you get a whole list of possible links.
 7      Sometimes you get they can't find anything,
 8      but you don't -- but in order to actually get
 9      to the page, you have to click on one of
10      those links and that brings you to the page
11      that is identified with that brand name, et
12      cetera.
13              Q.   What is the problem with that?
14                   MR. REESE:   Objection to form,
15              vague and ambiguous.
16              Q.   If anything?
17                   MR. REESE:   And asked over and
18              over again.  Harassing the witness at
19              this point.  You can answer again.
20              A.   The problem with that is that
21      you're taking over my, my searches.  You are
22      doing something that I have not chosen to do.
23      I mean I don't know.  You are interfering
24      with, with my life.
25              Q.   Did you complain to RCN?
```

Betsy Feist                                    April 13, 2012

                                                        97

                         Betsy Feist

 1

 2              MR. REESE:   Objection.   Other than

 3        the complaint?

 4              MR. GROSSO:   No.

 5        Q.   Other than --

 6        A.   Well, other than the complaint,

 7   before, before this, you know, before I had

 8   my initial conversation with Kim Richman and

 9   went through all the steps that we discussed

10   at length here, as it says here only a very

11   astute member, class members would even

12   notice that they were being directed to the

13   brand page rather than search results.

14              And I, without being able to be

15   specific or even very definite on this, I

16   think that there may have been occasions

17   where I did notice and I in my ignorance

18   didn't realize where the problem lay because,

19   you know, most people who use computers, who

20   are not experts, have all kinds of weird

21   things happen all the time.

22        Q.   Did you complain to RCN?

23        A.   Oh, I'm sorry, I didn't answer your

24   question.  I apologize.  No.

25        Q.   You said that there may have been

Betsy Feist                                    April 13, 2012

                                                          98

                            Betsy Feist
1
2      occasions where you got a brand name when you
3      wanted results?
4             A.   I am sure that there were, that
5      this has happened, yes.
6             Q.   It was obvious to you?
7             MR. REESE:   Objection to form,
8             vague and ambiguous.
9             A.   I'm not sure it was always obvious
10     to me, but there -- I think the best way I
11     can say this is I remember, without
12     remembering specific events, that there were
13     times I experienced surprise about ending up
14     where I ended up.
15            Q.   What do you base -- given that,
16     that you're ending up not where you
17     anticipated ending up, where do you, on what
18     do you base the statement that only a very
19     astute class member would notice this?
20            MR. REESE:   Objection to form and
21            mis -- you misread it.
22            Q.   I'll read the whole thing:  "Only
23     very astute class members would even notice
24     that they were being directed to a brand's
25     page rather than search results when this

Betsy Feist                                     April 13, 2012

99

1                    Betsy Feist

2       process occurs."

3           A.   I suppose what I just said about,

4       you know, accidents happen with computers and

5       if you don't end up -- as a lay person, if I

6       don't end up exactly where I expected to end

7       up, I am not assuming I'm redirected.  It,

8       just look at it as some kind of anomaly.

9           Q.   So is it fair to say that it would

10      be obvious that you wound up at the wrong

11      place?

12               MR. REESE:   Objection to form.

13          A.   I can't say that it was always

14      obvious.  I can only say that on occasion I

15      noticed it.

16          Q.   For what search terms did you

17      notice it?

18          A.   I have no idea.

19          Q.   What did you do on those occasions?

20               MR. REESE:   Objection to form,

21          compound.

22          A.   I could only guess and I don't

23      think I'm supposed to be making guesses here.

24          Q.   You've alleged that RCN intercepted

25      your search terms, your searches; is that

Betsy Feist                                          April 13, 2012

                                                              100

 1                      Betsy Feist

 2      correct?

 3              MR. REESE:   Objection to form.  Is

 4          there a place in the complaint you want

 5          to --

 6              MR. GROSSO:   Sure.  Let's go to

 7          count 1.

 8              MR. REESE:   Great, thank you.

 9      Q.    Page 19, count 1, paragraph 41.

10              MS. CLARK:   What paragraph number?

11              MR. GROSSO:   41.

12              MR. REESE:   41.

13      Q.    It says "Defendants" -- the

14      defendants were Paxfire and RCN, right --

15      A.    Correct.

16      Q.    -- "intentionally intercepted,

17      endeavored to intercept, and/or procured

18      another person to intercept or endeavor to

19      intercept a wire or electronic

20      communication."

21              You chose RCN as your internet

22      service provider, correct?

23              MR. REESE:   Objection to form,

24          vague and ambiguous, that's a compound

25          question.  But you can answer the

Betsy Feist                                        April 13, 2012
                                                              101
 1                    Betsy Feist

 2         question.

 3              When you read that and then you ask

 4         a question that's unrelated to it,

 5         that's why I'm objecting.  You just said

 6         did you ask RCN, --

 7         A.   Yes, yes.

 8              MR. REESE:   -- so that's why I'm

 9         objecting.

10    BY MR. GROSSO:

11         Q.   So your communications were sent to

12    wherever you wanted them to go through RCN,

13    correct?

14              MR. REESE:   Objection to form,

15         vague and ambiguous.

16         A.   That's the way I understand the

17    internet works, yes.

18         Q.   So RCN didn't intercept any of your

19    communications, did it?

20              MR. REESE:   Objection to form,

21         vague and ambiguous and calls for a

22         legal conclusion as that term is used.

23         A.   I think I know nitpicking is what

24    lawyers do.

25              MR. NEGER:   Objection.

Betsy Feist                                    April 13, 2012

                                                        102

1                        Betsy Feist

2          A.   So whether RCN -- you know, I mean

3     yes, my information correctly went to RCN, so

4     I guess maybe rather -- I mean it says here

5     intercept, but maybe RCN got it correctly but

6     then didn't allow it to travel further to the

7     intended place.  Maybe that -- is that not

8     intercepting?  I don't know.

9               MR. REESE:   Again, that's why I

10         objected.  This calls for a legal

11         conclusion as far as that term is used.

12         Q.   Do you know whether the term

13    "intercept" as used in the Wire Tap Act

14    includes intercepts as we would use it, done

15    in the ordinary course of an ISPs business,

16    or do you have no opinion?

17              MR. REESE:   Objection.  He's

18         asking you to ask -- to read his mind.

19         Calls for speculation.

20         A.   I neither know nor have an opinion

21    because I don't know what you're asking.

22         Q.   All right.  What was the

23    relationship as you understand it between

24    Paxfire and RCN?

25              MR. REESE:   Objection to form,

Betsy Feist                                    April 13, 2012

                                                          103

                     Betsy Feist

1

2        vague and ambiguous.

3            A.   I understood that they entered into

4    a contractual arrangement whereby RCN relayed

5    my searches to a Paxfire server rather than

6    directly to the place where they went and

7    that there was, you know, monetary

8    consideration for this.

9            Q.   Was this special for you?

10           A.   You mean for me personally, they

11   said let's do --

12               THE WITNESS:   I'm sorry, you

13           probably wanted to object.

14               MR. REESE:   I wanted to object to

15           form, vague and ambiguous, especially to

16           the term "special."

17           A.   You know, I do not think, if that's

18   what you meant, that somebody at RCN said

19   let's get Betsy Feist.

20           Q.   All right.  I also want to

21   understand your allegation with regard to

22   Paxfire having intercepted your

23   communications.

24               Are you alleging that Paxfire

25   inserted itself into your communications

                                                              104

1                      Betsy Feist

2        without your ISP knowing it?

3                MR. REESE:   Objection to form,

4            vague and ambiguous, and the complaint

5            speaks for itself.

6            A.   My ISP is RCN; is that correct?

7        What is my ISP?

8            Q.   Internet service provider.

9            A.   Yes, so that's RCN, correct?  I

10       don't think I'm alleging that.

11           Q.   Okay.  So what are you alleging?

12           A.   That --

13               MR. REESE:   Wait, objection to

14           form, vague and ambiguous.  You have

15           asked this a dozen times now.

16           A.   RCN and Paxfire were both involved

17       in what was happening.

18           Q.   From where did Paxfire get your

19       electronic communications?

20               MR. REESE:   Objection to form,

21           vague and ambiguous.

22           A.   From RCN.

23               MR. GROSSO:   This will be I

24           believe Number 7.

25               (Defendant's Exhibit 7, one-page

Betsy Feist                                    April 13, 2012

                                                          105

 1                    Betsy Feist

 2        document dated August 1, 2011, marked for

 3        identification, as of this date.)

 4        Q.    This document purports to be an

 5   E-mail from Christian Krebich to Jim Giles --

 6   Jiles -- Peter Seidman, Melissa Clark,

 7   Michael Reese and Kim Richman, dated Monday,

 8   August the 1st, 2011.

 9             Have you seen this E-mail before?

10        A.    Yes, I have.

11        Q.    When was the first time that you

12   saw this E-mail?

13        A.    I don't know exactly, but it is in

14   the course of all these papers that I have

15   been getting over these last months.

16        Q.    Was this before or after you filed

17   your complaint?

18        A.    I'm pretty sure it was after.  It

19   was after.

20        Q.    Who gave it to you?

21        A.    I think it came by E-mail as a pdf

22   with a whole batch of other things.  It

23   probably came, it came from somebody at Reese

24   Richman, but I don't know who actually sent

25   the E-mail.

Betsy Feist                                          April 13, 2012

106

                              Betsy Feist

1

2        Q.    I'm going to read this into the

3    record, it's short.  "Hello Everyone.  Allow

4    me to introduce you to Jim Giles, the

5    reporter at New Scientist who is currently

6    working on a story in the Paxfire Affair.

7    Jim, meet the legal front.  Jim has been

8    investigating Paxfire's search redirections

9    for quite some time now and is fully up to

10   date on our finding, so it seems helpful for

11   all of you to have each other's contact

12   information."

13              Why did Mr. Kreibich introduce Jim

14   Giles to your attorneys?

15              MR. REESE:   Objection to form,

16        calls for speculation.

17        A.    I have no idea.

18        Q.    Did anyone tell you that Mr.

19   Kreibich was communicating with Mr. Giles and

20   your attorney until you received this E-mail?

21              MR. REESE:   Objection to form,

22        vague and ambiguous.

23        A.    No.

24        Q.    When was the first time you heard

25   of Mr. Jim Giles?

Betsy Feist                                          April 13, 2012

                                                              107
 1                    Betsy Feist
 2          A.   When I saw this E-mail.
 3          Q.   When is the first time you heard of
 4     the New Scientist?
 5          A.   When I saw this E-mail.
 6          Q.   At the time that Mr. Kreibich sent
 7     this E-mail had he been retained as a
 8     consultant by your attorneys in this case?
 9               MR. REESE:   Objection to form.  If
10          you know.
11          A.   I don't know.
12          Q.   Let's take a look at the next
13     document.
14               MR. REESE:   Can we just break for
15          the lunch break so that I can make a
16          call at 12:30?
17               MR. GROSSO:   What time is it now?
18               MR. REESE:   It's 12:16.
19               MR. GROSSO:   Let me get through
20          this next document and then yes.  We'll
21          be done, and if not I'll stop.
22               MR. REESE:   Okay, thanks.
23               MR. GROSSO:   This is Number 8.
24               (Defendant's Exhibit 8, two-page
25          document dated August 1, 2011, marked for

Betsy Feist                                    April 13, 2012

108

1                    Betsy Feist

2          identification, as of this date.)

3          Q.   This is Number 8, it is also an

4     E-mail, this one's from Jim Giles to Peter

5     Seidman, Melissa Clark, Michael Reese, and

6     Kim Richman.

7                These are your attorneys, correct?

8          A.   That's correct.

9          Q.   Dated August 1, 2011.  It reads "Hi

10    All, how are you fixed tomorrow?  It would be

11    great if someone could spare a few minutes to

12    discuss your thinking regarding Paxfire's

13    activities."

14               Do you know why Mr. Giles sent

15    this?

16               MR. REESE:   Objection to form,

17          calls for speculation.

18          A.   No.

19          Q.   Did you authorize your attorneys to

20    discuss with Mr. Giles Paxfire's activities?

21               MR. REESE:   Object to form, vague

22          and ambiguous.

23          A.   No.

24          Q.   Did you know that your attorneys

25    were discussing Paxfire's activities with any

109

1                         Betsy Feist
2         member of the press prior to the filing of
3         your complaint?
4                    MR. REESE:   Objection to form,
5              vague and ambiguous.
6              A.   No.
7              Q.   There is a phrase in both Exhibits
8         7 and 8.  It says "Jim, meet the legal
9         front."
10                   Did you understand that you were
11        part of any legal front?
12                   MR. REESE:   Objection to form,
13             vague and ambiguous.
14             A.   I don't even know what a legal
15        front is.
16             Q.   So the answer is no?
17             A.   The answer is no.
18                   MR. GROSSO:   Do you want to have
19             your lunch break now?
20                   MR. REESE:   Yeah.
21                   THE VIDEOGRAPHER:   The time is
22             12:23 and we are off the record.
23                   (Lunch Recess: 12:23 p.m.)
24
25

Betsy Feist                                    April 13, 2012

110

1                        Betsy Feist

2              A F T E R N O O N    S E S S I O N

3                  (Time noted:  1:19 p.m.)

4     B E T S Y   F E I S T ,    resumed and

5     testified as follows:

6                  THE VIDEOGRAPHER:   The time is

7          1:19 and we're back on the record.

8     EXAMINATION (Cont'd.)

9     BY MR. GROSSO:

10         Q.   Miss Feist, you're still under

11    oath.  Do you understand that?

12         A.   Yes, I do.

13              MR. GROSSO:   This is Exhibit

14         Number 9.

15              (Defendant's Exhibit 9, three-page

16         document, marked for identification, as

17         of this date.)

18         Q.   I have handed you Exhibit Number 9

19    which is an article, purports to be an

20    article by James Giles of the New Scientist

21    captioned "US Internet Providers Hijacking

22    Users' Search Queries."

23              When did you first -- let me

24    rephrase this.

25              Have you seen this article before?

Betsy Feist                                      April 13, 2012

111

                        Betsy Feist

1    Why don't you take a few moments.

2            A.   I can't really say for certain.

3            Q.   Okay.  My question is did you ever

4    talk with Jim, James Giles?

5            A.   No.

6            Q.   In, about halfway down the first

7    page it says "Reese Richman, a New York law

8    firm that specializes in consumer protection

9    lawsuits, today filed a class action against

10   one of the ISPs and Paxfire, which

11   researchers believe provided the equipment

12   used to highjack and redirect the searches.

13   The suit, filed together with Milberg,

14   another New York firm, alleges that the

15   process violated numerous statutes and

16   including wiretapping laws."

17            Do you know who told Jim Giles

18   about this lawsuit?

19            A.   No.

20            Q.   Do you know how Jim Giles learned

21   about this lawsuit enough to put that

22   statement in his article prior to your

23   lawsuit actually being filed?

24            A.   No.

Betsy Feist                                    April 13, 2012

112

1                   Betsy Feist

2         Q.    Do you know why Jim Giles was told

3    about this lawsuit prior to your case being

4    filed?

5         A.    No.

6         Q.    Let's take a look at the first full

7    paragraph from the bottom.  "More than 10

8    ISPs in the United States, which together

9    have several million subscribers, are

10   redirecting search queries in this way.  None

11   of the companies will comment on the

12   redirection scheme, but evidence collected by

13   Christian Kreibich and Nicholas Weaver at the

14   International Computer Science Institute in

15   Berkeley, California, who discovered the

16   redirection and have been monitoring it for

17   several monthis, suggest that the process

18   generates revenue for the ISPs."

19              I showed you an exhibit earlier,

20   you can pull it out if you need it, it says

21   that "Christian Kreibich and Nicholas Weaver

22   had been retained by Milberg as consulting

23   experts in this case."

24              Did you authorize them to speak to

25   Jim Giles about your case?

113

1                    Betsy Feist

2               MR. REESE:   Objection to form,

3          vague and ambiguous.

4          A.   No.

5          Q.   Did you know they were speaking to

6     Jim Giles about your case?

7          A.   No.

8          Q.   Do you know whether they

9     discovered -- when they were speaking with

10    Jim Giles about your case, whether they were

11    speaking on behalf of the International

12    Computer Science Institute or on behalf of

13    you?

14               MR. REESE:   Objection, calls for

15          speculation.

16          A.   I have no idea.

17          Q.   Do you know whether at this point

18    in time Mr. Kreibich and Mr. Weaver have been

19    paid by Milberg or by Reese Richman?

20               MR. REESE:   Objection to form,

21          vague and ambiguous.

22          A.   No, I don't know.

23          Q.   Do you know why they presented

24    themselves as researchers with the

25    International Computer Science Institute as

Betsy Feist                                    April 13, 2012

                                                         114

1                    Betsy Feist

2      opposed to consultants for Milberg and

3      possibly researching?

4              MR. REESE:   Objection, vague and

5          ambiguous.

6          A.   Is that what it says in here?  I

7      not only don't know why, but I don't think I

8      was aware about how they presented themselves

9      at all.

10             MR. REESE:   And objection,

11         mischaracterizes the document.

12         Q.   It says "Christian Kreibich and

13     Nicholas Weaver at the International Computer

14     Science Institute at Berkeley."

15         A.   Yeah, well, they didn't write the

16     article so I don't know who presented them

17     that way.

18         Q.   It doesn't say anywhere in here

19     that they're consultants for Milberg, does

20     it?

21         A.   I haven't read the entire --

22         Q.   Go ahead, look at it.

23         A.   If you want to do a search for

24     that, that would be faster, but if you want

25     me to read the article, okay.  No, I don't

Betsy Feist                                    April 13, 2012

                                                        115

                        Betsy Feist

1                   Betsy Feist

2       see anything about it.

3           Q.   Let's take a look at the second

4       page of -- second paragraph of page 1.

5       "Reese Richman, a New York law firm that

6       specializes in consumer protection lawsuits,

7       today filed a class action against one of the

8       ISPs and Paxfire, which researchers believe

9       provided the equipment used to hijack and

10      redirect searches."

11              Did you tell the New Scientist that

12      Paxfire had highjacked searches?

13          A.   You're asking me if I personally

14      told them any such thing?

15          Q.   Right.

16          A.   No, no.

17          Q.   Did you authorize anyone --

18          A.   No.

19              MR. REESE:   Objection to form.

20          Q.   -- to say that?

21              MR. REESE:   Same objection, vague

22      and ambiguous.

23              MR. GROSSO:   I'm just completing

24      my question.

25          A.   No.

Betsy Feist                                April 13, 2012

116

1                    Betsy Feist

2          Q.    Let's take a look at the second

3     page.  This is a caption that says "Buy, buy,

4     buy."

5          A.    I see it.

6          Q.    It's in gray, light gray.  Third

7     paragraph from the top.  "This

8     interception" -- this is a quote.  "'This

9     interception and altercation of search

10    traffic is not just your average privacy

11    problem,' said Peter Eckersley at the

12    Electronic Frontier Foundation, a San

13    Francisco-based internet advocacy group that

14    helped the Berkeley team investigate the

15    ISPs."

16               Have you ever spoken with Peter

17    Eckersley?

18         A.    No.

19         Q.    Did you authorize Peter Eckersley

20    to say that to the New Scientist?

21         A.    No.

22               MR. REESE:   Object to the form,

23         but you can answer.

24         A.    No, I didn't.

25         Q.    Did you know that Peter Eckersley

Betsy Feist                                    April 13, 2012

117

            Betsy Feist

1     was retained as a consultant by Milberg or

2     Reese Richman --

3              MR. REESE:   Objection to form.

4          Q.   -- on behalf of this lawsuit?

5          A.   No, I don't know that.

6          Q.   Do you know how much Peter

7     Eckersley was paid at the time this interview

8     with the New Scientist took place?

9              MR. REESE:   Objection to form.

10         Q.   By Milberg?

11         A.   No.

12         Q.   Or by Reese Richman?

13             MR. REESE:   Objection to form.

14         A.   No.

15         Q.   Is there anywhere in here that it

16    says that Peter Eckersley was a paid

17    consultant for your lawyers in this case?

18         A.   I didn't see that when I looked

19    through the document, no.

20         Q.   Did you tell Mr. Giles of New

21    Scientist that that file was violating the

22    Wire Tape Act?

23             MR. REESE:   Objection to form,

24             asked and answered.

Betsy Feist                                    April 13, 2012

                                                        118

1                    Betsy Feist

2         A.    No.

3         Q.    Did you authorize anyone from the

4     law firm or law firms to tell the New

5     Scientist or Jim Giles that?

6              MR. REESE:   Objection to form,

7         vague and ambiguous.

8         A.    No.

9              MR. GROSSO:   I think we're up to

10    now.

11              (Defendant's Exhibit 10, four-page

12         document dated August 4, 2011, marked for

13         identification, as of this date.)

14        Q.    Exhibit Number 10 purports -- is a

15    printout, purports to be an article of August

16    the 4th, 2011, captioned "Widespread

17    Highjacking of Search Traffic in the United

18    States, Technical Analysis by ICSI

19    Researchers Christian Kreibich, Nicholas

20    Weaver and Vern Paxson, with Peter

21    Eckersley."

22              I would like you to read this to

23    yourself and see if, first of all, if you

24    recognize it, if you have seen this article

25    before; and, secondly, if anywhere in here it

Betsy Feist                                   April 13, 2012

                                                        119

                        Betsy Feist

 1     discloses that Mr. Krebich, Mr. Weaver, Mr.

 2     Paxson or Mr. Eckersley were paid consultants

 3     for Milberg or Reese Richman in this lawsuit?

 4                MR. REESE:   Object to form,

 5           compound.

 6           A.   Okay, I've read it.  Would you

 7     repeat your question, please?

 8           Q.   Sure.  Anywhere in here is there a

 9     disclosure or a statement that Mr. Kreibich,

10     Mr. Weaver, Mr. Paxson or Mr. Eckersley were

11     paid consultants for Milberg or Reese Richman

12     in your lawsuit?

13                MR. REESE:   Objection to form.

14           A.   I didn't see anything, no.

15           Q.   Did you speak with Mr. Eckersley or

16     any of these other three individuals about

17     your lawsuit before this was published?

18                MR. REESE:   Objection, asked and

19           answered.

20           A.   No.

21           Q.   Did you authorize your lawyers to

22     speak with them before this was published?

23                MR. REESE:   Objection to form.

24           A.   No.

Betsy Feist                                    April 13, 2012

                                                              120

1              Betsy Feist

2              MR. GROSSO:    Now this is Exhibit

3         Number 11.

4              (Defendant's Exhibit 11, four-page

5         document, marked for identification, as

6         of this date.)

7         Q.   Now, this is a printout of an

8    article, the same article, but this one is

9    updated as of August 25, 2011.  The

10   explanatory note reads "There are a couple of

11   revisions to this post which are marked

12   inline below, and explained further here."

13              This is again an article by ICSI

14   Researchers Christian Kreibich, Nicholas

15   Weaver and Vern Paxson, and Peter Eckersley.

16              My only question to you is, after

17   you review it -- two things I want you to

18   review for:  Did you authorize -- were you

19   contacted by anyone concerning the revisions

20   that were made in this article from the

21   previous one?

22        A.   No, I wasn't.

23        Q.    Is there any disclosure in this

24   article, which is dated some three weeks

25   after your complaint was filed, that Peter

Betsy Feist                                          April 13, 2012

                                                              121
1                     Betsy Feist
2       Eckersley, Vern Paxson, Nicholas Weaver or
3       Christian Kreibich were paid consultants for
4       your lawyers in this case?
5            A.    No, not that I see.
6                 MR. GROSSO:   I think we're up to
7           12.
8                 (Defendant's Exhibit 12,
9           Plaintiff-Counterclaim Defendant Betsy
10          Feist's Responses to Paxfire, Inc.'s
11          First Set of Requests For Admission,
12          marked for identification, as of this
13          date.)
14           Q.    This is captioned
15      "Plaintiff-Counterclaim Defendant Betsy
16      Feist's Responses to Paxfire, Inc.'s First
17      Set of Requests For Admission," and I ask you
18      to turn to page 15, the date there reads
19      March 1, 2012 and there's a signature of Kim
20      Richman.
21                That's your lawyer in this case,
22      correct?
23           A.    Correct.
24           Q.    Did you review the questions and
25      answers in this request for admissions?

Betsy Feist                                    April 13, 2012

                                                         122

 1                    Betsy Feist

 2          A.    Yes, I did.

 3          Q.    Before or after Mr. Richman signed

 4     it?

 5               MR. REESE:   Objection to form.  It

 6          could be both.  Unfair question.

 7               MR. GROSSO:   I didn't ask yes or

 8          no, I said before or after.

 9               MR. REESE:   And it could be both,

10          so it's an unfair question.

11          Q.    Was it before?

12          A.    It was before.

13          Q.    Okay, thank you.  Let's take a look

14     at request for admission number 2 on page 5.

15     The question is "Betsy Feist had no knowledge

16     or information that Paxfire ever identified

17     to third parties, persons who were end users

18     of internet service providers and were

19     engaged in searches using the internet."

20     Your answer says "This request is denied."

21               So my question to you is what

22     knowledge or information do you have that

23     Paxfire identified the third parties and

24     persons who were end users of internet

25     service providers and whom engaged in

Betsy Feist                                      April 13, 2012

                                                          123

                        Betsy Feist

 1                 Betsy Feist

 2     searches using the internet?

 3              MR. REESE:   Objection, asked and

 4          answered.

 5          A.   Okay, let me think.  Let me get

 6     back into this focus of this particular --

 7     okay.  I --

 8              MR. REESE:   I note for the record

 9          -- actually, could you give her a copy

10          of the request for admissions so that we

11          can have the definition?  Because there

12          are several terms here.

13          A.   I think maybe it is in the front.

14     No, it isn't.

15              MR. REESE:   There is a term, that

16          Feist is defined as you yourself and

17          your lawyers.

18          A.   Well, if it's myself and my

19     lawyers, I don't, I don't really know how to

20     answer this.

21          Q.   Let's do this one step at a time.

22     Do you personally have any information -- let

23     me rephrase that.

24              Do you personally have knowledge or

25     information that Paxfire ever identified to

Betsy Feist                                        April 13, 2012

124

                         Betsy Feist

1

2      third parties, persons who were end users of

3      internet service providers and who engaged in

4      searches using the internet?

5              MR. REESE:   Objection, asked and

6          answered.

7          A.   Do I have any knowledge or

8      information that Paxfire ever identified to

9      third parties, persons who used -- it's very

10     confusing.

11             I'm sorry, maybe I'm just missing

12     something here.  All those things that I said

13     before about knowing what happens because of

14     the Netalyzr and the research remain true,

15     and I don't know what else I can say that I

16     personally knew about any of this.

17         Q.   Now, you're a person, right?

18             MR. REESE:   Objection.

19             MR. GROSSO:   I don't think so.

20         Q.   You're a person, right?

21             MR. REESE:   It's actually a legal

22         definition.

23         Q.   You're a person, right?

24             MR. GROSSO:   I've been calm with

25         your objections.

125

                         Betsy Feist

1                        MR. REESE:   What does the Supreme

2           Court say a person is these days?  That

3           includes a company, right?

4           A.    Yes, I am a person.

5           Q.    Now, what knowledge or information

6    do you have personally that Paxfire ever

7    identified you --

8           A.    Oh, you're talking about me

9    personally as opposed to anybody -- I mean I

10   don't know.  You know, are you -- tell me

11   what you mean.  I don't get it.  You mean me

12   personally, individually?

13          Q.    Right.

14          A.    As opposed to just taking my

15   information and aggregating it?  I don't

16   know.  I just don't know.

17          Q.    Do you have it?

18                MR. REESE:   Objection to form,

19          vague and ambiguous.

20          A.    Have any knowledge of what?

21          Q.    Knowledge or information that

22   Paxfire ever identified you personally to

23   third parties as someone who engaged in

24   searches using the internet?

Betsy Feist                                    April 13, 2012

126

                        Betsy Feist
1
2          MR. REESE:   Objection to form,
3       vague and ambiguous, mischaracterizes
4       request for admission number 2, and
5       asked and answered.
6          A.   No, I mean nobody ever said to me
7    directly you, Betsy Feist are personally
8    being identified to somebody at some place
9    else.  No, I do not have any direct knowledge
10   of that, if that's what you mean.
11         Q.   Let's take a look at request for
12   admission number 4.  I'm going to read it and
13   I'm going to ask you similar questions to the
14   last request for admission.
15             "Betsy Feist has no knowledge or
16   information that Paxfire ever collected or
17   compiled information about End Users of ISPs
18   in a manner that constituted profiling of
19   such End Users, or of the searches of such
20   End Users," and this request was admitted.
21             So my question is what information
22   do you have personally, since you admitted
23   it, what information do you have personally
24   that Paxfire compiled the information about
25   you in a manner that constituted profiling?

Betsy Feist                                    April 13, 2012

                                                          127

                          Betsy Feist

1

2        A.   Well, all, as I -- all of those

3    things I said before about the Netalyzr and

4    the substance of a lot of information that I

5    had access to, that that is what they were

6    doing.

7        Q.   Okay.  Focus on the word

8    "compiled," not collected but compiled.

9        A.   Compiled.  Well, could you explain

10   to me what you, how you view the difference

11   between collected and compiled, please?

12        Q.   No.

13             MR. REESE:   I would just note that

14        part of the response includes objections

15        to several terms that were used,

16        including the terms "collected,"

17        "compiled," profiling of searches.  I

18        understand, I understand what you're

19        saying, but we'll talk about it off the

20        record.

21        Q.   This says that "compiled

22   information about End Users of ISPs in a

23   manner that constituted profiling of such End

24   Users," so my first question is what

25   information do you personally have that

Betsy Feist                                    April 13, 2012

                                                          128

1                      Betsy Feist
2      Paxfire ever compiled information about you
3      in a manner that constituted profiling of
4      you?
5              MR. REESE:  Objection to form,
6          mischaracterizes this request.  And I
7          also note that Betsy Feist, as defined
8          for your request for admission, includes
9          her attorneys.
10             MR. GROSSO:   This is a different
11         question.
12             MR. REESE:  But you're reading the
13         request for admission and then ask her a
14         different question.  It is unfair to
15         read her request for admission and then
16         characterize it as being something that
17         it's not.
18             MR. GROSSO:   Would you read back
19         my last question.
20                 (Record read.)
21             MR. REESE:  Same objection,
22         mischaracterizes the document, and vague
23         and ambiguous.
24         A.   I don't know, I mean, because I
25      don't know what any of this means I don't

Betsy Feist                                      April 13, 2012

                                                              129

                          Betsy Feist

1

2      know.

3              Q.   Now let me rephrase it.

4                   What knowledge or information do

5      you personally have that Paxfire ever took

6      search information from you, profiled it so

7      that it could be seen, what you were

8      searching for?

9                   MR. REESE:   Objection, vague and

10             ambiguous.

11             Q.   Your search history.

12                  MR. REESE:   Objection, vague and

13             ambiguous, compound.

14             A.   What is profiling?

15             Q.   Collecting or compiling demographic

16     information such as in your complaint.

17                  MR. REESE:   Objection to form.

18             Q.   Do you have any such information or

19     knowledge?

20                  MR. REESE:   Objection to form.

21             A.   Not about all of those things.  I

22     mean that is a lot of different things.  I

23     can't say.

24             Q.   What about your purchase history?

25                  MR. REESE:   Objection to form,

130

                         Betsy Feist

1

2        vague and ambiguous.

3            A.   I don't have any knowledge about

4        whether they could tell or compile when I

5        actually bought a product.  No, I don't have

6        knowledge of that.

7            Q.   Whether you looked at a product?

8            A.   Well, I don't know whether they

9        would have known whether I looked at a

10       product as opposed to looking at a product's

11       website.

12           Q.   What knowledge do you have that

13       Paxfire actually collected that information

14       about you looking at a product's website and

15       stored it under your name as Betsy Feist as

16       opposed to --

17           A.   I don't know.

18           MR. REESE:   Objection to form,

19           compound, vague and ambiguous.

20           Q.   Do you have any information that

21       Paxfire ever broke out the information from

22       all searches of anybody that was a user of

23       RCN and broke it under your particular IP

24       address?

25           MR. REESE:   Objection to form,

                       Betsy Feist

1              vague and ambiguous.

2         A.    No, I do not have any specific

3    personal information about that.

4         Q.    Okay.  Do you have any information

5    as to whether Paxfire was able to trace an IP

6    address back to you personally, as Betsy

7    Feist?

8              MR. REESE:   Object to form, vague

9         and ambiguous.

10        A.    No.

11        Q.    Let's take a look at number 6.

12   This reads "Betsy Feist has no knowledge or

13   information that Paxfire ever shared

14   information about End Users of ISPs or their

15   searches with third parties," and the answer

16   is that you denied this request.

17             So my question is what information

18   do you personally have, what knowledge or

19   information do you personally have that

20   Paxfire ever shared information about you or

21   your searches with third parties?

22             MR. REESE:   Objection to form,

23        vague and ambiguous, and also request

24        for admission, the definition of Betsy

Betsy Feist                                    April 13, 2012

132

1                    Betsy Feist

2          Feist included her attorneys.

3               MR. GROSSO:   That's not my

4          question though.

5               MR. REESE:   When you read the

6          request for admission and ask her about

7          it, it has defined terms that were used

8          in your request for admission.

9               MR. GROSSO:   I'm not saying that

10         she did something improper with the

11         request for admissions.  I'm asking a

12         question.

13              MR. REESE:   I understand, but when

14         you're reading the request for

15         admission, you're then asking her a

16         question about it, so it's only fair,

17         there are certain terms in the request

18         for admission that had been defined for

19         you and that includes when you define

20         Betsy Feist, your definition included

21         her attorneys as -- do we have it?  Do

22         you have a copy of the request for

23         admission?

24              MR. GROSSO:   Probably not.  Do we

25         have a copy?

Betsy Feist                                    April 13, 2012

                                                         133
1                    Betsy Feist
2     BY MR. GROSSO:
3          Q.    I'm asking you a separate question.
4          A.    Okay.
5          Q.    What information do you personally
6     have, what knowledge do you personally have
7     that Paxfire ever shared information about
8     you with third parties?
9               MR. REESE:    Same objection.
10         A.    I don't have any that I know of.
11         Q.    Okay.
12         A.    Or can remember.
13         Q.    Let's take a look at number 8.
14    This asks "Betsy Feist has no knowledge or
15    information that Paxfire ever sold
16    information about End Users of ISPs, or their
17    searches."
18              What information do you personally
19    have that Paxfire sold information about you
20    or your searches to third parties?
21              MR. REESE:    Same objection I made
22         before.  To the extent you're asking
23         about request for admission number 8, it
24         not being a defined term.
25         A.    I guess none.

Betsy Feist                                        April 13, 2012

                                                              134

1                     Betsy Feist

2          Q.    Let's take a look at number 10.

3     "Betsy Feist has no knowledge that Paxfire

4     ever allowed third parties to access

5     information about End Users of ISPs," and the

6     answer here is denied.

7               What information do you personally

8     have that Paxfire ever allowed third parties

9     to access information about you?

10              MR. REESE:   And same objection, to

11         the extent that you're asking about the

12         request for admission, there are defined

13         terms including the fact that Betsy

14         Feist includes attorneys, but you can

15         answer the question if you can.

16              THE WITNESS:   Thank you.

17         A.    Well, I mean I do not personally

18    have that knowledge I don't think.

19         Q.    I'll take that.  Number 12, "Betsy

20    Feist had no knowledge that Paxfire ever

21    allowed third parties to access searches by

22    End Users of ISPs."  This request was denied.

23              What information do you personally

24    have that Paxfire ever allowed third parties

25    to access your searches?

Betsy Feist                                    April 13, 2012

135

                        Betsy Feist

1               MR. REESE:   Same objection.   To

2          the extent you're asking about request

3          for admission number 12, it includes

4          defined terms which includes attorneys

5          as being part of the defined term, but

6          you can answer the question if you

7          understand it.

8     A.    I really don't because I don't know

9     the difference between what I said before

10    about what the Netalyzr revealed about my

11    searches.

12    Q.    Yeah.

13    A.    So I don't understand because I

14    don't understand how this differs from what I

15    said before about I knew from the result of

16    the Netalyzr that you were allowing third

17    parties access to my searches, which clearly

18    was happening according to the report of the

19    Netalyzr.

20    Q.    How does sending a search request

21    using -- how does sending a search request to

22    a webpage of a, of an advertiser or a seller

23    of a product constitute allowing a third

24    party to access your search?

Betsy Feist                                    April 13, 2012

                                                          136

 1                    Betsy Feist
 2             MR. REESE:   Objection, asked and
 3        answered.  You can answer again.
 4        A.   I mean I, to the best of my
 5   understanding that is in fact what is
 6   happening.  If I have that wrong, then maybe
 7   I just lack the technical knowledge to
 8   explain it properly, but that is what's being
 9   done as I understand it.
10        Q.   What -- so you're saying that by
11   routing -- well, let's talk about Apple.
12        A.   Okay.
13        Q.   If you want to go to the Apple
14   webpage, you type www.Apple.com or something
15   similar, right?
16        A.   Yes.
17        Q.   That's not a search request, is it?
18        A.   No, it isn't.
19        Q.   What comes back is the Apple
20   webpage, correct?
21        A.   Correct.
22        Q.   Now let's say that you go to that
23   search bar in the upper right-hand corner of
24   your browser, you type in Apple, okay?  What
25   comes back is a web page, right?

                                                         137

                         Betsy Feist
 1
 2         A.    Okay.
 3              MR. REESE:    Objection to form.
 4         Q.    From Apple, right?
 5              MR. REESE:    Objection to form,
 6         assumes facts not in evidence.
 7         Q.    Yes or no?
 8         A.    It could be what comes back based
 9    on the redirection that Paxfire's doing with
10    my information.
11         Q.    How do you know -- I'm sorry, I
12    didn't mean -- did I cut you off?
13         A.    I mean if what happened is what I
14    expected is supposed to happen when I type it
15    into the search thing, then what comes back
16    is the Google or the Yahoo! or the Bing or
17    whatever page which includes a whole bunch of
18    possible links, probably including, and maybe
19    even at the very top, one for Apple
20    Incorporated.  If what -- so that only comes
21    back if I've been redirected there.  So
22    you're talking about what happens if my
23    search has been redirected.
24         Q.    My question is how do you know if
25    Apple knows you're searching for them as

Betsy Feist                                            April 13, 2012

138

                              Betsy Feist

1        opposed to you wanted to see their webpage?

2                    MR. REESE:   Objection to form,

3                assumes facts, and that wasn't the

4                question that you asked.

5            A.   I'm now completely lost, I'm sorry.

6            Q.   Do you know whether or not when you

7        get a Google webpage, after putting the word

8        "Apple" in the search bar, Apple knows that

9        you were conducting a search as opposed to

10       just trying to click on their webpage?

11                   THE VIDEOGRAPHER:   Mr. Grosso,

12               we're about to run out of tape.

13           Q.   Yes?  Do you know?

14                   MR. REESE:   Objection to form.

15           A.   It's beyond my technical expertise.

16                   MR. GROSSO:    Thank you.

17                   THE VIDEOGRAPHER:   The time is

18               1:59 and we're off the record.

19                        (Recess taken.)

20                   THE VIDEOGRAPHER:    The time is

21               2:08 and this begins tape number 3 of

22               the videotaped deposition of Betsy

23               Feist.

24       BY MR. GROSSO:

Betsy Feist                                              April 13, 2012

139

1                        Betsy Feist

2           Q.    Miss Feist, we're going to continue

3       by looking at request for admission number 14

4       on page 10, Exhibit 12.

5           A.    Okay.

6           Q.    This says or asks, or states,

7       "Betsy Feist has no knowledge or information

8       that Paxfire ever allowed third parties to

9       monitor searches by End Users of ISPs."  The

10      request is denied.

11              What personal knowledge do you

12      personally have that Paxfire allows third

13      parties to monitor your searches?

14              MR. REESE:   Objection, vague and

15              ambiguous.  To the extent that it's

16              discussing request for admission number

17              14, there are defined terms including

18              attorneys within the definition of Betsy

19              Feist, and also asked and answered with

20              respect to your testimony here today.

21          A.    I think I have already answered

22      that more than once.

23          Q.    What is it?

24          A.    That, well, again, based on the

25      fact of the Netalyzr results, that this was

140

                          Betsy Feist

1

2    in fact happening when I did searches.

3        Q.   Well, what about the Netalyzr

4    results demonstrate that Paxfire allowed

5    third parties to monitor your searches?

6            MR. REESE:   Objection, asked and

7        answered.

8        A.   I don't really understand what the

9    difference is between what I said and what

10   you're now asking.

11       Q.   What does the word "monitor" mean

12   to you?

13           MR. REESE:   Objection to form.

14       A.   Monitor means watching.

15       Q.   So what information do you have

16   that demonstrates that Paxfire allowed third

17   parties to watch your searches?

18           MR. REESE:   Objection to form,

19       vague and ambiguous.   Go ahead.

20       A.   I'm sorry, I'm sorry.   Well, you

21   make it sound like there is an actual person

22   there with binoculars watching me and that's

23   not the way that, you know, that's not the

24   way that kind of monitoring happens, but it

25   means it can be knowledgeable about my -- I'm

Betsy Feist                                          April 13, 2012

                                                              141

          1                    Betsy Feist
          2     sorry, about my searches.
          3          Q.   What information do you have that
          4     demonstrates that Paxfire allowed third
          5     parties to watch your searches?
          6               MR. REESE:   Objection, asked and
          7          answered.  She just answered that
          8          question.
          9          A.   I don't know what else I can say.
         10     I'm sorry.
         11          Q.   Do you have any information?
         12               MR. REESE:   Asked and answered.
         13          A.   I'm sorry, I don't know what else I
         14     can say.  You keep asking me the same thing
         15     and I keep telling you.  I'm sorry.
         16          Q.   Just tell me one more time.
         17               MR. REESE:   Objection, asked and
         18          answered.
         19          A.   I will say I don't have any
         20     information that there is this person with
         21     binoculars watching me and you're allowing it
         22     to happen.
         23          Q.   Let's take a look at 16.  "Betsy
         24     Feist has no knowledge or information that
         25     Paxfire ever allowed third parties to

Betsy Feist                                          April 13, 2012

                                                                142

     1                    Betsy Feist

     2      intercept searches by End Users of ISPs."

     3                    Actually, I'm going to skip that.

     4      Let's go to 18.

     5                    "Betsy Feist has no knowledge or

     6      information that Paxfire ever disclosed to

     7      third parties confidential or private

     8      information relating to the use of internet

     9      by End Users of ISPs," and this was denied.

    10                    Betsy Feist -- let me phrase a

    11      question this way.

    12                    What information or knowledge do

    13      you personally have that Paxfire disclosed to

    14      third parties your confidential or private

    15      information relating to use of the internet?

    16                    MR. REESE:   Objection to form,

    17          mischaracterizes request for admission

    18          number 18 to the extent you're asking

    19          questions premised on that, due to the

    20          fact that Betsy Feist as defined

    21          included her attorneys, and this talked

    22          about end users and not just a specific

    23          person, and specifically being Miss

    24          Feist, vague and ambiguous.  You can

    25          answer the question if you understand

Betsy Feist                                    April 13, 2012

                                                        143

1                    Betsy Feist

2          it.  I also state that's asked and

3          answered as well.

4          A.   Well, I don't really understand it,

5     no.

6          Q.   Let me walk you through.  You have

7     alleged in your complaint that Paxfire has

8     disclosed your confidential private

9     information to third parties; is that

10    correct?

11              MR. REESE:   Objection to form.

12         Can you point to the complaint where it

13         says that?

14              MR. GROSSO:   I'm asking her, it's

15         her complaint.

16              MR. REESE:   Let's have a look at

17         the complaint and see if it actually

18         states that.  Please don't shout.

19         A.   I -- you know, first of all,

20    anything in my complaint, you know, this is

21    again about, you know, what I personally knew

22    as opposed to what my attorneys knew and all

23    of that.  So even if it's in the complaint, I

24    only -- I don't remember exactly where all

25    the borderlines are and all this information,

Betsy Feist                                    April 13, 2012

144

1                        Betsy Feist
2          but it is possible that if it's in the
3          complaint, and I have not read the complaint
4          thoroughly recently so I'm not saying whether
5          it is or isn't, it is possible, if it is in
6          there, it is still not based on my personal
7          knowledge but based on my lawyers who are my
8          agents in all of this and their personal
9          knowledge, and so therefore I don't know what
10         to expect.
11             Q.   Let's take a look at the complaint,
12         Exhibit Number 1.  My pages got mixed up.
13         One moment, please.  Page 23.  Actually, 24.
14         Paragraph 67 says "Plaintiff's personal and
15         private search history is valuable property
16         owned by plaintiff."
17                  That's your allegation, correct?
18                  MR. REESE:   Objection, asked and
19             answered.
20             A.   Yes.
21             Q.   Next paragraph is that "Defendants
22         unlawfully exercised dominion over said
23         property," and that's your personal and
24         private search history is the property you're
25         talking about, right?

Betsy Feist                                    April 13, 2012

                                                            145

1                     Betsy Feist

2          MR. REESE:   I'm sorry, asked and

3     answered.

4          A.   I believe so.

5          Q.   "And thereby converted Plaintiff's

6     and the Class Members' respective personal

7     information by providing to third parties

8     without authorization."

9              The question I have is what

10    information or knowledge do you personally

11    have that Paxfire ever disclosed to third

12    parties your confidential or private

13    information relating to your internet

14    searches?

15             MR. REESE:   Objection, asked and

16             answered.  Objection, calls for

17             information regarding both her and her

18             attorneys.  It's vague and ambiguous,

19             asked and answered, I think I said that,

20             but you can answer.

21         A.   My only answer can be I don't know

22    how, having just read those two things, I

23    would change the answer that I gave you

24    before in any way.

25         Q.   Which was?

Betsy Feist                                    April 13, 2012

146

1              Betsy Feist

2          MR. REESE:   Objection, asked and

3      answered.

4          A.   Which was that to the degree -- I'm

5      not going to be able to say it exactly the

6      same way, I'm sorry, but to the degree that

7      there is -- let me go back.

8              I admit that the whole time I was

9      looking through these, these questions, you

10      know, I had trouble when I was reading it,

11      remembering to myself that Betsy Feist does

12      not mean Betsy Feist, and to try, so that I

13      had to stop and remind myself frequently that

14      Betsy Feist was not only myself but my

15      lawyers.  And now you're trying to get me to

16      untangle, you know, to separate out what I

17      had to put together and all I can say is that

18      I, I cannot continue to make this

19      distinction.

20          Q.   Well, let me -- I want to know

21      what -- sitting here right now, as the

22      plaintiff in this case who has accused

23      Paxfire of providing your personal and

24      private search history to third parties, I'm

25      asking you to tell me what information or

1                    Betsy Feist

2      knowledge you have that demonstrates that

3      Paxfire did such a thing.

4              MR. REESE:    Objection, asked and

5          answered.

6          A.   Well, --

7              MR. REESE:    Vague and ambiguous.

8          I'm sorry.

9          A.   Okay, I will answer.  I mean I will

10     try to answer from a different way, though

11     it's not really a different answer because I

12     have referred repeatedly to the Netalyzr.

13     And if you remember that my private

14     information is in fact my searches, that's

15     private.

16              If I search about a medical

17     condition or, you know, one of my mother's

18     medications or something like that, I mean

19     the very fact that I'm putting the name of

20     that drug in a search engine is private

21     information and you are -- and that private

22     information is going someplace else, then my

23     private information is being whatever it is

24     all this is.

25          Q.   What information do you have that

Betsy Feist                                    April 13, 2012

148

1                    Betsy Feist
2         Paxfire gave your search histories to
3         anybody?
4                    MR. REESE:   Objection, asked and
5              answered.  You're harassing the witness
6              at this point.  She's answered several
7              times about the Netalyzr.
8                    MR. GROSSO:   No.
9              A.   My search history I believe is the
10        compilation of all the searches that I make;
11        and maybe there is something wrong, but the
12        search history is I don't think only that
13        place in my computer where my searches are
14        saved, but in fact is a cumulative thing.
15                   And if you search, if I search for
16        the name of a drug, say, then they have that
17        search.  And if after that I decide to search
18        for information about the medical condition
19        that that drug is known to treat, then you
20        have already the beginning of a history and
21        that you have two searches there.
22                   And if I then decide to go shopping
23        for new socks, then, and I search for my
24        favorite brand of socks, then you have three
25        things in the history.

149

                        Betsy Feist

1              And yes, Paxfire is giving that

2       history, which is my personal history, to a

3       third party.

4          Q.   What information do you have that

5       they gave your history, not perhaps -- let

6       me --

7              MR. REESE:   Please do not shout,

8          raise your voice at the witness.

9          Please.

10         Q.   Let me ask my question.

11             MR. REESE:   You can't shout at the

12         witness.

13             MR. GROSSO:   Let me -- I am not

14         shouting at the witness.

15             MR. REESE:   I think that --

16             MR. GROSSO:   I'm not going to get

17         into an argument with you.  Let's move

18         onto the next question.

19         A.   Okay.  Thank you.

20         Q.   We're not talking about an

21      individual search where Paxfire may have

22      arranged for a webpage of a company to come

23      back to you.  We're talking about exactly

24      what you were saying, a search history, 3,

Betsy Feist                                    April 13, 2012

                                                        150

1                    Betsy Feist
2        10, 1500, 10,000 searches, your history.
3                    What information do you have that
4        Paxfire gave that history to any third party?
5                    MR. REESE:   Objection, asked and
6              answered, vague and ambiguous.
7              A.   I suppose it depends on what you
8        mean by give.  Did they say -- you know, did
9        they give the history, like wrap it up in a
10       bow, or did they give access to information
11       that could cumulatively be a history.  And I
12       mean to the degree that I could answer this
13       question I have answered it, unless you can
14       further clarify something for me that I'm
15       missing here.
16             Q.   Number 1, let' s talk about the
17       overall aggregate that you say that they tie
18       it up in a bow.
19             A.   I didn't say that they tied it up
20       in a bow, you're saying it.
21             Q.   Or they packaged it?
22             A.   I'm saying that that's what they --
23       that if you think that's what giving the
24       history means, that's not what I say.
25             Q.   So you don't have any information

Betsy Feist                                    April 13, 2012

151

1                        Betsy Feist
2       that they did that?
3            A.   No, I have no information that they
4       did that.
5            Q.   Now, if they sent one of these 170
6       brand names to, say, Apple and then another
7       one to CA Technologies and then another one
8       to some other place, what information do you
9       have that any one of those companies knew it
10      was you that was conducting that inquiry?
11           MR. REESE:   Objection to form,
12           vague and ambiguous.
13           A.   I think that that's a completely
14      different question than what you asked me
15      before, and I can answer that question but I
16      don't have that information.
17           Q.   What information do you have that
18      any of those companies shared any of your
19      inquiries with each other?
20           MR. REESE:   Objection to form,
21           vague and ambiguous.
22           A.   Because I didn't think you were
23      asking only about redirecting.
24           Q.   Don't get upset.  Go ahead.
25           MR. REESE:   Please don't interrupt

Betsy Feist                                    April 13, 2012

152

                    Betsy Feist

1

2          the witness' testimony.

3                  MR. GROSSO:   We're going to take a

4          break after this.

5          A.   I didn't think that you were only

6     asking me about redirecting, but there are

7     two things -- I'm sorry.   There are two

8     things that Paxfire did:   One was

9     redirecting, the other was putting a proxy

10    server between me and my search, which is in

11    fact collecting all of my searches.

12                 MR. GROSSO:   All right, let's take

13         a break.

14                 THE VIDEOGRAPHER:   The time is

15         2:24 and we're off the record.

16                     (Recess taken.)

17                 THE VIDEOGRAPHER:   The time now is

18         2:34 and we're back on the record.

19    BY MR. GROSSO:

20         Q.   One last question out of Exhibit

21    12.   I'd ask you to turn to page 14, there is

22    a request for admission number 22.   It reads:

23    "Betsy Feist has no knowledge or information

24    that Paxfire ever received or retained money

25    from third parties as a result of sharing or

Betsy Feist                                    April 13, 2012

153

1                    Betsy Feist

2       allowing access to the personal information

3       of End Users of ISPs."

4            My question to you is what

5       information or knowledge, if any, do you

6       personally have that Paxfire received or

7       retained money from third parties as a result

8       of sharing or allowing access to your

9       personal information?

10           MR. REESE:   Same objection, vague

11              and ambiguous, asked and answered, and

12              to the extent it's premised on request

13              for admission number 22, includes

14              defined terms that include your

15              attorneys, but you may answer if you

16              understand the question.

17           MR. GROSSO:   That's a

18              mischaracterization of the question.

19              I'm asking only about you.

20        A.   Okay.  Okay, so this is -- maybe

21       you better restate the question for me.

22        Q.   Sure.  What information do you

23       personally have, information or knowledge,

24       have, that Paxfire received or retained money

25       from third parties as a result of sharing or

Betsy Feist                                    April 13, 2012

                                                      154

1                      Betsy Feist

2          allowing access to your personal information?

3                A.    I guess I don't have any.

4                MR. GROSSO:    This is going to be

5            document Number 13.

6                (Defendant's Exhibit 13,

7            Plaintiff-Counterclaim Defendant Betsy

8            Feist's Responses to

9            Defendant-Counterclaim Plaintiff Paxfire,

10           Inc.'s First Set of Interrogatories,

11           marked for identification, as of this

12           date.)

13           Q.    Now, I just want to make sure that

14     I'm not missing anything.  This is, this

15     document, Exhibit Number 13, is captioned

16     "Plaintiff-Counterclaim Defendant Betsy

17     Feist's Responses To Defendant-Counterclaim

18     Plaintiff Paxfire's First Set of

19     Interrogatories," and if you look at the last

20     page, that's a verification and that's your

21     signature there, correct?

22           A.    Correct.

23           Q.    Were you involved in the

24     preparation of these answers?

25           A.    Yeah.

155

1                    Betsy Feist

2         Q.   Now, interrogatory number 2 asked

3    you to "Identify all persons who brought to

4    your attention, described, or otherwise

5    provided you with information concerning

6    Paxfire."

7         A.   What page are you?

8         Q.   Page 7, interrogatory number 2.

9         A.   Uhm-hmm, I'm there.

10        Q.   "Identify all persons who brought

11   to your attention, described or otherwise

12   provided you with information concerning

13   Paxfire."

14             Now, you said that these two

15   people, Christian Kreibich and Peter

16   Eckersley, have information that can help

17   answer this question; is that correct?

18             MR. REESE:   Objection to form.

19        That misstates the response.

20        A.   I did not say that.  I think this

21   is another case with you, me or my attorneys,

22   and so if you include me and my attorneys,

23   then this is true.  If you're asking me did I

24   ever say this personally, maybe I'm not going

25   back to the last set of questions.  It does

Betsy Feist                                        April 13, 2012

                                                              156

1                         Betsy Feist

2       say this in this document.

3              Q.    So let me ask you this then:  You

4       personally, okay, identify all persons who

5       brought to your personal attention, you

6       personally, described or otherwise provided

7       you with information concerning Paxfire.

8              A.    If provided me with information

9       means that they published papers which I had

10      access to and I read, they did, that's as

11      close to a kind of personal providing that

12      would be true.

13             Q.    Was there any other information

14      other than papers that you had?

15             A.    No.

16             Q.    Did you have any conversations with

17      your lawyers where they brought to your

18      attention information about Paxfire?

19             A.    I don't remember specifically.

20             Q.    So the only information -- well,

21      let's rephrase the question.

22                   But you never spoke with Christian

23      Kreibich?

24                   MR. REESE:   Objection, asked and

25             answered.

157

                        Betsy Feist

1

2          Q.    Is that correct?

3          A.    I've told you that 17 times -- wait

4     a minute, I'm under oath, I don't know if

5     that's actually 17 times.  I have told you

6     that many times, that I have never had any

7     contact whatsoever with any of these people.

8          Q.    Okay.  All right.  So if it's not

9     in one of these papers, then you didn't know

10    about it; is that correct?

11              MR. REESE:   Objection to the form,

12         vague and ambiguous, completely

13         unintelligible.  I don't understand what

14         that means.

15         A.    I -- well, maybe you could say it

16    again in a way that is intelligible.

17         Q.    Sure.  Thank you.  If something is

18    in your complaint and the basis for it cannot

19    be found in one of the papers identified in

20    your response to this interrogatory, does

21    that mean that you did not have information

22    that demonstrated that item in your

23    complaint?

24              MR. REESE:   Objection to form,

25         vague and ambiguous.  I just don't

158

                    Betsy Feist
1
2          understand that question.  And
3          interrogatory 2 doesn't ask about
4          papers, it asks about persons, so there
5          are no papers identifying response to
6          interrogatory number 2.  It's not a fair
7          question.  Vague and ambiguous,
8          unintelligible.
9          A.   I don't understand what it is you
10     want to get at, so I can't answer.
11         Q.   You have allegations in your
12     complaint, correct?
13         A.   I have allegations in my complaint,
14     correct.
15         Q.   The complaint runs around, oh, 25
16     pages or something like that?
17         A.   I'll take your word for it.
18         Q.   I think it's more than that, but
19     that's close enough.  I'm asking for where
20     you got the information concerning your
21     allegations about Paxfire that appear in your
22     complaint?
23             MR. REESE:   Objection, asked and
24         answered numerous times at this point
25         and you are bordering on harassing the

Betsy Feist                                         April 13, 2012
                                                              159

1                      Betsy Feist
2          witness.
3          Q.   And my question is -- I think
4     you've told me that you got it from papers.
5          A.   I got it from Netzlyzr, I got it
6     from papers, I relied on the expertise of my
7     lawyers, and I don't know what else I can
8     say.
9          Q.   So if it's not in the papers, then
10    it came from the lawyers; is that accurate?
11              MR. REESE:   Objection.
12         A.   I don't know that that is exactly
13    accurate or that is what I said.
14              MR. REESE:   That's not what she
15         said.
16         Q.   What did you say?
17              MR. REESE:   Objection, asked and
18         answered.  You're hassing the witness at
19         this point.  I instruct you not to
20         answer that.  This is harassment at this
21         point.
22              MR. GROSSO:   No, I'm trying to
23         find out where the information came
24         from.
25              MS. CLARK:   The court reporter can

Betsy Feist                                    April 13, 2012

160

1                     Betsy Feist
2          read it back.
3                MR. REESE:   And she told you 50
4          times and you keep asking her the same
5          question.
6                MR. GROSSO:   Would you read back
7          her answer to the previous question.
8                     (Record read.)
9     BY MR. GROSSO:
10         Q.   Is there anything else besides
11    those three?
12               MR. REESE:   Asked and answered.
13         Q.   If you know, anything else besides
14    those three?
15         A.   I can't make gestures like that,
16    I'm sorry.  I apologize.
17               MR. SEIDMAN:   Excuse me, she
18         answered the question and last time she
19         answered the question, the same
20         question, she included the fact that she
21         did Google searches.
22               MR. GROSSO:   You're testifying.
23         Objection.  I ask that that be struck.
24               MR. SEIDMAN:   But that's what
25         happens, you ask her the same question

Betsy Feist                                      April 13, 2012

161

                        Betsy Feist

1    over and over again.

2              MR. GROSSO:   I'm asking, I want to

3         clarify her answer.

4         A.   Okay, now let me then clarify for

5    myself because at this particular point, if I

6    remember correctly, which is hard to remember

7    because it's been a long time since the

8    original question to here, you were not

9    asking in general about knowledge, you were

10   asking specifically about knowledge I

11   obtained from these three people, and so

12   that's where we were here and suddenly it

13   seems we've gotten someplace quite different

14   and I can't follow the thread of how we got

15   there.

16             MR. GROSSO:   Can you please read

17        back that same answer that I had you

18        read back before.

19                   (Record read.)

20   BY MR. GROSSO:

21        Q.   Is there any other place you got

22   the information concerning your allegations

23   against Paxfire?

24             MR. REESE:   Objection, asked and

162

1                    Betsy Feist

2          answered.

3          A.    I think I ended that question with

4     I don't know what else I can say, so I don't

5     know what else I can say.

6          Q.    Let's take a look at page 10,

7     interrogatory number 5.  Other than the day

8     that you were using the Netalyzr, are you

9     aware of any instance where Paxfire

10    intercepted one of your searches?

11              MR. REESE:   Objection to form,

12         vague and ambiguous.  Go ahead.

13         A.    Okay.  This is -- how could -- I

14    shouldn't answer a question with a question,

15    so since this happened invisibly I am not

16    aware of it because there is no way I could

17    be aware of it.

18         Q.    Are there any other researchers

19    besides the four we've mentioned, Weaver,

20    Paxson, Kreibich and Eckersley, that you or

21    to your knowledge your lawyers relied upon in

22    bringing this case?

23         A.    I have no knowledge of any other

24    researchers.

25         Q.    Any other articles of which you're

Betsy Feist                                    April 13, 2012

163

                          Betsy Feist

1

2     aware?

3                A.    I mentioned --

4                MR. REESE:   Objection to form.

5                A.    I mentioned earlier that I did a

6     lot of Googling and, and I think really right

7     after the time that the suit was filed I got

8     a lot of hits, most of them said the same

9     thing to the degree that I could remember, it

10    was as if they were all, you know, getting

11    the information from each other because there

12    was very little difference about it, but they

13    all mentioned the suit and mentioned that I

14    was the lead plaintiff in this suit.  Yeah, I

15    read, I read those articles.  I don't know

16    that they added anything, but I read them.

17                MR. GROSSO:   I have no more

18           questions.  Mr. Derek Care will take

19           over.

20                MR. CARE:   Why don't we take a

21           couple of minutes to reset up.

22                THE VIDEOGRAPHER:   The time is

23           2:50 and we're off the record.

24                     (Recess taken.)

25                THE VIDEOGRAPHER:   The time is

Betsy Feist                                      April 13, 2012

                                                              164

1                    Betsy Feist

2          2:58 and we're back on the record.

3     EXAMINATION

4     BY MR. CARE:

5          Q.   Good afternoon, Miss Feist.  My

6     name is Derek Care, I'm from the law firm of

7     Bingham McCutchen and I represent RCN in this

8     matter, with me is my colleague Alicia Reed,

9     and we're going to follow up on, continue the

10    questioning for today.

11              Do you understand that you remain

12    under oath from your earlier questioning?

13         A.   Yes, I do.

14         Q.   Okay.  And I'm going to apologize

15    in advance if I go over some of the territory

16    that we have already covered today.  I'll try

17    to keep that to a bare minimum.

18              Could you tell me what you did

19    today to prepare for, or could you tell me

20    what you did to prepare for today's

21    deposition?

22         A.   I did have a meeting with my

23    lawyers to discuss what was likely to occur

24    here.

25         Q.   By your lawyers are you referring

Betsy Feist                                    April 13, 2012

                                                           165

1                      Betsy Feist
2        to the gentlemen in this room and Miss Clark
3        as well?
4            A.    And earlier I met with Kim Richman
5        as well, who is not here today.
6            Q.    Did you meet with anyone other than
7        your attorneys in preparation for today?
8            A.    No.
9            Q.    Did you speak with anyone other
10       than your attorneys in preparation for today?
11           A.    It depends on what you mean by
12       "preparation."  I was nervous about today and
13       I spoke with friends who would say oh, don't
14       worry, you'll be fine.  That was actually
15       very good preparation.
16           Q.    So these were friends giving you
17       moral support?
18           A.    Yes, yes.
19           Q.    Okay.  Did you review any documents
20       in preparation for today?
21           A.    Not in any -- sort of like passing
22       in front of my face to remember that they
23       existed.  That was the extent of it I guess.
24           Q.    Were these documents that were
25       shown to you by your counsel?

Betsy Feist                                    April 13, 2012

                                                          166
1                    Betsy Feist
2         A.    Yes.
3         Q.    Did you look at any documents in
4    preparation for today other than documents
5    that were shown to you by counsel?
6         A.    No.
7         Q.    Did you search for any documents in
8    preparation for today?
9         A.    No.
10        Q.    I believe you testified that you're
11   presently a customer of RCN; is that correct?
12        A.    That's correct.
13        Q.    Since when have you been a customer
14   of RCN?
15        A.    From some time in 2004 I believe.
16   I mean someplace there is a record of my
17   first -- well, actually, I was a customer of
18   RCN before then, I apologize.  That is when I
19   started getting internet service from RCN.  I
20   don't know, I can't remember because I get
21   cable television from them and I have for
22   many years.
23        Q.    Okay.  So you have been a
24   subscriber to RCN's internet service since at
25   least 2004?

**SER-345**

Betsy Feist                                    April 13, 2012

167

                        Betsy Feist

1

2        A.    Correct.

3        Q.    And do you remain a subscriber to

4    RCN's internet service today?

5        A.    Yes, I do.

6        Q.    Have you continuously been a

7    subscriber to RCN's internet service since

8    2004?

9        A.    Yes.

10       Q.    And just to confirm, you have

11   remained a subscriber to RCN's internet

12   service since you filed your complaint; is

13   that correct?

14       A.    Yes, that's correct.

15       Q.    I would like to ask you some

16   questions just to get a feel for your level

17   of sophistication as a user and to your use

18   of the internet generally.

19              On average how much time do you

20   spend per day on the internet?

21       A.    I really don't know.

22       Q.    Does it -- is it a consistent

23   amount of time on the internet per day?

24       A.    No, I haven't been on the internet

25   once today.

Betsy Feist                                          April 13, 2012

168

                        Betsy Feist

1

2          Q.    I have.  Would you say that on

3     average you spend less than an hour per day

4     on the internet?

5          A.    Probably more, but, you know, I

6     can't say that with certainty, so if I'm

7     under oath I really feel better not saying.

8          Q.    Okay, that's fine.  For what

9     general purposes do you use the internet?

10         A.    I know you're going to want

11    something more specific than this, but let me

12    start by saying almost everything.

13              I search for trivia; I search for

14    reference information for things I'm working

15    on, either fact-checking or getting

16    background information, bibliographical

17    sources, editorial guidance in a subject I

18    might not be too clear on; information about

19    products, shopping; information about movies,

20    books, TV, what's in museums; directions to

21    places, directions; instructions for how to

22    do things; information about myself

23    frequently or to see what's out there about

24    myself, to find out how much is out there

25    about me; information about people I just

Betsy Feist                                         April 13, 2012

                                                              169
                            Betsy Feist
1
2       met, information about people I used to know
3       and lost touch with and am trying to find out
4       what happened to them; medical information,
5       information about drugs, information about a
6       doctor I might be going to.  That's just, I
7       mean that's not a comprehensive list.
8               Q.   That's a fairly comprehensive list.
9                    Other than yourself, does anyone in
10      your home use the internet access that RCN
11      provides you?
12              A.   No.
13              Q.   And this may sound like a dumb
14      question, but do you use a computer to access
15      the internet?
16              A.   Yes, I do.
17              Q.   What kind of computer do you use?
18              A.   It's a PC, Dell.
19              Q.   How long have you had that
20      computer?
21              A.   I -- I do know this exactly because
22      2009, because I had a computer crash and I
23      had to replace my computer at that point.
24              Q.   Do you remember at what point in
25      2009 you got that computer?

Betsy Feist                                    April 13, 2012

                                                          170

                       Betsy Feist

1
2        A.   I can't -- oh, I do as a matter of
3    fact.  Not to the date, but I believe it was
4    July.  I'm fairly certain it was in July.
5        Q.   And you said the computer that you
6    had prior to your current computer, that
7    crashed?
8        A.   Yes, it did.
9        Q.   Is that -- do you still possess
10   that computer?
11       A.   No, I don't.
12       Q.   Do you happen to know the model of
13   the computer that you currently have?
14       A.   I -- it's a Dell.  What's it
15   called?  It begins with an I, I believe, but
16   clearly I have that information but not in my
17   head right this second.
18       Q.   That's not a problem.  And is it a
19   laptop or a desktop computer?
20       A.   It's a desktop computer.
21       Q.   Do you use any other device other
22   than that Dell to access the internet?
23       A.   No, I don't.
24       Q.   So no iPad or Smartphones?
25       A.   No iPad, no Smartphone.

**SER-349**

Betsy Feist                                        April 13, 2012

171

                        Betsy Feist

1

2       Q.    I believe you testified earlier

3   that you've used several browsers.

4               Actually, sorry, I'm confusing

5   myself.

6               What internet browsers do you use?

7       A.    I use mostly Google, but I have

8   used other browsers.  I have used Yahoo! and

9   I did try out Bing at one point, though I

10  haven't used it recently.

11      Q.    Now, I'm sorry, withdraw my last

12  question, I confused myself and confused you

13  as well.

14              What internet browser do you use to

15  access the internet?  For example, do you use

16  Internet Explorer or Google Chrome?

17      A.    I'm sorry.

18      Q.    Now it's my fault.

19      A.    I use -- I always get confused

20  about whether Firefox is the E-mail program

21  and Thunderbird is the internet program, but

22  it's Mozilla basically.

23      Q.    So it's Firefox?

24      A.    Firefox.

25      Q.    Do you use any other internet

Betsy Feist                                    April 13, 2012

172

1                    Betsy Feist
2       browser?
3              A.    I occasionally use Chrome.
4              Q.    Within the last five years have you
5       used any other internet browsers other than
6       Firefox and Chrome?
7              A.    I can't remember for certain.  It's
8       possible that at some point I actually used
9       Internet Explorer, but I don't think in the
10      last five years I did.
11             Q.    Of Firefox and Chrome, which of
12      those browsers do you most frequently use?
13             A.    Firefox.
14             Q.    Are you familiar with the term
15      "browser history" as it relates to internet
16      browsers?
17             MR. REESE:   Objection to form,
18          vague and ambiguous.
19             A.    Yes.
20             Q.    What do you understand that term to
21      mean?
22             A.    I understand it to mean actual
23      record of all the sites that I have visited.
24      I don't know exactly where it exists, but
25      that it is an actual thing.

Betsy Feist                                    April 13, 2012

173

                    Betsy Feist
1
2       Q.   Do you make any effort to delete
3   the browser history for your internet
4   browsers?
5       A.   I use this Cclean Program to delete
6   cookies and various other things
7   periodically, yes.
8       Q.   Do you know if that clears your
9   browser history as well as any cookies?
10      A.   I believe it does.
11      Q.   How frequently do you use that
12  program?
13      A.   I'm not sure.  It's not as regular
14  as I feel it should be.
15      Q.   If I were to ask for your browser
16  history for your internet browser, how far
17  back would that history go, if you know?
18      A.   I don't know.
19      Q.   Do you know when the last time you
20  cleared your browser history was?
21      A.   I'm not sure.
22      Q.   And you don't keep hard copies of
23  your browser history, such as printouts?
24      A.   No.
25      Q.   Do you have what's been marked as

Betsy Feist                                    April 13, 2012

174

1                    Betsy Feist
2        D 1 in front of you?  That's your complaint.
3                    MR. REESE:   It's the first
4             exhibit.
5            A.   Yes, I do.
6            Q.   Could you turn to page 9, please.
7        Now, I just want to make sure that we're
8        using the same terminology as we go forward.
9                    If you see in paragraph 19 of your
10       complaint, there's a graphic there?
11           A.   Uhm-hmm.
12           Q.   And it appears to be part of a
13       screen shot of an internet browser.
14                   Do you see that?
15           A.   Yes, I do.
16           Q.   Now, if you see the line where it
17       says "www.Yahoo.com," do you know the term
18       for where that web address appears?
19           A.   I should know because it was
20       mentioned this morning, but I don't remember.
21           Q.   Just going forward, is it okay if
22       we refer to that as the address bar for your
23       web browser?
24           A.   Yes, it is.
25           Q.   Now, the bar to the right of that,

                                                                    175

              Betsy Feist
1
2     the wide white bar with the G at the very
3     beginning of that, do you know what that is
4     generally referred to as?
5          A.   Why don't you just tell me what you
6     would like me to call it.
7          Q.   Good point.  Let's call it the
8     search bar.
9          A.   Okay.
10         Q.   And as need be I'll differentiate
11    between that and say the box that appears on
12    a search engine's home page that you can
13    enter terms into and search directly from the
14    webpage, okay?
15              This is again a very basic
16    question, but within the last five years have
17    you conducted any searches of the internet?
18         A.   Yes.
19         Q.   And I believe you testified that
20    you've used Google, Bing and Yahoo! for, to
21    search the internet; is that correct?
22         A.   Correct.
23         Q.   Have you used any other search
24    engines?
25         A.   Probably not within the last five

Betsy Feist                                    April 13, 2012

                                                           176

1                        Betsy Feist

2      years.

3             Q.    And which of those three search

4      engines is your preferred search engine?

5             A.    Google.

6             Q.    Google?  And how frequently, or on

7      a percentage basis how much of your searching

8      on the internet is done by a Google?  You can

9      estimate.

10            A.    If I'm just estimating, maybe 90

11     percent.

12            Q.    90 percent.  Would you say that

13     during the last five years you generally used

14     Google 90 percent of the time?

15            A.    Generally I think that's probably

16     fairly close.

17            Q.    And I believe you testified earlier

18     that when you conduct searches on the

19     internet you either use the search bar that

20     appears on your internet browser or you'll go

21     to the search engine's webpage, like a

22     Google.com; is that correct?

23            A.    That's correct.

24            Q.    Do you use any other methods than

25     those two methods to search?

Betsy Feist                                        April 13, 2012

177

Betsy Feist

1

2       A.   I think sometimes I am at the

3    address bar and I write a search in there and

4    it works, but that's, you know, not my -- if

5    so, it's sort of -- I shouldn't be because

6    that's not what that's for.

7       Q.   But it has happened?

8       A.   It has happened and sometimes it

9    works and sometimes it just does strange

10    things.

11       Q.   What do you mean by it does strange

12    things?

13       A.   Sometimes I get pages that list all

14    kinds of weird stuff on them and I don't know

15    where it comes from or why.

16       Q.   Are you saying you're directed to a

17    page you're not expecting?

18       A.   Yeah.

19       Q.   Or it's an error?

20       A.   It's a page I'm not expecting.

21       Q.   Can you give me any more details

22    about the pages you get when -- the ones

23    you're not expecting?

24       A.   Well, it's not always the same and

25    I'm not sure how well I can remember, but

Betsy Feist                                    April 13, 2012

                                                        178
                          Betsy Feist
1
2       I'll try.  Sometimes it's not like a search
3       engine's list of choices, but it is some kind
4       of a list of names of organizations or
5       whatever that just seem to me to be out of
6       the blue and not necessarily related to any
7       term that I've used.  And sometimes of course
8       it's just the wrong page, which actually
9       isn't unexpected considering I didn't type in
10      a proper address.
11          Q.   Do they, do the pages you're
12      directed to indicate that they're error
13      pages?
14          A.   Maybe at some point.  That's not
15      what I -- it's possible that that's happened.
16      That's not what I remember seeing.
17              MR. REESE:   I don't think Mr. Care
18          wants you to speculate.
19              THE WITNESS:   I'm sorry.
20          Q.   Your counsel is correct?
21          A.   To my recollection, no.
22          Q.   Okay.  And you said you conduct
23      searches from the search bar in your browser
24      sometimes.
25              Do you know which search engine

Betsy Feist                                    April 13, 2012

                                                        179

                        Betsy Feist

1
2     those searches are routed through?

3          A.    Yes.  It isn't always the same one

4     because I get to choose.  If it has a "g"

5     next to it it's being routed through Google,

6     if it has a "y," et cetera, so if I'm paying

7     attention I know.

8          Q.    What do you mean you get to choose?

9          A.    Well, there's a little arrow over

10    on the side -- I mean this picture is of

11    Internet Explorer which I don't use, so it's

12    not exactly the same, but you can get a

13    pull-down menu and it lists in addition, it

14    lists a number of websites in addition to the

15    browser, and on mine I know Google is there,

16    Yahoo! used to be there, I'm not sure it's

17    there currently, Amazon is there, Internet

18    Movie Database is there, Wikipedia is there,

19    and it -- you know, so that I can, if I

20    remember to think about it, if I really want

21    to Wikipedia an article or something like

22    that, search just in Wikipedia from that bar.

23         Q.    Is there a default search engine

24    set up for your, the search bar on your

25    browser?

Betsy Feist                                    April 13, 2012

                                                        180

 1                    Betsy Feist

 2          A.   Google.

 3          Q.   Sometimes -- withdrawn.

 4               On those occasions when you

 5     conducted searches from your search bar do

 6     you ever specify that the search be conducted

 7     through Bing?

 8          A.   I, not that I remember.

 9          Q.   What about the same question but

10     with respect to Yahoo!?

11          A.   Well, not recently, but maybe

12     within the last five years I did.

13          Q.   But typically, if you're conducting

14     a search from the search bar and you choose a

15     search engine, you'll route it through

16     Google?

17          A.   Typically, yes.

18          Q.   Generally do you consider yourself

19     to be a sophisticated internet user?

20               MR. REESE:   Objection to form,

21          vague and ambiguous.

22          A.   I wouldn't necessarily say

23     sophisticated, but I seem to be pretty good

24     at it.

25          Q.   I believe you have what's been

Betsy Feist                                    April 13, 2012

                                                          181

1                    Betsy Feist

2        marked as D 1 in front of you, your complaint

3        in this action.

4                    Were you involved at all in the

5        preparation of the complaint?

6             A.    If -- to the extent that I read it

7        and I made some comments and I did make one

8        or two editorial changes.  I should say

9        recommended one or two editorial changes.

10       I'm not sure that they were taken.

11            Q.    For what purpose did you read the

12       complaint?

13            A.    It was my complaint, of course I

14       read it.

15            Q.    But were you trying to confirm that

16       it was accurate?

17            A.    Well, I,  I said maybe purposes

18       would be better.  Yes, I wanted it to be

19       accurate and I wanted to know what was in it.

20            Q.    I would have read it, too, if it

21       were my complaint.

22                    To the best of your knowledge are

23       the representations in your complaint as

24       concerns you and your specific conduct, are

25       they accurate?

**SER-360**

Betsy Feist                                    April 13, 2012

                                                          182

                         Betsy Feist

1

2        A.    Yes.

3        Q.    Do you know of any inaccurate

4    statements or representations in your

5    complaint as concern you or your conduct?

6        A.    No.

7        Q.    Could you refer to paragraph 8 of

8    your complaint, please.

9        A.    Do you have a page number for that?

10       Q.    Yes, it's on page 4 as appears on

11   the bottom.

12       A.    Okay, I'm there.

13       Q.    I'm going to read you a section of

14   paragraph 8.  "Defendant Paxfire provides its

15   software and/or hardware to ISPs," which has

16   been defined as internet service providers,

17   "at no expense; redirects DNS errors

18   (requests for mistyped web addresses or for

19   websites that do not exist) to a site

20   operated by Paxfire; and generates income via

21   advertising on that site.  Defendant Paxfire

22   splits the revenue it generates with the

23   ISPs, including Defendant RCN."

24            For reference I'm going to describe

25   the activities in this paragraph as DNS, or,

Betsy Feist                                      April 13, 2012

183

                        Betsy Feist

1

2        sorry, error redirection services.

3                   Do you understand?

4        A.    I do understand.

5        Q.    Am I correct that your complaint

6        does not seek to hold either RCN or Paxfire

7        liable for any error redirection services?

8                   MR. REESE:   Objection, form, the

9             complaint speaks for itself.

10       A.    Yes, that's my understanding.

11       Q.    Would you go to paragraph 15,

12       please.  It appears on page 7.

13       A.    Okay.

14       Q.    The second sentence in this

15       paragraph reads: "Defendant RCN (using

16       Paxfire technology) intercepts, manipulates

17       and/or redirects traffic for at least two of

18       these search engines: Bing.com and

19       search.Yahoo!.com."

20                   Now, earlier you had testified that

21       certain of your web communications had been

22       redirected by Paxfire and RCN.

23                   Is this the redirection activities

24       that you're referring to here?

25                   MR. REESE:   Objection to form,

Betsy Feist                                    April 13, 2012

184

                        Betsy Feist

1

2          vague and ambiguous.

3          A.   Well, yes, but that only showed

4     what showed up on the Netalyzr on one

5     particular day.  I really don't know whether

6     there were other redirect activities that are

7     not spelled out here.

8          Q.   Okay.  This paragraph continues

9     "When an RCN customer types in a web address

10    (i.e., domain name or URL), the user's system

11    asks the Defendant RCN's DNS resolver for the

12    location of that website."

13              The type of redirection that you're

14    describing in this paragraph, is it correct

15    that it only involves communications entered

16    into the web address of a internet browser?

17         A.   I'm a little bit confused.

18         Q.   I'll withdraw the question.

19              The type of redirection that we've

20    been discussing from paragraph 15, does that

21    involve communications that are entered

22    into --

23              MR. REESE:  Derek, if we can can

24         take one moment, I have to go make a

25         call.  I apologize for this.  Instead of

Betsy Feist                                    April 13, 2012

185

                    Betsy Feist

1          stopping the deposition, if it is okay

2          with you can I have Mr. Seidman take

3          over.

4              MR. CARE:    That's okay with me.

5              MR. REESE:    I'll be back, but I

6          appreciate this.  Thank you.

7     BY MR. CARE:

8          Q.    I'll start over with the question

9     whenever counsel is ready.

10         A.    Okay, thank you.

11             MR. SEIDMAN:    I'm ready.

12         Q.    Now, the type of redirection that's

13    described in paragraph 15 of your complaint,

14    does that involve communications that are

15    entered into the search bar of an internet

16    browser?

17         A.    Yes.

18         Q.    It does, okay.  Does it involve

19    communications or searches that are conducted

20    from the search bar on a search engine's

21    website, such as the bar that appears on

22    Google.com?

23         A.    I think not, but I'm not certain

24    about that.

Betsy Feist                                    April 13, 2012

                                                        186

1                    Betsy Feist
2         Q.    And does this type of redirection
3    involve communications entered into the
4    address bar of the internet browser?
5         A.    No.
6         Q.    No?
7              MR. SEIDMAN:   Could you repeat the
8         question, please.
9              MR. CARE:   Yes.
10        Q.    The type of internet activities
11   that are part of the subject of paragraph 15
12   of the complaint, does that involve
13   communications that are entered into the
14   address bar of an internet browser?
15             MR. SEIDMAN:   Okay, I got it.
16        That's fine, thank you.
17        Q.    If you would like, you can reanswer
18   the question that I just asked.
19        A.    The answer was no, so...
20        Q.    Okay, so this type of redirection
21   only involved the search bar of internet
22   browsers?
23        A.    That's my understanding, yes.
24        Q.    Okay.  Now, do you -- is the
25   document that's been labeled D 2 available?

Betsy Feist                                      April 13, 2012

                                                           187

                         Betsy Feist

1

2          A.    It's way down at the bottom.  Yes.

3          Q.    Okay.  Now, if you look at the date

4    that appears under the Results Summary header

5    at the top of the page, I believe it says

6    "JUL 25, 2011."

7                Does this indicate that these

8    Netalyzr results were searched on, were

9    produced on July 25, 2011?

10         A.    Yes, it does.

11         Q.    And are these the Netalyzr results

12   that are described in your complaint?

13         A.    Yes, they are.

14         Q.    Prior to July 25, 2011 are you

15   aware whether any communications that you ran

16   from the search bar on your internet browser

17   were redirected in the manner described in

18   paragraph 15 of your complaint?

19         A.    I'm not aware, no.

20         Q.    Not aware.  Do you have any

21   evidence as to whether any such

22   communications were redirected?

23         A.    Not that I remember.

24         Q.    And you don't have any documents or

25   other evidence?

Betsy Feist                                    April 13, 2012

188

Betsy Feist

1

2        A.   Oh, no documents, no.

3        Q.   Okay.  And just to confirm, I don't

4   mean to drag to the point, but you don't have

5   any specific recollection of any instances

6   where it appears that some redirection has

7   occurred?

8        A.   No specific recollection, no.

9        Q.   Do you have a general recollection?

10        A.    I do have a general recollection

11   that there were occasions when that would

12   happen.

13        Q.   Do you remember what terms you had

14   run on those occasions?

15        A.   No, I don't.

16        Q.   Do you remember what results

17   appeared after you ran those communications

18   on any of those occasions?

19        A.   No, I don't.

20        Q.   Do you have a general recollection

21   of what you saw after those searches were

22   run?

23        A.   No.  The only recollection is it

24   wasn't what I expected to see.

25        Q.   Do you remember if you saw what

Betsy Feist                                    April 13, 2012

189

1                    Betsy Feist

2      appeared to be search results of some nature?

3           A.   Well, if you mean the kind of

4      search results I would get if I were

5      searching Google or any of the other, then I

6      certainly wouldn't have noticed it was a

7      redirection.

8           Q.   Did you ever get any search

9      results -- withdrawn.

10               Do you have any estimate of the

11     number of times that your communications

12     might have been rerouted prior to when you

13     ran your Netalyzr program?

14          A.   No, I don't.

15          Q.   And just to confirm, any such

16     redirection that you're describing that

17     occurred when you ran a search from the

18     search bar rather than anything that you did

19     on the address bar?

20          A.   That's what we're talking about,

21     yes.

22          Q.   Turning back to your complaint,

23     D 1, would you please turn to paragraph 19

24     which appears on page 9.

25          A.   Okay.

Betsy Feist                                          April 13, 2012

190

                         Betsy Feist

1          Q.    Now, this paragraph states that

2    "RCN and Paxfire 'intercept and manipulate

3    plaintiff's searches by another means - the

4    search bar.'"

5               And, sorry, skipping ahead to the

6    next paragraph, that paragraph states that

7    "RCN and Paxfire use this search bar to

8    intercept and monetize searches for certain

9    'brand keywords.'  The researchers at ICSI

10   have identified approximately 170 brand

11   keywords that, when used in searches, are not

12   only intercepted by Defendants, but are then

13   forwarded on to a third party advertising

14   affiliate who redirects the user to the

15   brand's webpage."

16              Have you ever seen a list of the

17   brand keywords referenced in paragraph 20 of

18   your complaint?

19         A.    I don't think I saw a complete

20   list, but I'm not certain.

21         Q.    Have you seen a partial list?

22         A.    I think, yeah, some of the words

23   are in here.

24         Q.    Other than the words that are

Betsy Feist                                    April 13, 2012

191

                        Betsy Feist
1
2    identified in your complaint, do you know any
3    other brands or keywords that appeared on
4    this list?
5         A.   I don't remember.
6         Q.   Your complaint, as I recall,
7    identifies Apple and Dell as keywords, as
8    brand keywords are referenced in paragraph 20
9    of your complaint.
10              Have you ever run a search for the
11   term "Apple"?
12        A.   Yes.
13        Q.   When did you run that search?
14        A.   Yesterday.
15        Q.   You ran it yesterday.  How did you
16   conduct that search?
17        A.   I typed it in the search bar.
18        Q.   Search bar of your internet
19   browser?
20        A.   Of my internet browser.
21        Q.   And what did you see after you ran
22   that search?
23        A.   It, I got a Google page with a
24   typical list of Apple, you know, of all
25   different Apple results with of course Apple,

Betsy Feist                                        April 13, 2012

                                                              192

1                        Betsy Feist
2          the Apple store at the top, but that would be
3          normal.
4               Q.    So you got the search results that
5          you were anticipating?
6               A.    I did.
7               Q.    Were you using RCN to conduct that
8          search?
9               A.    Yes, I was.
10              Q.    Did you conduct that search in
11         preparation for today?
12              A.    Well, I think preparation is
13         perhaps too strong of a word.  I was curious
14         about what would happen and it was of course
15         because of today that I had that curiosity.
16              Q.    That's fair.  Did you search any
17         other terms yesterday?
18              A.    No.  Well, if you're talking about
19         terms from the list, you know, I might have
20         searched many other terms yesterday.
21              Q.    Before you ran your Netalyzr
22         results, before July 25, 2011 had you ever
23         searched the term "Apple" before?
24              A.    Not to my knowledge.  I don't
25         remember.

Betsy Feist                                    April 13, 2012

                                                         193

                        Betsy Feist

1    

2        Q.    Have you ever, prior to running

3    your Netalyzr search did you search for the

4    term "Dell"?

5        A.    No.  I own -- as you know, I own a

6    Dell computer and when I want to get to the

7    website I go to the address bar and type in

8    Dell.com.

9        Q.    When you typed in Dell.com have you

10   been directed to Dell.com?

11       A.    Absolutely.

12       Q.    Your complaint also identifies

13   "Mac" as a word that appears on the brand

14   keywords list, and that's Mac, M-A-C.

15            Prior to running your Netalyzr

16   search or test have you ever searched the

17   word "Mac" before?

18       A.    Not that I remember, no.

19       Q.    What about the term "Ca," as in

20   C-A?

21       A.    No, I don't think so, not that I

22   remember.

23       Q.    Do you ever prior to running your

24   Netalyzr search ever recall conducting any

25   searches via the search bar on your internet

Betsy Feist                                    April 13, 2012

194

                        Betsy Feist

1          browser and being directed directly to

2          someone's webpage as opposed to a list of

3          search results?

4          A.   I, as I answered before, I remember

5          not getting the list of search results I

6          expected, but I cannot say with certainty

7          that I remember, you know, specifically

8          getting to a webpage as opposed to some other

9          strange thing.

10         Q.   Do you happen to recall on any of

11         those occasions what search terms you ran?

12         A.   No.

13         Q.   And those were all searches that

14         were coming from the search bar of your

15         browser, correct?

16         A.   That's what we were talking about,

17         yes.

18         Q.   Have you ever been redirected to a

19         webpage rather than search results based on a

20         search that you ran from the address bar from

21         your internet browser?

22         A.   I don't remember.

23         Q.   The occasions when you think you

24         might have been redirected to webpages rather

**SER-373**

Betsy Feist                                    April 13, 2012

194

                        Betsy Feist

1          browser and being directed directly to

2          someone's webpage as opposed to a list of

3          search results?

4          A.   I, as I answered before, I remember

5          not getting the list of search results I

6          expected, but I cannot say with certainty

7          that I remember, you know, specifically

8          getting to a webpage as opposed to some other

9          strange thing.

10         Q.   Do you happen to recall on any of

11         those occasions what search terms you ran?

12         A.   No.

13         Q.   And those were all searches that

14         were coming from the search bar of your

15         browser, correct?

16         A.   That's what we were talking about,

17         yes.

18         Q.   Have you ever been redirected to a

19         webpage rather than search results based on a

20         search that you ran from the address bar from

21         your internet browser?

22         A.   I don't remember.

23         Q.   The occasions when you think you

24         might have been redirected to webpages rather

**SER-373**

Betsy Feist                                    April 13, 2012

195

1                    Betsy Feist
2        than search results, do you remember how
3        many, approximately, occasions that might
4        have happened?
5             A.    No, I don't remember.
6             Q.    And you don't specifically recall
7        any of the pages that you were directed to?
8             A.    No, I don't.
9             Q.    Do you have any documents --
10                  MR. SEIDMAN:    Excuse me, I would
11             like to clarify that the type of
12             redirection that you're referring to
13             does not refer to the redirection that
14             is described in paragraph 16 of the
15             complaint.
16                  MR. CARE:    Actually referring to
17             paragraphs 19 and 20.
18                  MR. SEIDMAN:    So you're not
19             referring to the routing of the searches
20             to a proxy server, you're just simply,
21             you're referring to rerouting to
22             websites.
23                  MR. CARE:    Correct.
24                  MR. SEIDMAN:    Okay, fine.
25        BY MR. CARE:

196

                       Betsy Feist

1

2      Q.    Getting back to the Netalyzr

3   results, D 2, could you tell me what you did

4   to run those, that test?

5      A.    Yes, I can.  I clicked on a link in

6   an E-mail message and basically it ran itself

7   to the best of my recollection.  I don't

8   remember anything other, having to do

9   anything else other than click on that link.

10     Q.    So who sent you that E-mail?

11     A.    Kim Richman.

12     Q.    Was he advising you as your

13  attorney at that time?

14     A.    Well, it was before, before --

15          MR. SEIDMAN:    Objection, compound

16     question.

17     Q.    Let's back up.  When did Mr.

18  Richman send you the E-mail containing the

19  link to Netalyzr?

20     A.    Immediately following our initial

21  discussion about the supposition that this

22  might be happening on my computer.

23     Q.    And do you remember when you had

24  that initial conversation with Mr. Richman?

25     A.    Well, I think it was probably on

Betsy Feist                                          April 13, 2012
                                                               197
 1                    Betsy Feist
 2        July 24th or 25th, 2011.
 3             Q.    And by "immediately," are you --
 4             A.    I mean, I mean within a day or two
 5        of the initial.  I mean this was the first --
 6        well, the first thing that happened was we
 7        had a discussion.  The second thing that
 8        happened is he sent me an E-mail that gave me
 9        the tools I needed to confirm or not confirm
10        that this problem was happening on my
11        computer.
12             Q.    When you had that initial
13        discussion with Mr. Richman was that a
14        telephone discussion?
15             A.    Yes, it was.
16             Q.    Okay.  Did he contact you or did
17        you contact him?
18             A.    He contacted me.
19             Q.    Prior to that discussion with Mr.
20        Richman, when was the last prior
21        communication you had had with Mr. Richman?
22             A.    I don't remember.
23             Q.    Had you communicated with Mr.
24        Richman within a year prior to your initial
25        discussion with him about this matter?

Betsy Feist                                    April 13, 2012

                                                        198

1                    Betsy Feist

2        A.    I don't remember.

3        Q.    Did Mr. Richman provide you any

4    legal advice during the initial conversation

5    that you had?

6             MR. SEIDMAN:   Objection, calls for

7             a legal conclusion.  You can answer the

8             question.

9        A.    Not that I can remember, or not

10   that I can remember.

11       Q.    When you picked up the phone that

12   day from Mr. Richman, did you consider him to

13   be your attorney?

14       A.    No, I didn't.

15       Q.    When you hung up the phone that day

16   did you consider him to be your attorney?

17       A.    No.

18       Q.    Do you remember whether he said if

19   he was contacting you in his capacity as an

20   attorney?

21       A.    I don't remember if he used those

22   words, but clearly he was contacting me about

23   a case that I might potentially be involved

24   in so it was as an attorney he was doing

25   that.

Betsy Feist                                    April 13, 2012

                                                        199

 1                    Betsy Feist
 2        Q.    And when he followed up to that
 3    conversation with an E-mail to you was it
 4    just a link or was there other communications
 5    in that E-mail?
 6        A.    It -- well, there was a link.
 7    There was also a link to the article that
 8    we've referred to frequently today that's in
 9    this pile as Exhibit something or other.
10            MR. SEIDMAN:    Objection insofar as
11        you started asking about the content of
12        the E-mail.
13            MR. CARE:    I believe I'm allowed
14        to ask whether there were other
15        communications.    I'm not inquiring as to
16        the contents of those communications.
17        A.    I think other than the two links
18    was just casual, polite introduction to, you
19    know, this is, here it is, but that's, you
20    know, as best as I can remember.
21        Q.    Do you remember whether he sent
22    that E-mail to you from his website?    Sorry,
23    withdrawn.
24            Do you remember whether that E-mail
25    was sent to you from his work account?

**SER-378**

Betsy Feist                                    April 13, 2012

                                                          200

                          Betsy Feist

1

2          A.    I don't remember.

3          Q.    So this E-mail was sent to you and

4      it contained a link to the Netzlyzr, at which

5      point you clicked on the link; is that

6      correct?

7          A.    I, I think so.  I don't know

8      whether I looked at the article first or the

9      Netalyzr first.

10         Q.    Okay.  As part of conducting the

11     Netalyzr test did you go to your internet

12     browser and conduct any searches?

13         A.    No.

14         Q.    Did you conduct a search in any

15     capacity in connection with your Netalyzr

16     test?

17         A.    No.

18         Q.    As you sit here today, are you able

19     to say with certainty that any of your

20     searches have ever been redirected that you

21     conducted from the search bar on your

22     internet browser?

23         A.    I believe I can say it with

24     certainty because the Netalyzr test results

25     tells me that it did in fact happen.

Betsy Feist                                    April 13, 2012

201

                        Betsy Feist

1    Q.    Did it tell you that your searches

2    had been redirected?

3              MR. SEIDMAN:    Objection, the

4              document speaks for itself.

5    A.    It did.

6    Q.    Could you point to the section on

7    there where it says that searches you had

8    conducted had been rerouted?

9    A.    "Your ISP appears to be using DNS

10   to redirect traffic for one or more websites

11   to third-party servers in cooperation with a

12   company called Paxfire."

13   Q.    Could you tell me where that

14   appears, please?

15   A.    Yeah, it's on the last page at the

16   top.  I think it's on another page here where

17   it says something similar.

18   Q.    So --

19             MR. SEIDMAN:    There were two

20             Netzlyzr result exhibits entered in.

21             Which one?

22             MR. CARE:    We're going to D 2.

23   Q.    If you would like to look at

24   Exhibit 3 as well.

Betsy Feist                                    April 13, 2012

202

```
1                Betsy Feist
2           MR. SEIDMAN:   I just didn't see
3       the --
4           MS. CLARK:   (Handing.)
5           MR. SEIDMAN:   Thank you.
6       A.    There's some stuff in here that I
7   can't really understand I must say, but it
8   may say that.
9                Yes, there's a section that begins
10  "Your ISP DNS server returns IP addresses
11  even for domain names, names which should not
12  resolve in.  Instead of an error, the DNS
13  server returns an address" and a whole string
14  of numbers "which does not resolve."
15               Then it says "There are several
16  possible explanations for this behavior.  The
17  most likely cause is the ISP is attempting to
18  profit from customer's typos by presenting
19  advertisements in response to bad requests,
20  but it could also be due to error
21  reconfiguration in the DNS server.  The big
22  problem with this behavior is that it can
23  potentially break any network application
24  which relies on DNS properly returning an
25  error when a name does not exist."
```

Betsy Feist                                    April 13, 2012

203

                    Betsy Feist

1

2          Then I don't know if it is the same

3     thing as before.  "The ISP appears to be

4     using DNS to redirect traffic for one or more

5     websites to third party servers in

6     collaboration with" -- oh, that's what I read

7     before.

8          Q.   And is it your testimony that these

9     portions of the Netalyzr results identify

10    searches that were run that were redirected?

11         A.   To the degree that I can --

12         MR. SEIDMAN:   Objection, this

13         calls for an expert opinion.

14         MR. CARE:   I'm trying to test her

15         understanding of what the Netalyzr

16         results say.

17         MS. CLARK:   Can you read back the

18         question.

19              (Record read.)

20         MR. CARE:   Would you repeat the

21         answer, please.

22              (Record read.)

23         A.   To the degree that I can understand

24    it, yes.

25         Q.   Are you saying that your answer

Betsy Feist                                    April 13, 2012

                                                           204
1                    Betsy Feist
2      is --
3            A.    I'll say my answer is yes.
4            Q.    Could you please repeat your
5      answer?
6            A.    Yes.  Yes, I could repeat my
7      answer, my answer is yes.
8            Q.    So yes.  Let's back up again.  Is
9      it your testimony that these sections of the
10     Netalyzr results identify searches that were
11     redirected?
12           A.    That's my understanding, yes.
13           Q.    Are these searches that you
14     yourself conducted?
15           A.    No.
16           Q.    Are you able to identify, based on
17     these sections, what the actual terms
18     searched were?
19           A.    No.
20           Q.    Other than these sections of the
21     Netalyzr report, is there any other section
22     of the Netalyzr report that identifies a
23     search that was redirected?
24           A.    I -- there was a lot of this report
25     that is highly technical and may in fact give

Betsy Feist                                    April 13, 2012

                                                          205

                          Betsy Feist

1

2      that information to somebody who could

3      understand it, but not to me.

4           Q.   Let's look at these sections that

5      you've highlighted.  I'm looking at D 3 now.

6      It says on what appears to be the one --

7      sixth page of this document, halfway down the

8      page, "Your ISP's DNS server returns IP

9      addresses even for domain names which should

10     not resolve.  Instead of an error, the DNS

11     server returns an address of 65.200.200.35,

12     which does not resolve.  There are several

13     possible explanations for this behavior.  The

14     most likely cause is that the ISP is

15     attempting to profit from customer's typos by

16     presenting advertisements in response to bad

17     requests."

18           We previously identified services

19     offered by Paxfire, including to RCN, called

20     error redirection services.

21           A.   Uhm-hmm.

22           Q.   Do you know whether this reference

23     in the Netalyzr results is describing

24     potential activities in connection with the

25     error redirection?

Betsy Feist                                        April 13, 2012

                                                             206
1                      Betsy Feist
2          A.   Yes, it is clearly error
3    redirection, but it adds to it the appearance
4    of an advertisement that is not strictly
5    error redirection so it's error redirection
6    plus.
7          Q.   Okay.  So you, your understanding
8    is that the activities here differ from error
9    direction -- error redirection in that
10   advertisements were also being presented in
11   response to the bad requests?
12         A.   Yes.
13         Q.   Could you refer to paragraph 8 of
14   your complaint, please, that appears on page
15   4.
16              THE VIDEOGRAPHER:   Excuse me, we
17         have 5 minutes left on the tape.
18              MR. CARE:   Okay.
19         A.   I'm sorry, I'm getting everything
20   backwards here.  Okay.  I'm not quite there
21   yet.
22         Q.   Take your time.
23         A.   All right.
24         Q.   I'll read this paragraph again.
25   Paragraph 8, "Publically Defendant Paxfire

Betsy Feist                                    April 13, 2012

                                                        207

1                    Betsy Feist

2       provides its software and/or hardware to ISPs

3       at no expense, redirects DNS errors (requests

4       for mistyped web addresses or for websites

5       that do not exist) to a site operated by

6       Paxfire and generates income by advertising

7       on that site.  Defendant Paxfire splits the

8       revenue it generates with the ISPs, including

9       Defendant RCN."

10              Now, earlier that's the activity

11      that we had defined as error redirection

12      activities.

13           A.   I guess I wasn't taking in that

14      advertising part of it and if that's the

15      case, it's the case.

16           Q.   Okay.  With the understanding that

17      error redirection services as we redefined

18      that includes the generation of income by

19      advertising, would you agree that the portion

20      of your Netalyzr result that say the most

21      likely cause is that the ISP is attempting to

22      profit from customer's typos by presenting

23      advertisements in response to bad requests,

24      would you agree that that section is

25      referring to what we understand to be, what

Betsy Feist                                    April 13, 2012

208

1                       Betsy Feist
2        we've defined to be error redirection
3        services?
4              A.   I think so, but I'm a little bit
5        confused now about exactly what encompasses
6        error redirection services.  And I know we, I
7        know previously I just accepted that
8        paragraph 8, you know, was all just simply
9        error redirection services, but, but it does
10       confuse me a little bit that it includes
11       advertising.
12                  MR. CARE:   We can break now.
13                  THE VIDEOGRAPHER:   The time is
14             3:53 and we are off the record.
15                       (Recess taken.)
16                  THE VIDEOGRAPHER:   The time is
17             4:02 and this begins tape number 4 of
18             the videotaped deposition of Betsy
19             Feist.
20       BY MR. CARE:
21             Q.   Miss Feist, could you turn to
22       paragraph 14 of your complaint, please.
23             A.   Okay.
24             Q.   And I'm going to apologize in
25       advance for going over some of the material

209

                       Betsy Feist
1
2    that had been covered earlier, but this
3    paragraph states, starting in the second --
4    sorry, third sentence "Defendant RCN and
5    Defendant Paxfire can monitor searches and
6    market the data to advertisers and data
7    aggregators interested in creating
8    demographic profiles."
9              What do you mean by the phrase
10   "data" as used in that sentence?
11        A.   I feel like I'm taking college
12   boards all over again.  Information,
13   collections of information.
14        Q.   What is the subject matter of that
15   data?
16        A.   If it says search data, then it's
17   data, it's information about my searches.
18        Q.   So the actual searches that are
19   being run, is that what you understand --
20        A.   Yes.
21        Q.   Sorry.  Let me rephrase that.
22              Do you understand that the data as
23   used, as that term is used in the sentence to
24   refer to the actual searches that you and
25   other RCN subscribers conduct?

Betsy Feist                                    April 13, 2012

                                                        210

1                     Betsy Feist

2          A.    Yes.

3          Q.    Does that term "data" include any

4    other information?

5          A.    I don't know.

6          Q.    To your understanding?

7          A.    It could.

8          Q.    What data could it be referring to?

9          A.    I don't know.

10         Q.    So the only type of information

11   you're certain is being referred to in this

12   sentence is the actual searches being run by

13   subscribers, correct?

14         A.    Correct.

15         Q.    And what do you understand the

16   phrase "market the data" as used in that

17   sentence to mean?

18         A.    Sell it, use it in a way to make

19   money.

20         Q.    This sentence says that "The

21   defendants can monitor searches and market

22   the data to advertisers and data

23   aggregators."

24               Are you aware of any instance when

25   either RCN or Paxfire has actually marketed

Betsy Feist                                    April 13, 2012

211

                        Betsy Feist
1
2    the data to advertisers and data aggregators?
3         A.    I'm not aware of this.
4         Q.    Do you have any documents
5    demonstrating that RCN or Paxfire has
6    marketed that data?
7         A.    I believe there are some documents,
8    but I'm not certain exactly which ones of all
9    of these documents do say that.  I do know
10   that the Paxfire website says we can make
11   money on this, so that implies marketing.
12        Q.    The Paxfire website says they can
13   make money off of selling search data as you
14   understand that to mean?
15        A.    I don't know whether it says
16   specifically that, no.  I take it back.
17        Q.    Do you know what the Paxfire
18   website says it's --
19        A.    I don't remember.  It was a long
20   time ago I looked at, that I didn't look at
21   yesterday.  That was maybe in July.
22        Q.    Other than the Paxfire website, are
23   you aware of any other document or evidence
24   demonstrating that RCN or Paxfire has
25   marketed or sold the data as you use that

Betsy Feist                                    April 13, 2012
                                                          212

1                      Betsy Feist
2      term in this sentence?
3              A.    I'm not certain.  I'm not certain.
4              Q.    You're not certain whether --
5              A.    I'm not certain whether -- I mean I
6      guess you could say right this second I'm not
7      aware of it.  I don't know whether that
8      information has, you know, entered my brain
9      at some point.  I'm not aware of where it
10     might have been said or exactly when, so I
11     don't remember.
12             Q.    Can you say for certain whether
13     you've ever seen such evidence?
14             A.    Not for certain.
15             Q.    Could you please turn to paragraph
16     24 of your complaint.
17             A.    Okay.
18             Q.    This paragraph reads, in part,
19     Defendant's breach -- Defendant's -- sorry.
20             "RCN and Paxfire's breach of
21     Plaintiff's privacy and computer security is
22     meaningful and problematic for numerous
23     reasons," including," at the first bullet,
24     "It allows Defendant and Paxfire to receive,
25     review, and compile the content of each of

213

                    Betsy Feist

1  the user's searches, no matter how personal

2  or private, and to share that information

3  with and/or sell that information to third

4  parties."

5         By the phrase "content of each of

6  the user's searches" are you again referring

7  to the actual terms used to conduct searches?

8         A.   Yes.

9         Q.   So the content of each of the

10 user's searches has the same meaning as the

11 term "data" in paragraph 14 that we just

12 discussed?

13        A.   I'm not certain.

14             MR. SEIDMAN:   Objection.

15             MR. CARE:   Withdrawn.

16        Q.   What do you mean by the phrase

17 "share that information" as that phrase is

18 used in paragraph 24 of your complaint?

19        A.   What it says.  I mean -- share

20 information is you let somebody else have it.

21        Q.   And do you know of anyone --

22 withdrawn.

23             Do you know the specific identities

24 of any third party with whom RCN has shared

Betsy Feist                                    April 13, 2012

214

1                    Betsy Feist
2      the contents of user searches?
3           A.    You mean other than Paxfire?
4           Q.    Other than Paxfire.
5           A.    No.
6           Q.    And this covers the same ground,
7      but do you know the specific identities of
8      any of the third parties as that term is used
9      at the end, paragraph 24?
10               MR. SEIDMAN:   I'm sorry, would you
11          repeat the question?
12               MR. CARE:   Yes.
13          Q.    Do you know the specific identities
14     of any of the third parties as that term is
15     used at the end of the first bullet in
16     paragraph 24?
17          A.    No.
18          Q.    Turn the page and go to paragraph
19     25.  The first sentence of this paragraph
20     reads "Not only is it profitable for RCN and
21     Paxfire to intercept searches because it
22     allows them to redirect traffic to
23     advertisers and marketers to pay them for
24     this information and/or increase traffic to
25     their own pages, the demographic data and

Betsy Feist                                    April 13, 2012

215

1                        Betsy Feist

2     search history of customers, like Plaintiff,

3     is itself tremendously valuable."

4              Now, this sentence that I just read

5     says that -- withdrawn.

6              What do you mean by the phrase

7     "demographic data and search history of

8     customers"?  Actually, withdrawn.

9              What do you mean by the phrase

10    "demographic data" as used in this sentence?

11         A.   Demographic data refers to things

12    like information about population groups

13    really, so how I would, how I or any like

14    plaintiff could fit into population groups

15    and I guess in terms of marketing the

16    demographic data that advertisers typically

17    collect in order to decide who to sell it to.

18         Q.   Do you have an understanding how --

19    withdrawn.

20              Is it your allegation that RCN uses

21    software or other technology provided by

22    Paxfire to collect demographic data on its

23    subscribers?

24              MR. SEIDMAN:   Objection.  What do

25         you mean by collecting?

Betsy Feist                                         April 13, 2012

216

1               Betsy Feist
2          MR. CARE:   By collecting I mean
3     compiling, recording, as that term is
4     commonly used.
5          A.   I think at this point it gets a
6     little, in my mind, not in the minds of my
7     lawyers or any technical people, but in my
8     mind I get a little fuzzy about where the
9     lines are drawn between what RCN does and
10    what Paxfire does, but based on my
11    understanding right this second RCN does not
12    itself do this.
13         Q.   RCN does not use Paxfire hardware
14    or software?
15         A.   No.  I guess maybe there were too
16    many things in that question again because it
17    would have to do with whether you -- whether
18    RCN itself is collecting data or whether the
19    software is allowing Paxfire to collect the
20    data, and that's where it's a little hard for
21    me as somebody, you know, to keep the lines
22    between the two companies straight, but that
23    is, I believe it's Paxfire that, I mean that
24    you make it possible for Paxfire to do this
25    rather than you doing it, you with RCN,

Betsy Feist                                    April 13, 2012

217

1                    Betsy Feist
2       rather than doing it yourself.
3            Q.    Maybe if I break down my question
4       it will help.
5                 Do you allege that RCN is
6       compiling, collecting or otherwise assembling
7       demographic data for its subscribers?
8            A.    No.
9            Q.    That's not your allegation?
10           A.    That's not my allegation.
11           Q.    Is it your allegation that RCN is
12      collecting, compiling or otherwise assembling
13      the search history of its subscribers?
14           A.    No.
15           Q.    Now, your complaint contains
16      several mentions to various RCN policies.
17      For example, paragraph 28 of your complaint
18      refers to RCN's current customer terms and
19      conditions, a customer privacy notice, and
20      paragraph 29 refers to RCN's online policies.
21      And if you flip ahead to paragraph 80 of your
22      complaint, it again refers to RCN's Privacy
23      Policy.  For the record, Privacy Policy is in
24      capital -- initial caps.
25                 Is it your understanding that these

Betsy Feist                                    April 13, 2012

                                                          218

1                    Betsy Feist

2    policies form a contractual relationship

3    between RCN and its subscribers?

4             MR. SEIDMAN:   Objection, calls for

5         a legal conclusion, but you can answer

6         the question.

7         A.   Well, since I do not recollect ever

8    seeing or reading any such policy ever, I

9    cannot believe that there is a contract

10   there.

11        Q.   You did not believe that there is a

12   contract there?

13        A.   No, but that's a lay opinion.

14        Q.   If you refer to paragraph 80 of

15   your complaint, I'm going to read it to you:

16   "Defendant RCN's Privacy Policy states that

17   Defendant RCN 'will not randomly monitor or

18   disclose the content of private E-mail or

19   private chat room communications.'  Despite

20   this promise, Defendant RCN did in fact

21   knowingly share users' personal information

22   with third parties in violation of its own

23   agreement with its users."

24        A.   Okay, I was wrong in my last

25   answer.

Betsy Feist                                    April 13, 2012

                                                          219

1                    Betsy Feist

2          Q.   Okay, that's fine.

3          A.   As I say, it was a lay answer, but

4     I was wrong.

5          Q.   Okay, that's perfectly fine.  So

6     just to ask the question again, do you

7     understand RCN's privacy policy to form a

8     contract between subscribers, RCN subscribers

9     and RCN?

10              MR. SEIDMAN:   Objection, calls for

11         a legal conclusion.  I'm wondering what

12         the point is.

13              MR. CARE:   I'm trying to determine

14         whether there is --

15         A.   I'm understanding it because it

16    says so here, because my lawyers are telling

17    me that that's a fact.  So my understanding

18    is the lawyer's understanding, whatever it

19    is.

20         Q.   But you yourself have never read

21    RCN's privacy policy, correct?

22         A.   Not that I recollect.

23              MR. SEIDMAN:   Except to the extent

24         that it's in the complaint, correct?

25              THE WITNESS:   Except to the extent

Betsy Feist                                April 13, 2012

                                                    220
1                    Betsy Feist
2        that it's in the complaint, correct.
3        Q.    Prior to your filing of the
4   complaint did you actually check whether
5   RCN's term of service, privacy policy or any
6   other policy reference in your complaint is
7   as described in your complaint?
8        A.    Prior to the complaint I couldn't
9   check whether it is described in the
10  complaint because I didn't know what was in
11  the complaint.
12            MR. CARE:   Could you repeat my
13       question, please.
14                  (Record read.)
15       A.    I answered that.  I couldn't check
16  about whether or not it was as described in
17  the complaint when the complaint didn't
18  exist.
19       Q.    I'll rephrase the question.
20       A.    Maybe you're not asking --
21            MS. CLARK:   I think he's asking
22       between using the draft and the filing.
23            THE WITNESS:   Oh, okay.
24       A.    No.
25       Q.    I'm going to hand you what's been

Betsy Feist                                    April 13, 2012

221

                          Betsy Feist

1

2        marked D 14.

3                    (Defendant's Exhibit 14, five-page

4             document, marked for identification, as

5             of this date.)

6                    MR. CARE:   I'm going to state for

7                the record that this is a document that

8                I printed from RCN's website yesterday,

9                April 12, 2012, and that the URL for

10               this document appears at the lower

11               left-hand corner of this page, the front

12               page of the document that reads

13               www.RCN.com/new-York/privacy-policy.

14                   (Defendant's Exhibit 15, document

15            printed from RCN's website, marked for

16            identification, as of this date.)

17           Q.   Have you ever seen this document or

18       any document -- withdrawn.

19                   Do you recognize this document?

20           A.   No, I don't.

21                   MR. SEIDMAN:   I would like to

22               clarify something.  Are you further

23               representing that this is the privacy

24               policy that would have been returned had

25               a person typed in this web address on or

Betsy Feist                                    April 13, 2012

                                                      222
1                     Betsy Feist
2          about the date that the complaint was
3          filed?
4               MR. CARE:    I'm not representing to
5          that.  I'm not qualified to do so.
6               MR. SEIDMAN:    Okay.
7      BY MR. CARE:
8          Q.   Do you see the upper left-hand
9      corner of this page under the RCN logo?
10         A.   Upper left-hand corner of the page
11     under the RC -- yeah.
12         Q.   Do you see the header that says
13     "Policies and Disclaimers in New York City,"
14     and below that "Privacy Policy"?
15         A.   Yes, I do.
16         Q.   Is this the privacy policy that's
17     referred to in paragraph 80 of your
18     complaint?
19         A.   I have no idea.
20         Q.   And you have never seen this
21     document before, correct?
22         A.   Not to my recollection.
23         Q.   On the first paragraph of this
24     document, under the header Privacy Policy,
25     below that first paragraph is some bolded

Betsy Feist                                    April 13, 2012

                                                          223
                         Betsy Feist
1
2      text.  I'm going to read that.
3            A.    I'm glad you're going to read it
4      because I can't.
5            Q.    This text states "As a customer of
6      RCN, you are agreeing to the terms of this
7      Privacy Policy, and revisions made to the
8      Privacy Policy from time to time (see Section
9      6 revision of this policy), unless and until
10     you terminate your RCN services."
11                 Have you ever seen that term
12     before?
13           A.    I can't even see it now.  Typed
14     this small is -- you know, that's ridiculous
15     if they really expect me to read that.
16     That's absurd.
17           Q.    Have you ever seen or heard or had
18     any understanding of this provision prior to
19     today?
20           A.    No, I don't think so.  I don't
21     remember.
22                 MR. SEIDMAN:   Objection.  It
23                 assumes facts in evidence that are not.
24                 So I would like her last answer
25                 stricken.

**SER-402**

Betsy Feist                                    April 13, 2012

224

1                    Betsy Feist

2          MR. CARE:   Can you repeat from my

3     question.

4                    (Record read.)

5          MR. CARE:   What facts is it

6     assuming?

7          MR. SEIDMAN:   Could you repeat the

8     question one more time, please.

9          It's assuming that this phrase

10    existed in a privacy policy that was

11    retrieved from this URL at a time before

12    you yourself retrieved it.  I can't

13    remember whether you said today or --

14         MR. CARE:   Yesterday.

15         MR. SEIDMAN:   -- yesterday.  So

16    that's a fact that hasn't been

17    established.  Your question can stand,

18    I'm not instructing her not to answer.

19         I'm sorry that I'm causing all of

20    this difficulty.  I ask that the answer

21    be stricken because my objection was not

22    noted before she started, before she

23    gave her answer.  But she can answer the

24    question.

25         MR. CARE:   Could you repeat her

**SER-403**

Betsy Feist                                    April 13, 2012

225

                        Betsy Feist

1

2          answer to the question.

3                  MR. SEIDMAN:   Again, I apologize

4          for delaying things.

5                          (Record read.)

6      BY MR. CARE:

7          Q.   Do you want to stand on your

8      answer?

9          A.   Yes.

10         Q.   Have you ever objected to RCN in

11     any way concerning the term that I just read

12     to you?

13         A.   Since I don't remember ever seeing

14     the term before, no.

15         Q.   You've never seen this privacy

16     policy as represented on this page before,

17     have you?

18         A.   Not to my recollection, no.

19         Q.   Have you ever read any incarnation

20     of RCN's privacy policy from any date?

21         A.   No.

22         Q.   Have you ever submitted any

23     objection in any form to RCN concerning its

24     privacy policy?

25         A.   No.

Betsy Feist                                    April 13, 2012

226

                        Betsy Feist

1

2          Q.    So you've never objected to any

3     term within RCN's privacy policy?

4          A.    I never read the policy, so I

5     couldn't well object to any term in it.

6          Q.    Okay.  Could you refer to paragraph

7     31 of your complaint, and that appears on

8     page 15 of the complaint.

9          A.    Okay.

10         Q.    You allege here that "Defendants

11    failed to provide adequate notice to

12    Plaintiff regarding the nature and use of

13    Paxfire technology, and failed to provide

14    Plaintiff an adequate opportunity to opt out

15    of the service."

16              By "service" are you referring to

17    Paxfire technology and any services provided

18    by Paxfire?

19         A.    Yes.

20         Q.    What is the basis for your

21    allegation that RCN failed to provide an

22    adequate opportunity to opt out of the

23    service?

24         A.    I never got that opportunity.

25         Q.    What do you mean by the phrase "opt

Betsy Feist                                         April 13, 2012
                                                                227

1                      Betsy Feist

2       out"?

3              A.    Could say don't do this to me.

4              Q.    So you wanted an opportunity to say

5       to RCN don't subject me to these services?

6              A.    Yes.  There are a lot of things in

7       the world where there are opportunities to

8       opt out and what it means is I don't choose

9       to get this.

10             Q.    What would you consider to be an

11      adequate opportunity to opt out of the

12      Paxfire technology?

13                   MR. REESE:   Objection,

14              hypothetical.

15             A.    I can imagine that there might be

16      many different ways, but it would have to be

17      in larger type than your privacy policy to

18      begin with and be very clearly written in lay

19      language and make it exactly clear what the

20      Paxfire policy was doing so that I could be

21      very educated when I opt out.

22                   And I mean clear not in the way

23      most lawyers write, my lawyers excepted, but

24      clear in, say, well, for me it could be

25      pretty high reading level, but given that I'm

Betsy Feist                                    April 13, 2012

228

1                    Betsy Feist

2       representing all users of RCN I would say

3       maybe a sixth grade reading level would do

4       it.

5            Q.   Okay.  Suppose RCN had allowed you

6       to opt out of the use of the Paxfire services

7       by request to RCN.

8                    In your opinion would that have

9       been an adequate opportunity to opt out?

10                   MR. SEIDMAN:   Objection.  You

11               don't specify the form of the request,

12               that the request must be made in, and

13               that would matter.

14                   MR. CARE:   Okay.

15           Q.   Suppose --

16                   MR. GROSSO:   Objection, the

17               attorney is testifying.

18                   MR. CARE:   I'll withdraw the

19               question and ask it again.

20                   MR. GROSSO:   Move to strike that.

21      BY MR. CARE:

22           Q.   Suppose RCN allowed you to opt out

23      of the use of Paxfire technology by making a

24      call to RCN's customer support people.

25                   In your opinion would that have

**SER-407**

Betsy Feist                                    April 13, 2012

229

                        Betsy Feist

1                                       been an adequate opportunity?

2     A.    I haven't had a chance to think

3   about what might be an adequate opportunity

4   before this very minute, but I'm inclined to

5   think no.

6        Q.   And why not?

7        A.    Well, first of all, probably it

8   would get screwed up when I reached the RCN

9   operator, but, you know, aside from that I

10  don't think it's significant enough and

11  binding enough or closely enough related to

12  the actual activity.  But I'm thinking out

13  loud here, you know, if I, if RCN asked me to

14  design an adequate opt-out form, I wouldn't

15  do it in 30 seconds.

16       Q.   Okay.  Suppose that an opt-out

17  mechanism was provided on any page to which

18  any search results or any search you had

19  conducted -- strike that.

20           Suppose that an opt-out mechanism,

21  like a box you could check, appeared on any

22  page to which you were redirected as a result

23  of the Paxfire services.

24           Would that be an adequate

**SER-408**

Betsy Feist                                      April 13, 2012

                                                           230

1                      Betsy Feist

2       opportunity to opt out?

3                      MR. SEIDMAN:   Objection, you're

4               not specifying the size of the box, the

5               size of the print, where it is on the

6               page.  I mean this is, the question is

7               vague, ambiguous and you can answer to

8               the best of your ability.

9            A.   I mean to the best of my ability by

10      the time I'm redirected to that page it's a

11      little late for me to opt out, but indeed I

12      would want to know.

13                     I mean I am somebody who has worked

14      in publishing for my entire career and the

15      way things are designed make a difference.

16      So in the abstract to say something you can

17      check on the screen, in theory something you

18      can click on the screen might or might not be

19      okay.  If it were absolutely obvious -- and

20      given again that I'm representing every user

21      of RCN, I would say it would have to be

22      absolutely obvious to people who, whose

23      vision is impaired and to any other user that

24      might have -- I guess under the Americans

25      with Disabilities Act would have to be pretty

Betsy Feist                                    April 13, 2012

                                                        231

                        Betsy Feist

1

2      damn clear.

3          Q.    Suppose on a page that you had been

4      redirected by as a result of Paxfire

5      technology, there was a link or there was a

6      phrase "why am I here" with a link that took

7      you to a different page explaining that you

8      had been redirected and providing you an

9      opportunity to opt out.

10              MR. SEIDMAN:   Objection as to form

11          and she has already testified --

12          objection as to form because the

13          question is vague for the reasons that I

14          previously gave, and objection because

15          the question has been asked and

16          answered.

17              She already said that before she

18          could recommend any kind of opt-out

19          mechanism, she wouldn't do it in 30

20          seconds at a deposition in this

21          circumstance.

22              MR. CARE:   Are you directing her

23          not to answer?

24              MR. SEIDMAN:   I'm not directing

25          her not to answer.

Betsy Feist                                    April 13, 2012

                                                           232
1                       Betsy Feist

2          A.    Well, first of all, there again

3     you're saying after I'm already redirected I

4     get a chance to opt out, which is too late.

5     And then all the other things that I've said

6     before apply because I would have to examine

7     the specific, the specific thing you're doing

8     and I'm not sure -- I would think, given the

9     varying degree of sophistication among

10    computer users, that why am I redirected to

11    this page is already problematic because

12    they're not going to understand the

13    terminology, which I certainly understand

14    now, if I didn't before, about what

15    redirecting is.

16               So on that basis I would say no,

17    but this would be a major design project for

18    RCN, a major project for a writer and a

19    graphic designer and a web designer.  This is

20    not an easy thing to achieve and I cannot

21    achieve it here for you.

22         Q.    Okay.  Are you aware whether RCN

23    provided an opt-out mechanism for any of the

24    Paxfire services?

25         A.    If so, I never saw it, so no, I'm

233

                    Betsy Feist
1
2    not aware of it I guess is the correct answer
3    to that question.
4         Q.    Are you aware whether you could
5    have opted out of the Paxfire services by
6    contacting RCN's customer service?
7         A.    No, I'm not aware of that.  And if
8    I didn't know I had the services, how could I
9    opt out anyway.
10        Q.    Okay.  Are you aware whether any
11   opt-out mechanism had ever been provided on
12   any of the -- withdrawn.
13             Are you familiar with the term "opt
14   in"?
15        A.    Yes, I am.
16        Q.    What is your understanding of that
17   phrase?
18        A.    Well, opt in is much better than
19   opt out because opt -- with opt out you have
20   something done whether you want it or not,
21   unless you take an action to stop it.  If you
22   have to opt in, you would not experience it
23   at all unless you actively chose to.
24        Q.    Am I correct that you have not
25   alleged that RCN should have provided its

Betsy Feist                                    April 13, 2012

234

1                         Betsy Feist
2        subscribers with an opportunity to opt in to
3        the use of Paxfire services?
4                  MR. SEIDMAN:   Objection, the
5              complaint speaks for itself.
6              Q.   You may answer.
7              A.   I never got as far as thinking
8        through what the solutions you might have to
9        the problems created by the fact that you
10       engage in something with Paxfire, but
11       certainly I never thought to allege that, no.
12             Q.   So you don't allege that RCN is
13       liable for, in any way for failing to provide
14       an opt-in to the Paxfire services?
15                  MR. SEIDMAN:   Objection, that's
16             not what she said.
17             A.   I did not say that, I did not say
18       that.
19                  MR. SEIDMAN:   That
20             mischaracterizes her testimony.
21                  MR. CARE:   Okay, I'll withdraw it.
22             Q.   Did your complaint anywhere allege
23       that RCN should have provided an opt-in to
24       the Paxfire services?
25             A.   Didn't I just answer that?

Betsy Feist                                    April 13, 2012
                                                         235
 1                      Betsy Feist
 2           Q.    I think it was a different
 3      question.
 4           A.    Oh, so it was a different question.
 5      I never thought -- I never did, no.
 6           Q.    Did you ever make any effort to opt
 7      out of the Paxfire services?
 8           A.    Are you talking about before I knew
 9      it existed or after I knew it existed?
10           Q.    At any time.
11           A.    At any time.  Before I knew it
12      existed I couldn't make the effort and I
13      think I'm making that effort right now.
14           Q.    Did you ever contact RCN in an
15      effort to opt out of the Paxfire services?
16           A.    Well, my lawyers contacted RCN.
17           Q.    Did you or anyone acting on your
18      behalf ever contact RCN's customer service
19      about opting out of the Paxfire services?
20           A.    No.
21           Q.    Did you make any inquiry of RCN to
22      determine whether you could be opted out of
23      these Paxfire services?
24                 MR. SEIDMAN:  Objection, she's
25           already testified that she did not know

Betsy Feist                                    April 13, 2012

                                                          236

                        Betsy Feist

1         that Paxfire's services were being
2         employed, so there is no way that would
3         even occur to her to contact RCN and ask
4         to be opted out.  So we will stipulate
5         that at no time prior to the filing of
6         this complaint did she contact RCN in
7         any way in order to opt out of this
8         service because she didn't know that it
9         was in place.  So let's move on to some
10        other questions, okay?
11            MR. CARE:  Okay, I'll take your
12        stipulation and ask that you keep the
13        speaking objections to a minimum,
14        please.  Introduce this as D 15.
15            (Defendant's Exhibit 15, Plaintiff
16    Betsy Feist's Responses to Defendant RCN
17    Telecom Service, LLC's First Set of
18    Interrogatories to Plaintiff, marked for
19    identification, as of this date.)
20            MS. CLARK:  Derek, could you tell
21        me what the title of this is?
22            MR. CARE:  Yes, it's Plaintiff
23    Betsy Feist's Responses to Defendant RCN
24    Telecom Service, LLC's First Set of

Betsy Feist                                    April 13, 2012

                                                           237

1                    Betsy Feist

2            Interrogatories to Plaintiff.

3       BY MR. CARE:

4            Q.    Miss Feist, do you recognize the

5       document that's been introduced as D 15?

6            A.    Yes, I do.

7            Q.    And what do you recognize it to be?

8            A.    It's my answers to your

9       interrogatories.

10           Q.    Could you flip to the last page in

11      this document, please.  Could you read into

12      the record all the text that appears below

13      the header Verification and ending before the

14      date.

15           A.    "I, Betsy Feist, declare as

16      follows:  I have read the foregoing Plaintiff

17      Betsy Feist's Responses to Defendant RCN

18      Telecom Services, LLC's First Set of

19      Interrogatories to Plaintiff and know its"

20      content -- "Contents," excuse me.  "I declare

21      that the information set forth in this

22      response is true and correct based upon my

23      own personal knowledge and upon information

24      and" be -- "upon information and belief.

25                 I declare under penalty of perjury

Betsy Feist                                    April 13, 2012

238

                          Betsy Feist
1

2        under the laws of the United States of

3        America that the foregoing is true and

4        correct."

5            Q.   And is that your signature that

6        appears on the signature line on that

7        verification page?

8            A.   Yes, it is.

9            Q.   Okay.  You can put that one away.

10       I'm going to apologize if I cover some

11       familiar territory with this question, but

12       have you ever submitted any customer

13       complaints to RCN in connection with the

14       conduct alleged in your complaint?

15               MR. SEIDMAN:   Objection.  You can

16           answer.

17           A.   No.

18           Q.   Why not?

19           A.   There is no why not.  I didn't.

20               MR. SEIDMAN:   Objection, she

21           already explained that.

22           A.   I mean okay, remember that I --

23       well, before I knew about it I couldn't

24       complain because I didn't know about it.

25           Q.   Have you ever submitted any

Betsy Feist                                          April 13, 2012

239

                        Betsy Feist

1   customer complaints to RCN other than in

2   connection with any of the allegations in

3   your complaint?

4        A.   Yes.

5        Q.   What complaints have you submitted

6   to RCN?

7        A.   I'm not sure I can get the details

8   exactly right about this because it happened,

9   you know, some time ago, but there was an

10  incident where I had been told by a customer

11  relations person that I was eligible to get a

12  certain package at a certain price and then

13  when I got my bill there was -- I got a

14  different -- I don't remember whether it was

15  a different package, but it certainly was a

16  different price.

17            And when I called I had

18  conversations with people in customer service

19  telling me I believe that they couldn't

20  correct the problem because they didn't have

21  the telephone number of the customer service

22  person that I spoke to first.

23            As a result of that, I wrote a

24  letter to the president of RCN telling them

Betsy Feist                                        April 13, 2012

240

1                        Betsy Feist
2       that that was unacceptable customer service.
3                   MR. CARE:    16.
4                   (Defendant's Exhibit 16, document
5              bearing Bates numbers FEIST 00000003
6              through 4, marked for identification, as
7              of this date.)
8            Q.    Miss Feist, is this the letter that
9       you have been describing that you sent to
10      RCN's chief executive officer?
11           A.    Yes, and I apologize for saying
12      president before.
13           Q.    No problem.  And this letter is
14      dated August 3, 2009, correct?
15           A.    Correct.
16           Q.    And would you agree with me that
17      this letter essentially concerns a billing
18      dispute?
19           A.    Yes.
20           Q.    And how much, what amount of money
21      was at dispute on the bill?
22           A.    Well, it was an ongoing dispute
23      because I was going to be billed at that rate
24      indefinitely, so it was approximately $10 a
25      month.

**SER-419**

Betsy Feist                                    April 13, 2012

                                                          241

1                    Betsy Feist

2         Q.    $10 a month, okay.  Before you sent

3    this letter, you had previously communicated

4    with RCN's customer service people, correct?

5         A.    Correct.

6         Q.    Do you know how many different

7    occasions you had communicated with the

8    customer service people?

9         A.    I don't remember.

10        Q.    Would you say it was more than

11   three?

12        A.    I would say at least three.  I

13   don't know whether it was more than three.

14        Q.    So at least three and you also

15   wrote a letter to the CEO of RCN, correct?

16        A.    Uhm-hmm.

17        Q.    Other than those communications in

18   this letter, did you have any other

19   communications with RCN concerning that

20   billing dispute?

21        A.    Not that I recollect.

22        Q.    Did this billing dispute play any

23   role in your decision to file the complaint

24   against RCN?

25        A.    Certainly not.

Betsy Feist                                          April 13, 2012

242

                        Betsy Feist

1

2              MR. SEIDMAN:   Excuse me, was this

3         entered as a exhibit?  I don't recall.

4              MR. CARE:   Yes.

5              MS. CLARK:   16.

6         Q.   You can put that document aside.

7         A.   Okay.

8         Q.   Could you go to paragraph 1 of your

9    complaint.  The first sentence of paragraph 1

10   of your complaint reads:  "Defendants

11   violated Plaintiff's privacy, and compromised

12   her financial interest and computer security,

13   by knowing" --

14        A.   I'm sorry, I was looking at the

15   wrong page.  Could you give me a page number,

16   please?

17        Q.   Yes, it appears on page 2 of 30 if

18   you look at the top of the page.

19        A.   I'm looking at the wrong document.

20             MR. SEIDMAN:   Maybe I can help you

21        out here.

22        A.   Okay, I've got the right document

23   now.

24             MR. SEIDMAN:   It's the first

25        numbered paragraph he's referring to.

Betsy Feist                                    April 13, 2012

                                                      243

                          Betsy Feist

1

2        Q.   So the first sentence in that

3   paragraph reads: "Defendants violated

4   Plaintiff's privacy, and compromised her

5   financial interest and computer security, by

6   knowingly and intentionally intercepting her

7   internet communications in order to generate

8   income for themselves."

9             What was the basis for the

10  statement that the defendants had compromised

11  your financial interests?

12       A.   I'm not sure how to answer that.

13  I'm sorry.

14       Q.   Is it your allegation that the

15  plaintiffs have in fact compromised your

16  financial interests?

17            MR. SEIDMAN:   Defendants you mean.

18       Q.   Yes, I'm sorry.  Let me rephrase

19  that.  Are you alleging that --

20       A.   I am.

21       Q.   Okay.  In what way have the

22  defendants compromised your financial

23  interests?

24       A.   I -- well, because they're -- I

25  think that -- I can't explain it, sorry.

244

                         Betsy Feist

1

2        Q.    Maybe we can break it down.

3              What did you mean by the phrase

4    "financial interests" as used in this

5    sentence?

6        A.    I think it's meant very broadly in

7    terms of anything to do with my, my finances,

8    my ability to earn money, my economic life.

9        Q.    And how had your economic life been

10   compromised as a result of, let's say,

11   conduct by RCN?

12             MR. SEIDMAN:   Objection.  You're

13             taking a single element of her

14             definition of financial interests and

15             assuming that that's what she said

16             exclusively.

17             MR. CARE:   I'll rephrase the

18             question.

19   BY MR. CARE:

20       Q.    What did you mean by the phrase

21   "compromised"?

22       A.    Well, that you in some way either

23   damaged or limited my financial interests.

24       Q.    Can you specify how your -- I'm

25   sorry, what was the phrase, damaged or

Betsy Feist                                    April 13, 2012

245

                         Betsy Feist
1
2      limited your financial interests?
3              A.    Well, when you take something that
4      belongs to me that may have financial value,
5      you're damaging my financial interests.
6              Q.    To the best of your knowledge have
7      you suffered a -- have you lost any money as
8      a result of any conduct by RCN?
9              A.    Other than because of what I said
10     in that letter which is completely different,
11     you're not talking about the billing dispute.
12             Q.    In connection with the allegations
13     in your complaint.
14             A.    No.
15             Q.    Other than strictly money, have you
16     suffered any other type of economic loss as a
17     result of any conduct by RCN?
18             A.    Not to my knowledge, no.
19             Q.    You're presently an RCN subscriber,
20     correct?
21             A.    That's correct.
22             Q.    If you believe that RCN's conduct
23     was compromising your financial interests,
24     why did you remain an RCN subscriber after
25     learning about this conduct?

Betsy Feist                                    April 13, 2012

246

1                        Betsy Feist

2          A.    My, my co-op is wired for RCN, has

3      a contract with RCN, and although I believe

4      it is theoretically possible for me to get

5      all the services that I'm currently getting

6      from RCN, which is cable television,

7      telephone and internet provision, without

8      using what my building is offering, it would

9      be very difficult and that would have a

10     financial cost to me too.

11         Q.    So the financial cost of replacing

12     RCN as your provider of internet, cable and

13     other services that RCN provides, the cost of

14     replacing all of those services would be

15     greater than any detrimental impact from the

16     compromising of your financial interests by

17     RCN?

18         A.    Yes.  My basic cable is included in

19     my maintenance bill and I'm going to pay RCN

20     for basic cable through my building.  You

21     know, I don't know how -- I should not say I

22     will be.  I don't know how I would get out of

23     paying for the basic cable which is not a

24     separate itemized line on my maintenance

25     bill, is just part of my maintenance bill.

Betsy Feist                                    April 13, 2012

                                                      247

1                     Betsy Feist

2          Q.    Okay.  You said your building is a

3    co-op, correct?

4          A.    Correct.

5          Q.    Do you sit on the Board of your

6    co-op?

7          A.    Not any longer.  I did.

8          Q.    As a member of your co-op, have you

9    recommended that the co-op terminate its

10   relationship with RCN?

11         A.    I decided I should not mention

12   anything to my Board about this action at

13   this time, especially since I am being

14   accused of trying to undermine Paxfire's

15   business -- excuse me, destroy its business.

16   And I think if I went to the president of my

17   Board and said hey, this bad thing is

18   happening, maybe you should get out of your

19   contract with RCN, I think I could be putting

20   myself in an extremely vulnerable position.

21         Q.    Okay.  Have you warned the other

22   members of your co-op that their financial

23   interests might be compromised as a result of

24   any conduct by RCN?

25         A.    No.  I have purposefully, because

                                                              248
                         Betsy Feist
1
2      of the position I just described, not warned
3      anybody who is an RCN user about this.
4           Q.   Are you concerned that the other
5      members of your co-op could have their
6      financial interests compromised as a result
7      of any conduct by RCN?
8           A.   Yes, I am.
9                MR. CARE:   I think if I can have a
10          couple of minutes, I think we can almost
11          wrap this up.
12               MR. SEIDMAN:   Sure.
13               THE VIDEOGRAPHER:   The time is
14          4:55 and we're off the record.
15                    (Recess taken.)
16               THE VIDEOGRAPHER:   The time is
17          5:10 and we're back on the record.
18     BY MR. CARE:
19          Q.   Thank you, Miss Feist, for your
20     patience.  I think we can wrap this up in a
21     few minutes with just a few more questions.
22               Now, earlier today you had
23     testified that before filing your lawsuit you
24     had done some Google searches to learn more
25     information about RCN and Paxfire and the

Betsy Feist                                          April 13, 2012

                                                              249

1                        Betsy Feist

2       conduct alleged in your complaint.

3                 Is that accurate?

4          A.    Not quite because I don't think

5       I -- I think it was only Paxfire that I was

6       Googling.

7          Q.    So you Googled about Paxfire and I

8       believe you testified that you came across

9       articles or other things on the internet

10      about Paxfire?

11         A.    A little bit.

12         Q.    Did you print out any documents in

13      connection with those, that Google searching?

14         A.    No.

15         Q.    Did you take any screen shots or

16      otherwise save them in any form?

17         A.    No.

18         Q.    As we discussed earlier, you

19      reference in your complaint the RCN terms of

20      service and the RCN privacy policy.

21                 Are you aware whether -- strike

22      that.

23                 Are you aware that RCN does not

24      allow people to -- does not allow subscribers

25      access to its services unless they agree to

**SER-428**

Betsy Feist                                      April 13, 2012

                                                          250

```
 1                 Betsy Feist
 2      the terms of service?
 3           A.    No, I'm not aware of that.  And
 4      since I was never presented with terms of
 5      service that I know of, it's hard to
 6      understand.
 7           Q.    Are you aware whether RCN allows
 8      subscribers access to its services if they
 9      don't agree to the RCN privacy policy?
10           A.    I'm not aware.
11           Q.    You testified that you have been an
12      RCN internet subscriber since 2004, correct?
13           A.    Correct.
14           Q.    Do you remember being presented
15      with the terms of service at that time?
16           A.    I don't remember.
17           Q.    Do you remember being presented
18      with a privacy policy at that time?
19           A.    I don't remember.
20           Q.    One last question:  Would you have
21      decided to file your complaint had you never
22      run the Netalyzr program?
23           A.    No, because I wouldn't have known
24      that this existed.
25                 MR. CARE:   Miss Feist, I would
```

Betsy Feist                                    April 13, 2012

                                                          251

 1                    Betsy Feist
 2          like to thank you for your time and
 3          patience today.
 4               MR. SEIDMAN:  I have a few
 5          questions on redirect.  Continue on the
 6          thank you.
 7               MR. CARE:  I'll save my thank you
 8          until, you know, we're kicking you out
 9          the door.
10               THE WITNESS:  Thank you.
11     EXAMINATION BY
12     MR. SEIDMAN:
13          Q.   Just a couple of questions.
14          A.   Okay.
15          Q.   Did you authorize your attorneys
16     Milberg LLP and Reese Richman to file the
17     complaint in this action?
18          A.   Yes.
19          Q.   Did you authorize your attorneys to
20     take the steps that they deemed necessary to
21     prosecute this litigation?
22          A.   Yes.
23          Q.   Did that authorization include the
24     hiring of experts?
25          A.   Yes.

Betsy Feist                                      April 13, 2012

                                                           252
1                      Betsy Feist
2          Q.   Did that authorization include
3     speaking to the media?
4          A.   Yes.
5          Q.   Did that include the hiring of
6     consultants?
7          A.   Yes.
8               MR. SEIDMAN:   Okay, no further
9          questions.
10              MR. CARE:   Miss Feist, again,
11         thank you for your time and patience
12         today.  We're going to close the dep for
13         today.
14              MR. GROSSO:   Can I have brief?
15              MR. CARE:   Yes.
16    EXAMINATION (Cont'd.)
17    BY MR. GROSSO:
18         Q.   During the examination by Mr. Care
19    you mentioned that you hadn't complained to
20    RCN about what you learned on the Netalyzr
21    and also your Exhibit Number 3, which --
22              MR. SEIDMAN:   Objection, that's
23         not what she testified.
24              MR. GROSSO:   Okay, let me just ask
25         the question.

253

1              Betsy Feist

2         Q.   Did you ever contact Paxfire to

3    determine or verify what Paxfire was doing

4    with searches?

5         A.   No.

6              MR. REESE:   By that gesture he

7         means no further questions.

8              MR. CARE:   Anything?

9              MR. GROSSO:   We're done.

10             MR. CARE:   For the third time,

11        thank you, Miss Feist, for your time and

12        your patience.  We're going to close the

13        deposition for today while reserving the

14        right to call you back for further

15        testimony after documents responsive to

16        RCN's document requests are produced.

17             MR. REESE:   We would object to

18        that.  Under the rules counsel gets one

19        chance to depose the witness, but we can

20        bring that up later if necessary.  But

21        we object to your reservation but we can

22        talk about that later.  Okay.

23             MR. CARE:   Understood.

24             MR. REESE:   All right, thank you.

25             THE VIDEOGRAPHER:   The time is

Betsy Feist                                        April 13, 2012

254

1                        Betsy Feist

2              5:15 and we are off the record.

3                      (Time noted:  5:15 p.m.)

4                   _____

5                      BETSY FEIST

6

7       Subscribed and sworn to before me

8       this ____ day of _____, 2012.

9

10      _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

255

1

2                    C E R T I F I C A T E

3        STATE OF NEW YORK    )

4                             : ss.

5        COUNTY OF NEW YORK   )

6

7                I, PAMELA J. MAZZELLA, a Notary

8        Public within and for the State of New

9        York, hereby certify:

10               That BETSY FEIST, the witness whose

11       deposition is hereinbefore set forth, was

12       duly sworn by me and that such deposition

13       is a true record of the testimony given

14       by the witness.

15               I further certify that I am not

16       related to any of the parties to this

17       action by blood or marriage, and that I

18       am in no way interested in the outcome of

19       this matter.

20               IN WITNESS WHEREOF, I have hereunto

21       set my hand this 23rd day of April, 2012.

22

23

24                          _____

25                          PAMELA J. MAZZELLA

Betsy Feist                                    April 13, 2012

                                                        256

 1

 2        ---------------- I N D E X ----------------

 3       WITNESS               EXAMINATION BY      PAGE

 4       Betsy Feist           Mr. Grosso         6, 252

 5                             Mr. Care             164

 6                             Mr. Seidman          251

 7        ----------------- EXHIBITS ----------------

 8        * * * * * EXHIBITS SEPARATELY BOUND * * * * *

 9

10         Defendant's Exhibit 1,      22       17

11         complaint, marked for

12         identification

13         Defendant's Exhibit 2,      40       7

14         Netalyzr results, marked

15         for identification

16         Defendant's Exhibit 3,      46       2

17         expanded version of

18         Netalyzr results, marked

19         for identification

20         Defendant's Exhibit 4,      63       23

21         Implications of Netalyzr's

22         DNS Measurements, marked

23         for identification

24         Defendant's Exhibit 5,      77       3

25         two-page letter dated April

**SER–435**

Betsy Feist                                         April 13, 2012

                                                              257

1

2          10, 2012, marked for

3          identification

4          Defendant's Exhibit 6,        87       18

5          Plaintiff-Counterclaim

6          Defendant Betsy Feist's

7          Responses to

8          Defendant-Counterclaim

9          Plaintiff Paxfire, Inc.'s

10         First Set of Requests For

11         Production of Documents,

12         marked for identification

13         Defendant's Exhibit 7,        104      25

14         one-page document dated

15         August 1, 2011, marked for

16         identification

17         Defendant's Exhibit 8,        107      24

18         two-page document dated

19         August 1, 2011, marked for

20         identification

21         Defendant's Exhibit 9,        110      15

22         three-page document, marked

23         for identification

24         Defendant's Exhibit 10,       118      11

25         four-page document dated

Betsy Feist                                        April 13, 2012

258

1

2        August 4, 2011, marked for

3        identification

4        Defendant's Exhibit 11,      120      4

5        four-page document, marked

6        for identification

7        Defendant's Exhibit 12,      121      8

8        Plaintiff-Counterclaim

9        Defendant Betsy Feist's

10       Responses to Paxfire,

11       Inc.'s First Set of

12       Requests For Admission,

13       marked for identification

14       Defendant's Exhibit 13,      154      6

15       Plaintiff-Counterclaim

16       Defendant Betsy Feist's

17       Responses to

18       Defendant-Counterclaim

19       Plaintiff Paxfire, Inc.'s

20       First Set of

21       Interrogatories, marked for

22       identification

23       Defendant's Exhibit 14,      221      3

24       five-page document, marked

25       for identification

Betsy Feist                                          April 13, 2012

259

1                 DEPOSITION ERRATA SHEET
2        Defendant's Exhibit 15,      221      14
3        document printed from RCN's
4        website, marked for
5        identification
6        Defendant's Exhibit 15,      236      16
7        Plaintiff Betsy Feist's
8        Responses to Defendant RCN
9        Telecom Service, LLC's
10       First Set of
11       Interrogatories to
12       Plaintiff, marked for
13       identification
14       Defendant's Exhibit 16,      240      4
15       document bearing Bates
16       numbers FEIST 00000003
17       through 4, marked for
18       identification
19
20
21
22
23
24
25

Betsy Feist                                      April 13, 2012

260

1                    DEPOSITION ERRATA SHEET

2        Our Assignment No.:  326759

3        Case Caption:  Betsy Feist, individually, and

4        on behalf of all others similarly situated

5        -v- RCN Corporation and Paxfire, Inc.

6

7            DECLARATION UNDER PENALTY OF PERJURY

8

9                    I declare under penalty of perjury

10       that I have read the entire transcript of my

11       Deposition taken in the captioned matter or

12       the same has been read to me, and the same is

13       true and accurate, save and except for

14       changes and/or corrections, if any, as

15       indicated by me on the DEPOSITION ERRATA

16       SHEET hereof, with the understanding that I

17       offer these changes as if still under oath.

18                           _____

19                           BETSY FEIST

20       Subscribed and sworn to on the _____ day of

21       _____, 20 _____ before me.

22       _____

23       Notary Public,

24       in and for the State of

25       _____.

**SER-439**

Betsy Feist                                    April 13, 2012
                                                          274

222:13

**disclose**
74:18 218:18

**disclosed**
62:24 69:17
142:6,13
143:8 145:11

**discloses**
119:2

**disclosure**
119:10 120:23

**discover**
77:20

**discovered**
112:15 113:9

**discuss**
75:13 108:12,
20 164:23

**discussed**
9:16 33:25
36:2 97:9
213:13 249:18

**discussing**
108:25 139:16
184:20

**discussion**
18:9 48:4
51:2 196:21
197:7,13,14,
19,25

**discussions**
39:23

**displaying**
92:17,18

**dispute**
240:18,21,22
241:20,22
245:11

**distinction**
20:23 146:19

**DISTRICT**
1:2,3 5:9,10

**DNS**
63:24 64:4
182:17,25
184:11 201:10
202:10,12,
21,24 203:4
205:8,10
207:3 256:22

**doctor**
169:6

**document**
24:13 40:18
41:8,11,12
43:7,8 46:25
47:19,22
48:19 49:17
50:10,11
56:22 64:12,
22 65:2,3,7
66:18 67:2,5,
11,13 88:17
89:4,25 90:7,
12,21 91:13
93:2 105:2,4
107:13,20,25
110:16 114:11
117:20 118:12
120:5 128:22
154:5,15
156:2 186:25
201:5 205:7
211:23 221:4,
7,10,12,14,
17,18,19
222:21,24
237:5,11
240:4 242:6,
19,22 253:16
257:14,18,
22,25 258:5,
24 259:3,15

**documentatio
n**
72:22

**documents**
11:17,18 20:2
41:16 46:23
63:15 64:14
66:9 72:7,23,
25 73:4,6,7,
11 84:14
87:23 88:5,7,
15 89:3,6,18,
20 165:19,24
166:3,4,7
187:24 188:2
195:9 211:4,
7,9 249:12
253:15 257:11

**doesn't**
18:18 45:4
50:8 61:16
62:12 80:2
89:14 114:18
158:3

**doing**
18:13 28:11
29:9 45:8,17
65:4 69:23
96:22 127:6
137:9 198:24
216:25 217:2
227:20 232:7
253:3

**domain**
43:17 184:10
202:11 205:9

**dominion**
38:13 51:23
53:3 144:22

**door**
251:9

**down**
8:17 43:15
67:8 91:23
111:7 187:2
205:7 217:3
244:2

**download**
64:23

**downloaded**
25:9

**dozen**
104:15

**draft**
17:15 19:5
220:22

**drag**
188:4

**drama**
13:25

**draw**
67:15

**drawn**
216:9

**drop**
16:18

**dropped**
16:16

**drug**
147:20
148:16,19

**drugs**
169:5

**due**
142:19 202:20

**duly**
6:18 255:12

**Dumain's**
24:2

**dumb**
169:13

**during**
34:2 176:13
198:4 252:18

—————— **E** ——————

**E**
3:2,8 4:2

**download**
6:17 110:2,4
255:2 256:2

**each**
32:3 44:9
49:8 54:20
106:11 151:19
163:11 212:25
213:6,10

**earlier**
14:19 33:9
36:15 62:13
63:11 72:14,
19,21 112:19
163:5 164:12
165:4 171:2
176:17 183:20
207:10 209:2
248:22 249:18

**early**
15:13

**earn**
244:8

**earnings**
92:11

**East**
9:4

**easy**
232:20

**eat**
32:21

**Eckersley**
77:16 85:13
116:11,17,
19,25 117:8,
17 118:21
119:3,11,16
120:15 121:2
155:16 162:20

**economic**
244:8,9
245:16

**editor**
14:21 15:16

Betsy Feist                                        April 13, 2012
                                                            275

| | | | | |
|---|---|---|---|---|
| **editorial** 168:17 181:8, 9 | 14:18 236:3 **encompasses** 208:5 | **engine's** 175:12 176:21 178:3 185:21 | 182:17 207:3 **especially** 103:15 247:13 | **EXAMINATION** 6:21 110:8 164:3 251:11 252:16,18 256:3 |
| **educated** 227:21 | **end** 49:18 99:5,6 122:17,24 124:2 126:17, 19,20 127:22, 23 131:15 133:16 134:5, 22 139:9 142:2,9,22 153:3 214:9, 15 | **English** 13:25 58:5 | **ESQ** 3:8,9,15,21, 22 4:9 | **examine** 22:25 48:9 232:6 |
| **education** 14:2 | | **enormous** 93:3 | **essentially** 240:17 | **examined** 6:19 |
| **educational** 13:24 | | **enough** 86:4 111:22 158:19 229:11,12 | **establish** 11:20 16:2 | **example** 13:7 171:15 217:17 |
| **effort** 173:2 235:6, 12,13,15 | | **enter** 28:19 175:13 | **established** 224:17 | **excepted** 227:23 |
| **either** 18:8 69:13 168:15 176:19 183:6 210:25 244:22 | **endeavor** 100:18 | **entered** 54:20 94:20 95:3 103:3 184:15,21 185:16 186:3, 13 201:21 212:8 242:3 | **establishes** 90:13 **estimate** 176:9 189:10 | **excepting** 54:10 **exclusively** 244:16 |
| **electronic** 100:19 104:19 116:12 | **endeavored** 100:17 **ended** 98:14 162:3 | | **estimating** 176:10 **et** 96:11 179:6 | **Excuse** 17:19 71:21 78:10 160:17 195:10 206:16 237:20 242:2 247:15 |
| **element** 244:13 | **ending** 98:13,16,17 237:13 | **entire** 43:7,8 60:23 91:19 95:12 114:21 230:14 260:10 | **events** 8:13 11:8 98:12 | **executive** 240:10 |
| **eligible** 239:12 | **engage** 234:10 | **entitled** 39:6 | **evidence** 66:9 79:18 112:12 137:6 187:21,25 211:23 212:13 223:23 | **exercised** 38:15 51:23 53:2 144:22 |
| **else's** 59:6 | **engaged** 122:19,25 124:3 125:24 | **equipment** 111:12 115:9 | | **Exhibit** 22:16,17 40:4,7 44:2 45:24 46:2, 10,13,14 47:9,13 48:10 49:5 51:13 56:23 63:22, 23 64:3 66:3, 14 68:2,3,20, 21,22 69:16 70:3,22 73:23 75:16 76:25 |
| **E-mail** 17:12,15 19:5,10 20:7, 14 21:2 74:21 89:10 90:22 105:5,9,12, 21,25 106:20 107:2,5,7 108:4 171:20 196:6,10,18 197:8 199:3, 5,12,22,24 200:3 218:18 | **engine** 20:21 28:2 29:16,21 30:6,25 33:5 34:10,16 36:17,22 37:20 90:5 95:4 96:2 147:20 176:4 178:25 179:23 180:15 | **ERRATA** 259:1 260:1, 15 261:1 262:1 **error** 43:18 177:19 178:12 183:2, 7 202:12,20, 25 205:10,20, 25 206:2,5,8, 9 207:11,17 208:2,6,9 | **exact** 61:9 90:22 **exactly** 27:5 32:4,11 37:12 43:3 53:17 99:6 105:13 143:24 146:5 149:24 159:12 169:21 172:24 179:12 208:5 211:8 212:10 227:19 239:9 | |
| **E-mailed** 10:13 | **engines** 21:2,3,15 175:24 176:4 183:18 | **errors** | | |
| **employed** | | | | |

Betsy Feist                                    April 13, 2012
                                                        276

77:3 79:24
87:9,17,18
91:14 104:25
107:24
110:13,15,18
112:19
118:11,14
120:2,4 121:8
139:4 144:12
152:20 154:6,
15 174:4
199:9 201:25
221:3,14
236:16 240:4
242:3 252:21
256:10,13,
16,20,24
257:4,13,17,
21,24 258:4,
7,14,23
259:2,6,14

**Exhibits**
40:2 61:23
62:2 69:15
70:2 109:7
201:21 256:7,
8

**exist**
43:3 182:19
202:25 207:5
220:18

**existed**
165:23 224:10
235:9,12
250:24

**existence**
78:14

**existential**
84:21

**exists**
90:12,21 91:3
172:24

**expanded**
42:9 45:23

46:2 48:14
256:17

**expect**
31:16,22,24
32:2,3 78:23
144:10 223:15

**expectations**
79:5

**expected**
30:18,19
57:10 84:12
99:6 137:14
188:24 194:7

**expecting**
177:17,20,23

**expense**
182:17 207:3

**experience**
233:22

**experienced**
98:13

**expert**
13:21 57:15,
16 76:23
77:21 85:18
86:13 203:13

**expertise**
138:16 159:6

**Experts**
77:15 78:17
84:23,24
85:3,16 87:3
94:16 97:20
112:23 251:24

**explain**
18:13 32:18
92:20 127:9
136:8 243:25

**explained**
39:19 75:6
120:12 238:21

**explaining**

231:7

**explanations**
202:16 205:13

**explanatory**
120:10

**Explorer**
25:19 171:16
172:9 179:11

**extent**
77:15 88:24
133:22 134:11
135:3 139:15
142:18 153:12
165:23 181:6
219:23,25

**extra**
46:15

**extremely**
247:20

**eye**
67:8

_____
        **F**

**F**
6:17 110:2,4
255:2

**face**
165:22

**fact**
50:14 84:25
85:4 134:13
136:5 139:25
140:2 142:20
147:14,19
148:14 152:11
160:20 170:3
200:25 204:25
218:20 219:17
224:16 234:9
243:15

**f a c t -
c h e c k i n g**
168:15

**facts**
77:21 79:18
137:6 138:4
223:23 224:5

**failed**
226:11,13,21

**failing**
234:13

**Fair**
86:4 93:18
99:9 132:16
158:6 192:16

**fairly**
169:8 170:4
176:16

**false**
83:18 84:8
86:8,15 88:19
90:3

**familiar**
21:4 172:14
233:13 238:11

**family**
9:24

**far**
14:8 34:2,24
35:2,6 102:11
173:16 234:7

**faster**
114:24

**fault**
171:18

**favorite**
148:24

**Federal**
77:18

**feel**
20:2 21:20
61:6 167:16
168:7 173:14
209:11

**FEIST**

1:4,14 2:5
5:5,6 6:1,23
7:1 8:1 9:1
10:1 11:1
12:1 13:1
14:1 15:1
16:1 17:1
18:1 19:1
20:1 21:1
22:1 23:1
24:1,17 25:1
26:1 27:1
28:1 29:1
30:1 31:1
32:1 33:1,24
34:1 35:1
36:1 37:1
38:1 39:1
40:1 41:1
42:1 43:1
44:1 45:1
46:1 47:1
48:1,8 49:1
50:1,21 51:1
52:1 53:1
54:1 55:1
56:1 57:1
58:1 59:1
60:1 61:1
62:1 63:1
64:1 65:1
66:1 67:1
68:1 69:1
70:1,19 71:1
72:1 73:1
74:1 75:1
76:1 77:1
78:1 79:1
80:1,10 81:1
82:1 83:1
84:1 85:1
86:1 87:1
88:1 89:1
90:1 91:1
92:1 93:1
94:1 95:1

# Tab 17

to
THIRD PARTY APPELLEES
ELECTRONIC FRONTIER FOUNDATION'S
and PETER ECKERSLEY'S
SUPPLEMENTAL EXCERPTS OF RECORD
IN SUPPORT OF ANSWERING BRIEF
Volume I

1 | SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
A Limited Liability Partnership
2 | Including Professional Corporations
JAMES M. CHADWICK, Cal. Bar No. 157114
3 | TENAYA RODEWALD, Cal. Bar No. 248563
379 Lytton Avenue
4 | Palo Alto, California 94301-1479
Telephone:    650.815.2600
5 | Facsimile:    650.815.2601
Email:        jchadwick@sheppardmullin.com
6 |              trodewald@sheppardmullin.com

FILED

JUN - 6 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

7 | Attorneys for Non-Parties, ELECTRONIC
FRONTIER FOUNDATION and PETER
8 | ECKERSLEY

RS

9 |

UNITED STATES DISTRICT COURT

10 |

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11 |

12 |

BETSY FEIST,

CV 12 80 135MISC

13 |

Plaintiff,

14 |

v.

15 |

RCN CORP. and PAXFIRE, INC.,

16 |

Defendants.

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

DECLARATION OF JESSE BURNS IN
SUPPORT OF MOTION TO QUASH
SUBPOENAS ISSUED BY DEFENDANT
PAXFIRE, INC. AND REQUEST FOR
PROTECTIVE ORDER

Date:
Time:
Crtrm.:

The Hon.

W02-WEST:1TER1\405526518.1
Case No.

BURNS DECLARATION ISO MOTION
TO QUASH SUBPOENAS

1     I, Jesse Burns, declare as follows:

2     1.     I have personal knowledge of the following matters and if called as a witness, I

3  could and would competently testify to the facts stated herein.

4     2.     I am a founding partner and VP of Research at iSEC Partners, a San Francisco

5  based computer security firm that I co-founded in 2004. At iSEC Partners I help find and fix

6  computer security problems. I perform penetration tests, write tools and lead research. I have

7  over a decade of experience as a software engineer and security consultant, and have helped many

8  of the industry's largest and most technically-demanding companies with their application security

9  needs. In addition to many other accomplishments, I have written network applications like web

10  spiders and heuristic analyzers. Because I help the companies that hold their data, my work can

11  affect the security of the data of millions of people.

12     3.     I have presented my research throughout the United States and internationally at

13  venues including the Black Hat Briefings, Bellua Cyber Security, SyScan, OWASP, Infragard, and

14  ISACA. I have also prepared and presented custom research reports for many security consulting

15  clients on a wide range of technical issues including cryptographic attacks, fuzzing techniques,

16  and emerging web application threats.

17     4.     Over the past several years, I have talked to the Electronic Frontier Foundation

18  ("EFF") about dozens of issues. As just one example, I shared with EFF formal assessments of

19  the impact of existence of security flaws in music CDs sold by SonyBMG. The flaws created

20  security risks for users of those CDs who played them on their computers.

21     5.     I have also discussed the risks from pending legislation, and how security

22  technologies apply or could be negatively impacted by the legislation. As discussed more below, I

23  also work with EFF to develop various security analysis tools and security assessment projects.

24     6.     I hold many of these discussions with EFF in confidence because, while I never

25  reveal any client secrets, EFF has been in conflict—or even litigation—with important customers

26  of iSEC. If the customers have negative feelings toward EFF, then it could potentially upset the

27  clients to learn that I sometimes also help EFF formulate its policy positions and technical analysis

28  of unrelated situations. Occasionally, I enumerate the complex negative security implications I

W02-WEST:1TER1\405526518.1
Case No.          -1-          BURNS DECLARATION ISO MOTION
TO QUASH SUBPOENAS

1 | see for policies that some customers, or prospective customers support. I would have to stop such
2 | discussions with EFF if I had to worry about it being publicly revealed every time I undertake an
3 | analysis like this. Similarly, I would not be able to speak with EFF freely whenever EFF's
4 | positions conflicted with those of a customer. Without confidentiality, I would have to remain
5 | silent or always take the same positions as my customers.

6 |     7.    I also sometimes talk to EFF about research projects I am working on, again
7 | without revealing any trade secrets or proprietary customer information. This discussion lets me
8 | understand the potential policy or legal implications of my work and helps me collaborate to make
9 | the projects work better.

10 |     8.    I believe these discussions are also essential to EFF. They have to understand what
11 | people like me, who work in the industry, know about sophisticated technologies so they can
12 | properly analyze the implications of the technology. It helps EFF to maintain its high standards of
13 | confidence when talking about the policy implications of these sophisticated and rapidly changing
14 | technologies.

15 |     9.    There are many security projects I worked on with EFF that had to be confidential
16 | in their early stages. Among other things, security research usually does not work if everyone
17 | knows what you are looking for, where you are looking, and what tools you are using. Therefore,
18 | EFF and I had to work on the projects in confidence. Later aspects of some of these projects
19 | became public, and so I can list examples here. Such projects include:

20 |     •    EFF's SSL Observatory project, which helps track security problems in the
21 |         "certificates" relied upon by websites, published at
22 |         https://www.eff.org/observatory;
23 |     •    Analysis of the security of forensics software, presented in 2007
24 |         http://www.isecpartners.com/files/iSEC-Breaking_Forensics_Software-
25 |         Paper.v1_1.BH2007.pdf; and
26 |     •    Work on mobile forensics presented in 2008
27 |         http://www.blackhat.com/presentations/bh-usa-
28 |         08/Lackey_Miras/BH_USA_08_Lackey_Miras_mobilephone.pdf.

W02-WEST:1TER1\405526518.1
Case No. CV-12-80-119-MISC     -2-     BURNS DECLARATION ISO MOTION
TO QUASH SUBPOENAS

1    10.    As with many projects dealing with internet security, it was key that these projects
2  were kept confidential in their development stages. There are many other projects I have with
3  EFF that are still confidential.

4    11.    I would not be willing to have these discussions with EFF if such discussions were
5  going to be subject to discovery in litigation, made public, or otherwise disclosed to anyone
6  outside of EFF.

7    12.    I also believe that allowing EFF to maintain the confidentiality of these
8  communications is vital to its mission to advocate on behalf of users of technologies. If people
9  with industry connections can't talk to EFF, a public policy organization such as EFF cannot hope
10  to understand the rapidly evolving technical issues of those industries and how they ultimately
11  affect the public.

12    13.    This confidentiality is especially important in the context of computer security
13  problems and the kind of "behind the scenes" technologies are not readily apparent to computer
14  users, but that can affect the security and privacy of those users. These problems can be difficult
15  to uncover and understand and require collaboration between advocates like EFF and people in
16  industry like me. When we work to understand the world's technological security challenges, we
17  often discover ways in which people can be harmed, or are currently being harmed, by
18  technologies that they may not see or understand. For instance, a security researcher could
19  discover a problem in a technology that could be exploited to allow someone access to the credit
20  card or other sensitive data of internet users. The researcher's work may need to be kept
21  confidential (for example, to avoid widespread exploitation of the vulnerability), while at the same
22  time it is important for a group like EFF to find out about the problem and try to fix it or get the
23  industry or regulators to do so. EFF is a trusted partner in those efforts, choosing when to use
24  public advocacy and when to use other methods in policy or technology, to push for protections
25  for consumers and internet users.

26    14.    If I felt that my efforts to dig into the technologies that people rely on every day, to
27  make sure that those technologies work in the ways that users expect and in ways that protect
28  them, were going to be dragged into litigation if I were to reveal them to EFF, I would hesitate

1  before doing so and probably would not do so at all. The result is that public advocates like EFF
2  will be less able to take steps to push for smart policies and other changes to protect consumers
3  and internet users.

4       15.    Without confidence that our discussions were private, I wouldn't be able to give
5  EFF technical advice or express my personally felt moral concerns about many security, privacy,
6  and policy issues.

7

8       I declare under penalty of perjury under the laws of the United States of America that the
9  foregoing is true and correct. Executed on June 4 , 2012.

10

11

12                                                        JESSE BURNS

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

W02-WEST:1TER1\405526518.1                                    BURNS DECLARATION ISO MOTION
Case No. CV-12-80-119-MISC                    -4-                 TO QUASH SUBPOENAS

**SER-447**

# Tab 18

to
THIRD PARTY APPELLEES
ELECTRONIC FRONTIER FOUNDATION'S
and PETER ECKERSLEY'S
SUPPLEMENTAL EXCERPTS OF RECORD
IN SUPPORT OF ANSWERING BRIEF
Volume I

**FILED**

JUN - 6 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

1   SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
    A Limited Liability Partnership
2   Including Professional Corporations
    JAMES M. CHADWICK, Cal. Bar No. 157114
3   TENAYA RODEWALD, Cal. Bar No. 248563
    379 Lytton Avenue
4   Palo Alto, California 94301-1479
    Telephone:    650.815.2600
5   Facsimile:    650.815.2601
    Email:        jchadwick@sheppardmullin.com
6                 trodewald@sheppardmullin.com

7   Attorneys for Non-Parties, ELECTRONIC
    FRONTIER FOUNDATION and PETER
8   ECKERSLEY

*RS*

9                       UNITED STATES DISTRICT COURT

10

        NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

11

12
    BETSY FEIST,                          CV  Case No.  80  135MISC
13
                   Plaintiff,             DECLARATION OF ARVIND
14                                        NARAYANAN IN SUPPORT OF
               v.                         MOTION TO QUASH SUBPOENAS
15                                        ISSUED BY DEFENDANT PAXFIRE,
    RCN/CORP. and PAXFIRE, INC.,          INC. AND REQUEST FOR
16                                        PROTECTIVE ORDER
                   Defendants.
17                                        Date:
                                          Time:
18                                        Crtrm.:

19                                        The Hon.

20

21

22

23

24

25

26

27

28

                                          NARAYANAN DECLARATION ISO
                                          MOTION TO QUASH SUBPOENAS

1    I, Arvind Narayanan, declare as follows:

2    1.    I have personal knowledge of the following matters and if called as a witness, I
3    could and would competently testify to the facts stated herein.

4    2.    I'm a post-doctoral computer science researcher at Stanford University and a junior
5    affiliate scholar with the Center for Internet and Society at Stanford Law School. I study
6    information privacy and security, and do work in public policy relating to these topics. My
7    doctoral research investigated the ways in which companies attempt to remove personal
8    information about consumers from data so that, for example, the data can be published or
9    transferred to other companies without violating consumer privacy. My research exposed the
10   problems with companies' current practices and showed that the level of anonymity that
11   consumers expect—and companies claim to provide—in published or outsourced databases is
12   fundamentally unrealizable. For example, a colleague and I demonstrated that the "anonymized"
13   data Netflix released as part of a contest to improve their movie recommendation system could be
14   used to identify specific customers. My more recent work has focused on what I call "privacy-
15   conscious system design" in the areas of online behavioral advertising (including "Do Not Track")
16   and location privacy. I have also undertaken analyses of pending and proposed legislation and
17   regulation, including providing comments and feedback to the Department of Homeland Security
18   and the Federal Trade Commission.

19   3.    I have worked with the Electronic Frontier Foundation ("EFF") on numerous
20   technology and policy issues, and regularly collaborate with EFF on reviews of each others' blog
21   posts. Important areas in which I collaborated with EFF include the following:

22   4.    I worked with EFF on a technology and policy analysis of the National Strategy for
23   Trusted Identities in Cyberspace (NSTIC), a proposal by the Obama administration to create
24   secure online identities for Internet users. I then joined EFF in giving feedback to the Department
25   of Homeland Security on NSTIC. I also co-authored a public comment on NSTIC that benefited
26   significantly from my discussions with the EFF. *See*
27   http://www.stanford.edu/~jmayer/papers/nstic10.pdf.

28

-1-                    NARAYANAN DECLARATION ISO
                       MOTION TO QUASH SUBPOENAS

1       5.     I received extremely helpful input from EFF in my analysis of Do Not Track

2 ("DNT"), a proposed internet standard that lets users opt-out of having websites track their online

3 behavior. I have coauthored numerous blog posts and articles with technical and policy analysis

4 of DNT, for example http://webpolicy.org/2012/04/23/tracking-not-required-frequency-capping/.

5 With my Stanford colleague Jonathan Mayer, I have also created and maintained

6 http://donottrack.us, a central clearinghouse for aggregating information about DNT. DNT is now

7 supported by Internet Explorer, Firefox and Safari. EFF provided valuable technology and policy

8 input for this work including technical feedback on the standard and advice about how to get

9 public support for the standard through public advocacy. EFF did some early blog posts and

10 spurred public discussion of the standard and helped me to develop the public-facing parts of the

11 effort.

12      6.     I also collaborated with EFF in submitting public input regarding Do Not Track to

13 the Federal Trade Commission. *See*

14 http://donottrack.us/docs/FTC_Privacy_Comment_Stanford.pdf. I also worked with EFF to help

15 develop and amend the Do Not Track bill that Congresswoman Jackie Speier (D-Calif.) introduced

16 last year. The bill would require an online opt-out mechanism (similar to the current DNT

17 standard) to allow consumers to effectively and easily prohibit the collection or use of data about

18 them. I believe I was able to make an important contribution to the proposed legislation because

19 of my experience in helping develop the DNT standard and EFF helped facilitate my input.

20      7.     I helped Peter Eckersley and EFF with technology analysis of Panopticlick and

21 Panopticklick data. Panopticklick is a tool Peter Eckersley and EFF developed that tests how

22 unique a user's browser is based on the information it will share with sites the user visits. See

23 https://panopticlick.eff.org/ Analysis of Panopticlick data showed individual browsers can be

24 identified to a high degree of accuracy without cookies or other commonly understood "stateful"

25 tracking technology. Because it means that users are much more easily identified than most

26 people previously understood, this type of information is essential for users to make informed

27 decisions about how they interact with Internet websites. It is also essential to informed public

28 debate on new technologies, standards, policies and legislation regarding user privacy. I believe

1  EFF depends on the expertise and skills of researchers like me when developing tools like
2  Panopticlick, and in analyzing the resulting data and the policy implications of the research.

3      8.     All of the work discussed above benefitted in essential ways from my ability to
4  work with EFF, and it depended critically from being able to communicate with EFF in
5  confidence. In each case, EFF and I needed to pool our resources and gain the benefit of the
6  other's expertise in technology, advocacy and policy.

7      9.     In my collaborations with EFF, I have had many frank discussions with them about
8  technological and legislative implementation of Do Not Track and similar consumer controls.
9  Such frank discussions, including testing vulnerabilities in technology and policy proposals, and
10  airing and considering the most incisive criticism possible, is a necessary step to producing good
11  technology, policy proposals and recommendations.

12      10.     I would hesitate to have frank discussions with EFF about existing technology and
13  technology that is in development and the policy and legal implications of that technology if I had
14  to worry that my comments might be made public in an untimely manner. Such untimely
15  revelations could allow others to exploit vulnerabilities or learn new ways to invade others'
16  privacy before I or others had determined the best means, whether through publicity,
17  recommendations or technology responses, to prevent possible harm. Of course, I and EFF would
18  hesitate to critically discuss policy recommendations if our private comments might be taken out
19  of context to discredit us, distort our positions or simply distract from our intended message.

20      11.     As a more specific example, I worked with EFF to develop and suggest
21  amendments to Rep. Speier's Do Not Track legislation. Collaboration was necessary so that EFF
22  could benefit from my expertise in helping develop the proposed DNT standard, and I could
23  benefit from EFF's extensive policy and legislative experience. As with any similar project, it
24  would be impossible to honestly and critically discuss suggested changes to the legislation if
25  opponents might be able to obtain our comments and use them to undermine the legislation or our
26  participation in the process.

27      12.     In addition, EFF and I are occasionally in a position to discuss privileged
28  information about companies – upcoming announcements, security vulnerabilities found by our

1 colleagues and not yet made public, etc. It is important that we discuss such information so that
2 both EFF and I can remain informed about the latest developments and, when necessary, help each
3 other formulate public comments or technology, policy or legislative responses. If we were not
4 able to keep important information confidential it would hurt our reputations as researchers, or, as
5 I said, allow others to use the information in harmful ways. As a result, we would not learn of the
6 privileged information in time for us to make critical contributions and we would become more
7 isolated in our fields.

8       13.     On a more personal level, I associate with EFF because we share concerns about,
9 among other things, ensuring users understand what happens when they interact with technology,
10 and empowering users to make effective choices about their personal privacy. We often discuss
11 specific practices of companies and whether such practices might be unethical. These companies
12 might be my future employers or fund my research. For example I recently interviewed for a
13 position at Microsoft Research and many of my colleagues have benefited from Google research
14 grants. I could not associate with EFF, and have frank discussions with them about my personal
15 moral views on mutual topics of concern, if I my thoughts or statements might not remain private.

16       14.     If I could not count on my communications with EFF remaining confidential I
17 would have to seriously reconsider whether I could continue most if not all of my work with EFF.
18 I do not believe I would be able to associate with EFF on many critical projects in the future, and
19 this would be detrimental to both me and EFF.

20

21       I declare under penalty of perjury under the laws of the United States of America that the
22 foregoing is true and correct. Executed on June $\underline{09}$, 2012.

23

24

25                                                 _Aewind . N._
26                                                 ARVIND NARAYANAN
27

28

# Tab 19

to
THIRD PARTY APPELLEES
ELECTRONIC FRONTIER FOUNDATION'S
and PETER ECKERSLEY'S
SUPPLEMENTAL EXCERPTS OF RECORD
IN SUPPORT OF ANSWERING BRIEF
Volume I

FILED

JUN - 6 2012

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA, SAN FRANCISCO DIVISION

| | |
|---|---|
| BETSY FEIST,<br><br>Plaintiff,<br><br>v.<br><br>RCN CORP. and PAXFIRE, INC.,<br><br>Defendants. | CV 12-80 135 MISC<br>Case No. ___<br><br>DECLARATION OF NICHOLAS CROYLE WEAVER IN SUPPORT OF MOTION TO QUASH SUBPOENAS ISSUED BY DEFENDANT PAXFIRE, INC. AND REQUEST FOR PROTECTIVE ORDER<br><br>Date:<br>Time:<br>Crtrm.:<br><br>The Hon. |

NICHOLAS WEAVER DECLARATION ISO MOTION
TO QUASH SUBPOENAS

SER-453

1       I, Nicholas Croyle Weaver, declare as follows:

2       1.    I am a Senior Researcher at the International Computer Science Institute ("ICSI")

3 in Berkeley, California. ICSI is a nonprofit research institute for research in computer science

4 affiliated with the University of California, Berkeley. I have personal knowledge of the following

5 matters and if called as a witness, I could and would competently testify to the facts stated herein.

6       2.    I am a member of ICSI's Networking Group that developed and operates the ICSI

7 Netalyzr, a popular tool and service tests the characteristics of users' Internet connections. The

8 Netalyzr runs as a Java "applet" that can be launched from a user's web browser. Since mid-2009

9 users around the world have run Netalyzr in order to debug or clarify their network connectivity.

10 Netalyzr is also the foundation of a comprehensive measurement study compiling a survey of the

11 health of the Internet's edge. To date, we have collected data from over 500,000 sessions from

12 over 375,000 distinct IP addresses located in virtually every country of the world. Netalyzr can be

13 found at http://netalyzr.icsi.berkeley.edu/index.html.

14      3.    In examining Netalyzr data, we began to notice that on a number of U.S. ISPs'

15 networks, customers were receiving false Domain Name System (DNS) responses for the domains

16 of the largest English-language search engines: www.bing.com, search.yahoo.com, and sometimes

17 www.google.com. By April 2011 we had published a preliminary paper which included

18 discussions about this phenomenon. Another research team, at Microsoft Research and New York

19 Polytechnic University, had also discovered it and had published a paper conjecturing about its

20 causes.

21      4.    Starting in April 2011, Vern Paxson, Christian Kriebich and I started working with

22 Peter Eckersley at the Electronic Frontier Foundation to discuss our findings and the impact on the

23 Internet and privacy.

24      9.    My association and communications with Mr. Eckersley and EFF about the DNS

25 responses and Paxfire's redirection of search traffic may not have occurred had we not been able

26 to communicate in confidence. Like many collaborations in academic and newsworthy research,

27 our association involved hypothesizing, testing ideas, offering frank criticism and discussing

28 sensitive sources and information. The association with Mr. Eckersley was important because we

1  were independently able to verify our conclusions. We also wanted to publish our findings and
2  make the public aware of what was going on. However, I would not have openly shared
3  preliminary findings with Mr. Eckersley, if I thought that outsiders would be able to intrude into
4  my research process and examine all of my private communications with EFF.

5      5.    Without confidence that my discussions with EFF would be private, I may not
6  collaborate with them in the future, or would dramatically limit my association with them. Among
7  other things, I would have to worry that others might take things I said out of context, or use my
8  speculations or hypotheses to unjustifiably cast doubt on my research, publications, or confuse
9  issues or even obtain an advantage on work I was doing or planned to do.

10      6.    In addition, it was important to me personally to be able to discuss some of the
11  policy implications of my findings with Mr. Eckersley and others at EFF and have them share
12  insights from their prior litigation and policy work on privacy and network neutrality issues. I
13  would not have been willing to share my private opinions, or ask for EFF's frank assessment of
14  various options if I could not have done so in private.

15      I declare under penalty of perjury under the laws of the United States of America that the
16  foregoing is true and correct. Executed on June 5, 2012.

17
18
19                    Nicholas Croyle Weaver
20
21
22
23
24
25
26
27
28

W02-WEST:1TER1\405533181.1
Case No. CV-12-80-119-MISC
DB2/23228066.1

    -2-    NICHOLAS WEAVER DECLARATION
ISO MOTION TO QUASH SUBPOENAS

# Tab 20

to
THIRD PARTY APPELLEES
ELECTRONIC FRONTIER FOUNDATION'S
and PETER ECKERSLEY'S
SUPPLEMENTAL EXCERPTS OF RECORD
IN SUPPORT OF ANSWERING BRIEF
Volume I

 **MILBERG** LLP

NEW YORK<br>LOS ANGELES<br>DETROIT

September 25, 2012

<u>VIA HAND DELIVERY</u>

Hon. Ronald L. Ellis
United States Magistrate Judge
Courtroom 18D
Daniel Patrick Moynihan United States Courthouse
500 Pearl St.
New York, NY 10007-1312

       Re:   *Feist v. RCN Corp.*, 11 Civ. 5436

Dear Judge Ellis:

We represent plaintiff Betsy Feist in the above-referenced litigation. We write following the Court's request, at the September 11, 2012, discovery conference, that Plaintiff formally submit her assertions of attorney-client privilege and the work product doctrine over certain communications. In particular, the Court asked that Plaintiff address the issues of privilege outlined in Defendant Paxfire's September 8, 2012, letter to this Court.

### I.   <u>Plaintiff Will Produce Her Counsel's Communications with Jim Giles</u>

Paxfire seeks "Any and all written communications, including but not limited to email communications, with either of the following: the New Scietnist [sic] and Jim Giles."

Ms. Feist has no such documents. Ms. Feist's counsel has made no communications with the *New Scientist*, but has communicated with Mr. Giles. Plaintiff's counsel will produce their communications with Mr. Giles promptly.[1]

### II.   <u>Plaintiff's Counsel's Communications with Plaintiff's Consultants Are Protected</u>

Paxfire seeks Counsel's communications with the International Computer Science Institute (ICSI), the Electronic Frontier Foundation (EFF), and four researchers employed at those institutions (the "Consultants").[2] The researchers served as Plaintiff's consultants in

---

[1] Although Ms. Feist's counsel believe that many if not all of their communications with Mr. Giles are protected by (at least) the work product doctrine, Plaintiff agrees to a limited waiver of this protection in the interest of efficiency, and in an effort to promptly resolve Paxfire's counterclaims at summary judgment.

[2] In its letter, Paxfire also notes that it seeks communications with Microsoft Research, Google, Yahoo!, and NY Poly. As Plaintiff has repeatedly informed Paxfire's counsel, neither Ms. Feist nor her counsel have had any communications with any of these entities in any way related to

1

One Pennsylvania Plaza · New York, NY 10119 · T 212.594.5300 · F 212.868.1229 · milberg.com



**SER-456**

connection with the litigation. The Consultants advised Plaintiff's counsel regarding the technical aspects of the litigation; such communications are thus protected by the attorney-client privilege and work product doctrine.

### A. ICSI, EFF, and their Employees Are Ms. Feist's Consultants

Plaintiff, through her attorneys, conferred with the Consultants to gain technological insight and know-how to assist in the prosecution of Plaintiff's claims. Plaintiff's counsel worked with the technologists and Internet experts from ICSI and EFF in order to inform their understanding of the complex, technical aspects of this litigation. Plaintiff's Consultants provided advice concerning the flow of information on the Internet, the types of physical appliances necessary for Internet communications, descriptions of various protocol that operate to transfer information across the Internet between end-users and websites, and many other matters within the Consultant's stated areas of expertise. The Consultants also reviewed documents drafted by Ms. Feist's attorneys in connection with this litigation, and agreed to keep all such documents and communications confidential.

All of the information shared with the Consultants, including any information from Ms. Feist, her computer, and her attorneys, and all communications regarding the services performed by the Consultants for Ms. Feist and her attorneys in connection with this litigation were made with the mutual understanding, between Ms. Feist, her attorneys, and the Consultants, that such documents and communications would remain confidential, privileged, and not subject to discovery. By their consultancy agreements (Plaintiff had a written agreement with consultants at ICSI and a verbal agreement with the consultant at EFF), Plaintiff's Consultants agreed not to disclose anything relating to the services they performed, the information they prepared or received, or any communications between them and Plaintiff or her counsel.

### B. The Federal Rules of Civil Procedure Prohibit Discovery of a Consultant's Work Product

Fed. R. Civ. P. 26(b)(3)(A) states that "a party may not discover documents and tangible things that are prepared in anticipation of litigation or for trial by or for another party or its **representative** (including the other party's attorney, **consultant**, surety, indemnitor, insurer, or agent)." (Emphasis added). The work product doctrine protects documents and things prepared in anticipation of litigation or for trial, including facts, opinions, mental impressions, conclusions, or theories concerning the litigation. Fed. R. Civ. P. 26(b)(3); *see also GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.,* No. 11-cv-1299, 2011 WL 5439046, at *3 (S.D.N.Y. Nov. 10, 2011) ("because 'attorneys often must rely on the assistance of investigators and other agents in the compilation of materials in preparation for trial,' the work product rule extends to 'material prepared by agents for the attorney as well as those prepared by the attorney for himself.'") (quoting *United States v. Nobles,* 422 U.S. 225, 238 (1975)).

---

this litigation, except to the extent Plaintiff issued document subpoenas to Google, Inc., Microsoft, Corp. and Yahoo!, Inc. Plaintiff has already produced to Paxfire all documents that it received in discovery from third parties.

MILBERG LLP

2

With regard to an expert employed only for trial preparation, i.e., non-testifying experts such as the Consultants, a party may not "discover facts known or opinions held by an expert who has been retained or specially employed by another party in anticipation of litigation or to prepare for trial and who is not expected to be called as a witness at trial." Fed. R. Civ. P. 26(b)(4)(d). Rule 26(b)(4)(D) immunizes consultants from discovery, expressly extending the work-product doctrine to all "facts known or opinions held" by an expert retained or informally consulted in connection with litigation but not expected to be called at trial. *William A. Gross Constr. Assocs. V. Am Mfrs. Mut. Inc. Co.*, 262 F.R.D. 354, 261 (S.D.N.Y. 2009).

## C. The Attorney-Client Privilege Extends to Communications with Consultants

"The attorney-client privilege protects communications (1) between a client and his or her attorney (2) that are intended to be, and in fact were, kept confidential (3) for the purpose of obtaining or providing legal advice." *U.S. v. Mejia*, 655 F.3d 126, 132 (2d Cir. 2011) (citation omitted). "Under certain circumstances . . . the privilege for communication with attorneys can extend to shield communications to others when the purpose of the communication is to assist the attorney in rendering advice to the client." *United States v. Adlman*, 68 F.3d 1495, 1499 (2d Cir.1995)

Where disclosure of otherwise-protected information to a third party is "necessary for the client to obtain informed legal advice," and the "client had a reasonable expectation of confidentiality under the circumstances," the documents are protected. *Nat'l Educ. Training Group, Inc. v. Skillsoft Corp.*, 1999 WL 378337, at *4 (S.D.N.Y. June 10, 1999) (citing cases); *see also U.S. v. Kovel*, 296 F.2d 918, 922 (2d Cir. 1961) (extending the attorney-client privilege to communications made to an accountant employed by the attorney in connection with the litigation; analogizing the role of the accountant to that of an interpreter); *See also GenOn Mid-Atlantic, LLC v. Stone & Webster, Inc.* 2011 WL 5439046, at *15 (S.D.N.Y. 2011) (letter from consultant to counsel re: possible provision of expert consulting services need not be produced); *In re Grand Jury Subpoenas dated March 9, 2001*, 179 F. Supp. 2d 270, 283 (S.D.N.Y. 2001) ("Confidential communications between a third party representative of the client, such as [a] . . . non-testifying expert, and the client's attorney . . . may be protected from disclosure if the communications are made on behalf of the client for the purpose of obtaining legal advice.") (citing *Upjohn Co. v. United States*, 449 U.S. 383, 391-92 (1981)) (internal citations omitted).

## D. Communications Created Before Ms. Feist Retained her Counsel are also Protected

Paxfire disputes the applicability of the work product doctrine to communications made prior to July 24, 2012, the date on which Plaintiff first began speaking to her counsel regarding this litigation.

### 1. Paxfire Will Receive Plaintiff's Counsel's Pre-July 24, 2012 Communications with ICSI Employees from ICSI

ICSI has already been ordered by the Northern District of California to produce the communications it had with Plaintiff's counsel prior to July 24, 2012. While Plaintiff believes that the work product doctrine (at least) applies to documents and communications made at any

MILBERG LLP

time during Counsel's investigation of the litigation, Plaintiff understands that protection will effectively be waived as to communications with ICSI once those documents are produced. (Plaintiff does not intend to undertake the time or expense to make a document production duplicative of ICSI's production).

## 2. Plaintiff's Counsel's Communications with EFF are Protected

EFF has also been ordered by the Northern District of California to produce the communications it had with Plaintiff's counsel prior to July 24, 2012, but EFF has sought *de novo* review of that decision, and the matter is currently pending. Accordingly, there has been and may never be a waiver of the protections afforded to Plaintiff's counsel's communications with EFF.

Indeed, the work product doctrine's protections apply during the course of Ms. Feist's attorneys' investigation of the matter, even before a client was formally retained. *See* 5-900 Weinstein's Federal Evidence § 900.04 ("work-product protection may apply to information that was gathered before commencement of litigation **but not necessarily collected for purposes of a specific lawsuit.**") (emphasis added). *See also Maloney v. Sisters of Charity Hosp.*, 165 F.R.D. 26, 30 (W.D.N.Y. 1995) (information compiled or prepared prior to large scale reduction in employee force was gathered in anticipation of **presumed likely litigation** on behalf of affected employees) (emphasis added); *Shipes v. BIC Corp.*, 154 F.R.D. 301, 309 (M.D. Ga. 1994) ("**Rule 26(b)(4)(B) . . . does not limit itself to 'the' litigation or 'this' litigation. . . .** The court interprets Rule 26(b)(4)(B) to apply to facts known and opinions held by an expert who was retained by a party **in anticipation of any litigation.**") (emphasis added); *In re Grand Jury Proceedings*, 73 F.R.D. 647, 653 (M.D. Fla. 1977) ("It is **not necessary to have foreseen the specific litigation** in progress at the time the materials were prepared") (citing *Bird v. Penn Central Co.,* 61 F.R.D. 43, 48 (E.D. Pa. 1973)); *Moore v. Tri-City Hosp. Authority*, 118 F.R.D. 646, 650 (N.D. Ga. 1988) (finding that "**[t]he mere fact that plaintiff's assertion of work-product includes the month and a half period before plaintiff retained counsel is not determinative.**") (emphasis added).

Ms. Feist's counsel began consulting with ICSI and EFF employees in connection with this litigation at least as early as May 2011. It was not in Counsel's ordinary course of business to speak with these consultants; rather, their communications were part of an investigation into a potential litigation on behalf of thousands of absent class members. Such communications are protected by the work product doctrine.

## E. Paxfire Cannot Demonstrate the "Exceptional Circumstances" or "Substantial Need" Necessary to Overcome these Protections

Rule 26's blanket prohibition on discovery of an "expert employed only for trial preparation" "who is not expected to be called as a witness at trial" can only be overturned "on showing **exceptional circumstances** under which it is impracticable for the party to obtain facts or opinions on the same subject by other means." Fed. R. Civ. P. 26(b)(4)(D) (emphasis added).[3]

---

[3] *See, e.g., 800 Front Street Corp. v. Travelers Property Casualty Co. of America*, No. 06-500, 2006 WL 3370350, at *2 (E.D.N.Y. November 20, 2006) (noting that: "There are two situations

MILBERG LLP

Similarly, in order to overcome the work product protection, Paxfire must "show[] that it has **substantial need** for the materials to prepare its case and cannot, without undue hardship, obtain their substantial equivalent by other means." Fed. R. Civ. P. 26(3)(A)(ii) (emphasis added); *see also* CPLR 3101(d)(2) ("materials otherwise discoverable . . . and prepared in anticipation of litigation . . . by or for that other party's representative (including an attorney, consultant, surety, indemnitor, insurer or agent), may be obtained only upon a showing that the party seeking discovery has **substantial need** of the materials in the preparation of the case and is **unable without undue hardship to obtain the substantial equivalent of the materials by other means"**).

Paxfire has yet to demonstrate any "substantial need" or "exceptional circumstances" that justify overturning the protections afforded by the work product doctrine or attorney-client privilege.

Paxfire states in its letter that it is entitled to discovery as to "promises or remuneration that might form a basis for a motive for Ms. Feist to bring this lawsuit against Paxfire, or a bias by the researchers to support the allegations against Paxfire." Paxfire has deposed Ms. Feist twice and separately posed specific interrogatories regarding whether any promises, remuneration, payment (other than hourly rate to the Consultants for their services), *cy pres* awards, or the like were promised to Ms. Feist or to the Consultants -- in every instance, the answer has been "No." Paxfire should not be allowed to overcome the attorney-client privilege or work product doctrine to go on a fishing expedition for documents that simply don't exist.[4]

Paxfire has claimed that it is entitled to discovery regarding the operation of the Netalzyr. The Netalzyr is a publically-available website that tests a user's Internet connection for signs of trouble. Plaintiff visited this website and received a message that her searches were being

---

where exceptional circumstances are commonly identified: (1) where the object or condition observed by the non-testifying expert is no longer observable by the expert of the party seeking discovery, and (2) where it is possible to replicate discovery on a contested issue but the cost would be prohibitive." Here, Paxfire has the unique ability to observe the "object or condition," i.e., its own redirection)).

[4] Paxfire's letter claims that "EFF, ICSI, and their researchers . . . concede" they took the position, "when they instigated this litigation," that Paxfire violated Internet "net neutrality" and "Paxfire and RCN needed to be ruined and to be made into examples in order to discourage other Internet companies from providing similar innovated services." This contention is absurd and Paxfire has no basis for making such claim. Likewise, Paxfire's letter states that it is "convinced the EFF and the researchers engaged in a 'kickback' arrangement, whereby Ms. Feist - through her attorneys - agreed or understood - in a formal or informal arrangement - that in exchange for the referral by EFF and the researchers of information about Paxfire and ten other ISPs (including but not limited to RCN), Ms. Feist - again through her attorneys - would seek to funnel a *cy pres* award to EFF and the researchers at the successful resolution of the case." As Ms. Feist's deposition answers and answers to Paxfire's interrogatories state, that is simply untrue. If Paxfire seeks to overturn the privilege and work product protections to discover any documents or communications relating to *cy pres* awards for the successful resolution of the case or "kickbacks," its efforts are wasted: none exist.

MILBERG LLP

5

redirected by Paxfire; this discovery led to further investigation of Paxfire's alleged wrongdoing. Paxfire has access to the Netalyzr website, Ms. Feist's Netalyzr results, and publically-available research papers (which were also produced by Plaintiff in discovery) that discuss the Netalyzr. Counsel's communications with the Consultants will not shed light on the operation of the Netalyzr (i.e., Counsel has not received any unique data from, reports about, or instructions for use of the Netalyzr) and Paxfire is not prejudiced from obtaining its own expert to address the Netalyzr. Moreover, Paxfire has full and complete knowledge and evidence as to whether it performed the services alleged in the complaint; the Netalyzr, which simply indicated to Plaintiff that Paxfire's services were employed in connection with her Internet use, does not establish any fact that is otherwise outside of Paxfire's own knowledge or possession. Indeed, Paxfire has first-hand knowledge as to whether its services were used by Ms. Feist's Internet service provider, and has not disputed that fact to date.

Accordingly, Plaintiff's counsel's communications with her consultants, during any time period, are protected by the work product doctrine and/or attorney-client privilege and need not be produced.

Respectfully Submitted,

*Melissa Ryan Clark/em*

Melissa Ryan Clark

cc: All Counsel of Record via Email

MILBERG LLP

6

# Tab 21

to
THIRD PARTY APPELLEES
ELECTRONIC FRONTIER FOUNDATION'S
and PETER ECKERSLEY'S
SUPPLEMENTAL EXCERPTS OF RECORD
IN SUPPORT OF ANSWERING BRIEF
Volume I

# REESE RICHMAN LLP

October 5, 2012

<u>**Via Hand Delivery**</u>
Hon. Ronald L. Ellis
United States Magistrate Judge
Courtroom 18D
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007-1312

Re:     *Feist v. RCN Corp.*, Case No. 11-CV-5436 (JGK)

Dear Judge Ellis,

My firm, Reese Richman LLP, and Milberg LLP represent plaintiff Betsy Feist in the above-referenced action. This letter is our reply to Defendant Paxfire's October 3, 2012, letter to the Court.[1]

### I.     Plaintiff Has Provided Paxfire with a Corrected Amended Privilege Log and Will Produce Her Communications with Jim Giles

Paxfire has brought to Plaintiff's attention that the amended privilege log Plaintiff provided had not printed correctly. Plaintiff has corrected the clerical error and provided Paxfire with a corrected amended privilege log.

Plaintiff intends to produce her attorneys' communications with Jim Giles by Friday, October 12, 2012.

### II.     Plaintiff Will Produce Her Agreement with Her Consultants

Paxfire has requested "All consulting agreements pertaining in any way to this case with any of the following: the Electronic Frontier Foundation, the International Computer Science Institute, Peter Eckersley, Christian Kreibich, Vernon Paxson, Nicholas Weaver, and the Polytechnic Institute of New York." To dissuade Paxfire of any concerns regarding *cy pres* awards, conspiracies, or kickbacks, Ms. Feist will produce her consulting agreement with Christian Kreibich, Vernon Paxson, and Nicholas Weaver of the International Computer Science Institute ("ICSI").[2]

---

[1] The Court asked that Paxfire file its opposition to Plaintiff's September 25, 2012, letter by Tuesday, October 2, 2012. Plaintiff expected that she, and the Court, would receive this letter by close of business that day. Instead, Paxfire sent its letter after business hours on October 3, 2012.

[2] Plaintiff has an oral consulting agreement with Peter Eckersley of the Electronic Frontier Foundation ("EFF"). That agreement does not include *cy pres* awards, a conspiracy, or kickbacks. Plaintiff does not have and has never had any agreement with Polytechnic Institute of New York.

As Paxfire has been informed repeatedly by Plaintiff, including in sworn declarations, Plaintiff entered into an oral consulting agreement with ICSI on July 18, 2012, and later memorialized that agreement in writing on August 31, 2012. The written agreement reflects both of these dates.

### III.    Plaintiff's Counsels' Communications with Plaintiff's Consultants Are Protected

Paxfire seeks all communications and correspondence between Plaintiff's counsel and EFF, ICSI, and four researchers at these institutions (the "Consultants").   As detailed in Plaintiff's September 25, 2012, letter, these communications are protected by the attorney-client privilege and the work-product doctrine.  Further, the protection afforded by the work-product doctrine extends to the period prior to Ms. Feist's retention of her counsel.

### A.    Plaintiff Has Not Waived the Attorney-Client Privilege or Work-Product Protection

In essence, Paxfire contends that Plaintiff waived attorney-client privilege and work-product protections by making factual allegations in her Complaint that relied on advice from attorneys and consultants; this simply cannot be the case. Every complaint relies on advice from attorneys and their representatives and defendants are not entitled to the communications or work product that led to the filing of the complaint based on a red-herring argument that they are entitled to discover the "basis" for a plaintiff's claims.

Paxfire argues that it is entitled to explore the basis of Plaintiff's allegations, noting that she alleged in her complaint that she "learned" about the alleged wrongdoing from information provided by her consultants and the Netalyzr website. Ms. Feist has produced evidence regarding her use of the Netalyzr. Paxfire has access to everything Ms. Feist has access to and/or will use at summary judgment or trial regarding this website: the website itself, Ms. Feist's Netalyzr results, publically-available documents regarding the website, and outside expert testimony if it chooses to engage an expert on this issue.

Moreover, the Netalyzr is alleged in the Complaint to have shown to Plaintiff that her Internet use was being redirected by her Internet Service Provider (Defendant RCN) in connection with Paxfire. Paxfire has full and complete knowledge and evidence as to whether this was true; it does not need any additional discovery into the Netalyzr or Ms. Feist's pre-filing understanding of Paxfire's conduct to determine whether it performed the conduct alleged in the complaint.

Paxfire cites authority regarding the selective assertion of the privilege.[3] But Paxfire made the same argument (that the "attorney client privilege cannot be used as both a shield and a sword") at an earlier discovery conference before the Court. There, Paxfire's counsel conceded that

---

[3] Paxfire cites, for example, *United States v. Workman*, 138 F.3d 1261, 1263-64 (8th Cir.1998). *Workman* concerned a situation where an attorney's former client sought to shield himself from liability for criminal conduct on the ground that he followed his former attorney's advice, but simultaneously sought to prohibit the attorney from revealing the advice.  *See* 138 F.3d at 1262.

2

Plaintiff's communications with its consultants were absolutely protected from discovery by the Federal Rules of Civil Procedure if those consultants were not going to testify, but disputed whether Paxfire should be allowed to gain fact information and communications from those consultants (the purported "shield") if they were later named as a testifying expert (the "sword"). Accordingly, the Court ordered that Plaintiff inform Paxfire -- prior to the Court-ordered deadline for designation of experts -- whether it would identify its consultants as testifying experts. Although Plaintiff informed Paxfire that its consultants would *not* testify, eliminating any argument that Plaintiff would use the consultants as a "sword" at summary judgment and trial, Paxfire asserts the identical argument in an ongoing attempt to overturn privilege and work product.

Paxfire also argues that the consultants have been alleged to be co-conspirators, but Paxfire has to show a substantial or exceptional need to overturn the privilege and work product protections. It has no evidence, even circumstantial, to justify allowing Paxfire to engage into a fishing-expedition of Plaintiff's counsel's communications to attempt to concoct evidence of a conspiracy. At most, before allowing Defendant Paxfire to view Plaintiff's counsels' confidential communications, Plaintiff would request that the Court perform an *en camera* review of Plaintiff's communications with her consultants to determine whether any discoverable information related to the counterclaims or a purported conspiracy actually exists.

### B. Plaintiff's Confidential Communications with Her Consultants Have Not Been Disclosed to the Public Nor Were they Made in the Ordinary Course of the Consultant's Business

Paxfire argues on page 3 of its October 3 letter that the privilege afforded to non-testifying consultants "cannot protect information that was disclosed to the press or to the public," citing many publicly available research papers authored by ICSI. Similarly, Paxfire argues that the privilege afforded to non-testifying consultants "cannot cover information that had [sic] been prepared for purposes other than the litigation at issue."

The confidential communications and correspondence that Plaintiff has had with her Consultants — *i.e.*, communications that include "facts known or opinions held" as well as the opinions, mental impressions, conclusions, or theories concerning the litigation — were made as a part of the investigation of this litigation and in the course of drafting of the complaint. Plaintiff's confidential communications with her Consultants were undertaken "because of" existing or expected litigation. *See United States v. Adlman*, 134 F.3d 1194, 1198 (2d Cir. 1998) (interpreting the phrase "in anticipation of litigation" in Rule 26 to mean "because of" existing or expected litigation, not "primarily or exclusively to assist in litigation"). It is plainly outside of ICSI's or EFF's ordinary course of business to communicate with Ms. Feist or her lawyers.[4] Neither Ms. Feist

---

[4] Paxfire's cited authority on this issue is unavailing. *Lamar Advertising of South Dakota, Inc. v. Kay*, 267 F.R.D. 568 (D.S.D. 2010) relates to investigative materials assembled by insurance companies, which would be assembled in the routine investigation of accidents, even in the absence of any anticipated or pending litigation. In *U.S. Postal Serv. V. Phelps Dodge Ref. Corp.*, 852 F. Supp. 156 (E.D.N.Y. 1994), the court noted that the attorney-client privilege can attach to reports by consultants, but found that there, the engineers did not fall into the recognized categories of representatives or agents because they were not employed by the attorneys to assist in rendering

3

or her lawyers have asserted privilege or work product protection over any of ICSI's or EFF's data, research papers (or drafts of research papers), or work performed prior to the consulting relationship with Plaintiff. Instead, Plaintiff asserts protection over her attorneys' communications with ICSI and EFF regarding this litigation.

The existence of publicly-available documents explaining how the Netalyzr operates and what its implications are does not lead to the conclusion that Plaintiff must reveal the contents of confidential emails between herself and her Consultants.[5]   The publicly available documents concerning the Netalyzr's operation are not "replete with work product," *compare Fullerton*, 194 F.R.D. at 104 (concluding that work product protection was waived because already-produced documents contained work product concerning the same subject as withheld documents), but are instead completely void of work product.  Plaintiff's communications and correspondence with her consultants, by contrast, contain Plaintiff's counsel's (and consultants') opinions, mental impressions, and legal theories concerning this litigation, and neither Plaintiff nor her Consultants have previously revealed those opinions. Indeed, the Consultants were subject to an explicit confidentiality agreement.

---

legal advice, but were employed by the client to oversee certain work and gather information. With regard to *William A. Gross Construction Associates v. Am. Mfrs. Mut. Ins.*, 262 F.R.D. 654 (S.D.N.Y. 2009), there can be no argument that the communications between Plaintiff's counsel and the consultants would have been "created in essentially similar form irrespective of the litigation."

[5] *See Fullerton v. Prudential Ins. Co.*, 194 F.R.D. 100, 103 (S.D.N.Y. 2000) ("'The work-product doctrine is waived when documents are voluntarily shared with an adversary or when a party possessing the documents seeks to selectively present the materials to prove a point, but then attempts to invoke the privilege to prevent an opponent from challenging the assertion.' *Niagara Mohawk Power Corp. v. Stone & Webster Eng. Corp.*, 125 F.R.D. 578, 587 (S.D.N.Y.1989). 'Generally, the work product privilege is waived when protected materials are disclosed in a manner which is either inconsistent with maintaining secrecy against opponents or substantially increases the opportunity for a potential adversary to obtain the protected information.' *Id.*, at 590; *see also*, 8 Wright, Miller & Marcus, Federal Practice & Procedure § 2024 (2d ed.1994). . . The rule against selective disclosure of work-products materials . . .does not rise to the level of 'waive work product as to some matters and you've waived as to all.'  Rather, any waiver of work product by disclosing that work product to one's opponent waives the privilege only as to matter covered in the waived documents. *See Chubb Integrated Systems Ltd., v. National Bank of Washington,* 103 F.R.D. 52, 63 n. 3 (citing cases).")

4

**C.    Paxfire's Request Creates the Risk of Conflicting Decisions and it Should Not Be Permitted to Usurp the Northern District of California's Order**

**1.    It is Unduly Burdensome for Plaintiff to Produce Documents It Will Already Receive from ICSI**

Plaintiff has repeatedly accommodated Paxfire by allowing Paxfire to shift its discovery obligations (including searching for and producing documents) to Plaintiff. Plaintiff has been required to travel to Washington, D.C. for all three depositions of Paxfire employees and twice to collect Paxfire's document productions. On one of these occasions, Plaintiff actually performed searches of Paxfire's documents in order to identify responsive documents that had not been previously produced. All of this has taken place at Plaintiff's own expense.

Paxfire now seeks to require Plaintiff to produce documents that it will already receive from a third party. Such a production would be nothing more than an unnecessary duplication of effort. Paxfire argues that Plaintiff should be required to undertake a duplicative review and production of documents in order to eliminate any potential gaps in ICSI's production or potential arguments concerning the authenticity of those documents.   Plaintiff should not be required to bear this additional time and expense simply because Paxfire prematurely concluded that ICSI's production will be inadequate or that Plaintiff may dispute the authenticity of ICSI's production.

Upon Paxfire's request, Plaintiff will review and stipulate to the authenticity of documents produced by ICSI (i.e., that Plaintiff or her counsel received and/or sent such documents) as appropriate and will cooperate with Paxfire in addressing any gaps Paxfire identifies in ICSI's production.

Paxfire also argues that Plaintiff should be required to make an immediate duplicative production of the documents ICSI has been ordered to produce because Paxfire requires an immediate production in order to prepare its summary judgment motions. ICSI has been ordered to produce documents to Paxfire by November 19, 2012 (60 days from Judge Koeltl's order on Plaintiff's motion to dismiss, entered September 18, 2012). The parties recently submitted a proposed revised schedule which sets the deadline for dispositive motions at January 28, 2013. Paxfire will have ample time to review the documents produced by ICSI and resolve any discovery issues well before the January 28, 2013, deadline.  (Furthermore, review, redaction, and production of those documents by Plaintiff would also take time.)

**2.    Paxfire Seeks Discovery from Ms. Feist that the Northern District of California Has Ruled is Privileged**

The Northern District of California has already ruled that once Ms. Feist conferred with counsel concerning her potential claims against Paxfire and RCN, all documents and communications with ICSI and EFF became privileged. Despite the Northern District of California's order, Paxfire now seeks to obtain the very same documents and communications created that have been deemed privileged and immune from disclosure. Yet Paxfire has failed to demonstrate any

5

basis for defeating Plaintiff's asserted privileges. Paxfire has made no showing of exceptional circumstances[6] and cannot demonstrate substantial need.[7]

### 3. Paxfire Seeks Discovery from Ms. Feist of Materials that are Currently the Subject of Litigation in the Northern District of California

Paxfire seeks documents and communications between Ms. Feist (or her counsel) and EFF and Peter Eckersley. Paxfire has sought the same materials from EFF and Mr. Eckersley in the Northern District of California, and both Plaintiff and EFF moved to quash those discovery requests. Much of the discovery Paxfire seeks is the subject of a pending motion in the Northern District of California; EFF and Mr. Eckersley have argued that the discovery Paxfire seeks implicates EFF and Mr. Eckersley's First Amendment rights. (The motions are scheduled to be heard on October 19, 2012).

An order requiring Ms. Feist to produce her communications with Mr. Eckersley would not only waive the attorney-client privilege and work product doctrines, but runs the risk of contradicting with a Northern District of California order and waiving First Amendment protections afforded to EFF and Mr. Eckersley.

Respectfully submitted,

Kim Richman

cc:     All Counsel of Record via Email

---

[6] Fed. R. Civ. P. 26(b)(4)(D); *see also 800 Front Street Corp. v. Travelers Property Casualty Co. of America*, No. 06-500, 2006 WL 3370350, at *2 (E.D.N.Y. November 20, 2006) (noting that: "There are two situations where exceptional circumstances are commonly identified: (1) where the object or condition observed by the non-testifying expert is no longer observable by the expert of the party seeking discovery, and (2) where it is possible to replicate discovery on a contested issue but the cost would be prohibitive." Here, Paxfire has the unique ability to observe the "object or condition," i.e., its own redirection).

[7] Fed. R. Civ. P. 26(3)(A)(ii).

6

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on May 15, 2014.

I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

Dated:  May 15, 2014      SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By         */s/  Tenaya Rodewald*
            TENAYA RODEWALD
            Attorneys for Third-Party Appellees
            ELECTRONIC FRONTIER FOUNDATION
            and PETER ECKERSLEY